No. 23-7173

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

DAVID O'CONNELL,
*Plaintiff - Appellee*

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,
*Defendant - Appellant*

_____

*On Appeal from the United States District Court for the District of Columbia,*
*Case No. 1:20-cv-01365-JMC*
*Honorable Jia M. Cobb, United States District Judge*

_____

# PLAINTIFF-APPELLEE'S RESPONSE TO
# DEFENDANT-APPELLANT'S JURISDICTIONAL STATEMENT

_____

Gabriel Doble (Bar No. 65055)
Simon Franzini (Bar No. 65081)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
gabe@dovel.com
simon@dovel.com

Martin Woodward
martin@kitnerwoodward.com
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: (214) 443-4300
Facsimile: (214) 443-4304

*Counsel for Plaintiff-Appellee*
*David O'Connell*

## TABLE OF CONTENTS

ISSUE PRESENTED ...................................................................................... 1

INTRODUCTION ......................................................................................... 1

STATEMENT OF THE CASE ....................................................................... 1

ARGUMENT ................................................................................................ 3

I.    The district court's order did not conclusively determine USCCB's church autonomy defense. ................................................................. 5

II.   The district court's order is not effectively unreviewable without an immediate appeal. .............................................................................. 10

CONCLUSION ........................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Abney v. United States*,
431 U.S. 651 (1977) ....................................................................5, 6

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022) ................................. 5, 6, 7, 8, 9, 11, 12, 15

*Belya v. Kapral*,
59 F.4th 570 (2d Cir. 2023) ...........................................................5, 6

*Cohen v. Beneficial Indus. Loan Corp.*,
337 U.S. 541 (1949) ........................................................................3

*Dayner v. Archdiocese of Hartford,*
23 A.3d 1192 (Conn. 2011) ...........................................................13

*Dig. Equip. Corp. v. Desktop Direct*,
511 U.S. 863 (1994) ............................................. 4, 10, 11, 12, 15, 16

*EEOC v. Catholic Univ. of Am.*,
83 F.3d 455 (D.C. Cir. 1996) ........................................................11

*Faith Bible Chapel Int'l v. Tucker*,
143 S. Ct. 2608 (2023) ................................................................5, 7

*Firestone Tire & Rubber Co. v. Risjord*,
449 U.S. 368 (1981) ....................................................................4, 7

*Gordon Coll. v. DeWeese-Boyd*,
142 S. Ct. 952 (2022) ............................................................. 10, 11

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .....................................................................14

*Harris v. Matthews*,
643 S.E.2d 566 (N.C. 2007) ..........................................................13

*Herx v. Diocese of Fort Wayne-South Bend, Inc.*,

   772 F.3d 1085 (7th Cir. 2014)........................... 5, 6, 7, 8, 11, 12, 13, 14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,

   565 U.S. 171 (2012) ...........................................................13

*Johnson v. Jones*,

   515 U.S. 304 (1995) ...........................................................15

*Kirby v. Lexington Theological Seminary*,

   426 S.W.3d 597 (Ky. 2014)................................................13

*Lauro Lines s.r.l. v. Chasser*,

   490 U.S. 495 (1989) .................................................... 10, 11

*McCarthy v. Fuller*,

   714 F.3d 971 (7th Cir. 2013).................................... 8, 12, 13

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,

   966 F.3d 346 (5th Cir. 2020).................................................9

*Midland Asphalt Corp. v. United States*,

   489 U.S. 794 (1989) ...........................................................10

*Mitchell v. Forsyth*,

   472 U.S. 511 (1985) ...........................................................14

*Mohawk Indus. v. Carpenter*,

   558 U.S. 100 (2009) ................................... 3, 4, 7, 10, 12, 16

*Morrison v. Nat'l Austl. Bank Ltd.*,

   561 U.S. 247 (2010) ...........................................................13

*N. Am. Mission Bd. of the S. Baptist Convention, Inc. v. McRaney*,

   141 S. Ct. 2852 (2021) .........................................................9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,

   140 S. Ct. 2049 (2020) .......................................................14

*Swint v. Chambers Cty. Comm'n,*

    514 U.S. 35 (1995) ................................................................4

*Synod of Bishops of the Russian Orthodox Church Outside of Russ. v. Belya,*

    143 S. Ct. 2609 (2023) .......................................................5, 6

*Tucker v. Faith Bible Chapel Int'l,*

    36 F.4th 1021 (10th Cir. 2022)............................. 5, 7, 9, 11, 12, 13, 14

*Tucker v. Faith Bible Chapel Int'l,*

    53 F.4th 620 (10th Cir. 2022)..............................................5, 7

*United Methodist Church v. White,*

    571 A.2d 790 (D.C. 1990) ...................................................13

*Whole Woman's Health v. Smith,*

    896 F.3d 362 (5th Cir. 2018) ..................................................9

*Will v. Hallock,*

    546 U.S. 345 (2006) .................................................... 3, 4, 15

*Wyatt v. Cole,*

    504 U.S. 158 (1992) ..........................................................14

**Statutes**

28 U.S.C. § 1291 ............................................. 3, 4, 11, 13, 15

28 U.S.C. § 2072(c) ...........................................................4

## ISSUE PRESENTED

Whether this Court should expand the collateral order doctrine to allow immediate appeals from orders denying motions to dismiss based on a church autonomy defense.

## INTRODUCTION

The United States Conference of Catholic Bishops ("USCCB") asks this Court to recognize a new category of collaterally appealable orders: orders denying motions to dismiss based on a church autonomy defense. No federal court of appeals has held that such orders are immediately appealable. And three circuits have rejected similar requests to expand the collateral order doctrine. This Court should too.

## STATEMENT OF THE CASE

USCCB administers the annual "Peter's Pence" collection in the United States. Addendum, A8-9. USCCB distributes uniform materials for parishes and dioceses to use in soliciting funds for Peter's Pence. A9. For example, USCCB distributes materials with statements like, "Funds from this collection will help victims of war, oppression, and natural disasters." A11. And USCCB distributes text to be read from the pulpit to solicit donations, which states that the collection "help[s] the Holy Father reach out to people suffering in our world, especially those enduring the effects of war and violence, natural disasters, and religious persecution." A11. USCCB's solicitations represent that the money collected for Peter's Pence will be used as emergency assistance for victims of war, oppression, natural disaster, or disease. A22. Plaintiff was solicited from the pulpit in the manner instructed by USCCB and donated to Peter's Pence, believing his money would be used as emergency assistance for those in need. A17-18.

In reality, most of the collected funds are used not for emergency assistance for those in need, but instead for administrative overhead or investments in things

like real estate developments or movies.  A14-16.  Plaintiff brought this lawsuit alleging that USCCB's solicitations misrepresented the actual use of the Peter's Pence funds.  A4.  Plaintiff's lawsuit is about misrepresentation; Plaintiff is not claiming that it is improper for USCCB to use collections for overhead or investments—only that USCCB cannot misrepresent what the collections will be used for.

USCCB moved to dismiss, arguing, among other things, that Plaintiff's lawsuit would require adjudication of religious questions, in violation of the First Amendment's church autonomy principles.  Then-Judge Jackson heard argument, and expressed skepticism of USCCB's church autonomy defense.  She stated that Plaintiff's allegations "appear to be stating a claim of fraud in the traditional sense."  A37.  She disagreed with USCCB's characterization of the allegations, stating, "I don't necessarily see it as the Court deciding whether or not the expenditures … are lawful or are consistent with church doctrine."  A39.  And she observed that "through neutral principles, the Court and a jury could decide whether or not there was fraud."  A41.

The case was later transferred to Judge Cobb, who denied USCCB's motion to dismiss because, "at this stage, it's not apparent … that the resolution of the claims will involve impermissible religious entanglement."  A116.  She reasoned that "this is a case about what defendant represented, what it knew, and the relationship between defendant and plaintiff as a putative class representative."  A115.  And, at this stage, it appeared those questions "can be resolved using neutral principles of law."  A115.

Judge Cobb was careful to note certain religious questions that the court would not—and could not—answer.  She stated that the church autonomy doctrine would "prevent [the court] from reviewing decisions involving matters of church government as well as those of faith and doctrine, and this would include any

decisions about the organization's determination of whose voice speaks for the church, whether someone may worship at church, matters that are purely ecclesiastical even if they affect civil rights." A113-114. Similarly, she stated that "it would be improper for [the court] to delve into" questions of "church operations, religious doctrine, religious hierarchy, or religious decisionmaking," as well as "church governance, the makeup of church congregations or anything related to membership and, importantly, … the way the church chooses to use its funds." A115. In fact, Judge Cobb specifically stated that the court would not "rule that the church could only exercise its financial discretion in one way or another." *Id.* At this stage, it did not appear that answering such questions was "required for the Court to determine, under straightforward common-law principles, whether or not fraud took place in this case." *Id.*

USCCB then filed this interlocutory appeal.

## ARGUMENT

The collateral order doctrine allows a "small class" of collateral rulings to be deemed "final" for purposes of appellate jurisdiction. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); *see* 28 U.S.C. § 1291. The Supreme Court has consistently emphasized the "modest scope" of the doctrine, *Will v. Hallock*, 546 U.S. 345, 350 (2006), and admonished that "the class of collaterally appealable orders must remain 'narrow and selective in its membership.'" *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 113 (2009) (quoting *Will*, 546 U.S. at 350).

That "admonition reflects a healthy respect for the virtues of the final-judgment rule. Permitting piecemeal, prejudgment appeals, [the Court has] recognized, undermines 'efficient judicial administration' and encroaches upon the prerogatives of district court judges, who play a 'special role' in managing ongoing

litigation." *Id.* at 106 (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)).

Moreover, "[t]his admonition has acquired special force in recent years with the enactment of legislation designating rulemaking, 'not expansion by court decision,' as the preferred means for determining whether and when prejudgment orders should be immediately appealable." *Id.* at 113 (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 48 (1995)). Congress enacted the Rules Enabling Act in 1990, allowing the Supreme Court to adopt rules "defin[ing] when a ruling of a district court is final for the purposes of appeal under section 1291." 28 U.S.C. § 2072(c). Since then, the Supreme Court has especially disfavored judicial expansion of the collateral order doctrine, paying "full respect" to "Congress' designation of the rulemaking process as the way to define or refine when a district court ruling is 'final.'" *Swint*, 514 U.S. at 48.

In short, the Court "ha[s] meant what [it has] said; although the Court has been asked many times to expand the 'small class' of collaterally appealable orders, [it has] instead kept it narrow and selective in its membership." *Will*, 546 U.S. at 350.

The "small category" of collaterally appealable orders "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk*, 558 U.S. at 106 (quoting *Swint*, 514 U.S. at 42). These "conditions are 'stringent.'" *Will*, 546 U.S. at 347 (quoting *Dig. Equip. Corp. v. Desktop Direct*, 511 U.S. 863, 868 (1994)).

Moreover, the "focus is on 'the entire category to which a claim belongs.' As long as the class of claims, taken as a whole, can be adequately vindicated by other means," collateral appeal is not warranted. *Mohawk*, 558 U.S. at 107 (quoting *Dig. Equip. Corp.*, 511 U.S. at 868).

USCCB asks this court to expand the collateral order doctrine to a new category of non-final orders: orders denying motions to dismiss based on a church autonomy defense.  Such orders are neither conclusive nor effectively unreviewable after final judgment.  For that reason, every circuit to have considered the issue has declined to expand the collateral order doctrine to this kind of order—and the Supreme Court has twice denied certiorari.  *Belya v. Kapral*, 45 F.4th 621 (2d Cir. 2022), *reh'g en banc denied*, 59 F.4th 570 (2d Cir. 2023), *cert. denied*, 143 S. Ct. 2609; *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021 (10th Cir. 2022), *reh'g en banc denied*, 53 F.4th 620 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2608; *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085 (7th Cir. 2014).  This Court, too, should decline to expand the collateral order doctrine to such orders.

## I.     The district court's order did not conclusively determine USCCB's church autonomy defense.

An order does not conclusively determine an issue unless it is "a complete, formal and, in the trial court, final rejection" of that issue.  *Abney v. United States*, 431 U.S. 651, 659 (1977).  This is so when there are "no further steps that can be taken in the District Court to avoid" infringement of the appellant's claimed right.  *Id.*

The district court's order was not a final rejection of USCCB's church autonomy defense.  All the district court held was that, at the pleading stage, this case did not appear to require adjudication of religious questions.  USCCB can continue to assert the defense during discovery, in future dispositive motions, before trial, and during trial.  And there are further steps the district court can take if doing so becomes necessary to protect USCCB's religious autonomy—e.g., limiting discovery, narrowing the scope of the suit, cautioning the jury, or dismissing the suit altogether.

The Second Circuit recently held that a virtually identical order was not conclusive and therefore not immediately appealable. *Belya v. Kapral*, 45 F.4th 621, 631-632 (2d Cir. 2022), *reh'g en banc denied*, 59 F.4th 570 (2d Cir. 2023), *cert. denied*, 143 S. Ct. 2609. In *Belya*, like here, the district court denied a religious institution's motion to dismiss on church autonomy grounds because "church autonomy principles … did not bar application of neutral principles of law, and [the] case could be resolved by such neutral principles." *Id.* at 627-28. And, like here, the district court "recognized … that there would be certain issues it 'would not consider … under the doctrine of ecclesiastical abstention.'" *Id.* at 631 (citation omitted).

This order was "not conclusive because [it did] not bar any defenses, [it] did not rule on the merits of the church autonomy defense, and [it] permit[ted] Defendants to continue asserting the defense." *Id.* The court observed that it was "possible that at some stage Defendants' church autonomy defenses will require limiting the scope of [the] suit, or the extent of discovery, or even dismissal of the suit in its entirety." *Id.* In fact, "the district court ha[d] shown that it is aware that religious questions may arise—and could instruct a potential jury to not weigh or evaluate those issues should litigation progress to that stage." *Id.*; *see Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085, 1091 (7th Cir. 2014) (rejecting collateral appeal based on church autonomy defense where district court "promised to instruct the jury *not* to weigh or evaluate the Church's doctrine").

*Belya* is on all fours with this case. The Second Circuit's reasoning shows why there are "further steps that can be taken in the District Court" to protect USCCB's religious autonomy. *Abney*, 431 U.S. at 659. And, like in *Belya* and *Herx*, the district court has shown that, if such steps become necessary, it will take them. A113-115 (recognizing religious questions that cannot be ruled on).

USCCB contends that the district court's order is nevertheless "conclusive" because "absent intervention from this Court, the case will proceed to discovery and toward trial." Br. 22.[1]  Multiple circuits have rejected this precise argument. *Belya*, 45 F.4th at 631-32; *Herx*, 772 F.3d at 1090-92; *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1047 (10th Cir. 2022), *reh'g en banc denied*, 53 F.4th 620 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2608.  And it fails here for two reasons.

First, as explained in more detail below, the church autonomy doctrine does not operate as an immunity from discovery and trial warranting immediate appeal. *See infra* §II.  So allowing the case to "proceed to discovery and toward trial" (Br. 22) is not a final rejection of the defense.  *See Mohawk*, 558 U.S. at 108 ("[W]e have generally denied review of pretrial discovery orders.") (quoting *Firestone*, 449 U.S. at 377).

Second, the district court's order is not conclusive even with respect to discovery.  "[T]he church autonomy doctrine at most protects against discovery that would intrude into the protected area of the church—it does not provide religious organizations with blanket protection from discovery."  *Belya*, 45 F.4th at 632.  So an order allowing this case to "proceed to discovery" (Br. 22) is not a final rejection of USCCB's church autonomy defense.  "If a discovery request targets non-secular components, a religious association may continue to raise a church autonomy defense with the district court."  *Belya*, 45 F.4th at 632.  And here, the district court has already shown its sensitivity to religious questions and could "limit[] … the extent of discovery" bearing on those questions if necessary to protect USCCB's religious autonomy.  *Id.* at 631.

USCCB relies on cases from the Seventh and Fifth Circuits, but neither supports its argument.  To the contrary, cases from those circuits confirm that

---

[1] This response cites to USCCB's jurisdictional statement as "Br."

orders denying motions to dismiss based on a church autonomy defense are not conclusive.

In *McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013), the Seventh Circuit exercised jurisdiction over a collateral appeal of the district court's order that a religious question—whether the defendant was a nun in good standing in the Catholic Church—be submitted to the jury. *Id.* at 975-76. The issue in *McCarthy* was not whether a religious institution would have to face discovery; no religious institution was even a party to the case. *Id.* at 976. Rather, the district court's order was conclusive because it had finally determined the issue whether the jury would decide a religious question. *Id.* at 976. And post–final judgment appellate review was insufficient because there was a risk that "the religious question on which the jury was (wrongly) allowed to rule [would] turn[] out not to be germane to the … appeal, or that there [would be] no appeal." *Id.* at 977.

Here, unlike in *McCarthy*, the district court has not finally concluded that the jury will decide any issue—let alone a religious one. The district court could take further steps if necessary to protect USCCB's religious autonomy, and has demonstrated its intent to do so. More analogous cases—including from the Seventh Circuit—have distinguished *McCarthy* on this basis. *Herx*, 772 F.3d at 1091 (distinguishing *McCarthy* where "[t]he district court has not ordered a religious question submitted to the jury" and instead "promised to instruct the jury *not* to weigh or evaluate the Church's doctrine"); *Belya*, 45 F.4th at 631.

Moreover, *McCarthy* shows why USCCB's appeal is premature. In the same case, the appellant also appealed the district court's denial of summary judgment "on the ground that the property dispute can be resolved without getting into religious questions." *McCarthy*, 714 F.3d at 979. The Seventh Circuit dismissed that appeal "as premature." *Id.* Here, similarly, the district court denied USCCB's motion to dismiss because Plaintiff's claims "can be resolved using

neutral principles of law." A115. And the appeal here is even more premature because it is at the pleading stage, not summary judgment. So *McCarthy* does not support USCCB's argument; it undermines it.

Nor does *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018), support USCCB's argument. In that case, the Fifth Circuit allowed a third party's interlocutory appeal of an order enforcing a subpoena because of "the predicament of third parties," "who cannot benefit directly from [post-trial] relief." *Id.* at 367-68; *see id.* at 368 (distinguishing cases rejecting appeals under the collateral order doctrine because "neither … involved discovery against a third party"). Here, the district court has not conclusively ordered any discovery against USCCB, and USCCB is a party able to benefit directly from a post-trial appeal. More analogous cases have distinguished *Whole Woman's Health* on this basis. *See Belya*, 45 F.4th at 632; *Tucker*, 36 F.4th at 1046.

Moreover, the Fifth Circuit subsequently reversed as "premature" a district court's dismissal of a case on the basis that "it would need to resolve ecclesiastical questions in order to resolve [the] claims." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 347 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2852 (2021). It reasoned that "many of the relevant facts have yet to be developed." *Id.* at 349. And it noted that "[i]f further proceedings and factual development reveal that … claims cannot be resolved without deciding purely ecclesiastical questions, the court is free to reconsider whether it is appropriate to dismiss some or all … claims." *Id.* at 350. Here, too, if further proceedings reveal that Plaintiff's claims cannot be resolved without deciding religious questions, the district court can take appropriate steps.

Thus, the Second, Fifth, Seventh, and Tenth Circuits are all in alignment that orders denying dismissal of a lawsuit based on the church autonomy doctrine are not conclusive.

## II.    The district court's order is not effectively unreviewable without an immediate appeal.

"[A]n order is 'effectively unreviewable' only 'where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498-99 (1989) (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989)).  "The crucial question … is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*, 558 U.S. at 108.

Accordingly, "the mere identification of some interest that would be 'irretrievably lost' has never sufficed to meet the third *Cohen* requirement." *Dig. Equip. Corp.*, 511 U.S. at 872.  Similarly, "[t]hat a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment … has never sufficed.'" *Mohawk*, 558 U.S. at 107 (quoting *Dig. Equip. Corp.*, 511 U.S. at 872).  Courts "routinely require litigants to wait until after final judgment to vindicate valuable rights, including rights central to our adversarial system." *Id.* at 108-09.

Courts have determined that religious autonomy defenses can be adequately vindicated after trial.  For example, the Supreme Court recently declined to review a state court's rejection of a religious college's ministerial exception defense, allowing the case to proceed to discovery and trial. *Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 952 (2022) (denying certiorari).  Justice Alito, joined by three others, observed that "the preliminary posture of the litigation would complicate our review" and that "nothing … would preclude [the defendant] from appealing … when the decision is actually final." *Id.* at 952, 955 (Alito, J., concurring).  Thus, these justices joined in the denial of certiorari "[o]n [the]

understanding" that the defendant's religious autonomy rights could be adequately protected by a post-trial appeal, "when the decision is actually final." *Id.* at 955.

Similarly, every U.S. court of appeals that has considered the issue has concluded the same thing: religious autonomy defenses can be adequately vindicated after trial. *Belya*, 45 F.4th at 633-34; *Herx*, 772 F.3d at 1090-92; *Tucker*, 36 F.4th 1036-47. These courts therefore declined to expand the collateral order doctrine to orders denying motions to dismiss or summary judgment motions based on church autonomy (or ministerial exception) defenses. *Belya*, 45 F.4th at 633-34; *Herx*, 772 F.3d at 1090-92; *Tucker*, 36 F.4th at 1036-47.

USCCB argues that "allowing discovery and trial where church autonomy is implicated visits harm on religious institutions that cannot be undone." Br. 13. It points to *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996), which held that "[a]n excessive entanglement may occur where there is a sufficiently intrusive investigation by a government entity into a church's employment of its clergy." *Id.* at 466. Therefore, USCCB suggests, it is conceivable that discovery itself will violate USCCB's church autonomy rights. Br. 13-14. Likening church autonomy to qualified immunity, USCCB argues that church autonomy confers a right not to stand trial that would be irreparably lost without an immediate appeal. Br. 13-14, 21-22. This argument fails.

In the context of collateral appeals, "§ 1291 requires courts of appeals to view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye." *Dig. Equip. Corp.*, 511 U.S. at 873. "[T]here is no single, 'obviously correct way to characterize' an asserted right." *Id.* (quoting *Lauro Lines*, 490 U.S. at 500). And allowing collateral appeals for every right that could be described as a right not to face discovery or trial "would move § 1291 aside for claims that the district court lacks personal jurisdiction, that the statute of limitations has run, that the movant has been denied his Sixth Amendment right to a speedy trial, that an action

is barred on claim preclusion principles, that no material fact is in dispute and the moving party is entitled to judgment as a matter of law, or merely that the complaint fails to state a claim." *Id.* (citations omitted); *see Tucker*, 36 F.4th at 1038 (listing other examples). So the mere fact that a right may be violated before final judgment is entered (e.g., right to a speedy trial) does not mean that the right is immediately appealable. Even where discovery orders intrude on the "right not to disclose the privileged information in the first place," like orders requiring disclosure of privileged attorney-client communications, the "imperfect[] reparab[ility]" of such orders does not bring them within the narrow confines of the collateral order doctrine. *Mohawk*, 558 U.S. at 109, 112 (quoting *Dig. Equip. Corp.*, 511 U.S. at 872).

Every U.S. court of appeals to have considered the issue in the collateral appeals context has rejected the argument that the First Amendment's religious protections provide a right not to be tried that cannot be adequately vindicated after trial. *See Belya*, 45 F.4th at 633 ("The church autonomy doctrine provides religious associations neither an immunity from discovery nor an immunity from trial on secular matters."); *Herx*, 772 F.3d at 1090 (rejecting argument that church autonomy doctrine "provides an immunity *from trial*, as opposed to an ordinary defense to liability"); *Tucker*, 36 F.4th at 1025 (rejecting "novel argument that the 'ministerial exception' not only protects religious employers from liability on a minister's employment discrimination claims, but further immunizes religious employers altogether from the burdens of even having to litigate such claims").[2]

---

[2] *McCarthy* did not hold, as USCCB suggests, that the church autonomy doctrine confers "immunity from the travails of a trial and not just from an adverse judgment." Br. 22 (quoting *McCarthy*, 714 F.3d at 975). That quotation was describing official immunity, not church autonomy. *McCarthy*, 714 F.3d at 975. And it was in the context of demonstrating that the collateral order doctrine does

The Supreme Court, too, has stated that religious autonomy rights operate as a defense to liability, not an immunity from suit. Resolving a circuit split, the Court held that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012). It is "a defense on the merits … because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear [the] case.'" *Id.* (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)); *see Tucker*, 36 F.4th at 1029 (observing that "the church autonomy doctrine … 'operates as an affirmative defense to an otherwise cognizable claim'") (quoting *Hosanna-Tabor*, 565 U.S. at 195 n.4).[3]

Courts have rejected comparisons of church autonomy and qualified immunity in the context of collateral appeals for other reasons as well. For

_____

not require that the appealed issue be (literally) completely separate from the merits—not in suggesting that the church autonomy doctrine also conferred this type of immunity. *Id.* In fact, the Seventh Circuit later expressly held the exact opposite: that the First Amendment's religious protections do not "provide[] an immunity *from trial*, as opposed to an ordinary defense to liability." *Herx*, 772 F.3d at 1090.

[3] USCCB's reliance on state court cases (Br. 13, 22) is misplaced. To begin, state courts are not subject to section 1291, the Supreme Court's admonition that federal courts keep the class of collaterally appealable orders narrow, or Congress's explicit preference for rulemaking as the way to determine which types of orders are "final" under section 1291. So those cases are significantly less persuasive than the federal cases cited herein. Moreover, the cases containing any analysis were decided before the Supreme Court clarified that religious autonomy operates as an affirmative defense to liability, not a jurisdictional immunity. *See United Methodist Church v. White*, 571 A.2d 790, 792-93 (D.C. 1990); *Dayner v. Archdiocese of Hartford,* 23 A.3d 1192, 1199-1200 (Conn. 2011); *Harris v. Matthews*, 643 S.E.2d 566, 569-70 (N.C. 2007); *see also Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 609 n.45 (Ky. 2014) (offering no analysis for comparing the ministerial exception to qualified immunity).

example, the Tenth Circuit stated that "the 'ministerial exception' and qualified immunity[] are simply not at all similar" for purposes of the collateral order doctrine.  *Tucker*, 36 F.4th at 1038.  "Unlike the 'ministerial exception,' the Supreme Court has explicitly recognized that qualified immunity protects government officials not only from liability, but also from the burdens of litigation itself."  *Id.*  And "protecting religious employers from the burdens of litigation based on the First Amendment does not make sense in the bigger picture of religious organizations and the legal system," under which "religious institutions do not 'enjoy a general immunity from secular laws.'"  *Id.* at 1040 (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020)).

Moreover, the rationales underpinning the immediate appealability of qualified immunity orders do not apply to private religious institutions.  Qualified immunity "acts to safeguard government, and thereby to protect the public at large, not to benefit its agents."  *Wyatt v. Cole*, 504 U.S. 158, 168 (1992).  "The reasoning that underlies the immediate appealability" of qualified immunity orders is therefore to avoid burdens, like discovery, that are "peculiarly disruptive of effective government."  *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)).  "These rationales are not transferable to private parties."  *Wyatt v. Cole*, 504 U.S. 158, 168 (1992).  So the Supreme Court has resisted extending the immunity from discovery and trial to private parties.  *See id.*  Thus, there is no basis for treating the church autonomy doctrine—which applies to private religious organizations—like the qualified immunity granted to government officials in this regard.  *See Tucker*, 36 F.4th at 1040 ("The fact that the 'ministerial exception' applies only to private religious organizations, then, counsels against treating the 'ministerial exception' like an immunity from suit ...."); *Herx*, 772 F.3d at 1090 (distinguishing church

autonomy, which "involves private parties," from immediately appealable issues involving "public officials or a unit of government").

USCCB's comparison to qualified immunity also fails because qualified immunity orders are immediately appealable only if they turn on the "purely legal issue" whether the law was "clearly established." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Where "[t]he order in question resolve[s] a *fact*-related dispute," immediate appeal is unavailable. *Id.* at 307. So comparisons to qualified immunity are especially inapt where, as here, the "claims asserted … hinge on crucial questions of fact, and … there are numerous 'disputes as to whether the factual situation presented fits into the [church autonomy doctrine].'" *Belya*, 45 F.4th at 634. Indeed, USCCB cites a variety of sources outside the Complaint to advance facts that it contends support its church autonomy defense (Br. 5-7, 20-21), demonstrating that this pleading-stage appeal is premature.

Thus, as numerous courts have held, a defendant's religious autonomy rights are not "destroyed" if vindicated after trial. To the contrary, church autonomy defenses can be adequately vindicated after trial because a finding of liability that turns on a religious question can be reversed. *See Dig. Equip. Corp.*, 511 U.S. at 882 ("[A]voiding trial probably pales in comparison with the benefit of limiting exposure to liability (an interest that is fully vindicable on appeal from final judgment).").

On the other side of the scale, recognizing this new category of collateral appeals would "overpower the substantial finality interests § 1291 is meant to further." *Will*, 546 U.S. at 350. Doing so would allow immediate appeals from orders denying motions to dismiss whenever a defendant asserts a church autonomy defense. Moreover, in practice, this would be whenever a religious institution is a defendant. A clever lawyer will always be able to argue that a claim against a religious institution relates in some way to a religious question. *See, e.g.*,

Br. at 25 (characterizing materials solicitating donations as "religious documents"). And defendants would have a strong incentive to raise even meritless church autonomy defenses, with immediate appeal providing a second bite at the apple as well as a mechanism for delay and raising costs for opponents. "[I]t would be no consolation that a party's meritless … claim was rejected on immediate appeal; the damage to the efficient and congressionally mandated allocation of judicial responsibility would be done, and any improper purpose the appellant might have had in saddling its opponent with cost and delay would be accomplished." *Dig. Equip. Corp.*, 511 U.S. at 873.

Thus, deferring review until final judgment does not "so imperil[] the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*, 558 U.S. at 108. "[T]he class of claims, taken as a whole, can be adequately vindicated by other means." *Id.* at 107.

This case illustrates why this Court should not create this new category of collateral appeal. The district court rightly concluded that it would not need to answer any religious questions to decide this case. A113-116. For example, USCCB's solicitations state, "Funds from this collection help victims of war, oppression, and natural disasters." A11. Determining what this statement means is not a question "that may only be answered by reference to religious … faith, doctrine, and administration" (Br. 19). It is a question of interpreting the ordinary meaning of words in the English language. Nor would determining whether that statement is consistent with the actual use of the funds require the court to determine whether the use is "proper" or "improper" (Br. 16)—only whether USCCB's solicitations are accurate.[4] But USCCB has contorted the allegations in

---

[4] USCCB devotes a substantial portion of its jurisdictional statement seeking to establish that this lawsuit involves religious questions. This goes to the merits

the Complaint in support of its religious autonomy defense, and now seeks to appeal not only that defense, but also every other ground for dismissal raised below.  Br. 25-26.  This Court should not expand the collateral order doctrine to allow religious organizations to relitigate interlocutory orders in the court of appeal whenever they lose a motion to dismiss.

## CONCLUSION

For the foregoing reasons, this Court lacks jurisdiction over USCCB's interlocutory appeal.

---

of USCCB's individual church autonomy defense, not the jurisdictional question whether the category of orders is immediately appealable.  Plaintiff addresses these examples simply to illustrate how religious institutions can always attempt to claim that purely secular lawsuits relate in some way to religious affairs.

Dated: March 20, 2024

Respectfully submitted,

By: _/s/ Gabriel Doble_
Gabriel Doble (Bar No. 65055)
Simon Franzini (Bar No. 65081)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
gabe@dovel.com
simon@dovel.com

Martin Woodward
martin@kitnerwoodward.com
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: (214) 443-4300
Facsimile: (214) 443-4304

_Counsel for Plaintiff-Appellee_
_David O'Connell_

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,177 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/Gabriel Doble*_____
Gabriel Doble

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2024 the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/Gabriel Doble*
Gabriel Doble

# ADDENDUM

# INDEX TO ADDENDUM

*O'Connell v. USCCB*, 1:20-cv-01365, Plaintiff's Class Action Complaint..............A1

Transcript of Motion Hearing (D.D.C. January 28, 2021) ......................................A28

Transcript of Status Hearing (D.D.C. November 17, 2023)....................................A110

United States District Court
District of Rhode Island

| | | |
|---|---|---|
| David O'Connell, individually and on behalf of all others similarly situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case no. |
| United States Conference of Catholic Bishops, | § § § | Class Action |
| Defendant. | § § | |

## Plaintiff's Original Class Action Complaint

A1

# Table of contents

Preliminary statement ........................................................................................... 1

Jurisdiction and venue ......................................................................................... 2

Parties.................................................................................................................. 2

Any applicable statutes of limitation are tolled................................................... 4

Factual allegations ............................................................................................... 5

      A.  USCCB specifically promotes Peter's Pence as a collection
          for emergency assistance to the neediest around the world ............................5

      B.  USCCB is keenly aware of the importance of accurate
          solicitations and honoring donor intent ...........................................................9

      C.  Contrary to USCCB's representations, Peter's Pence donations
          are used for investments in real estate and Hollywood films
          rather than emergency assistance for the needy .............................................11

      D.  David O'Connell donated to Peter's Pence after USCCB told him
          his donation would be applied for emergency assistance ...............................14

Class allegations ................................................................................................. 15

      A.  Numerosity......................................................................................................16

      B.  Commonality and predominance .....................................................................17

      C.  Typicality ........................................................................................................17

      D.  Adequacy ........................................................................................................17

      E.  Declaratory and injunctive relief ....................................................................18

      F.  Superiority.......................................................................................................18

Claims for relief ................................................................................................. 19

Count I.  Fraud ................................................................................................. 19

      A.  USCCB made affirmative misrepresentations..................................................19

      B.  USCCB fraudulently concealed material facts................................................. 20

Count II.  Unjust enrichment ........................................................................ 21

Count III. Breach of fiduciary duty .............................................................22

Request for relief...........................................................................................22

Demand for jury trial ...................................................................................23

A3

1.     Plaintiff David O'Connell brings this action on behalf of himself and all others similarly situated, against Defendant United States Conference of Catholic Bishops ("USCCB"). Plaintiff alleges the following based upon information and belief, the investigation of counsel, and his personal knowledge of the factual allegations.

**Preliminary statement**

2.     Requests for charitable contributions must be scrupulously accurate. This is especially true when a powerful religious organization, already trusted by its members, asks them to donate money for specific charitable purposes—why would anyone ever suspect that the money would not be spent as promised?

3.     For years, USCCB has solicited and collected hundreds of millions of dollars in donations from parishioners of Catholic churches throughout Rhode Island and the United States as part of its "Peter's Pence" collection. USCCB consistently promotes this specific collection as necessary for helping those suffering the effects of war, oppression, natural disaster, or disease throughout the world, and who are thus in need of immediate relief.

4.     Regrettably and tragically, only a very small portion of this money—as little as 10%—has found its way to the needy for whom it was given. The rest of the money—hundreds of millions of dollars over the last several years—has been diverted into various suspicious investment funds, which in turn have funneled the money into such diverse ventures as luxury condominium developments and Hollywood movies while paying fund managers hefty, multi-million dollar commissions.

A4

5.      At the urging of USCCB, David O'Connell gave to Peter's Pence at Sacred Heart Church in East Providence, Rhode Island, in order to help those in disaster-stricken parts of the world in immediate need of assistance. On behalf of himself and everyone else in Rhode Island and the United States, he now asks USCCB to come clean. Having collected hundreds of millions of dollars from faithful and well-meaning donors for the poor in immediate need of assistance, USCCB must now account for itself and the money with which it was entrusted, and, in the interests of justice, it must disgorge the funds that were not spent as it promised.

**Jurisdiction and venue**

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars exclusive of recoverable interest and costs, and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims of Plaintiff and the Class occurred in this District. Furthermore, venue is proper in this District because Plaintiff made a donation to Peter's Pence in this District at Sacred Heart Church in East Providence, Rhode Island.

**Parties**

8.      Defendant United States Conference of Catholic Bishops ("USCCB") is a District of Columbia non-profit corporation with its principal place of business at 3211

A5

4th Street NE, Washington, DC 20017. It may be served with process through its non-commercial registered agent, Monsignor J. Brian Bransfield, at 3211 4th Street NE, Washington, DC 20017.

9.     Defendant USCCB is the episcopal conference of the Catholic Church in the United States. It is composed of all active and retired members of the Catholic hierarchy in the United States. USCCB is served by a staff of approximately 315 lay people, priests, deacons, and others located at its headquarters in Washington, DC.

10.     USCCB describes its purpose as "to promote the greater good which the Church offers humankind, especially through forms and programs of the apostolate fittingly adapted to the circumstances of time and place. This purpose is drawn from the universal law of the Church and applies to the episcopal conferences which are established all over the world for the same purpose."[1] In the United States, that includes the promotion, oversight, administration, and collection of coordinated charitable donation efforts throughout the country called "collections," including the Peter's Pence collection. USCCB regularly and routinely conducts business throughout the United States and Rhode Island, specifically including the promotion, oversight, administration and intake of donations through the Peter's Pence collection.

11.     USCCB, including its members, employees, subsidiaries, affiliates, volunteers, and agents, promoted, advertised, provided instructions for, administered, oversaw, and collected funds from donors throughout Rhode Island and the United States in connection with the Peter's Pence collection, and specifically within the Diocese of Providence and the Parish of Sacred Heart in East Providence.

---

[1] http://www.usccb.org/about/index.cfm (accessed December 23, 2019).

3

12.     Plaintiff David O'Connell resides in East Providence, Rhode Island. He made a donation to Peter's Pence at Sacred Heart Church in East Providence, Rhode Island.

13.     Plaintiff specifically reserves the right to amend this Complaint to name additional party defendants revealed by discovery or further investigation to have been involved with the diversion of donor funds from the Peter's Pence collection to purposes other than those promised.

**Any applicable statutes of limitation are tolled**

14.     Plaintiff and Class members did not discover and could not discover through the exercise of reasonable diligence that USCCB has been promoting and collecting donations to Peter's Pence for purposes other than those to which the funds were applied. Any statutes of limitation otherwise applicable to any claims asserted in this Complaint have thus been tolled by the discovery rule.

15.     Any applicable statutes of limitation have also been tolled by USCCB's knowing, active, and ongoing fraudulent concealment of the facts alleged herein. USCCB has known or should have known of the non-charitable applications of donations to Peter's Pence while it has been soliciting and collecting them. Thus, USCCB has effectively concealed from, and failed to notify, Plaintiff, Class members, and the public of the critical material fact that the vast majority of donations to Peter's Pence are not spent for the purpose promised to donors. Although it knew or should have known that donations to Peter's Pence are diverted to non-charitable purposes, USCCB did not acknowledge the problem, and in fact actively concealed it.

16.     USCCB was, and is, under a continuous duty to disclose to Plaintiff and Class members the true character and nature of the Peter's Pence collection, including the critical material facts that donations to Peter's Pence are not used as promised to help those in need of immediate relief from war, natural disaster, and oppression, but rather are diverted to other purposes. Instead, USCCB actively concealed the true character and nature of the Peter's Pence collection and made misrepresentations about the specified purposes of the collection. Plaintiff and Class members reasonably relied upon USCCB's concealment of these facts that rendered their statements misleading.

17.     Based on the foregoing, USCCB is estopped from relying on any statutes of limitation in defense of this action.

**Factual allegations**

### A.     USCCB specifically promotes Peter's Pence as a collection for emergency assistance to the neediest around the world

18.     Peter's Pence is a special collection taken from Catholics around the world every June. USCCB explains Peter's Pence as follows:

> The Peter's Pence Collection derives its name from an ancient custom. In ninth-century England[,] King Alfred the Great collected money, a "pence," from landowners as financial support for the Pope. Today, the Peter's Pence Collection supports the Pope's philanthropy by giving the Holy Father the means to provide emergency assistance to those in need because of natural disaster, war, oppression, and disease.[2]

19.     In the United States, it is USCCB that promotes and administers the Peter's Pence collection in coordination with dioceses, parishes, and churches across the

---

[2] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/index.cfm (accessed December 23, 2019).

country. As USCCB states: "The USCCB National Collections Committee oversees the promotion of the Peter's Pence Collection."[3]

20.     To do this, USCCB creates and distributes uniform promotional materials for specific use in parishes and dioceses. These include a social media tool kit, church bulletin inserts, letters from bishops, web ads, posters, and print ads, all freely downloadable from USCCB's website.[4]

21.     All of the Peter's Pence solicitation materials contain the same essential message, as stated in USCCB's sample church bulletin insert: "Donations to this collection support the charitable works of Pope Francis for the relief of those most in need."[5]

---

[3] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/index.cfm (accessed December 23, 2019).

[4] See generally http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/ (accessed December 21, 2019).

[5] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/2019/upload/pp-2019-bulletin-insert-bilingual.pdf (accessed December 21, 2019).

22.    This screenshot of USCCB's bulletin insert solicitation shows exactly how USCCB illustrates the purpose of Peter's Pence to prospective donors:[6]

> ### How We Can Join Pope Francis and Be a Witness of Charity
>
> By supporting the Peter's Pence Collection, you assist the charitable works of Pope Francis. Your generosity witnesses to charity and helps the Holy See reach out compassionately to those who are marginalized.
>
> For example, in the Dioceses of Embeder, Harar, and Mek in Ethiopia, people rely exclusively on subsistence farming and nomadic herding. The El Niño weather phenomenon worsened drought conditions in these regions, and the people fear a new famine that could be far worse than the 1984 famine that led to more than a million deaths in Ethiopia. But your support of the collection is helping the Holy Father to bring aid to the affected villages. Your donations have funded food and medicines that give the Ethiopian people a measure of relief and hope. Learn more by visiting *www.peterspence.va/opere.*

---

[6] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/2019/upload/pp-2019-bulletin-insert-bilingual.pdf. (accessed December 21, 2019).

A10

23.    USCCB's exemplar "bulletin announcements" have a similar, more abbreviated approach, accompanied by instructions for use before, during, and after the collection:[7]

### Bulletin Announcements—English

**Week Before the Collection**
Next week, we will take up the Peter's Pence Collection, which provides Pope Francis with the funds he needs to carry out his charitable works around the world. The proceeds benefit our brothers and sisters on the margins of society, including victims of war, oppression, and natural disasters. Please be generous. For more information, visit *www.usccb.org/peters-pence*.

**Week of the Collection**
Today is the Peter's Pence Collection, a worldwide collection that supports the charitable works of Pope Francis. Funds from this collection help victims of war, oppression, and natural disasters. Take this opportunity to join with Pope Francis and be a witness of charity to our suffering brothers and sisters. Please be generous today. For more information, visit *www.usccb.org/peters-pence*.

**Week After the Collection**
Thank you for your generous support in last week's Peter's Pence Collection! Our parish collected $[*amount*]. Our contributions, combined with those from our brothers and sisters around the world, will help Pope Francis provide essential relief to people in need. If you missed the collection, it is not too late to give! Visit *www.usccb.org/nationalcollections*, and click on the "How to Give" link.

24.    USCCB also furnishes specific instructions for Peter's Pence appeals to be read from the pulpit at church services:[8]

## Parish Appeal

(*Please read this text from the pulpit, or include it as part of your weekly announcements.*)

Today we take up the Peter's Pence Collection, which supports the charitable works of Pope Francis. Catholics around the globe support this collection to help the Holy Father reach out to people suffering in our world, especially those enduring the effects of war and violence, natural disasters, and religious persecution. Please be generous today.

---

[7] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/2019/upload/pp-2019-bulletin-announcements.doc (accessed December 21, 2019).
[8] http://www.usccb.org/catholic-giving/opportunities-for-giving/peters-pence/collection/2019/upload/pp-2019-parish-appeal.doc (accessed December 23, 2019).

25.     For those American Catholics inspired to research Peter's Pence directly from the Vatican website, the messages all reinforce that of the USCCB materials. The Vatican catalogues "works realized" by Peter's Pence, replete with images and elaborate descriptions of disaster relief undertaken in various countries (for example, Ecuador):[9]



**ECUADOR**

Thanks to Peter's Pence has begun a new reconstruction project after the earthquake that struck the coastal regions

In April 2016, an earthquake of 7.8 on the Richter scale hit the coastal area of Ecuador, located less than 200 kilometers from the capital Quito, causing - according to the UN Office for Humanitarian Affairs (OCHA) - 700 deaths, 12,000 injured, 50 thousand homeless.

After aid for the first emergencies, the Holy See started **a project for the reconstruction of houses, schools and public buildings** in the province of Manabi, the epicenter of the earthquake.

In fact, governments' data shows that the destroyed or damaged buildings exceed 2,000 units, over 600 of these are schools, while in many cities water, sewage and electricity networks have to be rebuilt.

The material damages amount to over 3 billion dollars.

**B.     USCCB is keenly aware of the importance of accurate solicitations and honoring donor intent**

26.     USCCB is well aware of the importance of transparency, accountability, accuracy, and honoring donor intent in connection with national collections like Peter's Pence. It has adopted specific guidelines for administering USCCB national collections in dioceses.[10] The guidelines discuss the importance of the proper use of promotional materials; they additionally have an extensive discussion about honoring donor intent.

---

[9] http://www.peterspence.va/en/opere-realizzate/ecuador.html (accessed December 21, 2019).

[10] http://www.usccb.org/_cs_upload/about/national-collections/collection-administration/43214_1.pdf. (accessed December 21, 2019).

Citing both Canon law and "civil laws observed within the United States," the guidelines "call for procedures that ensure donor funds are used for precise purposes intended in the donation appeal." In particular, USCCB guidelines state:[11]

> The national collections are required to adhere to the fundamental principle of "donor intent." For this reason, the following principles should be closely followed:[16]
>
> - Donors should be informed about the intended uses of donated resources.
> - Donors must be assured that gifts will be used for the purposes for which they were given.
>
> The principles and requirements of donor intent must be preserved throughout the entire collection process, from the announcement of the intention of the collection, through the safeguarding and delivering of funds, to the final use by the various collection Subcommittees of the USCCB, including the use and reporting by eventual recipient grantees. Diocesan bishops and parish pastors have a special obligation to be vigilant that the norms of both canon and civil law are followed in these instances.[17]

---

[11] http://www.usccb.org/_cs_upload/about/national-collections/collection-administration/43214_1.pdf (at p. 5) (accessed December 21, 2019) (footnotes from original document omitted in screenshot).

### C. Contrary to USCCB's representations, Peter's Pence donations are used for investments in real estate and Hollywood films rather than emergency assistance for the needy

27.    Despite USCCB's assurances that it honors donor intent, and that donations to Peter's Pence are for the suffering in immediate need, it has recently become apparent that these donor funds are not being used for the purpose USCCB promises. On October 17, 2019, the Italian news magazine *L'Espresso* published a story sourced from secret internal Vatican investigative reports, as pictured in this screenshot:[12]



---

[12] http://espresso.repubblica.it/plus/articoli/2019/10/17/news/vaticano-obolo-san-pietro-1.340060 (accessed December 23, 2019).

A14

28.     The *L'Espresso* story revealed that most of the Peter's Pence funds are diverted into "reckless speculative operations," with 77% of the collections—roughly $560 million—given to Credit Suisse, a Swiss-based investment company.[13] The story also detailed how an Italian financier named Raffaele Mincione was approached by a high-ranking Vatican official to make a $200 million investment, which Mincione used to purchase real estate in London for a luxury apartment development through a fund he managed. Eventually, when returns were less than projected, the Vatican pulled out of the fund and bought the entirety of the property, resulting in Mincione realizing almost $170 million in income.[14]

29.     On December 4, 2019, the Italian newspaper *Corriere della Sera* published additional details on the diversion of Peter's Pence funds.[15] This revealed that more than $1 million was invested in the Elton John biopic *Rocketman*, and more than $3.6 million in the film *Men in Black: International*.[16] Additionally, millions of dollars were invested in a Malta-based investment company called Centurion Global Fund run by an Italian financier named Enrico Crasso, who received "millions of euros in commissions" while losing 4.61% of the fund (approximately two million euros) by the end of 2018.[17]

---

[13] https://cruxnow.com/vatican/2019/10/leaked-documents-detail-200-million-vatican-deal-for-swanky-london-property/ (accessed December 22, 2019).
[14] https://cruxnow.com/vatican/2019/10/leaked-documents-detail-200-million-vatican-deal-for-swanky-london-property/ (accessed December 22, 2019).
[15] https://www.corriere.it/english/19_dicembre_04/vatican-invested-lapo-elkann-and-elton-john-film-72e070b0-16c0-11ea-b17e-02f19725a806.shtml?refresh_ce-cp (accessed December 22, 2019).
[16] http://www.ncregister.com/site/print/62807 (accessed December 22, 2019).
[17] http://www.ncregister.com/site/print/62807 (accessed December 22, 2019).

A15

30.     On December 11, 2019, the Wall Street Journal reported that only 10% of donations to the Peter's Pence collection actually go to charitable works.[18] Most of the money is used to plug holes in the Vatican's administrative budget, "[b]ut for at least the past five years, only about 10% of the money collected—more than €50 million was raised in 2018—has gone to the sort of charitable causes featured in advertising for the collection, according to people familiar with the matter."[19]

31.     Asked in November about the reports of Peter's Pence being used for purposes other than charity, Pope Francis, according to the Catholic News Service, "said no one should be bothered by the fact that the Vatican invests the money it collects from Catholics around the world. 'The sum of Peter's Pence arrives and what do I do? Put it in a drawer? No, that's bad administration. I try to make an investment.'"[20]

32.     But many reactions to news of the actual use of Peter's Pence were not accepting. Some commentators asked whether there was "a bait and switch at Peter's Pence," noting "the great disparity between how it is marketed and what the vast majority of the collection is actually used for."[21]

---

[18] https://www.wsj.com/articles/vatican-uses-donations-for-the-poor-to-plug-its-budget-deficit-11576075764  (accessed December 22, 2019).
[19] https://www.wsj.com/articles/vatican-uses-donations-for-the-poor-to-plug-its-budget-deficit-11576075764  (accessed December 22, 2019).
[20] https://www.catholicnews.com/services/englishnews/2019/financial-scandal-shows-vatican-reforms-are-working-pope-tells-media.cfm (accessed December 22, 2019).
[21] https://acton.org/publications/transatlantic/2019/12/13/bait-and-switch-peters-pence (accessed December 22, 2019); *see also* https://www.lifesitenews.com/opinion/catholics-should-be-outraged-at-vaticans-peters-pence-bait-and-switch (accessed December 23, 2019).

A16

33.     Another commentator, writing in the *Catholic Herald*, noted this exchange between Francis X. Rocca, author of the *Wall Street Journal* article, and one Cardinal of the Catholic Church, shown in the following screenshot:[22]

> On Twitter, Cardinal Wilfrid Napier of Durban noted, "According to information given to the Council for the Economy," of which he is a member, "the Pope's Petrine ministry extends beyond care of the poor". Napier went on to say, "Therefore, if the Peter's Pence Collection is taken up to support the Pope in his Petrine ministry, it is for a much wider purpose than simply care of the Poor."

> Rocca replied: "Your Eminence, that is of course correct under the law. The problem is that the promotional material from the Vatican and local churches gives an entirely different impression, so people are giving under the misapprehension that the money goes mainly to the poor."

> Cardinal Napier responded, "Then I think we have to say the promotional material is not accurate, misleading or even wrong, because it does not reflect the truth."

### D.    David O'Connell donated to Peter's Pence after USCCB told him his donation would be applied for emergency assistance

34.     David O'Connell regularly attends Sunday mass at Sacred Heart Church in East Providence, Rhode Island.  In the summer of 2018, during a Sunday mass in which he was solicited from the pulpit as directed by USCCB to help those in need of emergency relief, he made a cash donation to the Peter's Pence collection. Nothing he saw or heard, on that day or beforehand, told him or made him understand that his

---

[22] https://catholicherald.co.uk/commentandblogs/2019/12/15/what-the-peters-pence-furore-tells-us-about-vatican-financial-reform/ (accessed December 23, 2019).

donations to Peter's Pence would be used for anything other than emergency assistance to the neediest people around the world.

35. Even if David O'Connell had slowly and carefully researched external sources such as the USCCB or Vatican websites, he would still reasonably be unaware that his donations to Peter's Pence would not be used entirely and exclusive for emergency assistance to the poor. He had no reason to suspect that the Peter's Pence collection was actually used for investments and other purposes rather than for emergency assistance, and USCCB's failure to inform them about this was material; if USCCB had disclosed this fact, David O'Connell would not have donated to the Peter's Pence collection.

36. USCCB has always known the difference between a donation for emergency assistance and a donation to defray Vatican administrative expenses. But USCCB hid this distinction in its promotion, oversight, and administration of the Peters Pence collection in the United States, and, as a result, it has effectively profited at the expense of David O'Connell and the members of the public. David O'Connell donated money for specific charitable purposes, which USCCB directed into other, non-charitable purposes. All along, USCCB knew or should have known this was the likely result, but it promoted the Peter's Pence collection as a charitable effort meant only for the poorest of the poor regardless; accordingly, millions of donors across the country ended up in the exact same position as David O'Connell.

**Class allegations**

37. Plaintiff David O'Connell seeks to represent the following Class:

All persons in the United States who donated money to the Peter's Pence

collection. Excluded from the Class are USCCB and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.

38.     Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

39.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

40.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

### A.     Numerosity

41.     Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are millions of members of the Class, the precise number is unknown to him. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

A19

### B.    Commonality and Predominance

42.    Pursuant to Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3), this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether USCCB engaged in the conduct alleged herein;

b) Whether USCCB's conduct violates common law as asserted herein;

c) Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

d) Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

### C.    Typicality

43.    Pursuant to Federal Rule of Civil Procedure 23(a)(3), Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through USCCB's wrongful conduct as described above.

### D.    Adequacy

44.    Pursuant to Federal Rule of Civil Procedure 23(a)(4), Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

A20

**E.      Declaratory and Injunctive Relief**

45.      Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

**F.      Superiority**

46.      Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against USCCB, so it would be impracticable for Class members to individually seek redress for USCCB's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

A21

**Claims for relief**

**Count I.    Fraud**

47.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

**A.    USCCB made affirmative misrepresentations**

48.    USCCB consistently, routinely, and uniformly solicited donations for the Peter's Pence collection as emergency assistance needed for victims of war, oppression, natural disaster, or disease throughout the world. By doing this, USCCB communicated to Plaintiff and to each Class member that any money they donated to Peter's Pence would be used exclusively for these purposes.

49.    This was a material representation, as USCCB knew that prospective donors would be inclined to donate to Peter's Pence if they believed their donations were urgently needed by people in dire circumstances.  And this was a false representation, because the donations were never going to be routed immediately to the needy, but rather were going to be diverted into investment funds and subsequently into purposes such as real estate, Hollywood films, and hefty commissions for fund managers.

50.    USCCB knew or should have known the representations were false and intended Plaintiff and Class members to rely on them. Plaintiff and Class members decided to donate to Peter's Pence based in part on the representations communicated to them by USCCB.

51.    But for USCCB's fraud, Plaintiff and the members of the Class would not have donated to the Peter's Pence collection. Plaintiff and the members of the Class have sustained damage because they contributed money for specific charitable purposes

A22

which USCCB did not spend in accordance with its promises. Accordingly, USCCB is liable to Plaintiff and the members of the Class for damages in an amount to be proven at trial.

### B.    USCCB fraudulently concealed material facts

52.    USCCB consistently, routinely, and uniformly solicited donations for the Peter's Pence collection as emergency assistance needed for victims of war, oppression, natural disaster, or disease throughout the world. By doing this, USCCB communicated to Plaintiff and to each Class member that any money they donated to Peter's Pence would be used exclusively for these purposes.

53.    USCCB concealed and suppressed the fact that the donations were never going to be routed immediately to the needy, but rather were going to be diverted into investment funds and subsequently into purposes such as real estate, Hollywood films, and hefty commissions for fund managers. This was a material fact about which USCCB had or should have had knowledge, and that it concealed from Plaintiff and the members of the Class to mislead them.

54.    Plaintiff and the members of the Class did not know this fact and could not have discovered it through a reasonably diligent investigation.

55.    USCCB had a duty to disclose that donations to Peter's Pence would not be immediately spent on emergency assistance for the needy around the world because (1) USCCB had or should have had exclusive knowledge of the material, suppressed facts; (2) USCCB took affirmative actions to conceal the material facts, including by devising and implementing a promotional program for Peter's Pence that emphasized the need for emergency assistance for the poor; (3) USCCB made partial representations by

suggesting in promotional and solicitation materials that donations to the Peter's Pence collection are exclusively to aid the needy in dire circumstances around the world. Plaintiff and Class members decided to donate to Peter's Pence based in part on the representations communicated to them by USCCB's promotions and solicitations.

56.     But for USCCB's fraud, Plaintiff and the members of the Class would not have made donations to the Peter's Pence collection. Plaintiff and the members of the Class have sustained damage because they contributed money for specific charitable purposes which USCCB did not spend in accordance with its promises. Accordingly, USCCB is liable to Plaintiff and the members of the Class for damages in an amount to be proven at trial.

### Count II.     Unjust enrichment

57.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

58.     As described in detail in the factual allegations above, USCCB made false representations to Plaintiff and the members of the Class that resulted in their contributions of money for charitable purposes to their detriment.

59.     Under these circumstances as described above, USCCB has received money from Plaintiff and the members of the Class that USCCB, in equity and good conscience, ought not to retain.

60.     As a result, USCCB is liable in restitution to Plaintiff and the members of the Class to disgorge and remit to Plaintiff and the Class all monies contributed, in an amount to be proved at trial.

A24

## Count III.   Breach of fiduciary duty

61.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

62.    As described in detail in the factual allegations above, USCCB promoted, advertised, provided instructions for, administered, oversaw, and collected funds from donors throughout Rhode Island and the United States in connection with the Peter's Pence collection. USCCB owed Plaintiff and the members of the Class fiduciary duties in connection with its promotion, solicitation, and handling of all charitable contributions to the Peter's Pence collection.

63.    Under the circumstances described in detail above, USCCB breached its fiduciary duties to Plaintiff and the members of the Class by failing to ensure that the charitable contributions to the Peter's Pence collection were spent in accordance with USCCB's promises.

64.    As a result of USCCB's breaches of its fiduciary duties, Plaintiff and the members of the Class have sustained damages, and USCCB is liable to Plaintiff and the members of the Class for damages in an amount to be proved at trial.

## Request for relief

65.    David O'Connell, individually and on behalf of the members of the Class, respectfully request that the Court enter judgment in their favor and against USCCB, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiff's counsel as Class Counsel;

A25

B.   An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, and fraudulent practices alleged in this Complaint;

C.   Injunctive relief;

D.   Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

E.   An order requiring USCCB to pay both pre- and post-judgment interest on any amounts awarded;

F.   An award of costs and attorneys' fees; and

G.   Such other or further relief as may be appropriate.

## Demand for jury trial

66.   Plaintiff hereby demands a jury trial for all claims so triable.

A26

Dated:  January 22, 2020                  Respectfully submitted,

                                          /s/ *Peter N. Wasylyk*
                                          Peter N. Wasylyk
                                          Rhode Island Bar No. 3351
                                          pnwlaw@aol.com
                                          **LAW OFFICES OF PETER N. WASYLYK**
                                          1307 Chalkstone Avenue
                                          Providence, Rhode Island 02908
                                          401.831.7730
                                          401.861.6064 (fax)

                                          Marc R. Stanley (*pro hac vice* forthcoming)
                                          marcstanley@mac.com
                                          Martin Woodward (*pro hac vice* forthcoming)
                                          mwoodward@stanleylawgroup.com
                                          **STANLEY LAW GROUP**
                                          6116 N. Central Expressway, Suite 1500
                                          Dallas, Texas 75206
                                          214.443.4300
                                          214.443.0358 (fax)

                                          *Counsel for Plaintiff and the Class*

A27

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF COLUMBIA |

2  _____

| 3 | David O'Connell, | ) Civil Action |
| | | ) No. 1:20-cv-01365-KBJ |
| 4 | Plaintiff, | ) |
| | | ) |
| 5 | vs. | ) **Motion Hearing** (via Zoom) |
| | | ) |
| 6 | United States Conference of | ) |
| | Catholic Bishops, | ) Washington, D.C. |
| 7 | | ) January 28, 2021 |
| | Defendant. | ) Time:  1:30 p.m. |

8  _____

| 9 | Transcript of **Motion Hearing** (via Zoom) |
| | Held Before |
| 10 | The Honorable Ketanji Brown Jackson (via Zoom) |
| | United States District Judge |

11  _____

12              A P P E A R A N C E S

| 13 | For the Plaintiff: | **Marc R. Stanley** |
| | (via Zoom) | **Martin Woodward** |
| 14 | | STANLEY LAW GROUP |
| | | 6116 North Central Expressway |
| 15 | | Suite 1500 |
| | | Dallas, Texas 75206 |
| 16 | | |
| | For the Defendant: | **Emmet T. Flood** |
| 17 | (via Zoom) | **Kevin T. Baine** |
| | | **Richard S. Cleary, Jr.** |
| 18 | | WILLIAMS & CONNOLLY LLP |
| | | 725 12th Street, Northwest |
| 19 | | Washington, D.C. 20005 |

20  _____

| 21 | Stenographic Official Court Reporter: |
| | (via Zoom) | Nancy J. Meyer |
| 22 | | Registered Diplomate Reporter |
| | | Certified Realtime Reporter |
| 23 | | United States Courthouse, Room 6509 |
| | | 333 Constitution Avenue, Northwest |
| 24 | | Washington, D.C. 20001 |
| | | 202-354-3118 |

25

2

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic restrictions and is subject to the
3  limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4  signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5  reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7          THE COURTROOM DEPUTY:  Your Honor, we are here for

8    Civil Action 20-1365, David O'Connell v. United States

9    Conference of Catholic Bishops.  I'm going to ask that counsel

10   please state their appearance for the record and introduce any

11   co-counsels that might be present.

12          MR. STANLEY:  Good afternoon, Your Honor.  I'm

13   Marc Stanley and my co-counsel is Martin Woodward.  We

14   represent Mr. O'Connell and the putative class.

15          THE COURT:  Good afternoon.

16          MR. STANLEY:  Nice to meet you.

17          MR. FLOOD:  And good afternoon, Your Honor.  My name

18   is Emmet Flood.  I'm here along with my Williams & Connolly

19   colleagues Kevin Baine and Richard Cleary, and we represent the

20   sole defendant, U.S. Conference of Catholic Bishops.

21          THE COURT:  Good afternoon to you as well.

22          MR. FLOOD:  Thank you, Your Honor.

23          THE COURT:  This is a hearing regarding the

24   defendant's motion to dismiss the plaintiff's putative class

25   action complaint.  The plaintiff's complaint alleges that --

1    and I guess I'll call it USCCB, although I'll do my best to

2    keep the acronyms straight.  The plaintiff alleges that the

3    defendant is liable for fraud, unjust enrichment, and breach of

4    fiduciary duty based on the USCCB's alleged misrepresentations

5    with respect to how funds that are collected from parishioners

6    pursuant to the Peter's Pence collection are being spent.

7         In its motion, USCCB contends that this Court lacks

8    subject-matter jurisdiction over O'Connell's claims, which, I

9    believe, is a threshold consideration, even though it does not

10   come first in the motion to dismiss.  The motion also maintains

11   that the plaintiff has failed to plead fraud with particularity

12   as required by Rule 9(b) and that the defendant is entitled to

13   judgment on the pleadings under Rule 12(c) or, in the

14   alternative, entitled to summary judgment.

15        I have reviewed your briefs.  I am familiar with your

16   arguments.  So I hope that we can just have a discussion that

17   illuminates the various legal issues.  Let me start by

18   acknowledging that my hopes of how we will be able to proceed

19   are somewhat limited due to the circumstances, the constraints

20   that we face, in having to conduct this hearing virtually.  We

21   are proceeding by videoconference due to the court's closure as

22   a result of the pandemic, and I found that these circumstances

23   are not exactly ideal for having the kinds of discussions that

24   I ordinarily have with parties that appear before me.

25        So we'll do our best, but I may have to scale back in

1   terms of my ordinary level of engagement.  I will be asking you

2   questions, but probably fewer than I ordinarily would.  We

3   won't impose any time limits.  I find them distracting, and I'm

4   just trying to get to the heart of the matter.  So let's just

5   do that.

6        And I'm going to alter my typical format just a bit to

7   expedite things in this way.  I typically -- even though it is

8   a motion to dismiss, I ask the plaintiffs to start to set the

9   sort of framework of the complaint before we turn to the

10  arguments and dismissal.  I think the general complaint is

11  straightforward.  So I actually want to start with defense

12  counsel -- it is defense -- the defendant's motion -- and focus

13  in initially on the concerns about jurisdiction.  We'll do a

14  round that focuses only on that threshold issue, and the

15  plaintiff can respond, and we'll have any replies.

16       And then we'll move to what I consider sort of a

17  two-part second set of questions, which is, one, the procedural

18  question of whether the defendant is able to make the arguments

19  that it seeks to advance here about particularity and failing

20  to state a claim as a Rule 12(c), motion and then also the

21  second part of this is the merits of the defendant's argument

22  about why this matter should not be allowed to proceed, whether

23  on particularity grounds or failure to state a claim or

24  otherwise.

25       One thing that occurred to me as I reviewed this -- and

1    it could be something of a function of the way in which this

2    Court has organized its practices.  It occurred to me that the

3    parties haven't really focused on the difference between the

4    plaintiff's individual claim and the class claims with respect

5    to the arguments that they're making about particularity,

6    et cetera.  And I'm starting to wonder whether some of the

7    disputes about the complaint and its sufficiency would be

8    resolved by addressing class certification first.

9         I know that I -- you know, as part of my routine, I

10   say the class action allegations, and sometimes that works,

11   but perhaps in this case we might need to do the class

12   discussion first, but obviously not in this context, since we

13   haven't prepared for it, but I think we should keep that in

14   mind as we figure out how we're going to deal with this

15   particular motion.

16        So let me start with defense counsel, Mr. Flood, and

17   have you address jurisdiction.

18        MR. FLOOD:  Thank you, Your Honor.

19        If I might -- first of all, let me say that the -- the

20   bishops conference -- and I may just call it the Conference,

21   which might be simpler than the long acronym.

22        THE COURT:  Perfect.

23        MR. FLOOD:  The Conference -- our position is we

24   agree with the Court's initial statement that it is a threshold

25   matter.  And we also, as Your Honor noted, argued it last in

1    the sequence.  And I'd like to begin by giving the Court an

2    idea of why we did that.

3         It seems to -- to us that there are two principles of

4    very broad application that have indisputable bearing on the

5    case.  One is the principle we argue for here that there are

6    situations in which a civil court should not insert itself into

7    what are internal questions of church governance.  That

8    principle is not limited merely to a church administration or

9    property disputes or doctrine, but it also covers, in our view,

10   matters like internal governance, which includes spending

11   decisions.  We think this case is covered by that principle and

12   have so argued.

13        But there's another principle of quite general

14   application that we think is here, and I hope, Your Honor, this

15   explains why we approached the matter the way we did.  Churches

16   and, you know, ministers, you know, representatives of

17   religious orders acting, you know, in their official capacity

18   do not have some immunity from fraud claims.  That's just a

19   fact.  No one can cloak him- or herself in vestments or under a

20   church's rubric or ejus and say you may not approach me in a

21   civil court.  That's not just the law.

22        And so our -- our -- our approach here was undertaken on

23   the following thought; that if we in our briefing discussed

24   something of the particulars of what is asserted here, we --

25   that could we use that as an opportunity because we believe it

1     would generally shed light on the problem of the degree of

2     difficulty, entanglement, intrusiveness and show just what it

3     is that plaintiff seeks to have the Court do here.  And

4     that's -- so those are the two sort of background thoughts that

5     explain the sequencing we adopted.

6                THE COURT:  All right.  I mean, that's totally

7     logical, but I do think that if the Court does not have

8     jurisdiction, as you claim, with respect to the first principle

9     that you articulated, then my view of whether and to what

10    extent the plaintiffs have sufficiently alleged fraud given the

11    allegations of the complaint is not on the table.  So as a

12    threshold matter, I think, it's important for me to evaluate

13    your ecclesiastical abstention contentions.  So can we start

14    there?

15               MR. FLOOD:  So --

16               THE COURT:  Yes.

17               MR. FLOOD:  Of course, Your Honor.

18          The -- what the -- what the plaintiff seeks here, in a

19    nutshell, is a ruling from a civil court that will provide some

20    kind of scheme or schedule or internal rule of a decision for a

21    Court to adopt in which it asks the Court to impose that rule

22    on a religious organization.  So the gravamen of plaintiff's

23    complaint is that he was under the impression that the donation

24    he gave would be used immediately and exclusively for some

25    purpose.

1          And his view of the matter is that a civil court based

2     on what we regard as very thin allegations here -- but save

3     that for letter -- later -- should be able to tell a religious

4     institution how it should spend its money; right?  When you

5     say -- this is not -- it's not alleged and not brought as a

6     simple case of somebody lied to me and here's the lie and I

7     would like to vindicate the lie.

8          THE COURT:  Let me -- let me ask you why you say

9     that, Mr. Flood, because I marked in the complaint, for

10    example, paragraph 32, which is pretty clear with respect to

11    the -- what I thought was the essence of the alleged fraud,

12    which is that there is a great disparity between how this

13    Peter's Pence fund collection is being marketed and what the

14    vast majority of the collection is actually used for.  And if

15    that is the statement, isn't that a classic fraud kind of

16    dynamic?

17         In other words, he's not saying you can't use the money

18    for these other means because it violates the guidelines -- I

19    know that's in there, but I feel like that's a red herring --

20    you know, because the -- the church is supposed to be using

21    this money in a certain way.  I think the essence of the fraud

22    claim is here's all the marketing material that tells people

23    what you are using it for and, lo and behold, according to the

24    plaintiff, it's not being used for those purposes.

25         MR. FLOOD:  Your Honor, I think the first point to

1    make in response is that if we want to call statements on the

2    website marketing material about Vatican use, that should be

3    fairly read side by side with the Vatican's own website about

4    how it's used.  And we've quoted from the website in our

5    opposing papers.  And it's very clear on the Vatican website

6    that what appears in plaintiff's complaint is only some of the

7    available uses, and the Vatican website makes no secret that it

8    is also used generally for the needs of the Holy Father.  And

9    so that's -- that -- and I think that there's no getting around

10   plaintiff's intention to ask this Court to sort out which uses

11   are immediate enough and which uses are exclusive enough.

12   And --

13              THE COURT:  Except -- except, Mr. Flood, the problem,

14   I think, with that argument is that that's the kind of thing

15   that you would argue to the jury as to why it is that you --

16   your client was not fraudulent.  It's not an argument that

17   accepts the allegations in the complaint as true, which one

18   does on a 12, at least, (b)(6) kind of theory.  And we'll talk

19   about whether or not you're even able to bring that kind of

20   argument at this point in the case.  But assuming you are,

21   don't I have to accept what the plaintiff says about the

22   allegations -- excuse me -- about the, you know, marketing of

23   this, notwithstanding the fact that there may be some other

24   evidence that the plaintiff is mischaracterizing what's

25   actually going on?

1            MR. FLOOD:  Your Honor, I don't think you have to

2    accept it for this purpose, and I think the reason is that,

3    to use Your Honor's terms, we're talking about marketing

4    here, and this plaintiff has not alleged that he was the

5    recipient of marketing in this form.  It's very clear from his

6    complaint that he doesn't seem ever to have seen the USCCB

7    website.

8            THE COURT:  But you're shifting, Mr. Flood.  You're

9    not talking about this plaintiff and his standing and his

10   ability to raise these allegations; right?  I want to isolate

11   the allegations in the complaint and determine whether or not,

12   if true, they state a claim for fraud.

13           And -- and I understood you to be saying that, well,

14   what's really being stated here is not a fraud claim.  It is a

15   claim that the church should be spending the money in certain

16   ways and that's the kind of thing that courts can't get

17   involved in.  All that might be true, but I'm finding

18   allegations in this complaint that appear to be stating a claim

19   of fraud in the traditional sense.  Here's what you're saying,

20   Conference, and here's what you're actually doing, and that's a

21   fraud.

22           Now, whether or not Mr. O'Connell actually saw it, all

23   of those are other questions as to why there might be defects.

24   I just want to know whether you're right that the essence of

25   the claim is something that this Court cannot consider because

1    it goes to church policy and doctrine in the way that you

2    suggest.

3             MR. FLOOD:  Your Honor, I think it goes directly to

4    church policy, church use of funds, church governance and

5    administration.  And the reason I say that is the -- the

6    plaintiff, Mr. O'Connell's own opposition in response to this

7    motion, says that he wants to take discovery on how funds

8    travel from -- from the -- from the collection plate all the

9    way to what he calls Swiss hedge funds.  He's asking the Court

10   to sort out which modes of internal transmission in a religious

11   body may or may not be fraudulent.

12            What he does not do, we submit, is ever allege that the

13   Conference had knowledge of any purported fraud.  And the

14   Conference is the sole defendant here.  And so he -- he only

15   brings the case against one defendant, and then he wants to use

16   that to expand, if we take his pleadings and his submissions at

17   face value, into the universal church.  And that -- and once

18   you expand it to universal church and it becomes questions of

19   allocation and promptness of distribution, you're into the core

20   of church governance, and he doesn't make any secret that

21   that's what he wants to do in the case.  And this appears at

22   page 22 of his opposition.  At page -- you know, throughout

23   his opposition, he makes clear that this Court is going to

24   have to decide whether there is fraud on not only the USCCB

25   website but on the Vatican website.  He's asking you to make

 1    that call.

 2              THE COURT:  But I thought you said at the

 3    beginning -- I thought you said at the beginning that churches

 4    are not immune by their nature to claims of fraud.  And so to

 5    the extent that he is seeking to trace the money and figure out

 6    whether or not the contributions that are being made by

 7    parishioners are actually going to charitable works or going to

 8    Hollywood, that that's just a means of proving his case that

 9    there's a fraudulent expenditure going on in light of what

10    you -- the Conference has said about what happens to these

11    funds.

12              I don't necessarily see it as the Court deciding whether

13    or not the expenditures, the investments, the real estate

14    purchases and whatnot, are lawful or are consistent with church

15    doctrine or anything else.  I mean, I understand the nature of

16    what you're saying, that he's seeking discovery into actually

17    how the money moves, but everything about discovery is relative

18    to a purpose.  And it sounds to me from the complaint and from

19    what he's argued that the purpose of doing that is just to show

20    that the statements that are being made about what's happening

21    to this money are not true, which is the essence of a classic

22    fraud claim.

23              MR. FLOOD:  Well, Your Honor, first of all, no one is

24    immune, per se, from a claim of fraud.  I think that's well

25    established.  You can't be a church and maintain that position.

1          With that said, however, the degree of intrusiveness

2    necessary to establish a purported fraud does implicate

3    Article III in subject-matter jurisdiction.  There's just no

4    question about it.

5          That's why the Supreme Court and various, you know,

6    lower courts have said that presumptively the default position

7    is that civil courts should not get involved in -- you know, in

8    entanglement questions.  In terms of the *Bible Way* case from

9    the D.C. Court of Appeals, questions of how money was spent,

10   where it flowed, what was the accounting, you don't get

11   involved.  But the Court -- the cases also say that if there is

12   a case of fraud that can be brought and can be decided purely

13   on the basis of neutral principles, then we have a different

14   kettle of fish.

15         This case cannot be decided, it's our submission, on the

16   basis of neutral principles.  We'll have to get involved in how

17   much is too much, and I think this is on the face of the

18   complaint.  If you say exclusively, then is any deviation from

19   exclusive?  And -- and as an aside, nothing says exclusive in

20   our materials, but --

21         THE COURT:  Well, that's the answer, Mr. Flood.

22   That's why I wouldn't have to get involved; right?  Isn't --

23   isn't the degree of intrusiveness or entanglement that you're

24   highlighting here relative to the statements that the church

25   made; so that if the Conference says this money is exclusively

1    being diverted to charitable -- or, you know, purpose for --

2    given to charitable works, that's the statement on the table,

3    then evidence concerning the money going somewhere else is

4    relevant under the rules of evidence.  And through neutral

5    principles, the Court and a jury could decide whether or not

6    there was fraud.  I don't know what you mean that it's not to

7    be evaluated via neutral principles or that the Court is going

8    to have to decide how much is too much.

9         MR. FLOOD:  Your Honor, I think to take the last

10   point first, I think the "how much is too much" question is

11   certainly implicated by the claim that the money was not

12   distributed immediately.  I think immediate and immediacy is a

13   question of degree.  I think it's not possible to lay down a

14   single universal principle that separates the satisfactorily

15   and immediate from the unlawfully delayed.

16        As to exclusive, Your Honor, if we had a very different

17   case than this one in which someone stood up and spoke to this

18   defendant and said you're going to give a hundred dollars and

19   every penny is going to go to this specific purpose, we'd have

20   a different case; but we don't have that here.  The -- the

21   client -- or I'm sorry.  The plaintiff has pled the case in a

22   way that ineluctably invites the Court into the question of how

23   much is too much on the -- what he calls the exclusivity

24   question.  There is no --

25        THE COURT:  All right.  Well, let me ask Mr. Stanley.

A41

1    I mean, do you have anything more to say on jurisdiction

2    before I ask him respond to your well-taken point?

3        MR. FLOOD:  I don't think so, Your Honor, except if

4    there's anything I could assist the Court in understanding why

5    we put the jurisdictional point last.  I think I've said my

6    peace, but I realize it's a little bit unorthodox given

7    Your Honor's statement, but we thought some education on the --

8    inform the Court on -- on the fraud and other claims would help

9    to assist in understanding the degree of entanglement and

10   intrusiveness.  That's all.

11       THE COURT:  That's very helpful.  Thank you.

12       So, Mr. Stanley, you have been listening to this

13   dialogue, and Mr. Flood makes the important and interesting

14   argument that -- that this Court would necessarily have to

15   evaluate how much is too much in the context of analyzing your

16   fraud claim given the allegations that you've made.  Why is he

17   wrong about that?

18       MR. STANLEY:  Okay.  I'd like to come back to that in

19   one second, if I may.

20       THE COURT:  Sure.

21       MR. STANLEY:  I'd like to just set the stage.  And,

22   that is, we absolutely agree that the ecclesiastical abstention

23   applies if a Court is required to interpret religious doctrine

24   or practice in order to resolve claims against a religious

25   organization.  If the claims can be resolved, like Mr. Flood

1    said, in a neutral and generally applicable principles of law,

2    you have subject-matter jurisdiction.

3        So we offer an example in our -- in our response about a

4    defrocking of a Serbian Orthodox priest that goes too far.  And

5    the Court should abstain on a lawsuit about that.  That's

6    church doctrine.

7        In this case, what we're talking about is not the

8    actions of the Vatican.  We're talking about the actions of

9    the Conference, not how the Vatican did it, but what the

10   Conference represented to the parishioners.  We did not -- we

11   cannot, have not yet sued the Holy See.  Whether that happens

12   in the future, that's another issue, but that's not up for

13   debate today.

14       In my case, we just settled a class action -- we had a

15   class certified against an organization called Gospel for Asia.

16   In that case what was happening was they were soliciting

17   donors.  There were 179 categories you could make a

18   contribution for:  water buffalos, bicycles, motorcycles,

19   lamps, heating lamps, stuff that would go to southeast Asia.

20   And they promised a hundred percent of it would be spent there

21   on those items.  In fact, it's our position that none of it was

22   spent on that.  Yet, they were a religious organization, and

23   they tried to say the same thing.

24       The class was eventually certified, and the Eighth

25   Circuit said no.  I mean, this is a proper class certification.

1    You represented these people.  You sought -- the representation

2    was made, the class members donated to it, and you didn't spend

3    the money as you promised.

4              THE COURT:  Can I just ask you because --

5              MR. STANLEY:  Please.

6              THE COURT:  -- I think Mr. Holm -- Mr. Flood has

7    isolated a little bit of daylight between the positions that

8    you're talking about with respect to total abstention and --

9    and the ability to be able to proceed.  And by that I mean, you

10   suggested in the Eighth Circuit case that you just mentioned

11   that the representations that were being challenged were

12   that a hundred percent of the money was going to some

13   organization.

14        My question -- and I think Mr. Flood's argument -- is

15   whether if the representation is not that definitive, if it's

16   just we're going to be giving this money to charity, would

17   evaluating whether or not that is a fraudulent statement in

18   light of where the money actually goes open the door to the

19   kinds of entanglement that courts have been worried about in

20   this abstention context?

21              MR. STANLEY:  Not at all.  And, in fact -- well, I

22   need to break it into two ways.  One, we're not suing the

23   Holy See for how they spent the money.  We're suing the

24   Conference for representing to us -- and if you actually look

25   at their representations, look at what they actually said --

A44

1    and I'll come back to that.  I'll find that in a second.  In

2    the -- in the -- from the pulpit the week before it was read,

3    the week after, what people were told, and by their own

4    guidelines, that their job is to ensure that the money was

5    spent as represented.

6         In this case, just so you know, the Vatican is actually

7    engaged in lawsuits right now against the Swiss investment

8    funds involving Peter's Pence.  They just got letters rogatory

9    in the last month in Switzerland to obtain documents on the

10   fraud that was made by certain cardinals and monsignors in how

11   they were investing this money.  So they're upset about it too.

12   It's not just the donors that are upset.

13        But regardless of that, let's go back and look at

14   what was actually said.  And I need to pull up that document

15   and -- you're right.  It's difficult in doing it this way.

16   We attached the flyer they put out, and I'll make it bigger

17   so I can read it.  Footnote 7, there's an attachment that

18   said --

19             THE COURT:  Is this your complaint, because that's

20   what I'm sort of focused on.

21             MR. STANLEY:  Yes, in the complaint, footnote 7.  And

22   I can actually -- may I share my screen?  Is that easier?

23             THE COURT:  No, I have it.  I have it.  Thank you.

24             MR. STANLEY:  The week before the collection, "Next

25   week, we will take up the Peter's Pence Collection, which

19

1    provides Pope Francis with the funds he needs to carry out his

2    charitable works around the world."  The benefits proceed our

3    brothers -- "The proceeds benefit our brothers and sisters on

4    the margins of society, including the victims of war,

5    oppression, and natural disasters.  Please be generous."

6         Okay.  They say it's going there.  Just like my Gospel

7    for Asia case, it's going somewhere, not to posh condo projects

8    in London, not to Swiss investment funds -- where they lost a

9    lot of money -- not to movies.

10        All right.  This week, same thing, almost the same

11   statement.  And then nothing about, hey, we're going to invest

12   this.  It -- it -- if, by the way, Your Honor, they said:  Hey,

13   we're going to invest this and grow it so when there are

14   emergencies the Pope can use that -- if they said in there,

15   by the way, the Pope might use this to satisfy deficits in

16   the Vatican budget, if they said they put -- might use it

17   for anything like that and people were told that, that's fine.

18        Then they say:  Thank you for your generous

19   contribution.  You're helping people around the world.  Our

20   point is it didn't go to that.  Ten percent went to that,

21   maybe, and the discovery is going to show that.  But what the

22   discovery is also going to show is they promised every year

23   that they would ensure that the money went exactly as promised.

24   And from 2011, when they came out with that promise, to the

25   present, they never did anything to show that the money was

1    actually being spent for poor people.  They never did

2    anything -- year after year -- this 2019 thing and 2020, even

3    this year, they came out with the same representations without

4    telling people, hey, there's a controversy here on how the

5    money is being spent.

6            THE COURT:  All right.  But is the essence of your

7    claim that you have a problem with how they're spending the

8    money, whether they're spending it for poor people or not, or

9    are you focused in on the statements that have been made?

10           MR. STANLEY:  I guess I have to dummy down for

11   myself.  The dummy down for myself is what did you promise the

12   class?  We promised the class -- what did you solicit the class

13   for?  We solicited the class exclusively -- nothing else.  We,

14   the Conference of Bishops, told our dioceses, who were required

15   to report to us, and the churches, who were required to report

16   to us -- we supervise them.  We told them to say to our

17   parishioners we need money for poor people in immediate need.

18   We need it now.  Please give generously.  Whether we need it or

19   not, we need it for poor people.  Help your brothers and

20   sisters on the margins of society, including victims of war,

21   oppression, and natural disasters.

22           Not -- not $170 million going to profit to the guy that

23   started the apartment -- the condo project in London.  He made

24   $170 million off of Peter's Pence.  Not to the guy in

25   Switzerland who made a lot of money.  It's going to our

1    brothers and sisters on the margins of society, including

2    victims of wars, oppression, and natural disaster.  It didn't

3    go to them, hasn't gone to them, 2011 to present.

4         I think what the jury will find is 10 to 20 percent went

5    to them and the rest simply did not.  And year after year, even

6    though they promised they would ensure donor intent is

7    fulfilled -- and that's really important.  They promised donor

8    intent would be fulfilled.  It is not being fulfilled.  That's

9    fraud.  There's nothing religious about this.  If I --

10        Judge, I do a lot of fundraising.  If I raise money for

11   a building, which I just did, and I take the money instead for

12   a religious organization -- I did it for a religious group,

13   Jewish senior housing -- and we take the money instead and we

14   put the money for salaries, because that's what we decided to

15   do, that's fraud.

16        I'm not asking you to decide anything religious about

17   abortion, about whether -- same sex marriage, about whether

18   priests can marry, about -- in my religion whether something is

19   kosher or not.  We're not going that far.  We're simply saying

20   to the Conference, you represented the money is going here,

21   didn't go there.  You've had -- year after year, you're making

22   the same representation.  You're promising you're going to

23   follow up and make sure the money was spent as promised.  Did

24   you do what you promised?  And it's fraud if not.  There's no

25   religious encroachment whatsoever.

```
 1              THE COURT:  All right.  Mr. Flood.

 2              MR. FLOOD:  Thank you, Your Honor.

 3         Picking up the last point and also something Your Honor

 4    said about paragraph 32.  I don't think we actually have here

 5    fairly read a specific allegation that these funds have been

 6    diverted to noncharitable uses.  What we have is an allegation

 7    that there are some newspaper reports that say that the Peter's

 8    Pence funds were invested and invested in some, you know,

 9    different modalities that some persons might find unusual or

10    worse.  But I think it's very important that the record not be

11    without more from the plaintiff that they are actually

12    asserting through specific allegations that these have, in

13    fact, been diverted to noncharitable uses.

14              THE COURT:  Let me -- let me explore that a little

15    bit, because I'm trying to understand what you mean.  At the

16    pleading stage, people plead upon information and belief all

17    the time, and their source could be a newspaper article.  I

18    mean, I don't take you to suggest that plaintiffs should have

19    already done all of the discovery that's necessary to figure

20    out where this money is going.

21              MR. FLOOD:  I -- I totally agree, Your Honor, but

22    I -- if I'm reading the complaint correctly and fairly -- and

23    I've also looked at the newspaper reports -- I don't view the

24    newspaper reports as saying this money has been diverted in the

25    way that I think a reasonable person would agree that, you
```

1    know, using the money to go to Las Vegas and gamble or using

2    the money to buy, you know, some -- a minister's brother-in-law

3    a condo or something is diversion.

4         The reports are about investments.  The investments have

5    caused some people to question the character or quality of

6    them.  That's not the same thing.  I think it's important as

7    saying the money isn't stolen.

8         THE COURT:  But why is that not a jury argument,

9    Mr. Flood?  Why isn't this a jury argument?  You're just saying

10   there's no fraud here, and that's not really the province of

11   these early-pleadings-stage kinds of motions.  You're saying

12   they're wrong; you know, to the extent that the plaintiff is

13   alleging that we are -- we've acted inappropriately or

14   improperly or we've not done what we said we were going to do,

15   he's wrong.  And that's -- that's -- that is what the jury is

16   supposed to decide at the end of day or what you would be

17   entitled to summary judgment regarding after all the facts come

18   out and the Court assesses it.

19        MR. FLOOD:  Your Honor, I don't disagree as to the

20   great run of cases, but Article III jurisprudence here cautions

21   courts at the threshold to look hard so that we don't wind up

22   in an entanglement situation.  And our position is that if, as

23   I believe counsel is asking, the Court is going to have to

24   assert itself into questions of how much is too much, where is

25   the money going; if this is an investment, is it an improper

1    investment.  That is the kind of thing forbidden by

2    Article III.  And it's forbidden both to -- to a Court, we

3    submit, but also to a jury.

4        I mean, that's why these motions get made at the

5    threshold.  Because if a juror -- 12, you know, of our fellow

6    citizens are going to sit in Your Honor's court and decide the

7    question of, well, you know, I didn't like the Elton John movie

8    or, you know, nobody said anything about, you know, high-end

9    London condos or whatever the newspaper accounts say, that

10   itself on the assumption that these are actually investments,

11   for which there's no contrary allegation, is itself

12   exceptionally intrusive.  And it would open up --

13       THE COURT:  And absolutely the defendant would have

14   the opportunity to make that argument at summary judgment

15   before the jurors would be engaged, but on the basis of the

16   allegations, I'm just not so sure, especially when we have

17   cases like *Ambellu*, RICO fraud claims, not barred, you know, on

18   this basis.

19       So it's clear, as you conceded, that churches can be

20   subject to fraud claims, and any fraud claim is going to

21   require the Court and ultimately a jury to evaluate the truth

22   of the matter being asserted.  And that -- you know, the

23   question, I guess, is whether or not that amounts to the kinds

24   of entanglements that you are asserting.

25       And I'll have to look at the cases.  I think I

25

1    understand that issue.  Unless you want to say something more

2    about jurisdiction -- you said something about paragraph 32

3    that I mentioned?

4         MR. FLOOD:  Yes, Your Honor.  It's -- I -- I think I

5    folded my point into my response to Mr. Stanley, which is that

6    the great disparity between marketing and use at this stage,

7    there is no allegation of unlawful use.  There is an allegation

8    that newspapers reported certain investments.  And that's the

9    only point I wanted to make.

10        THE COURT:  Right.  And let me just underscore that

11   the Court does not understand Mr. Stanley to be making an

12   argument about unlawful use, and that that may well be where,

13   you know, we're sort of blurring the lines between entanglement

14   or not concerning the -- the money at issue.  So I think I

15   understand your argument.

16        Did you want to move to your sort of -- what you

17   consider to be the key here, the first set of principles, the

18   arguments about -- about the failure to state a claim, I guess

19   and Rule 9(b)?

20        MR. FLOOD:  I will, Your Honor.  If I might be

21   allowed 30 seconds on the prior points.

22        THE COURT:  Sure.

23        MR. FLOOD:  Just by way of

24   supplementation/clarification, it's not our position that

25   churches are generally subject to all kinds of fraud claims,

1    but, rather, that an appropriately pled case, in which there is

2    no intrusion and in which the case can either be resolved

3    entirely by neutral civil law principles, there is an opening

4    there.  We don't think this case meets that, but it's -- but I

5    wanted to make sure I wasn't on the record as having conceded

6    that there is a general openness to this under Article III.

7                THE COURT:  Understood.

8                MR. FLOOD:  Thank you, Your Honor.

9            On our point about -- about the rules.  Your Honor, you

10   broke this into two parts.  So I will take Part 1 first from

11   the question whether the -- whether the kinds of arguments

12   we -- we made are cognizable by a district court for there

13   having been made under Rule 12(c).  The short answer, it will

14   not surprise the Court, is that we believe that they can be.

15   And we think that there's several reasons for this.  Perhaps

16   the most noteworthy -- or the first in order, I think, derives

17   from the language of the federal rules themselves.

18           We have brought a 12(b)(6)-type -- 12(b)(6)-type motion

19   pursuant to 12(c), and we've done that because we believe --

20   procedural point, Your Honor.  The case was brought in

21   Rhode Island federal court.  Predecessor counsel for the

22   Conference moves on, as I remember it, only venue grounds.

23   Maybe it was personal jurisdiction as well.  In any event, they

24   succeeded.  Their argument was so persuasive that even

25   Mr. O'Connell's counsel agreed and sought a transfer.

1          All right.  The -- they did not file on every

2     conceivable available ground.  I have not asked for

3     predecessor's counsel opinion on why.  I think it's a fair

4     presumption, because it is well settled in the rules

5     themselves, that a person is not -- a defendant is not

6     obligated to bring a 12(b)(6)-type motion at the beginning

7     because the opportunity to do that is preserved by Rules 12(g)

8     and 12(h)(2)(B).  And so we -- we are proceeding on that basis.

9     We think that the 12 -- that the Rule 12(b)(6) grounds are

10    perfectly appropriate at this stage, even under Rule 12(c).

11          THE COURT:  All right.  Let me just -- I -- I did

12    write about this in *Murphy*, and Mr. Stanley points that out in

13    his opposition.  And I -- I'm still very, very perplexed by the

14    confusion that appears to have arisen about these different

15    rules.

16          You suggest that Rule 12(b)(6) and Rule 12(c) motions

17    are of the same type.  But, in fact, as I said in -- in *Murphy*,

18    they're actually two different types of motions.  They both can

19    relate to whether or not the plaintiff states a claim upon

20    which relief can be granted.  That argument can be the same,

21    but the motions are different.  And they have different bases,

22    and they have different results.

23          So let me ask you this:  If you're bringing a Rule 12(c)

24    motion, which you are saying you're trying to do here, are you

25    seeking judgment on the pleadings as a result of that motion or

1    what -- what is it that you're asking the Court to do if I

2    grant your 12(c) motion?

3              MR. FLOOD:  Your Honor, we're asking you to -- to

4    grant the motion for all the reasons set forth in *Iqbal* and

5    *Twombly* and by the D.C. Circuit in the *Rollins* case.

6              THE COURT:  But that's a -- that's dismissal.  So

7    there are two different things that a court can do in a

8    situation like this, and they, in fact, track the differences

9    between 12(b) and 12(c).

10             I understood 12(c) to be a motion for judgment on the

11   pleadings.  A motion for judgment says I win judgment

12   preclusively.  Not dismiss the plaintiff's case or dismiss his

13   claims.  That's Rule 12(b).

14             So I'm asking you are you seeking judgment as a result

15   of the Court's -- let's say I agree with you concerning their

16   failure to state a claim.  Are you asking me for judgment?

17             MR. FLOOD:  Your Honor, we're asking for the full

18   panoply of relief that may be available under 12(c).  If that's

19   just judgment -- and I think there would be problems at this

20   stage if judgment were granted -- that's agreeable to us, but I

21   also think that the *Rollins* case makes very clear that the

22   12(b)(6)-type grounds are available for vindication on a 12(c)

23   motion.

24             THE COURT:  All right.  Let me explain to you.  I

25   haven't read the *Rollins* case, but I'll explain my

1    understanding, and then we can move to the -- to the merits of

2    this; all right?

3                MR. FLOOD:  Sure.

4                THE COURT:  12(c) is a motion for judgment on the

5    pleadings.  And I appreciate that Rule 12(h)(2) says that you

6    can -- you can make the argument that a plaintiff has failed to

7    state a claim upon which relief can be granted by a motion

8    under Rule 12(c).

9          But when you are doing that, I say in *Murphy* -- and --

10   and this is my view of the rules -- you're actually making a

11   different kind of argument about their failure to state a claim

12   than you are in the Rule 12(b) scenario in the following sense.

13   As a Rule 12(b) motion, you are saying, Your Honor, I would

14   like to test the allegations of the complaint.  I want you to

15   assume for the purpose of this motion that the facts that are

16   being alleged in the complaint are true.  And I say looking

17   only at those allegedly true facts, you can say this person has

18   failed to state a claim and you dismiss their complaint as a

19   result.

20         Alternatively, under Rule 12(c), when you're asking for

21   a judgment on the pleadings, you have answered, and when the

22   Court looks at both the complaint and the answer, it

23   appreciates that there's no material dispute of fact regarding

24   the allegations of the complaint.  So a Rule 12(c) motion in

25   that context says, Your Honor, we agree as a matter of fact

1    with the allegations in the complaint.  There's no need to go

2    to trial.  There's no need to go to discovery.  Everybody's in

3    agreement about the basic facts here.  And appreciating that,

4    understanding that, we win, says the defendant.

5        Now, plaintiff can also bring a motion for judgment on

6    the pleadings under Rule 12(c) to say we win.  The defendant

7    has agreed to all of the material facts, and given those facts,

8    when you look at the legal standards, we win.

9        That is why, even though they both are failure to state

10   a claim arguments, one is assuming the facts are true,

11   testing the allegations of the complaint, they fail to state a

12   claim.  The other is there is no dispute of fact.  Everything

13   they say is true, and yet they still don't win and, therefore,

14   judgment comes to us.  It's almost like we're at the end of the

15   case, as though we've done everything we need to do, we get

16   judgment.

17       The second scenario is also a failure to state a claim

18   because relief cannot be granted to the plaintiff given those

19   true facts; all right?

20       I said this in *Murphy*.  That's my view.  And as a

21   result, I look at your -- your answer, and I don't see the

22   kinds of concessions that are necessary with respect to the

23   material facts to tee up procedurally a Rule 12(c)-type motion.

24   And I think you, therefore, have waived your ability to make

25   the kind of Rule 12(b)-type argument, because you had to make

1   that before you answered.

2          The outstanding question -- and I'm going to ask this of

3   both of you -- is whether you can make a Rule 12(b) kind of

4   argument post-answer, and I'm not sure.

5          Mr. Flood, why don't you tell me a little bit about

6   that.

7          MR. FLOOD:  Well, Your Honor, I begin by saying I

8   very much hope you can because the kind -- I hope we can,

9   rather, because the kind of argument that we've made is a

10  12(b)(6)-type argument.  We don't think it's waived, and not

11  only -- and we don't think that for a couple of reasons.

12         First, I think that were it to be determined that we've

13  waived it, I think there would be an element of unfairness in

14  that.  You know, the initial motions made in Rhode Island

15  federal court were made against the backdrop of a set of

16  federal rules that preserves the ability to make those kinds of

17  arguments later, which is to say that no party is obligated to

18  make every available 12(b)(6) -- 12(b), rather, grounds for

19  dismissal in a first motion or they are forever waived.  That's

20  not -- that's not the -- the text and purpose of the rules.

21         And so the idea we -- that we may have waived by reason

22  of the procedural sequence in this case, especially when we're

23  here in front of Your Honor because plaintiff successfully

24  moved the case, having essentially agreed with -- with us

25  about -- about the jurisdictional flaw -- venue flaw.  So I

1    just think there's an element on fairness, and I think if you

2    look at Rule 1 --

3            THE COURT:  I'm sorry.  Can I just ask you because --

4    I must not understand the procedural history enough to be able

5    to evaluate what you're saying.  Was there something about the

6    circumstances in Rhode Island that made it necessary for the

7    defendant to answer?

8            MR. FLOOD:  I don't think so, Your Honor.  I mean, I

9    think the circumstances were such that there clearly was not

10   proper venue, and I think that the plaintiffs, once they saw

11   the motion on that basis, understood that.

12           THE COURT:  Right.  So the unfairness would only

13   arise if there was something that made the defendant answer

14   such that they then lost their ability to make these kinds of

15   arguments.  The defendant presumably could have brought their

16   motion for transfer, had the case transferred, the answer is

17   still outstanding, and brought their 12(b)(6) motion to

18   dismiss; right?

19           MR. FLOOD:  Well, Your Honor, I'm not sure that

20   the -- that the cases permit the sequential motions of that

21   sort; right?  And for the extended matters to Your Honor, the

22   possibility of doing that was proposed to Mr. Stanley by my

23   partner, who said he was not agreeable to that.  And given the

24   very short timetable because -- as Rule 12 provides, once that

25   first decision is entered on the venue question, there's a very

1    brief time to make the -- file an answer.

2          And so we did it on that abbreviated time and then very

3    promptly by -- consistently, as we believe, with the text of

4    the rules -- brought the 12(b)(6)-type motion under 12(c).  And

5    I just think the idea that it's forever waived if you don't

6    bring it in a very first motion --

7          THE COURT:  Well, Mr. Flood, I mean, I get your point

8    in general.  I don't understand it to be unfair because the

9    rules are what they are, but I get your point that, you know,

10   it seems like, wow, this is forever waived.  But the question

11   is:  What is the "it"?

12         The only argument that is waived in this sense is the

13   mere testing of the allegations of the complaint, and there are

14   many, many defendants who don't even bother with the motion to

15   dismiss, especially in a fraud-type case where they understand

16   that there are genuine issues of material fact as to what is

17   going on, and they answer.  And then they answer, and they move

18   for a very rapid discovery schedule or, you know, early motion

19   for summary judgment because they say we win on -- you know, we

20   know that this isn't true and so they just move the case that

21   way.

22         So it's not as though you don't get to litigate this

23   matter, like you're waiving something substantial.  The only

24   thing you're waiving is the ability to make an argument that,

25   based purely and solely on the allegations of the complaint

1    taken as true, the plaintiffs cannot proceed, and it sounds to

2    me like you have many other arguments for why you think they

3    can't.

4            MR. FLOOD:  Your Honor, I'm -- I'm compelled to

5    disagree with the Court on the question of whether we're

6    waiving something, whether we just haven't waived something

7    substantial.  It seems to me that the -- that the right

8    afforded by the rules and preserved by Rules 12(g) and 12(h) to

9    bring *Iqbal*- and *Twombly*-type arguments under 12(c) is

10   something very substantial.  It would be substantial for any

11   defendant, but it's particularly substantial for a church

12   defendant that enjoys a degree of protection or immunity or

13   ecclesiastical abstention.

14           At the end of the day, Your Honor, a similar question

15   was presented -- and I -- refer the Court to a decision by

16   Judge Cooper of this Court on a question like this, and the

17   answer he provided, drawing, I think, in part on Your Honor's

18   own jurisprudence in this area was -- was this:  Can a

19   12(b)(6)-type argument -- can -- can this motion to dismiss

20   type Rule 12 arguments be brought under Rule 12(c).  And his

21   answer was sometimes they can and sometimes they can't.  And

22   when he was -- and this case is called Jimenez against

23   McAleenan, who was the Secretary of HHS, I think, a couple

24   years ago.

25           And -- and in deciding that a 12(b)(6)-type motion could

1    be brought, Judge Cooper quoted, actually, from the *Rollins*

2    case that I mentioned.  And the *Rollins* case says, very

3    expressly, other circuits have held that *Iqbal* and *Twombly*

4    apply to 12(c) motions -- and it gives some citations -- and we

5    do likewise.

6         Now, I -- I had not read Your Honor's jurisprudence in

7    this area in the *Murphy* case and *Alliance of Artists* and some

8    of your other opinions in this to extend across any and every

9    conceivable Rule 12(c) case.  I did not find -- I confess,

10   Your Honor, I did not read the briefs in all those cases, but I

11   did not find in any of the Court's opinions a situation in

12   which the defendant posing the 12(b)(6)-type argument in a

13   12(c) posture had made the rule-based arguments under Rules

14   12(g) and 12(h)(B)(2) [sic].  I just didn't see that there.

15   And so perhaps Your Honor's jurisprudence does extend across

16   every possibility, but it seemed to me --

17        THE COURT:  I mean, I just don't understand how it

18   can't.  Because I don't know what it means to have Rule 12(c)

19   and Rule 12(b)(6) mean the same thing.  I don't understand what

20   it means to say we'd like to bring a Rule 12(b)(6) argument as

21   a Rule 12(c) motion when those are different things; when one

22   is asking for judgment versus asking for dismissal when

23   Rule 12(b) says a motion asserting any of these defenses must

24   be made before pleading if a responsive pleading is required.

25        I don't know what it means to suggest that we don't have

1     to worry about that part and we can just say the same thing in

2     the context of a Rule 12(c) motion.  And so my attempt in

3     *Murphy* and looking at Wright and Miller and working through it

4     is to explain why it is that there's language in (h)(2), for

5     example, that makes it seem as though you might be able to do

6     that, but, in fact, it's really not opening the door to

7     repeating a Rule 12(b)(6) kind of analysis after the answer.

8             So let me have Mr. Stanley respond, he wants to.  I

9     think it's unlikely that I'm going to change my view of what's

10    happening with the rules.  So the question, I think, that is

11    most productive at this point, Mr. Flood, is whether Rule 9,

12    your arguments about particularity, are actually also

13    encompassed by this waiver of process or prospect or whether

14    Rule 9 is something else entirely that really doesn't have to

15    do with the timing of an answer.

16             MR. FLOOD:  Your Honor, I think that --

17             MR. STANLEY:  May I respond on Rule --

18             MR. FLOOD:  Oh, I'm sorry.

19             THE COURT:  Yes.  Go ahead, Mr. Stanley.  Just -- you

20    can respond on this point that we've been making and then go to

21    Rule 9.

22             MR. STANLEY:  Yeah, I'm not going to belabor it.  I

23    do want to correct the record, though.  Mr. Flood, I guess,

24    wasn't involved in this at the time, but if you look at

25    Document 14, we agreed to a consent motion for extension of

1    time to answer the complaint.  There wasn't a rush to answer.

2    We gave them plenty of time to answer it.  That was their

3    choice.

4         The truth is that the table's already set for counsel,

5    for Mr. Flood and Mr. Baine, by the Rhode Island counsel.

6    There were two different sets of lawyers, and they could have,

7    as the judge said, simply done a motion to transfer.  And they

8    didn't go that way.  They went with a 12 -- Rule 12(b) motion,

9    which required the Court's consideration, would have required

10   us to -- to resolve it.  So the fairness is we've been through

11   that process once.  It wasn't extraordinarily heavy on us, but

12   we did do it.  And --

13        THE COURT:  Mr. Stanley, let me just be clear.  You

14   said -- so you say in responding to your complaint, they filed

15   the Rule 12 motion and it included a transfer component; is

16   that what it was?

17        MR. STANLEY:  That's what it was, yes, ma'am.  Let me

18   find it exactly, and I'll tell you the -- it was -- I'm

19   going -- there it is.  Motion to dismiss.  It's Document No. 7

20   in this case and a brief, and it was under Rule 12 to dismiss

21   it, Rule 12(b).

22        And so the Court eventually found that as moot, but that

23   was their -- their -- their response.  I actually expected

24   them -- when they got the case to D.C., I expected them to say,

25   hey, we didn't really take a stab at some of the 12(b)(6)

1    stuff, are you okay with us taking another bite at the apple

2    before we answer.

3              THE COURT:  Yes.  Can I pause?

4        Mr. Flood, why didn't you do that; right?  Isn't that

5    your unfairness issue?  In other words, you appreciated that

6    there was some limitation with respect to 12(b)(6) because when

7    you came to D.C., you sought to move under 12(c).

8              MR. FLOOD:  That's correct, Your Honor.

9              THE COURT:  So why didn't you try to reopen the 12(b)

10   motion that you had previously -- that had you previously

11   issued or -- you know, the motion that you had before in

12   Rhode Island?

13             MR. FLOOD:  The short answer, Your Honor, is that I

14   was not quarterbacking the case at that point.  My partner

15   Mr. Baine is -- is muted on the line, and my understanding is

16   he did reach out to counsel and suggest to him that we would

17   like to file a motion of that sort, and -- and now I will read

18   you counsel's response to that, Your Honor.

19        Actually, I'll begin with Mr. Baine.  This is May 26th

20   of last year.

21             THE COURT:  I'm sorry.  When did the answer come in?

22   Was it prior to the filing of the original motion to

23   transfer/dismiss?

24             MR. FLOOD:  No, Your Honor.  On that subject, I don't

25   believe my client through predecessor counsel actually moved

1    for a transfer.  I think that the motion was made by

2    Mr. Stanley on behalf of the plaintiff, and I'm advised that

3    we, in fact, did not move for a transfer.

4            THE COURT:  Okay.

5            MR. FLOOD:  The transfer motion was made solely by

6    the plaintiff --

7            THE COURT:  Okay.

8            MR. FLOOD:  -- and was granted by the Court.  So I'm

9    happy to have the opportunity to clear that up.

10           Given the timing until the transfer was made -- I have a

11   chronology here somewhere, Your Honor -- around the third week,

12   I believe, of May in 2020.  The transfer order was issued on

13   May 21 by a Rhode Island federal court denying the motion as

14   moot and granting plaintiff's motion, which it calls a

15   cross-motion in its minute order, to transfer.  And so that's

16   the 21st.

17           I think under the rules there's only -- there are only

18   three weeks then to answer that absent an extension of time,

19   and, of course, if it were possible to actually file another

20   12(b) motion before the answer, it would make sense, of course,

21   to extend that time to permit a full motion.

22           I now come to the record in -- in the matter -- or to --

23   to the back and forth.  On May 26th, my -- my partner

24   Mr. Baine, you know, asked for an extension of time.  He

25   believed -- he -- he worded the request as a 30-day extension

 1    for time to respond.  He did not use the word "answer" or the

 2    word "move."  He used the more general term.

 3         In response, same day, Mr. Stanley wrote back and said

 4    nice to meet you, et cetera, and said we agree to --

 5         MR. STANLEY:  That's actually not true.  Can I -- I

 6    have the email up.  He did talk about a motion in his initial

 7    letter.

 8         MR. FLOOD:  Well --

 9         MR. STANLEY:  Can we -- can we at least make the

10    record correct?  He says:  I understand our response by way of

11    answer or motion is now due on June 4th.  So he was

12    contemplating a motion when he did that.

13         MR. FLOOD:  Answer -- answer or motion is, of course,

14    generic for all possibilities.

15         MR. STANLEY:  Right.

16         MR. FLOOD:  And I'll gladly provide this exchange to

17    the Court.

18         THE COURT:  All right.

19         MR. FLOOD:  But if I --

20         THE COURT:  Keep going, Mr. Flood.

21         MR. FLOOD:  If I may finish just one sentence,

22    Your Honor.  The response says:  We agree to a July 6th answer

23    date, but we do not agree that a section -- second motion to

24    dismiss would be proper.  And in those circumstances,

25    Your Honor would have -- motion being -- with an opposition to

1    any effort to bring a motion having been clearly stated.  What

2    we adopted is rather than make an emergen- -- rush motion and

3    burden the Court with that, to answer and then promptly move

4    under 12(c).

5           THE COURT:  Not getting into your litigation

6    strategy, you could have also disputed that; right?  I mean,

7    the Court does have process for these for adjudicating early

8    stage disputes between the parties regarding what is the

9    appropriate course of action.  And it may well be that the

10   initial Court's determination that your -- that your motion to

11   dismiss was moot was actually not correct, such that you were

12   entitled to renew your motion to dismiss and should have never

13   been adjudicated on the merits in the previous forum.

14         Mr. Stanley.

15         MR. STANLEY:  Yes.  That's exactly right.  And that

16   was our position.  And he responded by saying:  Thank you for

17   agreeing to the 30-day extension.  And that's not a rush.

18   That's several weeks plus 30 days.  I understand your position.

19   It is not our intention to file another preanswer motion.  The

20   motion for judgment on the pleadings or motion for summary

21   judgment would not be precluded upon providing an answer.  That

22   was their choice to go this way.  And then he -- I complimented

23   him on working with Thurgood Marshall.  And he compli- -- he

24   talked about that, and we talked about that for a moment.  But

25   that was it.

1          And then he agreed to prepare a stipulation.  We agreed

2     to sign it.  I liked our position.  So I definitely was taking

3     that position.  I did not -- I wasn't sure I was going to win

4     if it actually went that way, but they chose to go a different

5     route, and that was evident in their response.

6          THE COURT:  Well, that -- that was actually helpful

7     just to understand fully why Mr. Flood is suggesting that there

8     might be a fairness issue.

9          To the extent that they did previously bring a motion to

10    dismiss under 12(b)(6) timely and prior to the answer and it

11    was never ruled upon, I do now understand at least your

12    suggestion, Mr. Flood, that it would be fair to allow you to

13    make those same arguments in this context.

14         Now, on the other hand, as Mr. Stanley is suggesting and

15    given the Court's own evaluation of the rules, that may well

16    have been, you know, your choice; that -- that your -- and I

17    see that Mr. Baine has popped up.  Maybe he'd like to say

18    something, but let me just finish putting on the table my

19    thought that perhaps, you know, the -- the parties proceed at

20    their own peril to the extent that they are making an

21    evaluation of what they believe the rules require or allow, and

22    if the thought was, well, we'll do this as a 12(c) motion

23    because it's our understanding that the rules allow it, if the

24    Court disagrees, then you would necessarily be precluded.

25         Mr. Baine.

1          MR. BAINE:  Your Honor, thank you.  I'm not dressed

2    for court because I took at face value the Court's request that

3    only people who are speaking appear.

4          THE COURT:  That's quite all right.

5          MR. BAINE:  But since people have tried to

6    characterize why I made decisions, I'd like the opportunity to

7    explain it, if I may.

8          THE COURT:  You may.

9          MR. BAINE:  And it's simply this:  That I thought

10   that Mr. Stanley was correct when he said that the rules don't

11   allow a second motion pursuant to Rule 12(b)(6) to dismiss the

12   complaint because the rules say that failure to state a claim

13   can't be raised on a second motion solely under 12(b)(6).  It

14   says if you want to do that, if you've made any motion under

15   Rule 12(b) that's denied, you have to answer.

16         THE COURT:  But the motion wasn't denied, Mr. Baine.

17   The mistake may have been that what happened was that the

18   original motion really doesn't count as a motion because the

19   Court just --

20         MR. BAINE:  That's what I wanted to get to.  That's

21   what I wanted to get to.  The rules say you can't make a second

22   12(b) motion, but -- so you have to -- so normally you have to

23   answer and then make the failure-to-state-a-claim argument

24   under 12(c), which is expressly allowed by the rules.

25         Now, my point about the unfairness here is simply

1    this -- and, quite frankly, if the Court thinks that the motion

2    should be brought under 12(b)(6) and not under 12(c), we would

3    respectfully ask to amend the motion to make it under 12(b)(6).

4    But the reason why we thought we had to make it under 12(c) was

5    because ordinarily when you -- when you made one 12(b)(6), the

6    rules say, well, you can't make a second one.

7         Normally what would have happened after the 12(b)(1)

8    motion in Rhode Island, which the defendant concedes was

9    proper, was correct, the Court would have dismissed the case.

10   The complaint would have been refiled in D.C.  We would have

11   filed a motion under Rule 12(b)(6) to dismiss the new

12   complaint.  But the defendants persuaded the judge to transfer

13   the case rather than dismiss it.  And so we thought well, we

14   can't make a second motion and label it 12(b).  We have to

15   label it 12(c).

16             THE COURT:  I understand your point.

17             (Indiscernible simultaneous cross-talk.)

18             MR. BAINE:  -- wrong about that, we hereby move to

19   amend it to make it under 12(b).

20             THE COURT:  All right.

21             MR. BAINE:  But it shouldn't be a game of gotcha.  It

22   shouldn't be a game.  It should be -- we should look at the

23   rules and try to -- try to follow a procedure that's -- that's

24   just and fair to us.  If I made the mistake of putting the

25   wrong letter after 12 in the motion, my mistake.

```
1              THE COURT:  Well, I -- I totally understand your

2       point, and we'll sort it all out.

3              I just want, you know, everyone who comes before me to

4       at least appreciate that there is actually a distinction

5       between 12(b) and 12(c) with respect to what the Court is

6       supposed to be doing, what the parties are supposed to be

7       arguing.  And I know that many, many courts have said, oh,

8       these are basically the same thing.  And in my view, they're

9       not.

10             MR. BAINE:  And all I --

11             THE COURT:  It matters.

12             MR. BAINE:  All I can say, Your Honor, is you're

13      correct.  That at this stage, because we've answered it, you

14      may also look at the answer as well as the complaint.  Then you

15      have to ask the same question:  Now that I see the answer and

16      now I see the complaint, has the plaintiff alleged facts which

17      would entitle the plaintiff to relief?  And we don't think it

18      has.  We don't think they have.

19             THE COURT:  But -- but in that view of the world,

20      Mr. Baine, the answer does no work.  In other words, just

21      looking at the answer doesn't matter if I'm asking the same

22      questions.

23             My view is that 12(c) actually requires an answer for a

24      reason and that you're doing something when you issue judgment

25      on the pleadings on the basis of both the complaint and the
```

1    answer.  Not just I look at the answer and I put it down and I

2    go back to the 12(b) world.

3         But all that said, I mean, we've sort of, you know, been

4    around this corner.  All I'm suggesting is that it is possible

5    that in -- and I do understand with all of the machinations

6    moving around, I consistently and typically transfer cases with

7    pending motions, with the motion still pending, because I never

8    want to do anything to the parties' rights concerning pleadings

9    that they have made or motions they have made if it's not my

10   case.  So I figure the judge who gets it can decide what to do

11   with this motion.

12        It appears in this situation that the motion was somehow

13   mooted before the case was transferred, which led to confusion

14   about whether it had been handled and, therefore, if you make

15   it again in this context, is it a second motion that violates

16   the rules or whatever?  And it seems to me that in that

17   circumstance, the -- the defendant has a good argument that it

18   isn't a second motion; that it doesn't transgress the rules in

19   that way because we were never -- you know, we never got any

20   answer or relief with respect to our first motion under these

21   circumstances, especially since the plaintiff was the one who

22   requested the transfer.

23        So all that said, you know, I'll have to go back and see

24   whether -- you know, what I think about that, and maybe they'll

25   be -- you know, give you an opportunity to evaluate in writing

1    as to whether or not the Court should construe the motion

2    that exists as one under 12(b)(6).  But I think if it sticks

3    as a 12(c) based on my view, you lose because 12(c) is not

4    doing what it is that you're requesting me to do in this

5    context.

6          Mr. Stanley.

7          MR. STANLEY:  I just want to say two things.  One,

8    that was the route they chose, and the rules are very clear; a

9    motion asserting any of the 12(b) defenses must be made before

10   a pleading -- before pleading if a responsive pleading is

11   allowed.  They went and chose to do the responsive pleading.

12   So it's now too late.  That's the path they chose.

13         In terms of fairness, we're now a year down after we

14   filed the suit, and we're -- we're out of the starting gate, in

15   our view, and ready to get discovery.

16         THE COURT:  But there's no prejudice to you,

17   Mr. Stanley, if they were allowed to make these motions.  I

18   mean, I understand the rules preclude it, but if they -- if the

19   Court were to somehow construe this as a 12(b)(6) that was

20   properly filed in light of the unique circumstances of this

21   case, you're not necessarily prejudiced by that, are you?

22         MR. STANLEY:  I think so.  I -- we could have at

23   least argued -- we could have argued beforehand that it wasn't

24   inappropriate, but the real point is I think it sets a bad

25   precedent.  The rules clearly state that once you file an

48

1    answer, it's too late to do it.  And I think that sets a bad

2    precedent.  I think you talked in the *Tapp* case that you can't

3    convert a 12(c) into 12(b) motion.  And I just don't think it's

4    proper.

5            THE COURT:  All right.  I understand this.  I think

6    it was very helpful.  And, Mr. Baine, thank you for coming on

7    and explaining your perspective, and the procedural history was

8    helpful.

9            Let's talk about -- let's assume for a second that we

10   are moving forward with the arguments that are being made.

11   What -- what about this particularity, Mr. Flood?  And let

12   me -- let me just home in, in the interest of time, on my

13   concern.  It's something that I articulated at the beginning,

14   which is:  As I read your motion, it seems to be making

15   particularity arguments only with respect to the plaintiff's

16   individual claim, but the complaint is a class -- a putative

17   class action complaint.

18           So even if I agree with you, that he hasn't said who,

19   what, where, when with respect to the, you know, summer of 2018

20   in his own circumstance, are you making the argument that the

21   complaint in general fails on Rule 9(b) grounds?

22           MR. FLOOD:  Your Honor, I think the only succinct way

23   I can say it is we're making the argument that this complaint

24   alleging these facts fails on Rule 9(b) grounds.  We're not in

25   a position to move on any complaint other than the one brought,

A75

1    and the complaint brought alleges facts relating to

2    Mr. O'Connell, and, in our view, those do not survive the 9(b)

3    rigors.

4              THE COURT:  Let me put it this way.  Let's say I

5    cross out the paragraphs that relate to Mr. O'Connell -- and

6    there's only a couple -- and I left in everything elsewhere

7    where he says here are all the statements that the Conference

8    has made, he quotes at length, he says where they come from,

9    you know, this is in the bulletin announcement, this is

10   provided to all the churches to be read from the pulpit, this

11   is on the website, all that remains, and the only thing that I

12   cross out, pursuant to your argument, is the section starting

13   on page 14, paragraphs 34 through 36; all right?

14        Are you suggesting that what remains is not particular

15   enough under Rule 9(b)?

16             MR. FLOOD:  Your Honor, there's a couple -- I need to

17   take this from a couple of different angles.  First of all,

18   without an individual plaintiff -- you know, some plaintiffs --

19   some groups -- some- -- someone other than Mr. O'Connell

20   whom -- who does not actually allege that he heard this,

21   there's no hearer, there's no receiver.  And so all the

22   elements -- for example, the reliance element is missing.  If

23   that's all -- if this is all we have are these three

24   paragraphs, some of the other elements that are, you know --

25   that are fundamental components of -- of a fraud claim are just

1    not there.

2         THE COURT:  And so you think it's not enough that it

3    alleges that these statements were made and that millions of

4    dollars come in from parishioners around the world, or at least

5    around the country, as a result?

6         MR. FLOOD:  Your Honor, I think it is nowhere near

7    enough, and there are any number of reasons why.  First of all,

8    this plaintiff doesn't allege that he read or saw or heard

9    those statements before he acted.

10         THE COURT:  No, I'm not talking about him.  I'm

11    talking about the class allegation claims.  An individual

12    plaintiff can say this sort of thing happened to me but

13    describe the scheme more broadly.  And I'm trying to understand

14    whether you are suggesting that the -- that the individual

15    plaintiff, all of the particulars of his own potential

16    individual claims have to be in there.  And if they're not, why

17    doesn't that just eliminate the ability for the individual

18    claim to advance but not the class claim?

19         MR. FLOOD:  Your Honor, the -- the plaintiff and

20    plaintiff's counsel are the masters of this complaint.  One

21    would think that if one were intent on -- on seeking the kind

22    of remedy sought and on, you know, surviving the preliminary

23    motions and pursuing this through the normal process, there

24    would be a plaintiff who could actually say here's what I

25    heard and here's what I replied on and here's how I was

1    wronged.

2         You're putting me, candidly, Judge, in an impossible

3    position to say what somebody else might say if they had heard

4    it.  Let me point out that the statements referred to on the

5    website are -- are statements that -- they're on the website,

6    just as the Vatican statements, which complement them, are on

7    a website.  And -- but I don't know how the case will go

8    forward as a class other than on an analogy to what we know

9    now.  I would be speculating if I did otherwise.  And on

10   analogy --

11        THE COURT:  So shouldn't we -- shouldn't we do the

12   class part first then?  I mean, this was my -- my point in

13   raising this is shouldn't we sort out the class allegations

14   under these circumstances?  Where you're saying these are

15   website statements, we don't know who saw, we don't know who

16   heard, we don't understand the reliance -- not from a Rule 9(b)

17   standpoint necessarily, because I think you understand what it

18   is he's talking about, but just in terms of can this go forward

19   as a class action, shouldn't we sort that out?  And then in the

20   context of that, we will know whether Mr. O'Connell is typical,

21   whether he's an adequate representative based on what he says

22   happened to him?

23        MR. FLOOD:  Well, Your Honor, in -- in all candor,

24   this is a little bit outside my lane and my zone of preparation

25   today.

1          THE COURT:  Okay.

2          MR. FLOOD:  If -- if we could give you an informed

3     opinion on that, you know, by written submission, obviously

4     we'd be glad and -- and promptly prepared to do just that.

5          But it seems to me, Your Honor, that if -- if a

6     complaint is brought and it's brought as a putative class

7     action -- and there are roughly 50 million Catholics in the

8     United States and on any given Sunday, you know, I surmise

9     maybe half of them are in the pews.  And if the plaintiff comes

10    forward with -- if counsel comes forward with this sole

11    plaintiff and he turns out to be a person who didn't hear any

12    of this and, if in addition to that -- and here I'd like to

13    supplement something Your Honor said.  Excuse me.

14         I don't believe there is an allegation that my client,

15    the Conference, automatically provides or imposes or gives the

16    scripted material, from which he's asking you to draw this

17    inference, to the diocese.  That's an assumption that -- that I

18    have not been allowed to test yet.  And it is a multi-step

19    inference for which there is no predicate.

20         THE COURT:  But wait.  I'm sorry, Mr. Flood.  Again,

21    I'm just -- I'm getting confused because many of your

22    arguments, in my view, start getting into summary judgment

23    territory as opposed to the allegations in the complaint.

24         So I see on paragraph 24 the allegation that the

25    Conference also furnishes specific instructions for

1       Peter's Pence appeals to be read from the pulpit at church

2       services.  And then he quotes something that says, in parens,

3       "*Please read this text from the <u>pulpit, or</u> include it as part

4       of your weekly announcements.*"  So there is an allegation in

5       the complaint that the Conference is providing specific

6       instructions to the parishes to make these statements, and we

7       have to accept that as true at this stage; right?  That's what

8       *Iqbal* and *Twombly* tell us; right?

9               MR. FLOOD:  Your Honor, we have to -- you have to --

10      our submission is you have to take the complaint in its

11      totality.  And if something in the allegations, his intention

12      or -- contradicts something else or something on the website,

13      which plaintiff is relying on, you should look to that.

14              The Conference's website, you know, fairly read makes it

15      pretty clear, I think, that this is -- although this -- he has

16      read the text correctly, it is not, by any means, obligatory.

17      He has not alleged as a fact that the Conference has actually

18      provided to his diocese and from there to his parish and from

19      there to the pulpit in his case.  And there are a couple of

20      places on the site, which it's clear, and it says, you know, I

21      mean, how to give for Peter's Pence:  If your diocese --

22      archdiocese does not participate, if you want further

23      information for resources.  Now, I didn't want to introduce a

24      body of factual information in response to an opening -- or as

25      supplement to a motion of this sort.

1       But if he's going to say that the instructions were

2    provided, then he's got to take into account that the website

3    and nothing else that he's pointed to actually supports that.

4    It's a bare allegation in -- in intention and contradiction, I

5    submit, with the website itself.

6               THE COURT:  All right.  Mr. Stanley.

7               MR. FLOOD:  That's our claim.

8               THE COURT:  Mr. Stanley.

9               MR. STANLEY:  Thank you.

10       First of all, I want to remind everybody that the

11   Conference said in their -- in their motion -- I mean in their

12   reply -- for the purpose of this motion we are ". . . not

13   disputing any of Plaintiff's allegations, such as they are."

14   And if you look at the allegations themselves, it's different

15   than what Mr. Flood said.

16       If you look at paragraph 48 under fraud, it says that

17   they -- the Conference consistently, routinely, and uniformly

18   solicited donations for the collection.  By doing this, they

19   ". . . communicated to Plaintiff and to each Class member

20   that" -- they communicated to us -- that the money would be --

21   ". . . they donated to Peter's Pence would be used exclusively

22   for these purposes."  And if you go down -- it says material

23   representation.

24       Then we go to paragraph 50, and it says, ". . .

25   Plaintiff and Class members decided to donate to Peter's Pence

1    based in part on the representations communicated to them by"

2    the Conference.  It does say that the plaintiff did rely on it.

3        And then on the next paragraph, it says the same thing.

4    But for it, he wouldn't have given.  He had damages.  And so we

5    did say that O'Connell did, in fact, rely on the Conference's

6    representations to them as flooded down to the church.

7        THE COURT:  And, Mr. Flood, if that turns out to be

8    not true, which I assume will be the Conference's position,

9    isn't that the work of discovery and summary judgment and, if I

10   can't figure it out based on the evidence, eventually trial.

11   That's the essence of the -- the claim to be evaluated going

12   forward, isn't it, Mr. Flood?

13       MR. FLOOD:  Your Honor, I think that -- that the

14   Court ought to evaluate that claim in the context of the other

15   claims.  And the other claim -- one of the other claims is he

16   heard something from the pulpit, but he does not give it any

17   content.  To get from a script that is available to dioceses on

18   the -- on the Conference's website to an actual hearing by a

19   plaintiff and actual reliance requires multiple factual steps.

20   And the burden is on the plaintiff to make -- allege at least

21   enough --

22       THE COURT:  But only isn't that in the context of

23   helping the defendant to understand the nature of the fraud?  I

24   mean, I -- I sometimes think defendants make too much of

25   Rule 9(b) and its assertion that you have to plead fraud with

1    particularity when the cases indicate that really its function

2    is just to make sure that we don't have such vague allegations

3    concerning fraud that a defendant doesn't have any idea what

4    really to defend itself against.

5         Here we have particular statements.  We have an

6    allegation of reliance on such statements by the plaintiff and

7    other class members.  We have an allegation that those

8    statements mattered because at least the plaintiff -- and he

9    alleges also class members -- gave the money because they heard

10   these solicitations and they believed the representations that

11   were being made and an allegation that, in fact, those

12   statements were not true, because at the end of the day, the

13   money was not being used for what was being represented.

14        I -- I'm just struggling to understand why that's

15   unclear from a Rule 9(b) standpoint and why you suggest that

16   that's not sufficient to at least get us past -- at least on

17   the class-wide claims to get us past this very initial early

18   hurdle that the rules require.

19        MR. FLOOD:  Your Honor, the short of it is that

20   Mr. O'Connell is -- wants to pursue a fraud claim.  Fraud

21   requires a specific false representation.  The thing that he

22   says is false he never alleges that he heard, and the thing he

23   says he heard he can't particularize enough to know whether

24   it's even false.

25        The whole approach to -- plaintiff's whole approach to

1    the complaint is like one of these little paper toys that

2    adults would make for me when I was a boy.  And on one side was

3    a blue coloring, and on the other side was yellow.  And they

4    could spin it like a top, and it looked like it was green.

5    But I -- it wasn't green.  There was a blue side and a yellow

6    side.  And if plaintiff wants to be green, he should say that

7    he heard a thing that misled him personally; and he never does

8    that.

9          He says in his opposition on page 16, in the --

10   footnote 17, he says his ". . . fraud allegations are based on

11   USCCB's affirmative representations."  But USCCB, he doesn't

12   allege, actually ever made any representations at all to him.

13   Because he doesn't have that, he asks you to draw an inference.

14   And he asks you to draw it as, I presume, one of those fair

15   inferences as permissible from a complaint when a reviewing

16   court at this stage looks at the facts alleged.

17         But he does not allege any connecting inferences between

18   what is on one version of a script and what he heard.  He

19   doesn't do it because he can't tell you what he heard, and he

20   doesn't do it because he doesn't allege the connecting joints.

21   He wants a three- or four-stage inference, and we submit that's

22   too much to ask at this stage of the case.

23         THE COURT:  Mr. Stanley.

24         MR. STANLEY:  Again, paragraph 48 says just the

25   opposite of what Mr. Flood is saying.  You can't recast

1    this.  By doing these communications -- by doing the

2    representations or what they set out, they -- the Conference

3    ". . . communicated to Plaintiff and to each Class member that

4    any money he donated to Peter's Pence would be used exclusively

5    for these purposes."  He said he received a communication from

6    them.

7              THE COURT:  All right.

8              MR. FLOOD:  But, of course, Your Honor, it doesn't

9    say he received that communication, and I think that's the key.

10             THE COURT:  And I also think that that -- you -- you

11   are not suggesting, Mr. Flood, that you wouldn't be able to

12   make that kind of argument in the summary judgment context

13   after, of course, you depose plaintiff and have gotten the full

14   statement as to what he heard or what he saw?  You'd make this

15   same argument to me at summary judgment, wouldn't you?

16             MR. FLOOD:  Your Honor, I think we will make any

17   argument that Your Honor will permit at that stage, if we find

18   ourselves at that stage.

19         My only point is that these burdens in a fraud claim,

20   you know, rest in the first instance with the plaintiff.

21   Plaintiff has to come forward with particulars of this sort.

22   We submit he hasn't done it as to the content of the statement.

23   We submit also that he certainly hasn't done it as to

24   allegations, you know, that -- that my client, the Conference,

25   made false statements, that they knew they were false and in

1    making them they intended to deceive somebody.  He hasn't even

2    responded --

3            THE COURT:  How can you ever say more about

4    knowledge?  Isn't in the complaint enough to say that the

5    Conference, you know, makes these statements and the record

6    demonstrates that the -- the newspaper says the money is not

7    going and I allege, upon information and belief, that the

8    Conference knew the money wasn't going at the time they made

9    the statement?  How can you say more than that from a

10   particularity standpoint?

11           MR. FLOOD:  Well, it seems to me, Your Honor, that --

12   that if the -- if the gist of the complaint, as -- as I -- I

13   believe it's fair to say, is that the money was not spent

14   exclusively and immediately, then plaintiff ought to say

15   something about how the -- the defendant -- here the only

16   defendant -- knew that and, nevertheless, made the statements

17   knowing and understanding that they were false.  And he doesn't

18   do anything of the kind.  I mean, I understand --

19           THE COURT:  It's not enough, in your view, for him

20   to say that the Conference is responsible for collecting

21   these solicitations, that the Conference is responsible for --

22   he makes some statements about what the Conference does;

23   right?

24           MR. FLOOD:  He does, Your Honor.  And -- and, again,

25   you know, I think there just comes a point, I think, where the

1    Court -- we -- we, you know, respectfully ask the Court to look

2    at the website.

3        There is nothing in the record and there's -- the record

4    is the wrong term, and I withdraw that term, Your Honor.

5    There's nothing in the complaint and there's nothing on the

6    website -- and much to the contrary -- to suggest or -- or show

7    that the Conference oversees this; that it actually does the

8    solicitations, that it collects the money, that it's

9    responsible for conveying it.  All of that is just unfounded

10   and that a lack of basis is set forth on the very website they

11   invoke for other purposes.

12       THE COURT:  So you believe that I can go to the

13   website in order to test the proposition at paragraph 3 that

14   the Conference has solicited and collected hundreds of millions

15   of dollars in donations from parishioners, you think that at

16   this stage of the case the Court is to go to the website and

17   try to determine whether it provides evidence that supports or

18   rebukes this statement?

19       MR. FLOOD:  Your Honor, I don't think you need to --

20   it's a question of -- of having the Court find evidence, at

21   least not at this stage.  But if plaintiff can use the website

22   as a sword, we ought to be able to use at this stage the same

23   website as a shield to this -- the assertions made there.  And

24   if you go there, you will find -- at least in two different

25   places -- number one, that -- that the -- the Conference does

1    not collect this money and, number two, that the money is not

2    to be sent to the Conference.  It's to be sent to the

3    nunciature.

4          THE COURT:  I just -- I guess I don't understand your

5    view that a shield is supposed to be what's happening at the

6    motion to dismiss stage.  I'm just confused by that, because

7    the motion to dismiss stage, a defendant is not shielding him-

8    or herself.  The defendant is, in fact, accepting for the

9    purpose of the motion what plaintiff says.  That's what I

10    thought those motions do.  Now, maybe I'm wrong about that.  I

11    don't think so.  And if that's the case, my looking at the

12    website is not helpful from the defendant's perspective because

13    I'm just testing the allegations of the complaint.

14          MR. FLOOD:  I don't disagree with -- with

15    Your Honor's description of the Court's role here, but it

16    seems to me -- and while I'm not familiar with any cases

17    from -- from the district courts in this circuit, there's good

18    case law in -- in other -- in other circuits to the effect that

19    if a plaintiff makes an assertion and -- and includes a website

20    as part of the complaint and if in the other parts of the

21    website that assertion is flatly contradicted, then the Court

22    adopts the view of the website in contradiction to it.  I

23    mean --

24          THE COURT:  So is there a part of the website that

25    says, quote, the Conference does not solicit or collect money

1    from parishioners for the Peter's Pence collection?

2           MR. FLOOD:  Your Honor, there's certainly a part that

3    says send your money directly to -- to the nunciature and

4    don't send it to us.  And -- and there is nothing else on the

5    website, I'm confident, that says the diocese -- that the

6    Conference, rather, oversees the collection or does the

7    collecting or retains the collection or anything of that sort.

8           THE COURT:  So the absence of a statement by the

9    Conference indicating that it does this, you think, is

10   sufficient contradiction that I at the motion to dismiss stage

11   can take that to undermine what the plaintiff has said here?

12          MR. FLOOD:  Your Honor, I think the absence of that,

13   combined with the affirmative statements that the money is

14   supposed to go directly to the nunciature are more than

15   adequate in the absence of, you know, greater detail by the

16   plaintiff.

17          THE COURT:  All right.  Mr. Stanley.

18          MR. STANLEY:  I don't think that they're bank

19   robbers, but if a boss tells someone like me -- my boss tells

20   me I want you to plan a bank robbery, I want you to hire -- go

21   get the bank robbers, tell them how they're going to do it,

22   give them all the plans, tell them exactly what they're going

23   to do, have them rob the bank on this day, then have them send

24   the money straight to me, you won't touch it, you can say I'm

25   out -- I'm out of -- I'm out of trouble.  Certainly in RICO and

63

1    other cases -- we haven't alleged RICO yet -- but the issue

2    here is really the false representation that they made.  They

3    represented -- and if you look at -- at their One Church One

4    Mission, they say very clearly that we and you, the churches --

5    the dioceses and the churches, are going to follow this set of

6    rules ". . . to adhere to the fundamental principle of 'donor

7    intent.'  Donors should be informed about the intended uses of

8    donated resources.  Donors must be assured that the gifts will

9    be used for the purposes in which they were given."

10   Recognition, handle with confidentiality, et cetera.  Then they

11   go back and forth --

12            THE COURT:  I understand, Mr. Stanley.  Help me to

13   understand that set of allegations.  Because the thing that

14   worries me a little bit about your reliance on that is the

15   conversation that we had at the beginning about entanglement.

16            So to the extent that you're suggesting that what is

17   wrong here is that the plaintiff -- excuse me -- that the

18   Conference and the Vatican are not actually following its own

19   guideline, then doesn't Mr. Flood have a point; and is that the

20   function of your pointing to these other statements about

21   ensuring that donors 'monies goes to their intended uses?

22            MR. STANLEY:  First of all, are we still talking

23   about 9(b), or have we gone back to the motion to dismiss or

24   something else?

25            THE COURT:  We're sort of talking about both at the

A90

1   same time, 9(b) and motion to dismiss, but I wanted to make

2   sure that I understood -- you -- you at various points said

3   it's critical, Your Honor, that you understand that the

4   Conference at times has guidelines and statements and rules

5   about ensuring that donors' money goes to where it's intended.

6        And I'm just trying to flesh out whether any part of

7   your claim is about the failure to do what they said they were

8   going to do with the money.

9        MR. STANLEY:  Well, no.  The failure to understand

10  what was being done with the money, not what -- not promising

11  what they're going to do.  We all encounter people who make

12  representations to us in general things, whether they have a

13  right to or not, that sometimes they just don't check.  They

14  don't know what they're talking about.

15       They continued year after year with a very specifically

16  worded solicitation that they promised that -- me, as -- I

17  wouldn't know any better if I'm in a church and they say, hey,

18  do something right.  There's this special collection going to

19  people with special needs, they're suffering from poverty,

20  they're -- they're on the edges of society.  Please give this

21  money now.

22       They don't know -- have a clue one way or the other --

23  we're going to find through our discovery they never checked to

24  see if that was true or not, year after year after year.  Yet

25  they promised to.  Not only did they promise to -- to

1    themselves, but they promised to the churches, to the dioceses,

2    and the churches and the parishioners, the rules of the game

3    for these special collections are that we're going to know what

4    we're talking about.  We're going to make sure that when you

5    give money that you're giving to something real, and that's --

6    that's the neglect I was talking about before.

7              THE COURT:  Mr. Stanley, but you're not bringing -- I

8    didn't understand you to be bringing or making some kind of a

9    negligence claim; right?  What you've just articulated is a

10   whole other set of duties that, I guess, one could make a claim

11   about, that's separate and apart from the fraud.

12             MR. STANLEY:  It's not just negligence.  If you know

13   something not to be true and there was no -- from the last --

14   from 2015 on, they knew it wasn't true, and they kept doing it

15   over and over again.  So there will be a time period from 2011

16   to 2015 where they actually knew.  And discovery is going to

17   let us get into these documents and see what they knew and

18   didn't know about Peter's Pence.  But if they knew that it

19   wasn't going there, but yet every year they repeated the same

20   thing, that's fraud.  It's a --

21             THE COURT:  Obviously.  So you're using -- so you're

22   using this notion of a duty to ensure that the money is going

23   to where it's supposed to go to fulfill the element of

24   knowledge in the context of the fraud; that -- that you're

25   saying because there's this requirement that they have adopted

1     to ensure the donor funds are used for precise purposes, one

2     could infer that they knew when they made the representations

3     that it was going to X place that it really wasn't?

4              MR. STANLEY:  Right.

5              THE COURT:  Okay.

6              MR. STANLEY:  Yes.

7              THE COURT:  I mean, I think I understand it.  You

8     said that there's overlap between that and the totally separate

9     kind of claim about negligence with respect to their following

10    their own guidelines and that that claim might well raise the

11    kinds of concerns that Mr. Flood is talking about with respect

12    to entanglement, et cetera.

13             MR. STANLEY:  We think they knew for most of these

14    years it wasn't going as they were doing [sic], and that's

15    fraud.  There may be a line, and we may lose on 2011 to 2012,

16    2013, 2014.  I haven't seen the documents yet.  They may have

17    known.  They may not have known.  I don't know the answer.

18             But I believe that -- and that when we go for class

19    certification we'll add some documents to let us know exactly

20    what we're going for on that, if they did know or should have

21    known.  We'll look at that and make those arguments to the

22    Court then.

23             But for 9(b), again, we say that he heard the

24    representations.  We'll make -- they can take the -- the

25    deposition of the -- the reverend who made the representations.

1   They can take the deposition of the bishop who sent it down

2   there and find out what was said and not said.  And we have

3   tons of other people in the wings who have contacted us after

4   this lawsuit was filed that say I'm angry about this.  This is

5   exactly what I thought I was giving a lot of money to, and I'm

6   really not happy with it, and they also want to join in as

7   members of the class or class representatives, if we need to

8   substitute or add somebody.  But there is a large outcry of

9   this.  I'm not picking on the church because it's a church.

10  It's the fraud of it, the fact of what happened here.

11          THE COURT:  All right.  I think I understand.  Let me

12  give Mr. Flood a chance, and then I'll come back to you

13  finally, Mr. Stanley.  I'm -- I'm mindful of the time.

14      Mr. Flood.

15          MR. FLOOD:  Your Honor, to -- to Mr. Stanley's last

16  observations, as a matter of survival on adequacy of the motion

17  at this point, it's not enough that he believes that my client,

18  the bishops' conference, knew about its uses or, you know,

19  diversions or allocations that his client doesn't approve of.

20  He has to allege that, and he hasn't alleged that.  There was

21  no specific allegation with any semantic content that doesn't

22  fail under Your Honor's analysis at the front of the *Tran* case

23  to show that.

24      It's not enough to say they knew.  It's not enough to

25  say, you know, they knew or should have know known.  If you

1   look at the complaint, it says in paragraph 15 they ". . . knew

2   or should have known" that Peter's Pence contributions were

3   diverted.  That's boilerplate.  At 49 --

4          THE COURT:  So -- sorry.  What, Mr. Flood, are they

5   supposed to say?  What would they need to have said in order to

6   satisfy Rule 9 for this purpose?

7          MR. FLOOD:  Respectfully, Your Honor, at a minimum, I

8   should think they ought to say something about why it is

9   that -- you know, something factual, not by way of an

10  explanation, but allege some facts that show that the

11  Conference, which has a coordinating role in the promotion for

12  those dioceses to then elect to follow through and actually

13  have the -- have the campaign, that why it is in doing that

14  there's any reason, in fact, to think that they knew how the

15  Vatican, which handles contributions from six continents, was

16  actually allocating its funds, and they don't do that.

17         It's a -- it's -- I think there's a tendency with

18  churches -- and I suppose not only the churches -- to think of

19  it as a single monochromatic, monolithic organization in which

20  everyone knows what everybody else is doing, but the conference

21  is -- is an independent entity.  It's a nonprofit.  It's based

22  in D.C.  It's not in Rome.  And I just don't think it's enough

23  at the threshold to say, these guys, if they didn't know how

24  the Vatican was spending this money, by golly, they should have

25  and that's fraud.  I just respectfully submit something more

1   than that is required to satisfy --

2           THE COURT:  At the allegation stage.  Not at the -- I

3   mean, you are probably correct if the facts don't bear out that

4   they actually knew, but I just am worried about the suggestion

5   that prediscovery a plaintiff in a fraud case has to have

6   specific facts concerning information that really is only in

7   the purview of the defendant, which is what they knew at any

8   particular time.  The plaintiff can allege that, and then we go

9   to discovery.  And when it's clear that they didn't actually

10  know, you win.

11          MR. FLOOD:  With -- Your Honor, I don't disagree with

12  the rule as you formulate it with the following qualification:

13  If in addition to the arch- -- to the Conference -- I keep

14  saying the archdiocese.  I apologize.  If in addition to the

15  Conference, they had also alleged that my son's swim team was a

16  participant in this and they had some role, one would expect

17  there to be allegations about why it is that they had the kind

18  of knowledge that would obligate them to go forward in a case

19  like this.

20          THE COURT:  Only insofar as your son's swim team has

21  nothing to do with this.  He says in his complaint that this

22  very institution, the Conference, is the one that's collecting

23  the money.  And he says that the Conference, through these

24  other guidelines, indicates that donor money is supposed to go

25  to where it's supposed to go.  So it's not as though they're

1    your son's swim team or somebody who has nothing to do with the

2    allegations at issue here.  And the question is just whether

3    it's enough having made those allegations at the very beginning

4    of the case to get past this initial hurdle.

5         MR. FLOOD:  I agree, Your Honor.  I don't want to

6    overparse your language, but it's not enough, I submit, to

7    say they had something to do with it.  I think much more

8    is required is -- because it's fraud.  It has been

9    particularized.

10        Now, this is not something -- I'm not suggesting that

11   there's some insanely draconian legal gloss that attaches to

12   Rule 9(b).  We all know it's actually to the contrary.  But if

13   you sue a single defendant and you sue them in fraud, it's not

14   enough to say, as plaintiff says four, five, six times, they

15   knew or should have known.  Knew or should have known is the

16   language of negligence.

17        THE COURT:  But, Mr. Flood, these -- he's also

18   alleging that these are the very defendants who are making the

19   statement that he says is fraudulent; right?  I take your point

20   in the world in which the person -- the party at issue is

21   someone who doesn't have any connection to the allegedly

22   fraudulent statement or to the underlying facts that would

23   indicate that this is fraud.

24        But he says these are the people who are making the

25   statements, see the website, see the brochures and materials.

1  These are the people who, he alleges, are collecting the

2  money; right?  So they're not just random people.  They're --

3  they're the statement makers and the money collectors.  And so

4  the question is saying they knew at the time they made the

5  statement, is that sufficient or do they have to have -- or

6  does he have to have more in terms of how they might know

7  or what is the org chart between the Conference and the

8  Vatican?

9       And I'm just not sure -- given the allegations that

10  place the Conference at the center of this with respect to the

11  alleged misrepresentations, I'm not sure he needs to say more

12  than when they made the statement, they knew.

13       MR. FLOOD:  Well, and our response to that,

14  Your Honor, I think is, number one, when they made the

15  statement, they need to make it to him.

16       Number two, the statement that he points to, which is in

17  the script, it does not say what he interpreted it to mean and

18  cannot be fairly read to say immediate and exclusive.

19       Number three, if you're going to identify a defendant as

20  a fraudster in a complaint, you ought to come forward with

21  facts, you know, specific enough to show why they had the

22  improper mental state and -- and knowledge and also an attempt

23  to deceive.

24       There's -- there's really nothing in the complaint

25  that's not the kind of boilerplate ruled out by -- by the rule

1    and the case laws about -- about this knowledge element and

2    this intent element.  They're asking you to assume that because

3    they managed to cobble together, you know, pieces of the

4    website that nobody has ever alleged to have seen.

5               THE COURT:  All right.  Any final thoughts on this,

6    Mr. Flood?  I'm going to give Mr. Stanley the last word, but

7    I'm happy to entertain any other arguments that we haven't

8    touched on here.

9               MR. FLOOD:  With Your Honor's leave, I know we

10   touched on this, but if I could say one last thing about the

11   jurisdictional argument.  The basis -- the centerpiece of the

12   complaint is that Mr. O'Connell gave money but he didn't -- but

13   his gift was not used, exclusively and immediately solely for

14   the poor.

15              THE COURT:  I'm sorry.  I didn't hear you.  Solely

16   for --

17              MR. FLOOD:  For the poor or the displaced.

18              THE COURT:  Thank you.

19              MR. FLOOD:  I'm sorry.  This necessarily, unavoidably

20   invokes questions of church governance and how money is spent.

21   You cannot claim that the fraud consists in imperfect immediacy

22   or fatal lack of -- of directness and at the same time say this

23   can be decided on neutral principles.  Inevitably, unavoidably

24   the Court or a jury will be put in a position ultimately of

25   saying how much is too much, how soon is too soon.  And the

1     same thing goes with exclusivity.

2              THE COURT:  Can I ask you how much is too much but

3     not relative to the canons or to the Bible; right?  I mean,

4     it's not asking whether this is true or untrue as it relates to

5     religious teachings, is it?

6              MR. FLOOD:  No, not at all, Your Honor.  This is not

7     a doctrine case, you know, or -- you know, like the defrocking

8     case that -- that my counterpart mentions.  This is about the

9     use of church funds for the church's charitable purposes.

10             THE COURT:  Can I -- if the Court's ultimate

11    ruling -- and I'm -- I don't know how we get here, but I'm just

12    trying to play out what you're suggesting about entanglement.

13    What if the answer is the defendants just have to say exactly

14    what is happening to the money?  They don't have to change

15    their practice.  They don't have to give more to the poor

16    versus, you know, not.  And so it's not really about are you

17    breaking some sort of rule or law or principle based on how you

18    allocate money, but the answer is just you have to tell people

19    this is what we do with the money.  Why isn't that a neutral

20    principle kind of analysis?

21             MR. FLOOD:  Well, I think, Your Honor, because in --

22    in the real world, in the world of hierarchal church with

23    worldwide jurisdiction and a bishops' conference located in one

24    country, to avoid, you know, the -- the very rigorous -- to

25    survive a motion to dismiss, the only possibility in the world

1    in which Your Honor's suggestion becomes law is to have a kind

2    of disclosure that is so detailed, so ramified it would be like

3    one of those -- you know, all the disclaimers on those -- on

4    those medication commercials for people my age that I see.  You

5    have to say it's going here and there's not going to be any of

6    this and you don't have to worry about that and the other

7    thing.

8         The bishops' conference in one country, I submit,

9    doesn't know what the Vatican does.  I'm not offering that as a

10    proposition of fact to create a factual issue.  I'm just saying

11    that in the natural scheme of things, given the nature of the

12    church and where the -- the Conference fits, they're just not,

13    by reason of structure, in a position to have that knowledge.

14         THE COURT:  And so isn't Mr. O'Connell's claim that

15    they shouldn't be telling people where it goes?  So fine.  They

16    don't know what the Vatican does with the money.  The essence

17    of the fraud claim is here are all these statements where

18    they're telling people it goes to the poor.  And so isn't the

19    answer don't say where it goes.  Don't solicit; right?  It's

20    not -- that's not complicated.

21         Don't solicit money telling people this goes to the poor

22    if you either don't know where it goes or if it's going to all

23    of these investments and whatever before it gets to the poor,

24    such that people are confused or people feel as though they

25    haven't been leveled with in terms of how this money is being

1    allocated.

2            MR. FLOOD:  With respect to Your Honor, I don't think

3    that could be the answer.  And I don't think it could be the

4    answer because the -- the -- the alternative you've given is --

5    and I don't mean to mischaracterize it.  Sounds like you've

6    either got to tell them everything or you've just got to be

7    quiet about it.  And I think both are -- I think that the "be

8    quiet about it" is just utterly impracticable.  I don't think

9    you can ask parishioners in the pews to give money without

10   giving them some sense of where it might go.  This is kind of a

11   rhetorical point about how appeals work.

12           On the other side -- on the other part of the

13   disjunction, I don't think you can itemize every conceivable

14   use because I don't think, in a local church, meaning the

15   church in this or that country, is going to have that

16   information and I also --

17           THE COURT:  But can I ask you --

18           MR. FLOOD:  Could I have one last point, Your Honor?

19           THE COURT:  Yeah.

20           MR. FLOOD:  Just one.

21           And I also think to insist on that as a rule of law for

22   churches that raise money going forward is to impose an

23   exceptionally intrusive and burdensome standard on something

24   that at least before this case I'm not aware any Court has ever

25   contemplated.

1           THE COURT:  Can I -- can I ask you a hypothetical?

2     And then I'll move to Mr. Stanley.

3           MR. FLOOD:  Of course, Your Honor.

4           THE COURT:  This is not this case because you are

5     alleging that -- or maybe -- I don't know.  We haven't really

6     seen your side of the case yet, but I can imagine you would

7     argue that, you know, as the Pope apparently did in some of the

8     responses to the articles, that he's making investments and

9     some percentage of it is going to the poor.

10          But in a world in which -- let's say a hundred percent

11    of the money was going to, you know, Vatican operations and

12    none of it was going to the poor and yet we had the same facts

13    concerning solicitations being made with the statement this is

14    going to the poor, is that a viable basis for a fraud claim or

15    would that still be subject to the entanglement concerns that

16    you're talking about?

17          MR. FLOOD:  The short answer, Your Honor, is I don't

18    know.  It's a whole lot closer to actionable fraud than what we

19    have here, because I think that a 100-percent erroneous

20    assertion, it would be highly problematic from a deception

21    standpoint.  Now that, I think, alone doesn't give a

22    plaintiff -- in Your Honor's hypo, I don't think that is enough

23    alone to deliver all elements of the fraud.  But I think, you

24    know, it does sound to me like it's a false statement and on

25    Your Honor's hypo, it's an in- -- inarguably false statement

1      that can't be qualified away, not what we have here.

2              THE COURT:  And -- and no defense, I'm a church, this

3      would have you looking at my uses of the money, wouldn't be --

4      would you or would not be able to make the kind of

5      jurisdictional claim that you're making here?

6              MR. FLOOD:  Your Honor, I'd want to know a whole lot

7      more about the factual context, but I think the best I can say

8      on -- on your hypo is it would be a much more difficult case

9      than what we have here.  Because the idea of the -- of, you

10     know, faithful discretion, the idea, you know -- the things

11     that are said on the Vatican website, that's all taken out of

12     play.  If everybody is lying about this, then I think, you

13     know, a church member -- I think -- let me put my point

14     differently and then I'll -- and then I'll shut up.

15         I think Your Honor's hypothetical becomes very close to

16     those very rare -- I can only find two of them -- cases in

17     which a church says -- in which the Court has said, you know,

18     somebody who raises money in a subscription, where there's a

19     specific purpose, clearly identified commitment forms are

20     filled out -- for example, to building a building, and then

21     they don't build the building and just keep it in the church

22     treasury -- courts have allowed those kinds of cases to go

23     forward, and I think Your Honor's hypothetical, if not on all

24     fours, is much, much closer to that.

25              THE COURT:  All right.  Thank you.

```
 1              MR. FLOOD:  Thank you, Your Honor.
 2              THE COURT:  Mr. Stanley, I'll give you the final
 3    word.
 4              MR. STANLEY:  Thank you very much.
 5          Again, none of that happened here.  The representations,
 6    it's not very complex.  They give a very small paragraph of
 7    what they passed down, what they're going to do with the money.
 8    It didn't say, hey, we're going to build a rainy day fund,
 9    we're going to invest in apartments and condos in London or
10    Swiss funds or movies, and then if it spins off profit, we'll
11    have a bigger one or we will lose money.  It didn't say one day
12    we might use it for church deficits.
13          This was the rule of the game.  Give money for this.
14    And our client will testify that he did not give money to the
15    church.  He gave money as a pass-through.  He was giving money
16    to poor people.  His goal was not to give any money to the
17    church.  His goal was to give money to people who were on the
18    edges.  And --
19              THE COURT:  But I guess Mr. Flood's point is, all
20    right.  So fine.  Even if the allegations in the complaint are
21    true, that only 10 percent of this money actually ends up going
22    to poor people, does the Court really have the authority to
23    evaluate that in -- in order to assess whether or not there's
24    fraud?
25              MR. STANLEY:  Yes.  Because our position will be --
```

1    and, again, the discovery will allow us to show behind there

2    that a hundred percent was supposed to go to the poor people,

3    not 10 percent.  And that when it turns out, the facts that

4    come out, that the money went to Cardinal Becciu's relatives

5    instead of poor people -- and they aren't poor -- they went to

6    investment fund managers in Switzerland, they went to --

7    170 million went to this profit, went to this developer in

8    London, who was very suspicious, that the multi-fund -- it went

9    wrong.  This was run amuck.  This was a fund that nobody -- who

10   was watching whatever.  It wasn't done right.

11       Again, our client's testimony will be he expected a

12   hundred percent of it to go to the poor, not to be gone this

13   way, and it was very poorly done.

14            THE COURT:  Is that an expectation that just comes

15   from him, or are you saying that's what they said?

16            MR. STANLEY:  That's what they said to him.  It was

17   going to go to the poor and people in the margin.  And, again,

18   discovery will show this, and we'll get this out, but that's

19   our position.

20       As to the bottom line, we're happy with our complaint.

21   It's -- as you said in the *Tapp* case, "It is . . . axiomatic

22   that for the purpose of the court's consideration of the

23   Rule 12(c) motion, all of the well-pleaded factual allegations

24   in the adversary's pleadings are assumed to be true and all

25   contravening assertions in the movant's pleadings are taken to

1    be false."

2          And any contravening assertions they simply denied, but

3    this other stuff about what's on the Pope's website, that's in

4    their -- in their motions.  But our pleadings, the well-pleaded

5    factual allegations, are assumed to be true, which is also what

6    they said in their reply.  For the purpose of this motion,

7    the Conference is not disputing any of the plaintiff's

8    allegations.

9          So we're resting on our pleading, we're happy with our

10   pleading, and we think the Rule 12(c) should be denied, and we

11   think denying (b) allegations, we think there's -- we told --

12   we told them what he relied on and we gave it out very clearly.

13         THE COURT:  But you don't say on June 12th, 2018,

14   while in this particular church service, Pastor So-and-So said

15   X; right?

16         MR. STANLEY:  We did -- you have to -- maybe -- maybe

17   not clearly on that day, and you talked about that in your

18   *Tran* case.  You said you don't have to give every -- it's just

19   give them fair notice of what's going.  But what we do say is

20   that this is a once-a-year solicitation, a special collection

21   once a year.  What we do say is that O'Connell heard that and

22   he relied on it and he donated money.  So, yeah, we do say it.

23         And, again, they can take the deposition of the pastor,

24   see what he -- the Father to see what -- what he said and what

25   was instructed to him to say.  We can get all that there, but

1  O'Connell is going to say that's exactly what he heard.  And

2  that's what he said here.  And if you look, it's very clear --

3  paragraphs 48 to 51 are very clear on that.

4           THE COURT:  All right.  Thank you very much.  I will

5  take the motion under advisement and issue a written ruling.

6           MR. STANLEY:  Thank you for your patience.

7           THE COURT:  Thank you.

8           MR. FLOOD:  Thank you, Your Honor.

9           THE COURT:  Have a good day.

10          (The proceedings concluded at 3:34 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                      Dated this 1st day of February, 2021.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


  DAVID O'CONNELL,                 .
                                   .
            Plaintiff,             .  CA No. 20-1365 (JMC)
                                   .
       v.                          .
                                   .
  UNITED STATES CONFERENCE         .  Washington, D.C.
  OF CATHOLIC BISHOPS,             .  Friday, November 17, 2023
                                   .  2:30 p.m.
            Defendant.             .
  . . . . . . . . . . . . . . . . .
```

```
                    TRANSCRIPT OF STATUS HEARING
                 BEFORE THE HONORABLE JIA M. COBB
                    UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

| | |
|---|---|
| For Plaintiff: | MARTIN WOODWARD, ESQ.<br>Kitner Woodward PLLC<br>13101 Preston Road<br>Suite 110<br>Dallas, TX 75240 |
| | SIMON C. FRANZINI, ESQ.<br>Dovel & Luner LLP<br>201 Santa Monica Boulevard<br>Suite 600<br>Santa Monica, CA 90401 |
| For Defendant: | KEVIN T. BAINE, ESQ.<br>EMMET T. FLOOD, ESQ.<br>RICHARD S. CLEARY JR, ESQ.<br>Williams & Connelly LLP<br>680 Maine Avenue SW<br>Washington, DC 20005 |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR<br>U.S. Courthouse, Room 4704-A<br>333 Constitution Avenue NW<br>Washington, DC 20001 |

```
Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.
```

A110

1                     P R O C E E D I N G S

2                     (Via Videoconference)

3              THE DEPUTY CLERK:  Good afternoon, Your Honor.  We're

4     on the record in civil action 20-1365, David O'Connell versus

5     United States Conference of Catholic Bishops.

6         Starting with Plaintiff, please state your appearance for

7     the record.

8              MR. WOODWARD:  Martin Woodward, Kitner Woodward PLLC,

9     for the plaintiff.

10             MR. FRANZINI:  Good afternoon, Your Honor.

11    Simon Franzini, from Dovel & Luner, for the plaintiff.

12             MR. BAINE:  Good afternoon, Your Honor.  Kevin Baine

13    from Williams & Connelly for the defendant.

14             MR. FLOOD:  Good afternoon, Your Honor.  Emmet Flood

15    from Williams & Connelly, also for the defendant, and with me

16    in my office is a colleague from Williams & Connelly, Richard

17    Cleary.

18             THE DEPUTY CLERK:  Your Honor, before you get started,

19    counsel, there is someone in the waiting room, a William

20    Quinn.  Is Mr. Quinn with someone.

21             MR. FLOOD:  Ms. Franklin, Mr. Quinn is our client.

22             THE DEPUTY CLERK:  Okay.  I'm admitting Mr. Quinn.

23             THE COURT:  Okay.  Good afternoon, everyone.  So we

24    are here to allow me to resolve the pending motions.  And this

25    case has been stuck for quite some time, and that is certainly

1   on the court.  So I'm happy to move things along and again

2   hope you can appreciate that I'm still relatively new here in

3   dealing with kind of onboarding backlog that we're working

4   through.  But, certainly, I recognize that you've been very

5   patient and appreciate that patience.

6       So I set this hearing so that I could issue my ruling

7   orally as to the pending motions.  Defendant has brought a

8   motion to dismiss for lack of subject matter jurisdiction,

9   for judgment on the pleadings, and in the alternative for

10  summary judgment.  I'm going to deny those motions at this

11  time and explain my reasoning briefly on the record.

12      After putting my reasoning on the record, however, I do

13  want to discuss not only next steps in terms of discovery,

14  but also this was filed as a putative class action and I want

15  to discuss a way in which, as you have your conferences for

16  discovery, can determine whether or not that motion for class

17  certification can be briefed as early as possible.  Because

18  I imagine that if this is not a class action that that changes

19  a lot about this case.  We can deal with that after I put my

20  reasoning on the record.

21      I'll jump right to my reasoning.  The factual background

22  the parties are well aware about.  The motion to dismiss for

23  lack of subject matter jurisdiction is a threshold issue, so

24  I'll start there.

25      As the parties recognize, federal courts lack jurisdiction

1    over disputes that cannot be resolved without extensive

2    inquiry into religious law and polity.  This is the

3    ecclesiastical abstention doctrine, and I reserve the

4    parties to *Serbian E. Orthodox Diocese for U.S.A. and Canada*

5    *v. Milivojevich*, 426 U.S. 696 (1976).

6        There are, however, narrow exceptions top this.  The Court

7    can decide church-related disputes if they can do so without

8    being unduly entangled in matters of ecclesiastical

9    cognizance, or if they can apply neutral principles of law.

10   And these questions are treated as jurisdictional.

11       Accordingly, when a defendant moves to dismiss for lack of

12   subject matter jurisdiction under Rule 12(b)(1), the plaintiff

13   bears the burden of establishing that a court has subject

14   matter jurisdiction.

15       Although I can consider matters outside the pleadings and

16   the motion bears closer scrutiny than a motion under, say,

17   Rule 12(b)(6), I am still required to accept the complaint's

18   factual allegations as true, and the plaintiff is afforded the

19   benefit of all reasonable inferences.

20       In its motion, defendant argues that the Court lacks

21   subject matter jurisdiction over this case because, on its

22   face, the dispute raises two basic questions about how the

23   highest authorities of the church may choose to allocate

24   funds.

25       And defendant is correct that the doctrine would prevent me

from reviewing decisions involving matters of church
government as well as those of faith and doctrine, and this
would include any decisions about the organization's
determination of whose voice speaks for the church, whether
someone may worship at church, matters that are purely
ecclesiastical even if they affect civil rights.  But the
doctrine does not prevent the Court from reviewing decisions
when it's possible to do so using completely neutral
principles of law.  And that's a proposition from *Jones v.*
*Wolf*  at 443 U.S. 595 (1979).

Importantly for this case, alleged fraud or collusion may
fall into the neutral principles category where civil court
review is appropriate.  And the reasoning for that exception
is that when a dispute is purely secular, even if it involves
a religious-affiliated organization, the perceived danger
that, in resolving interchurch disputes, the state will become
entangled in essentially religious controversies or intervene
on behalf of groups espousing particular doctrinal belief is
diminished.

And that's from *General Council of the United Methodist*
*Church v. California Superior Court*, also a Supreme Court
case, 439 U.S. 1355 (1978).  I do find, as pled, the complaint
falls within the neutral principles category.

The plaintiff alleges, in short, that defendant made
affirmative misrepresentations and fraudulent omissions, was

1  unjustly enriched and breached a fiduciary duty.  The elements

2  of these claims include falsity of statements, knowledge and

3  intent on the part of the statement makers, reliance, whether

4  a benefit was conferred and retained, and whether a fiduciary

5  duty was created and breached.  Those questions can be

6  resolved using neutral principles of law.

7      In other words, there's no need that I inquire into church

8  operations, religious doctrine, religious hierarchy, or

9  religious decisionmaking to evaluate the merits of this claim.

10 Instead, this is a case about what defendant represented, what

11 it knew, and the relationship between defendant and plaintiff

12 as a putative class representative.

13     I also understand that the case will not require me to

14 consider church governance, the makeup of church congregations

15 or anything related to membership and, importantly, to make

16 any judgments whatsoever about the way the church chooses to

17 use its funds.

18     To be sure, it would be improper for me to delve into those

19 purely religious determinations in order to rule.  For

20 example, I could not rule that the church could only exercise

21 its financial discretion in one way or another.  But I don't

22 believe that's required for the Court to determine, under

23 straightforward common-law principles, whether or not fraud

24 took place in this case or for a fact-finder to make that

25 determination.

1        As such, at this stage, it's not apparent to me that the

2    resolution of the claims will involve impermissible religious

3    entanglement, and so I conclude that I do have subject matter

4    jurisdiction in this case.

5        I'll turn next briefly to stating my reason for denying my

6    motion for judgment on the pleadings and in the alternative

7    for summary judgment.  As the parties are well aware, entering

8    judgment on the pleadings is appropriate if the movant shows

9    that there is no disputed material fact and they are entitled

10   to judgment as a matter of law.

11       The D.C. Circuit has recognized that such motions -- I'm

12   sorry -- that was the summary judgment standard.  But for Rule

13   12(c), the D.C. Circuit has recognized that such motions are

14   rare and that the party seeking judgment shoulders a heavy

15   burden of justification.

16       I am required to accept the nonmoving party's allegations

17   as true, and consider false the controverted assertions of the

18   moving party.  Judgment on the pleadings are not appropriate

19   if there are any issues of fact that, if proved, would defeat

20   recovery even if I am convinced that the opposing party is

21   unlikely to prevail at trial.

22       In sum, if there are any material questions presented by

23   the pleadings, I cannot grant a Rule 12(c) motion, and I find

24   that to be the case.

25       I'm going to start with the fraud claims.  As the parties

are well aware, under D.C. law, a claim for fraudulent

misrepresentation or omission requires a showing that a

defendant made a false representation of, or willfully omitted,

a material fact, had knowledge of the misrepresentation or

willful omission, intended to induce another to rely on the

misrepresentation or willful omission, that the other person

acted in reliance on the misrepresentation or willful

omission, and that damages were suffered as a result.

I understand plaintiff to be making two fraud-related

claims: fraudulent misrepresentation and fraudulent

concealment.  The complaint alleges fraudulent

misrepresentation.  O'Connell contends that defendant

communicated to him that money he donated would be used

exclusively for victims of war, oppression, natural disaster

or disease, and that defendant knew or should have known that

the proceeds were in fact used for noncharitable purposes; and

the plaintiff contends that these representations constitute

fraudulent misrepresentation.  The plaintiff also contends

that he donated to defendant based on these representations

and that the defendant intended for him to rely on its

statements in his decision to donate.

The requirement to plead fraudulent concealment are

substantially the same.  However, while fraudulent

misrepresentation turns on a false representation, fraudulent

concealment turns on an omission.  And under D.C. law, mere

1  silence does not constitute fraud unless there is a duty to

2  speak.  And a duty to speak attaches in an instance where a

3  material fact is unobservable or undiscoverable by an

4  ordinarily prudent person upon reasonable inspection -- and

5  that's from *Sununu v. Philippine Airlines, Inc.*, 792 F.Supp.2d

6  39, (DDC 2011) -- or as a result of partial disclosure.

7  So, in this complaint, plaintiff alleges that defendant

8  knew or should have known that the charitable fund was not

9  used to fund charitable purposes exclusively as represented.

10  And because of this knowledge, plaintiff alleges that

11  defendant's failure to inform prospective donors of the true

12  use of funds constitutes unlawful concealment.

13  Further, plaintiff alleges that the defendant had a duty to

14  disclose because it had exclusive knowledge of the suppressed

15  facts and made representations about what the funds would be

16  used for.  Again, at this very early stage of the litigation,

17  I'm required to draw all of those inferences in plaintiff's

18  favor, and I do find that material disputes of fact remain

19  based on the defendant's answer and the briefing, including

20  whether any statements were in fact false, whether defendant

21  was actually involved in the alleged statements, whether the

22  defendant knew the statements were false, the defendant's

23  intentions regarding the statements, and plaintiff's reliance

24  on the representations.

25  For these reasons, taking the allegations as true, I deny

1   the motion with respect to Count 1.  And I'll briefly just

2   say, with respect to the 9(b) requirements, I know there was

3   some discussion in the pleadings about whether or not such a

4   motion is appropriate after an answer.  I do note that

5   defendants did answer the complaint, but don't think it's

6   necessary for me to resolve the question, because I find that

7   the complaint contains enough detail to satisfy the heightened

8   pleading requirements.

9        I do think the fact that there was an answer is relevant to

10  the overall purpose of the rule, which is to provide enough

11  information to the defendant to be able to respond to the

12  complaint, which isn't done, but I think that Plaintiff has

13  alleged a narrow time frame, persons involved, what was said;

14  and all of this is, in my view, sufficiently detailed to

15  satisfy a Rule 9(b).

16       My findings with respect to unjust enrichment are similar

17  to my ruling on the first count.  It's just simply at this

18  stage, prediscovery in the case, where I'm required to take

19  plaintiff's allegations as true, I believe that plaintiff's

20  complaint checks the relevant boxes.

21       Under D.C. law, a claim for unjust enrichment requires

22  that a plaintiff confer a benefit on a defendant who in turn

23  retained the benefit.  Further, it must be the case that,

24  under the circumstances, the defendant's retention of the

25  benefit is unjust; and in the complaint, plaintiff alleges

that defendant retained the benefit of his donations to the

fund, Peter's Pence fund, and he alleges that the donations

were induced by false representations and omissions and that

the retention of these donations was unjust.

And I know that there are disputes about whether in fact

the defendant did retain the donations or whether the

defendant is actually the proper defendant at all.  These

factual disputes do not allow me to grant the motion.

Finally, for breach of fiduciary duty, under District of

Columbia law, the plaintiff must allege facts sufficient to

establish that the defendant owed such a duty to a plaintiff

and breached that duty.  And they must also plead probable

cause and injury, and plaintiff makes these allegations in his

complaint, that a fiduciary duty was generated by certain

promotions, advertisements, the overseeing and collection of

funds, and that the defendant breached the duty by not

ensuring that the charitable contributions were spent in

accordances with promises made.

As plaintiff recognizes, this question about a fiduciary

relationship is often a fact-intensive inquiry that's often

based on a fuller record, and given my rulings on the other

matters and at this earlier stage, I do think it would be

premature and not appropriate for me to grant the motion given

plaintiff's allegation.

And finally, there was a motion to treat the motion in the

1    alternative as one for summary judgment.  Plaintiff has

2    responded to defendant's statements by representing that he

3    isn't in a position to respond because he needs further

4    discovery.

5        Although I did not see that the motion included a

6    declaration to support that contention, I do agree that

7    plaintiff would be entitled to some information to have a

8    reasonable opportunity to present all the material that is

9    pertinent to the motion.  So I will decline to convert the

10   motion to one for summary judgment at the time, and deny it

11   certainly without prejudice.

12       So, again, thank you for your patience as I get this case

13   unstuck, but that's my ruling.  I think what we need to do

14   next is set a date for a scheduling conference and a deadline

15   for a Rule 26(f) report.

16       But I wanted to just take a step back and ask plaintiff's

17   counsel, because this case has been filed as a putative class

18   action, and I know that the defense has not moved, at least

19   yet, to strike any class allegations, and I certainly haven't

20   delved into that issue; but it seems to me that there's some

21   question particularly concerning, I would say -- to the extent

22   that the fraud counts require some showing about individual

23   people who donated their individual understanding and

24   reliance, that there may be some questions about commonality.

25       I mean, I don't know -- I don't want to put you on the

1    spot, but I guess my question is do you think that we can set

2    a schedule that would allow briefing on the class

3    certification question early, because I imagine if this case

4    is not certified as a class, then that changes a lot about the

5    case.  I don't know how much is at stake if this were just an

6    individual plaintiff case and not a class.  So maybe you can

7    speak to that, Mr. Woodard.

8         MR. WOODWARD:  Sure.  Thanks, Your Honor.  I agree that

9    it makes sense to proceed with class certification, or at

10   least as soon as is reasonable.  In connection what that,

11   though, we will need some discovery, and we are ready to move

12   forward just as soon as we can with the 26(f) conference and a

13   26(f) report.

14       We actually had already served a request for production of

15   documents on the day that the defendant filed its answer.

16   That was then followed, of course, with the motions that Your

17   Honor just ruled on, and the request for production hasn't

18   been responded to.  But it will be useful, we think, in sort

19   of outlining the types of discovery we're going to be seeking

20   in connection with our class certification motion, and it's

21   certainly the groundwork and foundation for what we think to

22   be a productive discussion about how long it might take

23   defendants to gather up and produce the materials that we're

24   asking for that will help resolve the issues.

25       Then briefly, just to respond to Your Honor's point about

 1    the relationship of the fraud claims that we've alleged to

 2    class certification issues, there's plenty of case law that

 3    speaks to an inference of reliance if reliance is even to be a

 4    required element where you have, as we've alleged, a

 5    fraudulent scheme that's more or less uniform, we think that

 6    that is -- the discovery is going to bear that out.  And if

 7    that in fact proves to be the case, that is likely to be one

 8    of the arguments that you'll hear when we move to certify that

 9    claim, if we choose to do so.

10         THE COURT:  Okay.  And that's fair.  And again, I'm not

11    suggesting that I'm ruling, but I just gathered that it seems

12    like a case where, to the extent discovery can be bifurcated,

13    to deal with class certification first.  And it may be

14    possible that there's no way to disentangle from the merits

15    and that that's not possible.

16      So maybe instead of saying bifurcating discovery, if

17    there's some way that discovery can be phased such that some

18    of these issues can be addressed early, that would be

19    beneficial.  Again, it may be completely impossible to

20    disentangle, and I'll let you all discuss that.  I certainly

21    don't want to have overlapping and confusing phases of

22    discovery where parties don't know what box that they're in.

23      And then similarly, Mr. Woodward, just because I noted this

24    in the briefing that there was some question about whether or

25    not this is the proper defendant, obviously, that's a question

1    as well that we would want to resolve early.  And so I don't

2    know if you've had any conversations with defense counsel

3    about that issue, but I guess you can conduct discovery and

4    then we can set a deadline for amending pleadings at the

5    appropriate time.

6         Okay.  So -- and then who's speaking for the defense?

7              MR. FLOOD:  I am, Your Honor.  Mr. Flood.

8              THE COURT:  Okay.  Mr. Flood, so that's my ruling,

9    again, without prejudice, for any further motions that you may

10   file, I just think it's premature at this stage given the

11   allegations in the complaint.  Do you have a sense of how much

12   time it will take for the 26(f) report to be filed in the

13   conference?  How much time do you need?  And I'll ask

14   Mr. Flood the same thing.

15             MR. FLOOD:  I don't have a clear sense, Your Honor.

16   Next week is challenging --

17             THE COURT:  Yes.

18             MR. FLOOD:  -- to confer.  And then December, of course,

19   is holiday month, but I should think sometime in December even

20   if it's closer to the holidays at the end, and I would propose

21   talking to Mr. Woodward and Mr. Franzini and then figuring out

22   what we can do.  But I would think, with allowance for the

23   holidays, several weeks ought to be enough time.

24             MR. WOODWARD:  We agree.  I think that's right.

25             THE COURT:  Mr. Flood, do you have a proposed date,

```
 1        or do you want to confer and submit a proposal to me?

 2              MR. WOODWARD:  I think it makes sense, Your Honor,

 3        for us to confer and submit a proposal.  I'm not sure what

 4        Mr. Flood feels about that.  If it's easier to propose dates,

 5        just looking at my calendar, I could pick -- just the broad

 6        parameters what you laid out, I think maybe it would be most

 7        productive for us to confer and then come back to you with

 8        what works for both sides.

 9              THE COURT:  Okay.  Why don't we do this:  Why don't you

10        all confer, and if you send a joint email to chambers letting

11        us know the time frame that you want to have the scheduling

12        conference in and the time frame or date that you've agreed to

13        submit the discovery planning report, the Rule 26(f) report,

14        then we'll just issue a minute order memorializing those

15        dates.

16              MR. WOODWARD:  That sounds good, Your Honor.  Thank you.

17              THE COURT:  All right.  Is there anything else we

18        should address today before concluding the hearing, and then

19        I'll receive your information and set the minute order for the

20        scheduling conference?

21              MR. FLOOD:  Your Honor, I would like to mention just

22        one thing by way of what might informally be thought of as a

23        possible heads-up.

24              THE COURT:  Okay.

25              MR. FLOOD:  We'll want to confer, our legal team, with
```

A125

1    our client about Your Honor's ruling.

2         THE COURT:  Okay.

3         MR. FLOOD:  But as Your Honor pointed out at the

4    beginning, the ecclesiastical abstention doctrine partakes

5    of something jurisdictional, and so I think we have a live

6    continuing question now of whether there is subject matter

7    jurisdiction.

8         THE COURT:  Okay.

9         MR. FLOOD:  We are at least going to give consideration

10   of whether that calls for an immediate appeal of one kind or

11   another.

12        THE COURT:  Sure.

13        MR. FLOOD:  And related to that is the consideration

14   of conducting discovery, you know, when that question is

15   pending is also something covered or not by the same doctrine.

16        THE COURT:  Sure.

17        MR. FLOOD:  It doesn't mean of course we won't be

18   meeting with Mr. Woodward per your directions we of course

19   will but I just thought I'd signal that for you Your Honor and

20   let's see how our conversations go and we may be back with you

21   with something in the manner of a motion there.

22        THE COURT:  Sure.  I appreciate that.  Thank you for

23   letting me know.

24        MR. FLOOD:  Thank you, Your Honor.

25        THE COURT:  Okay.  If that's it, I will look forward to

1     hearing from you, and I will issue a minute order.  If you

2     do file such a motion, I'll be on the lookout for it, and I

3     promise I will resolve it promptly.

4          MR. FLOOD:  Thank you.  Actually, Your Honor, I do have

5     one other question just obviously without purporting to do

6     what I cannot do, namely, fix for you or have you tell us with

7     any determination you may not have made, but does Your Honor

8     intend to reduce your oral ruling today for an order for the

9     docket?  And the reason I ask of course is if we did think an

10    appeal was necessary, I think the law is we've gotta have

11    something on the docket to start the timeline.  So that's just

12    an open question, not necessarily looking for an answer today,

13    just an expectation question.

14         THE COURT:  Sure.  I was just going to put an order

15    that says for the reasons stated orally on the record that the

16    motions are denied.  My understanding was that was sufficient

17    in terms of...

18         MR. FLOOD:  And I'm not quarreling with Your Honor at

19    all, so much as I think there are some technical features of

20    the D.C. Circuit regime not shared with others that can affect

21    the running of the time.  I don't think it affects our ability

22    actually to file something.

23         THE COURT:  Right.

24         MR. FLOOD:  That was the nature of my inquiry.  And I

25    suppose if we have a transcript from the court reporter, that

```
1     will go a long way toward.
2              THE COURT:  But to your question, yes.  I'm going to
3     put an order on the docket that formally denies the motion,
4     but it will just simply say for the reasons stated orally on
5     the record.
6              MR. FLOOD:  I think that answers my question.
7     Thank you, Your Honor.
8              THE COURT:  Okay.  Thank you so much.  Have a good one.
9         (Proceedings adjourned at 2:56 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne