**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**No. 23-7173**

# In the United States Court of Appeals for the District of Columbia

DAVID O'CONNELL,
Plaintiff-Appellee,

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,
Defendant-Appellant.

Appeal from the United States District Court for the District of Columbia
Honorable Jia M. Cobb
(1:20-cv-01365-JMC)

## OPENING BRIEF OF DEFENDANT-APPELLANT

KEVIN T. BAINE
EMMET T. FLOOD
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, DC 20024
(202) 434-5000
*eflood@wc.com*

DANIEL H. BLOMBERG
  *Counsel of Record*
LAURA WOLK SLAVIS
COLTEN L. STANBERRY
KELLY R. OELTJENBRUNS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketlaw.org*

*Counsel for Defendant-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel of record certifies as follows:

**A. Parties.** The following are parties in this Court:

    a. Plaintiff-Appellee: David O'Connell.

    b. Defendant-Appellant: United States Conference of Catholic Bishops.

**B. Rulings Under Review.** The ruling under review is the 11/17/2023 Minute Order issued by Judge Cobb. A6. No formal citation exists. The district court's reasoning can be found in the Joint Appendix, at pages A145 through A155.

**C. Related Cases.** Appellant is unaware of any related cases pending in this Court or in any other court.

**D. Rule 26.1 Disclosure.** Counsel of record for Defendant United States Conference of Catholic Bishops (USCCB) certifies that USCCB is a 501(c)(3) non-profit corporation. USCCB has no parent, subsidiary, affiliate, or company which owns at least 10% of its stock.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..................................................................... i

TABLE OF AUTHORITIES ................................................................ v

JURISDICTIONAL STATEMENT ..................................................... 1

INTRODUCTION ............................................................................... 2

STATEMENT OF ISSUES................................................................. 5

STATEMENT OF THE CASE ............................................................ 6

    I.   The Papacy. ........................................................................... 6

    II.  Peter's Pence ......................................................................... 7

    III. The United States Conference of Catholic Bishops..................... 10

    IV. O'Connell's Offering to the Pope ................................................ 12

    V.  Procedural Background ................................................................ 14

SUMMARY OF ARGUMENT ............................................................ 16

STANDARD OF REVIEW .................................................................. 17

ARGUMENT ...................................................................................... 18

    I.  This Court has jurisdiction over this appeal................................. 18

        A. This Court has jurisdiction under the collateral-order
           doctrine over USCCB's church-autonomy defenses. ............... 19

           1. The district court's order is effectively
              unreviewable absent immediate appeal. .............................. 19

           2. The district court's order conclusively
              determines that USCCB must defend
              the case on the merits. .......................................................... 24

           3. USCCB's church-autonomy defenses are collateral
              to the merits of O'Connell's claims...................................... 24

B. Other courts and scholars confirm that church-autonomy defenses permit interlocutory appeal....................................................25

    1. Caselaw and scholarship confirm that church-autonomy defenses can obtain interlocutory appeal............................25

    2. Contrary cases are distinguishable......................................27

II. O'Connell's claims are barred by the First Amendment's church-autonomy doctrine. ...................................31

A. Church autonomy bars claims that interfere with matters of faith, doctrine, and internal church governance. ...................................................................31

B. O'Connell's claims interfere with matters of faith, doctrine, and internal church governance................................33

    1. The claims call for second-guessing the Pope's use of religious offerings. ........................................34

    2. The claims call for interfering in internal religious speech and polity. ...................................38

    3. The claims' elements call for other entangling inquiries..............................................................40

    4. The claims call for entangling discovery.............................42

C. The district court erred. ....................................................44

III. O'Connell failed to adequately plead his claims..........................48

A. This Court has pendent jurisdiction over the issue of O'Connell's pleading deficiencies.................................49

B. O'Connell's claims fail on the pleadings. ...................................49

    1. O'Connell's fraud claim fails...............................................50

    2. O'Connell's unjust enrichment claim fails............................55

    3. O'Connell's breach of fiduciary duty claim fails. .................57

CONCLUSION ..........................................................................59

CERTIFICATE OF COMPLIANCE ........................................................ 60

CERTIFICATE OF SERVICE.................................................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abhe & Svoboda v. Chao,*
   508 F.3d 1052 (D.C. Cir. 2007) ........................................................... 10

*Acosta Orellana v. CropLife Int'l,*
   711 F.Supp.2d 81 (D.D.C. 2010) .......................................................... 52

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,*
   387 F.Supp.3d 71 (D.D.C. 2019) ...................................................... 37-38

*Anderson v. USAA Cas. Ins.,*
   221 F.R.D. 250 (D.D.C. 2004) .............................................................. 50

*Anderson v. Watchtower Bible & Tract Soc'y of N.Y.,*
   No. M2004-01066-COA-R9-CV, 2007 WL 161035
   (Tenn. Ct. App. Jan. 19, 2007) ....................................................... 45, 51

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................ 49

*Axon Enter. v. FTC,*
   598 U.S. 175 (2023) ...................................................................... 19, 30

*Azima v. RAK Inv. Auth.,*
   926 F.3d 870 (D.C. Cir. 2019) .............................................................. 49

*Bell v. Presbyterian Church (U.S.A.),*
   126 F.3d 328 (4th Cir. 1997) .......................................................... 37, 48

*Belya v. Kapral,*
   45 F.4th 621 (2d Cir. 2022) ........................................................... 27, 28

*Belya v. Kapral,*
   59 F.4th 570 (2d Cir. 2023) ............................................ 28, 29, 30, 48

*Bennett v. Kiggins,*
   377 A.2d 57 (D.C. 1977) ...................................................................... 40

*Billard v. Charlotte Catholic High Sch.*,
    101 F.4th 316 (4th Cir. 2024) ...................................................... 22, 23

*Bouldin v. Alexander*,
    82 U.S. (15 Wall.) 131 (1872) .............................................................. 23

*Bryce v. Episcopal Church*,
    289 F.3d 648 (10th Cir. 2002) ...................................................... 39, 48

*Busby v. Capital One*,
    772 F.Supp.2d 268 (D.D.C. 2011) ...................................................... 52

*Cannon v. District of Columbia*,
    717 F.3d 200 (D.C. Cir. 2013) .............................................................. 7

*Carroll Coll. v. NLRB*,
    558 F.3d 568 (D.C. Cir. 2009) ...................................................... 22, 44

*Carson v. Makin*,
    596 U.S. 767 (2022) ............................................................................ 40

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949) ...................................................................... 1, 18

*Conlon v. InterVarsity Christian Fellowship*,
    777 F.3d 829 (6th Cir. 2015) .............................................................. 22

*Demkovich v. St. Andrews the Apostle Parish*,
    3 F.4th 968 (7th Cir. 2021) .......................................................... 40, 43

*Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .............................................................................. 20

*In re Diocese of Lubbock*,
    624 S.W.3d 506 (Tex. 2021) ........................................................ 26, 48

*Dist. No. 1, Pac. Coast Dist. v. Liberty Mar. Corp.*,
    933 F.3d 751 (D.C. Cir. 2019) ............................................................ 18

*Duquesne University of the Holy Spirit v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020) ................................ 21-22, 31, 32, 35, 42

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) .................................... 3, 4, 18, 20, 21, 31,
    32, 33, 40, 41, 42, 47-48

*El-Farra v. Sayyed*,
    226 S.W.3d 792 (Ark. 2006) ................................................................ 48

*El Pescador Church v. Ferrero*,
    594 S.W.3d 645 (Tex. Ct. App. 2019) ................................................ 38

*Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*,
    944 A.2d 1055 (D.C. 2008) ............................................................ 50, 54

*Fowler v. Rhode Island*,
    345 U.S. 67 (1953) ................................................................................ 39

*Frota v. Prudential-Bache Sec.*,
    639 F.Supp. 1186 (S.D.N.Y. 1986) ...................................................... 57

*Garrick v. Moody Bible Inst.*,
    95 F.4th 1104 (7th Cir. 2024) .................................................. 27, 28, 29

*Harris v. Matthews*,
    643 S.E.2d 566 (N.C. 2007) ............................................................ 27, 38

*Hawthorne v. Couch*,
    911 So.2d 907 (La. Ct. App. 2005) ...................................................... 38

*Hayduk v. Lanna*,
    775 F.2d 441 (1st Cir. 1985) ................................................................ 57

*Heard v. Johnson*,
    810 A.2d 871 (D.C. 2002) ............................................................... 26, 48

*Henok v. Chase Home Fin.*,
    915 F.Supp.2d 162 (D.D.C. 2013) .................................................. 41, 57

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012) ........................................................ 49-50

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012) ......................................... 21, 23, 32, 35, 36, 39, 46

*Huntsman v. Corp. of President of Church of Jesus Christ*
  *of Latter-day Saints*,
  76 F.4th 962 (9th Cir. 2023) .............................................................. 45

*Hutchison v. Thomas*,
  789 F.2d 392 (6th Cir. 1986) .............................................................. 48

*Jefferson v. Collins*,
  905 F.Supp.2d 269 (D.D.C. 2012) ................................................ 53, 55

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
  115 F.3d 1020 (D.C. Cir. 1997) ........................................................... 49

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952) .............................................................................. 46

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ............................................................. 51

*Lee v. Sixth Mount Zion Baptist Church*,
  903 F.3d 113 (3d Cir. 2018) ................................................................ 22

*Marceaux v. Lafayette City-Par.*,
  731 F.3d 488 (5th Cir. 2013) ............................................................... 20

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ...................................................................... 19, 24

*N. Am. Catholic Educ. Programming Found. v. Cardinale*,
  567 F.3d 8 (1st Cir. 2009) ............................................................... 53-54

*NLRB v. Catholic Bishop*,
  440 U.S. 490 (1979) .................................................... 20-21, 22, 23, 42

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018) ..................................................... 19-20, 22

*Our Lady of Guadalupe v. Morrissey-Berru*,
  591 U.S. 732 (2020) ...................................... 2-3, 6, 21, 32, 36, 37, 46-47

*Paul v. Jud. Watch*,
  543 F.Supp.2d 1 (D.D.C. 2008) .................................................... 56, 57

*Poblete v. Rittenhouse Mortg. Brokers*,
    675 F.Supp.2d 130 (D.D.C. 2009) ........................................ 51

*Presbyterian Church (U.S.A.) v. Edwards*,
    566 S.W.3d 175 (Ky. 2018) ................................................. 27

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l*
    *Presbyterian Church*,
    393 U.S. 440 (1969) ................................................. 32, 45

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020) ............................................ 24

*In re Rafferty*,
    864 F.2d 151 (D.C. Cir. 1988) ............................................ 20

*Rayburn v. Gen. Conf.*,
    772 F.2d 1164 (4th Cir. 1985) ............................................ 33

*Rodriguez v. Lab'y Corp. of Am. Holdings*,
    13 F.Supp.3d 121 (D.D.C. 2014) ......................................... 54

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols.*,
    60 F.Supp.3d 36 (D.D.C. 2014) ...........................40-41, 42, 55

*Sandza v. Barclays Bank*,
    151 F.Supp.3d 94 (D.D.C. 2015) ......................................... 58

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ...........................21, 31-32, 38, 44-45, 46

*Smith v. Supple*,
    293 A.3d 851 (Conn. 2023) ................................................ 26

*Sobin v. District of Columbia*,
    480 F.Supp.3d 210 (D.D.C. 2020) ....................................... 10

*St. Joseph Catholic Orphan Soc'y v. Edwards*,
    449 S.W.3d 727 (Ky. 2014) ................................................. 27

*In re Stone*,
    940 F.3d 1332 (D.C. Cir. 2019) ...................................... 16, 20

*Sundberg v. TTR Realty*,
    109 A.3d 1123 (D.C. 2015) ............................................................ 53, 55

*Surinach v. Busquets*,
    604 F.2d 73 (1st Cir. 1979) ................................................................. 43

*Thomas v. Rev. Bd.*,
    450 U.S. 707 (1981) ............................................................................ 46

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) ............................................................... 26

*Tucker v. Faith Bible Chapel*,
    36 F.4th 1021 (10th Cir. 2022) .......................................................27-28

*Tucker v. Faith Bible Chapel*,
    53 F.4th 620 (10th Cir. 2022) ............................................................. 29

*United Methodist Church v. White*,
    571 A.2d 790 (D.C. 1990) ................................................................... 26

*United States v. Martin-Baker Aircraft Co.*,
    389 F.3d 1251 (D.C. Cir. 2004) .....................................17-18, 50, 51-52

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ............................................................ 20

*United States v. Trump*,
    88 F.4th 990 (D.C. Cir. 2023) ....................................................... 18, 20

*United States v. Trump*,
    91 F.4th 1173 (D.C. Cir. 2024) .................................................... 22, 23

*University of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002) ............................................... 21, 40, 42

*Van Osdol v. Vogt*,
    908 P.2d 1122 (Colo. 1996) ................................................................ 45

*W. Rsrv. Life Assur. Co. v. Caramadre*,
    847 F.Supp.2d 329 (D.R.I. 2012) ....................................................... 53

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872)......................................................22, 32

*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018)...................................................25, 43, 49

**Statutes**

28 U.S.C. §1291.................................................................................1, 18

28 U.S.C. §1332......................................................................................1

28 U.S.C. §1367......................................................................................1

**Other Authorities**

1983 *Code of Canon Law* ................................6, 9, 10, 11-12, 56

*About USCCB*, U.S. Conference of Catholic Bishops........................10-11

Catechism of the Catholic Church (2d ed. 2000)............................6, 9, 37

Committee on National Collections, *One Church, One Mission:
  Guidelines for Administering USCCB National Collections
  in Dioceses*, U.S. Conference of Catholic Bishops (2011) ..................11

Congregation for Bishops, *Apostolorum Successores* (2004)..................10

Carl H. Esbeck, Thomas C. Berg, Richard W. Garnett, et al.,
  *Religious Freedom, Church-State Separation, and the
  Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175
  (2011) .............................................................................................27

Fed. R. Civ. P. 8 .................................................................................17

Fed. R. Civ. P. 9 .................................................................................53

Fed. R. Civ. P. 12 ...............................................................................12

Fed. R. Evid. 201.................................................................................6

*History of Peter's Pence*, The Vatican ...................................................8

*Matthew* ........................................................................................6, 34

Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307 (2016)................ 45-46

*Office of National Collections: Frequently Asked Questions*, U.S. Conference of Catholic Bishops........................ 9-10, 11, 12, 42, 56

*Peter's Pence: An Ancient Custom Still Alive Today*, The Vatican (June 2018) ...................................................................... 7, 9

*Peter's Pence: How to Send Your Contribution to the Holy Father*, The Vatican (June 2018)........................................... 7-8

*Peter's Pence*, Merriam-Webster Dictionary ........................................... 10

*Peter's penny*, Oxford English Dictionary ............................................... 10

Pope Benedict XVI, *Address to Members of St. Peter's Circle* (2006) ...................................................................................... 8

Pope Benedict XVI, *Address to Members of St. Peter's Circle* (2007) ............................................................................... 8, 9, 37

Pope Benedict XVI, *Deus Caritas Est* (2005)..................................... 9, 37

Pope Francis, *Address to Members of St. Peter's Circle* (2013)................ 9

Pope John Paul II, *Address to Members of St. Peter's Circle* (2003) ................................................................................ 8, 36

Pope John Paul II, *Apostolos Suos* (1998) ............................................... 11

Pope John Paul II, *Sacrae Disciplinae Leges* (1983)................................. 6

Pope Leo XIII, *Paternae* (1899) ................................................................. 7

Pope Paul VI, *Lumen Gentium* (1964) ..................................................... 11

Pope Pius IX, *Saepe Venerabiles Fratres* (1871) ...................................... 7

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 503-04 (2023)................................... 27

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023)................................................. 48

## JURISDICTIONAL STATEMENT

The Complaint asserts diversity jurisdiction under 28 U.S.C. §1332 and supplemental jurisdiction under 28 U.S.C. §1367. On November 17, 2023, the district court denied USCCB's motion to dismiss for lack of subject-matter jurisdiction and motion for judgment on the pleadings. A145-55. On December 18, 2023, Appellant timely noticed this appeal of that order. Dkt.40. This Court has appellate jurisdiction under 28 U.S.C. §1291. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

## INTRODUCTION

This case concerns the words spoken during Mass from the pulpit of a Rhode Island Roman Catholic church about an annual worldwide religious offering collected specifically for the Pope for over 1,000 years.

Plaintiff David O'Connell alleges he contributed an unknown amount to the offering in 2018 and, without specifying what was said during the Mass, claims he was misled about how his offering would be used. He now seeks a civil judgment that the Pope's prudential judgment to invest some of the funds was wrong because, he contends, the Holy Father was obligated to use the funds "immediately" and "exclusively" for charitable purposes. He further seeks a ruling that Pope Francis's use of the offering to support the Holy See cannot—as a matter of law—be considered part of the "charitable works of Pope Francis" or otherwise a "witness to charity" in the Catholic Church. And instead of punishing the Pope for his religious judgment, he wants a civil jury to hold liable the United States Conference of Catholic Bishops, an association of U.S. bishops which did not collect the offering and cannot as a matter of canon law control how it is used. Finally, he wants all of this not just for himself, but for a putative nationwide class.

O'Connell's claims are barred by the First Amendment, which allows religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe v. Morrissey-Berru*, 591 U.S. 732, 737

2

(2020). Under this "general principle of church autonomy," *id.* at 747, civil courts cannot second-guess the Pope's religious use of offerings expressly entrusted to his stewardship, what his "charitable works" are, what it means in the Catholic Church to be a "witness to charity," or how to interpret canon law. And they cannot supervise sermons.

These First Amendment bars are accompanied here by O'Connell's failure to satisfy basic rules of pleading. He never even specifies the alleged words that form the basis of his claims, much less that he ever relied upon—or even read—what the USCCB said about the offering. That alone dooms his claims.

Yet instead of dismissing the case, the district court below issued a short oral ruling sending it to deeply entangling merits litigation. The court's rationale was that this case can be resolved under "neutral" and "straightforward common-law principles" that would avoid interference in "purely religious" disputes.

That was error. Under this Court's precedent, only "*purely secular*" disputes can proceed in federal courts. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 466-67 (D.C. Cir. 1996) (emphasis in original). For fundamentally religious disputes like this one, there is no "neutral" way to "filter out the religious elements from the secular." *Id.* As if to prove the point, O'Connell seeks sweeping discovery into sensitive internal Church communications between the bishops, the Holy See, and Vatican City about the offering; lists of all the faithful who contributed; and copies of

3

all church law governing such offerings. His claims must thus be rejected at the outset. Otherwise, the "very process of inquiry" into the merits of the dispute will itself violate the First Amendment. *Id.* (quoting *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979)).

For that reason, this Court has jurisdiction to review the district court's order. The threshold First Amendment protection here is a fundamental part of constitutional structure. It protects the autonomy of the Church from state interference by barring not just liability but also, in cases like this one where that autonomy is obviously imperiled, the entangling burden of litigation itself. Allowing merits litigation in this case will irreparably harm the Church's autonomy and impermissibly entangle civil courts in religion.

This Court has jurisdiction and should reverse.

## STATEMENT OF ISSUES

I.    Whether this Court has jurisdiction over this appeal.

II.   Whether O'Connell's claims are barred by the First Amendment's church-autonomy doctrine.

III.  Whether O'Connell failed to sufficiently plead his claims.

## STATEMENT OF THE CASE

### I. The Papacy

The Roman Catholic Church has a distinct hierarchical structure, rooted in Sacred Scripture and tradition. This structure is not merely administrative, but an essential aspect of its identity, reflecting the Church's understanding of Christ's organization of his followers and the transmission of authority through apostolic succession.

At the apex of this hierarchy stands the Pope, the Bishop of Rome. The Pope holds "full, supreme, and universal power over the whole Church." Catechism of the Catholic Church §882 (2d ed. 2000); 1983 *Code of Canon Law* 330-331.[1] He is the Supreme Pontiff. The Pope's authority comes from his position as the successor to the first Pope, St. Peter, who was appointed directly by Christ. *See, e.g.*, *Matthew* 16:18-19.

---

[1]  Canon law is the Church's "fundamental body of ecclesiastical laws." Pope John Paul II, *Sacrae Disciplinae Leges* (1983). Canon law is binding on the faithful and has legal effect in the Church. *See id.*; Canons 11, 12. Though all members of the hierarchy apply canon law, official interpretation of all universal Church laws is reserved to the Pope and designated Vatican offices. Canon 16 §1. This Court may take judicial notice of the Code of Canon Law, the Catechism of the Catholic Church, Encyclicals, and similar church authorities. Fed. R. Evid. 201; *see*, *e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754 (2020) (relying on canon law and the catechism).

## II. Peter's Pence

The *Obolo di San Pietro*, or "Peter's Pence," is an annual offering given by Catholic faithful to the Pope. Peter's Pence is named after the original Pontiff and arose around the ninth century, when Anglo-Saxon Catholics began the practice of sending annual contributions to the Pope. A16 ¶18; *Peter's Pence: An Ancient Custom Still Alive Today*, The Vatican (June 2018), https://perma.cc/5ATN-HSFM ("*Peter's Pence Custom*").[2]

This tradition has continued. In 1871, Pope Pius IX thanked Catholic faithful for generous contributions as "proof of [the Church's] devotion and love for Us and this Apostolic See." Pope Pius IX, *Saepe Venerabiles Fratres* ¶¶1, 4 (1871) (noting the "wonderful spectacle of Catholic unity … inspired by the one spirit of God"). These contributions supported the Holy See, *see* Pope Leo XIII, *Paternae* ¶14 (1899), which in turn helped alleviate the "need of so many churches," *Saepe Venerabiles Fratres* ¶4.

Today, over a millennium since it began, Peter's Pence continues as a gift "offered by the faithful to the Holy Father," to be used both for "the many different needs of the Universal Church" and "the relief of those most in need." *Peter's Pence: How to Send Your Contribution to the Holy Father*, The Vatican (June 2018), https://perma.cc/G53Z-QP7G ("*Peter's*

---

[2] This Court may take judicial notice of official government websites. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

*Pence: How to Send Your Contribution*"). These uses include providing support for "the apostolate," "ecclesial communities" and "peoples, individuals and families in precarious conditions." Pope John Paul II, *Address to Members of St. Peter's Circle* (2003), https://perma.cc/FUC4-JTLV ("2003 Address").

This contribution is "a sign of [the faithful's] sharing in the concern of the Successor of Peter for the many different needs of the Universal Church and for the relief of those most in need." *Peter's Pence: How to Send Your Contribution*, *supra*. As Pope Benedict XVI explained, "it is precisely thanks to Peter's Pence that [the Church] can accomplish her mission of evangelization and human advancement." *Address to Members of St. Peter's Circle*, 2 (2007), https://perma.cc/8CY3-82XL ("2007 Address"). Peter's Pence thus "not only has practical value but is also highly symbolic as a sign of communion with the Pope and attention to the needs of the brethren." Pope Benedict XVI, *Address to Members of St. Peter's Circle* (2006), https://perma.cc/9BMD-QJHJ.

Further, Peter's Pence fits within the Church's larger tradition of religious giving. As an offering to the Holy See itself, it is comparable to collections taken by St. Paul to support both the early church in Jerusalem and its poor during a time of economic difficulty. *See History of Peter's Pence*, The Vatican, https://perma.cc/72GK-GXYJ (citing *Luke* 8:1-3; *John* 12:4-7; *1 Timothy* 5:17-18; *1 Corinthians* 16:1-4); *see also* 2007 Address at 1-2. And the dual focus of Peter's Pence on the spiritual and the

physical is consistent with the Church's beliefs on charity, the prime the-ological virtue in the Catholic tradition, which provides for both "spiritual and bodily necessities." Catechism §§2447, 1826-1827 (citing *1 Corinthians* 13:13); *see also* Pope Francis, *Address to Members of St. Peter's Circle* (2013), https://perma.cc/7BC2-XYAG (Peter's Pence is a "visible sign of Christ's charity to those who are in need either materially or spiritually"). The Church's "ecclesial charity" seeks to serve the suffering, regardless of their faith, while also appropriately redressing what is often "the deep-est cause of suffering": "the very absence of God." Pope Benedict XVI, *Deus Caritas Est* ¶31 (2005).

Peter's Pence is collected annually worldwide on or near the Solemnity of Saints Peter and Paul, a liturgical feast day celebrated on June 29 that commemorates the martyrdom of both saints by their civil government. *See Peter's Pence Custom, supra*. Bishops are responsible for collecting Peter's Pence, "procuring those means which the [Holy] See needs." Canon 1271. The offering is collected in dioceses and parishes and "sent to the cent[er] of the Church." *See* 2007 Address at 2.

Dioceses in the United States route offerings collected for Peter's Pence directly to the Apostolic Nuncio, the Papal representative at the Apostolic Nunciature in Washington, D.C. The offerings are then trans-ferred to the Holy See for the Pope's use. *Office of National Collections: Frequently Asked Questions*, U.S. Conference of Catholic Bishops,

https://perma.cc/4GCT-U4HR ("*Office of National Collections FAQs*").[3] The Pope exercises supreme authority over that use. Canon 331; Canon 360; Congregation for Bishops, *Apostolorum Successores* ¶14 (2004) ("Peter's Pence [is] designed to enable the Church of Rome to fulfil properly its office of presiding in universal charity" and bishops place it "at the disposal of the Holy See.").

Peter's Pence has been a part of general parlance for centuries. *Peter's Pence*, Merriam-Webster Dictionary, https://perma.cc/LNV3-MH9Z ("a voluntary annual contribution made by Roman Catholics to the pope"); *Peter's penny*, Oxford English Dictionary, https://perma.cc/AJY4-4252 ("a voluntary contribution to the papal treasury"; listing references stretching from 1209 AD to modern discussions in Encyclopedia Britannica, Vanity Fair, and the New York Times).

## III. The United States Conference of Catholic Bishops

USCCB, a nonprofit organization, is an assembly of Catholic bishops who jointly exercise pastoral functions on behalf of the Christian faithful of the Catholic Church in the United States and the U.S. Virgin Islands. *About USCCB*, U.S. Conference of Catholic Bishops,

---

[3] This Court may take judicial notice of USCCB's website, which is incorporated by reference into O'Connell's Complaint. *Abhe & Svoboda v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *Sobin v. District of Columbia*, 480 F.Supp.3d 210, 221 n.8 (D.D.C. 2020). O'Connell's allegations rely heavily on USCCB's website. *See*, *e.g.*, A14 ¶10; A16-20 ¶¶18-24, 26.

https://perma.cc/RM7R-FW9N. USCCB must act in accord with canon law and the Catholic Church's teachings. Pope John Paul II, *Apostolos Suos* IV, Art. 4 (1998); *accord* Pope Paul VI, *Lumen Gentium* ¶22 (1964).

As part of its mission to support the work of the Church, USCCB operates an Office of National Collections that serves as a coordination point for various annual collections. *See* Committee on National Collections, *One Church, One Mission: Guidelines for Administering USCCB National Collections in Dioceses*, 3, U.S. Conference of Catholic Bishops (2011), https://perma.cc/6P4T-UNVZ. USCCB-authorized and administered collections support the global church and include the Collection for the Church in Latin America, The Catholic Relief Services Collection, and the Catholic Campaign for Human Development. *Id*. Such collections support USCCB's ministry, and USCCB itself receives and decides how to use them.

USCCB's involvement with universal collections like Peter's Pence is very different. Although USCCB "oversees the promotion of the Peter's Pence Collection" in the United States, A16-17 ¶19, USCCB does not administer, oversee, collect or distribute the funds collected for Peter's Pence. *See Office of National Collections FAQs*. USCCB's role in Peter's Pence is creating promotional materials in English and Spanish. A17 ¶20. Dioceses may choose to use them, but USCCB does not exercise any canonical control over individual dioceses; canon law entrusts that responsibility to each diocesan bishop. Canon 381; Canon 455 §4; Canon

11

1266. Collected offerings are routed by dioceses directly to the Apostolic Nunciature. If funds are mistakenly transmitted to USCCB, they are transferred or forwarded to the Apostolic Nunciature. *See Office of National Collections FAQs.*

## IV. O'Connell's Offering to the Pope

David O'Connell is a parishioner of Sacred Heart Church in East Providence, Rhode Island. On January 22, 2020, he filed a putative class-action complaint against USCCB in federal district court, claiming that USCCB committed fraud, unjust enrichment, and breach of fiduciary duty.

In support, O'Connell alleges that, in summer 2018, he gave some unspecified amount to Peter's Pence after hearing a "solicit[ation] from the pulpit" "during a Sunday Mass" at his church. A25-26 ¶34. He does not identify the speaker, and he does not specify the content of the message from the pulpit other than that "[n]othing [O'Connell] saw or heard, on that day or beforehand, told him or made him understand that his donations to Peter's Pence would be used for anything other than emergency assistance to the neediest people around the world." *Id.*

O'Connell alleges that he was intentionally misled when he somehow received the message that Peter's Pence collections would be used "immediately" and "exclusively" for humanitarian purposes, rather than for other religious purposes or investments intended to serve those purposes in the future. A26 ¶36; A30-32 ¶¶48-49, 52-53, 55. None of the USCCB

12

materials O'Connell quotes use the terms "exclusively" or "immediately," A16-21 ¶¶18-26, or otherwise represent that all funds are used only for "emergency assistance," A26 ¶34.

To show "exactly" how USCCB allegedly "illustrates the purpose of Peter's Pence," O'Connell quotes a bulletin insert that USCCB made available for dioceses to use at their discretion. A18 ¶22. The optional insert, which O'Connell does not allege his parish used, much less at the Mass in question, states: "By supporting the Peter's Pence Collection, you assist the charitable works of Pope Francis. Your generosity witnesses to charity and helps the Holy See reach out compassionately to those who are marginalized." *Id*. The optional insert then encourages parishioners to "learn more" by visiting the Vatican's Peter's Pence webpage. *Id.* O'Connell also quotes an optional "Parish Appeal" that could be "read from the pulpit at church services," which similarly states that Peter's Pence "supports the charitable works of Pope Francis." A19 ¶24.

The Complaint never alleges that O'Connell heard, saw, or relied upon any of these optional materials before giving his contribution to Peter's Pence. Further, O'Connell acknowledges that the Pope controlled the alleged use of Peter's Pence. A24 ¶31. He alleges Pope Francis gave some of the offering to the poor and put most of it into investments or support for the Holy See. A23-24 ¶¶28, 30. O'Connell never alleges that the Pope, any official within USCCB, or any other individual took the offering for personal gain or nonchurch uses. He seeks to certify a class of all persons

13

in the United States who donated money to Peter's Pence and requests monetary damages and injunctive relief.

## V. Procedural Background

O'Connell initially sued USCCB in the U.S. District Court for the District of Rhode Island. A2-3. On USCCB's motion, the case was transferred to the U.S. District Court for the District of Columbia.

O'Connell served discovery requests seeking a broad swath of USCCB, diocesan, and Vatican documents, including lists of all donors to Peter's Pence; all documents related to the ultimate use of Peter's Pence offerings; all church laws and guidelines relating to Peter's Pence; and even all communications with the "Holy See, Vatican City, [and] Apostolic Nunciature" relating to Peter's Pence. *See*, *e.g.*, A175. O'Connell told the district court that he will "need" such evidence to prove his claims, and that without such records of the "collection, administration, accounting, or disposition" of Peter's Pence, he "cannot" make out his case. A170, A172.

Invoking the standard in Rule 12(b)(1), USCCB filed a motion to dismiss the Complaint and for judgment on the pleadings, arguing that the court lacked subject-matter jurisdiction because resolving O'Connell's claims would violate the First Amendment by intruding on the Catholic Church's internal governance. USCCB also argued that O'Connell failed to adequately plead his claims.

In opposition, O'Connell repeated his demand for invasive discovery, stating his view that "discovery is necessary" into all that USCCB "actually does and does not do with respect to the collection," and that "[i]t is plain that discovery is needed" to pry into how each and every Peter's Pence offering was spent. Dkt.24 at 18 n.18, 22. He emphasized that his claims would involve, among other things, asking civil courts to construe internal USCCB guidelines for collections at the national, diocesan, and parish level, *id.* at 4-5, 18, and to scrutinize church speech from the Vatican, dioceses, and parish pulpits around the country, *id.* And he reiterated that he views an essential legal component of his case as involving a judicial determination of what it means for all Peter's Pence offerings to be used "immediately" and "exclusively" for the "charitable works of Pope Francis." *Id.* at 5-6, 16 n.16.

On November 17, 2023, the district court orally denied USCCB's motion to dismiss. A146. It acknowledged that the church-autonomy doctrine was a "threshold" issue, since "federal courts lack jurisdiction over disputes that cannot be resolved without extensive inquiry into religious law and polity." A146-47. Nonetheless, the court held that a lawsuit over a religious offering to the Pope given at Mass was a secular dispute governed by "straightforward common-law principles" that could be resolved by a civil jury. A149. The court did so by importing the so-called "neutral principles" approach from church property disputes and applying it to O'Connell's tort claims. A148 (citing *Jones v. Wolf*, 443 U.S. 595 (1979)).

15

Under that approach, because the court did not believe the case would require inquiring into "purely religious determinations" such as how "the church chooses to use its funds," it found the First Amendment was not implicated. A149. The court next held that O'Connell had sufficiently pled his tort claims, A151-54, and instructed the parties to proceed to the merits, A155.

USCCB timely appealed. Dkt.40. This Court issued an order requesting that USCCB explain the basis for appellate jurisdiction. Order of Dec. 22, 2023. USCCB did so, and O'Connell filed a response on April 3, 2024. This Court issued an order sending the jurisdictional issue to the merits panel on June 20, 2024.

## SUMMARY OF ARGUMENT

**I.** This Court has appellate jurisdiction through the collateral order doctrine. The district court's order conclusively determined important structural First Amendment rights that are separate from the merits and will be effectively unreviewable on appeal. This Court has repeatedly recognized that "alleged injur[ies] to First Amendment rights during the pendency of a case" warrant interlocutory appeal. *In re Stone,* 940 F.3d 1332, 1340-41 (D.C. Cir. 2019). Numerous other courts and scholars agree that this rule applies to the First Amendment's structural protection for church autonomy. Interlocutory review is necessary to prevent irreparable harm to First Amendment rights.

16

**II.** The church-autonomy doctrine bars O'Connell's claims. That protection prohibits courts from intruding on churches' independence in matters of faith, doctrine, and internal governance. O'Connell's Complaint makes plain, and the discovery he seeks confirms, that the Complaint violates this rule four times over. The allegations require entangling civil courts in (1) second-guessing the Pope's prudential judgment on stewarding religious offerings from the faithful, (2) comparing church speech from the pulpit at Mass with canon law and statements of other church leaders, (3) questioning church structure and polity; and (4) intrusive merits discovery into sensitive internal religious decisions.

**III.** O'Connell failed to meet Rule 8's pleading standards, let alone Rule 9's heightened requirements for fraud-based claims. His fraud claim lacks allegations supporting the basic who, what, where, and when of the alleged fraud. His unjust enrichment claim fails to plausibly allege (as it must) that O'Connell either conferred a benefit on USCCB or that USCCB retained any benefit. And his breach of fiduciary duty claim—also subject to Rule 9—is a threadbare allegation that a fiduciary relationship existed and was breached, without any supporting facts.

## STANDARD OF REVIEW

This Court reviews de novo the district court's denial of USCCB's motion to dismiss, or, alternatively, motion for judgment on the pleadings. *United States v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C.

17

Cir. 2004); *Dist. No. 1, Pac. Coast Dist. v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019).

## ARGUMENT

### I. This Court has jurisdiction over this appeal.

This Court has jurisdiction under the collateral-order doctrine. Federal appellate courts may hear appeals of "all final decisions of the district courts of the United States," 28 U.S.C. §1291, which include pre-judgment orders concerning rights that are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred," *Cohen*, 337 U.S. at 546. An order falls into that category if it "is effectively unreviewable on appeal from a final judgment," "conclusively determines the disputed question," and "resolves an important issue completely separate from the merits of the action." *United States v. Trump*, 88 F.4th 990, 1000 (D.C. Cir. 2023).

Each requirement is met here. USCCB does not merely assert a right to prevail against O'Connell's claims. It asserts a First Amendment autonomy from being "deposed, interrogated, and haled into court" to question the Pope's judgment about how to steward a religious offering. *Catholic Univ.*, 83 F.3d at 467. That autonomy is distinct from the merits of O'Connell's claims, was conclusively rejected by the district court's order requiring the case to proceed to merits litigation, and will be irreparably harmed absent immediate review. This Court thus has jurisdiction to reach and resolve USCCB's church-autonomy defenses.

And it should reach them. O'Connell's unusually intrusive claims raise a threshold legal issue rooted in the First Amendment's structural limitations on the power of the state to interfere in internal religious affairs. If USCCB is correct, delayed review will breach both its independence in matters of religion and the judiciary's concomitant duty to avoid entanglement in such matters. O'Connell's merits litigation will itself be a "here-and-now" First Amendment injury caused by subjecting the Catholic Church to "an unconstitutionally structured decisionmaking process." *Axon Enter. v. FTC*, 598 U.S. 175, 191-92 (2023).

## A. This Court has jurisdiction under the collateral-order doctrine over USCCB's church-autonomy defenses.

This Court has repeatedly held that the *Cohen* factors are satisfied where First Amendment interests are threatened by the process of litigation or where the Constitution provides a right against the burdens of litigation. Both are true here.

### 1. The district court's order is effectively unreviewable absent immediate appeal.

The "major characteristic" of an appealable collateral order "is that unless it can be reviewed before the proceedings terminate, it can never be reviewed at all." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (cleaned up). And the "decisive consideration" on that score is whether "a substantial public interest or some particular value of a high order" would be "imperil[ed]" by "delaying review until the entry of final judgment." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 529

(D.C. Cir. 2018) (quoting *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 107 (2009)). That decisive consideration is easily met here.

*First*, the First Amendment's Religion Clauses embody substantial interests of the "highest order": "the constitutional right of a church to manage its own affairs free from governmental interference." *Catholic Univ.*, 83 F.3d at 460. And this Court has "long allowed" interlocutory appeal of "alleged injur[ies] to First Amendment rights during the pendency of a case." *In re Stone,* 940 F.3d at 1340-41; *see also Marceaux v. Lafayette City-Par.*, 731 F.3d 488, 490 (5th Cir. 2013) (courts have "repeatedly" granted interlocutory appeal "in cases in which pre-trial orders arguably infringe on First Amendment rights"). That is because First Amendment protections implicate "important issue[s]," and delayed appeal cannot redress "unconstitutional prohibitions" imposed on these rights "prior to or during trial." *Trump*, 88 F.4th at 1000-01. Infringing First Amendment rights "for even minimal periods of time" causes irreparable harm, *Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020), meaning "a slow, tortuous appeal, filed after a long, time-consuming trial, is not an effective remedy," *In re Rafferty*, 864 F.2d 151, 154 (D.C. Cir. 1988).

*Second*, where a right protects "not only from the consequences of litigation's results but also from the burden of defending" from suit, "post-trial review" of an order denying that protection "is insufficient to vindicate [constitutional] rights." *United States v. Rostenkowski*, 59 F.3d 1291, 1297 (D.C. Cir. 1995). Here, "[i]t is not only the conclusions that may be

reached by the [court] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Catholic Bishop*, 440 U.S. at 502. Those rights bar "any attempt" by courts "even to influence" matters of faith, doctrine, or governance, *Our Lady*, 591 U.S. at 746—including by "inquiring into" internal religious decisions, *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 187 (2012), or "analyz[ing]" the "ecclesiastical actions of a church*," Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976). Church-autonomy rights accordingly can be harmed by "the *mere adjudication* of such questions." *Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., joined by Kagan, J., concurring) (emphasis added).

This Court has repeatedly recognized the immediate harm arising from the process of inquiry into religious disputes. It held in *Catholic University* that being "deposed, interrogated, and haled into court" over a religious dispute itself violated the First Amendment. 83 F.3d at 466-67. *University of Great Falls v. NLRB* held that the government "trolling through" the "nature of the University's religious beliefs and how the University's religious mission was implemented" violated the First Amendment. 278 F.3d 1335, 1341-43 (D.C. Cir. 2002). And in *Duquesne University of the Holy Spirit v. NLRB*, this Court echoed *Catholic Bishop* in recognizing that the "very process" of inquiring into religious beliefs would "impinge on rights guaranteed by the Religion Clauses" and "entangle the [Court] in religious affairs." 947 F.3d 824, 829-30 (D.C. Cir.

2020); *accord Carroll Coll. v. NLRB*, 558 F.3d 568, 571 (D.C. Cir. 2009).

Thus, as detailed below in Section II, "delaying review" until after invasive merits discovery and civil rulings on questions of internal church governance and canon law would not merely "imperil" church autonomy, *Oglala Sioux Tribe*, 896 F.3d at 529, but would violate it in ways that cannot be repaired after trial.

*Third*, *Cohen*'s application is appropriate because USCCB's specific First Amendment rights imperiled here are structural protections akin to the separation of powers, which have long received interlocutory review. *See United States v. Trump*, 91 F.4th 1173, 1186-88 (D.C. Cir.) (collecting cases), *vacated on other grounds*, 144 S. Ct. 2312 (2024).

Like the "separation of powers," church autonomy is "grounded" in "constitutional structure," "confin[ing] the state and its civil courts to their proper roles." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024); *Catholic Bishop*, 440 U.S. at 500-01 (comparing "Religion Clauses" to the "separation of powers" as highly ranked "national values").[4] The "relations of church and state under our system of laws," *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1872), leave civil

---

[4]  *Accord Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) ("structural limitation imposed on the government"); *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (citing *Conlon*, agreeing right is "rooted in constitutional limits on judicial authority").

courts "no power" to adjudicate religious disputes, *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872). The "principles of the First Amendment" prohibit the "power of the state" from "intrud[ing] … into the forbidden area of religious freedom." *Hosanna-Tabor*, 565 U.S. at 187 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 119 (1952) (internal quotation marks omitted)).

This "structural understanding" of church autonomy "immunizes" religious groups from entangling merits litigation and "exempt[s] from legal process 'decisions of religious entities'" over internal religious matters. *Billard*, 101 F.4th at 325-26. Denials of such structural claims to immunity are "quintessential examples" of appealable collateral orders. *Trump*, 91 F.4th at 1183. And given O'Connell's intrusive allegations, the basis for jurisdiction here is far more than "colorable," and is therefore "sufficient to confer appellate jurisdiction." *Id.* at 1187.

\* \* \*

Absent immediate appeal, this case promises to be a model of how merits litigation harms church autonomy. A post-judgment appeal won't be able to disentangle the "impermissible entanglement" caused by "subject[ing] church personnel and records to subpoena, discovery, and cross-examination." *Catholic Univ.*, 83 F.3d at 467.

23

### 2. The district court's order conclusively determines that USCCB must defend the case on the merits.

By denying USCCB's church-autonomy defense, the district court also conclusively determined the issue here: whether USCCB may "be compelled to defend on the merits." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 581-82 (D.C. Cir. 2020). "Because the district court conclusively rejected that contention," and thus required USCCB to "defend litigation on the merits despite an unresolved assertion of immunity," "the [conclusiveness] prong of the collateral-order doctrine is satisfied." *Id.*

### 3. USCCB's church-autonomy defenses are collateral to the merits of O'Connell's claims.

The resolution of USCCB's threshold assertion of church autonomy is entirely separate from the merits of O'Connell's claims. The "question of law"—whether the Religion Clauses provide a "claim of immunity" from merits litigation—is "conceptually distinct" from "the merits" of whether O'Connell was somehow misled from the pulpit in a manner that could somehow be attributed to USCCB. *See Mitchell*, 472 U.S. at 527-28. Here, this Court "need not consider the correctness of the plaintiff's version of the facts"; instead, "[a]ll it need determine is a question of law." *Id.* at 528. That is "precisely" the kind of inquiry that is sufficiently separate from the merits. *Process & Indus.*, 962 F.3d at 582.

**B. Other courts and scholars confirm that church-autonomy defenses permit interlocutory appeal.**

A host of other courts and leading scholars agree that church-autonomy defenses warrant interlocutory appeal. The handful of cases suggesting otherwise are distinguishable.

## 1. Caselaw and scholarship confirm that church-autonomy defenses can obtain interlocutory appeal.

In *Whole Woman's Health v. Smith,* the Fifth Circuit recognized that church autonomy's "structural protection" permitted interlocutory appeal of the denial of a church-autonomy defense addressed solely to further discovery into religious deliberations, not liability. 896 F.3d 362, 366, 373 (5th Cir. 2018). There, a district court ordered all Catholic bishops in Texas to comply with a third-party subpoena and produce internal communications about abortion. *Id*. at 366. The bishops sought interlocutory review, claiming the order threatened irreparable harm to the protections the Religion Clauses afford religious organizations. *Id*. at 373.

The Fifth Circuit agreed, explaining that the bishops' asserted rights "go to the heart of the constitutional protection of religious belief and practice," and that "the importance of securing religious groups' institutional autonomy … cannot be understated." *Id*. at 368, 374. Because "the consequence of forced discovery" would be "'effectively unreviewable' on appeal from the final judgment," the court permitted interlocutory review, relying on cases recognizing that "First Amendment rights remain subject to appeal pursuant to the collateral order doctrine." *Id*. at 367-68.

25

The D.C. Court of Appeals has agreed. Applying *Cohen* and citing *Catholic Bishop*, the court held it had jurisdiction to consider the denial of a church-autonomy defense because the Religion Clauses "grant churches an immunity from civil discovery and trial under certain circumstances." *United Methodist Church v. White*, 571 A.2d 790, 792-93 (D.C. 1990). The defense had to be evaluated "before trial" because, "once exposed to discovery and trial, the constitutional rights … to operate free of judicial scrutiny would be irreparably violated." *Id.* at 793; *accord Heard v. Johnson*, 810 A.2d 871, 876-77 (D.C. 2002) (collecting cases).

Several state high courts have agreed that the substance of the Religion Clauses protect against the burdens of merits litigation and permit interlocutory appeal:

- *Smith v. Supple*, 293 A.3d 851, 864 (Conn. 2023) ("[L]itigating a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a First Amendment violation");

- *In re Diocese of Lubbock*, 624 S.W.3d 506, 515-16 (Tex. 2021) (allowing interlocutory appeal, finding church autonomy bars "any investigation" by courts of "the internal decision making of a church judicatory body"); *Tilton v. Marshall*, 925 S.W.2d 672, 682 (Tex. 1996) ("trial itself," not "merely the imposition of an adverse judgment, would violate [religious defendant's] constitutional rights");

26

- *Presbyterian Church (U.S.A.) v. Edwards*, 566 S.W.3d 175, 179 (Ky. 2018) (Religion Clauses protect "against the 'cost of trial' and 'burdens of broad-reaching discovery'"); *St. Joseph Catholic Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014) (similar);

- *Harris v. Matthews*, 643 S.E.2d 566, 570 (N.C. 2007) ("substantial" church-autonomy rights are "irreparably injured" by allowing merits proceedings).

Scholars have also concluded that the Religion Clauses protect against merits discovery and trial, not just liability, and allow interlocutory appeal in appropriate cases. *See*, *e.g.*, Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 503-04 (2023); Carl H. Esbeck, Thomas C. Berg, Richard W. Garnett et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 185-90 (2011).

### 2. Contrary cases are distinguishable.

The handful of cases declining to exercise collateral-order jurisdiction all turned on perceived disputes of fact. *See Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1115 (7th Cir. 2024) (stating case turned on "veracity of … factual allegations" regarding whether asserted religious reasons were pretextual); *Belya v. Kapral*, 45 F.4th 621, 632-34 (2d Cir. 2022) (stating "non-ecclesiastical questions of fact remain," including whether certain letters were signed and sealed), *cert. denied*, 143 S.Ct. 2609 (2023); *Tucker v. Faith Bible Chapel*, 36 F.4th 1021, 1035 & n.8 (10th Cir.

2022) (stating "quintessentially … factual determination" of whether employee was a minister remained), *cert. denied*, 143 S.Ct. 2608 (2023). No such disputes are present here, where the Complaint on its face demands invasion of church-autonomy principles.

Those cases also all arose from employment-related disputes. *See Moody*, 95 F.4th at 1107-09; *Belya*, 45 F.4th at 625-28; *Faith Bible*, 36 F.4th at 1026-27. But this case concerns the Pope's prudential religious judgments over an expressly religious offering he has stewarded for a millennium, the words spoken from the pulpit during a Mass about that offering, and issues of church polity and canon law.

Indeed, the analysis in those other cases may well have yielded different outcomes on these facts. *Moody* acknowledged that, under circuit precedent, a "clear violation of church autonomy" such as second-guessing "the Holy See on a decidedly doctrinal question" allowed interlocutory appeal. 95 F.4th at 1113-14 (citing *McCarthy v. Fuller,* 714 F.3d 971 (7th Cir. 2013) (Posner, J.)). The *Belya* panelists likewise agreed that a pre-judgment order injecting the court "into matters of church governance" could "be immediately appealable." *Belya v. Kapral*, 59 F.4th 570, 583 (2d Cir. 2023) (Chin, J., statement respecting denial of rehearing en banc); *accord id.* at 572 (Lohier, J., concurring); *see also Faith Bible*, 36 F.4th at 1032 n.7 (acknowledging that interlocutory appeal of church-autonomy defenses "presents difficult questions" distinct from the ones it resolved).

And here, this case presents an obvious intrusion into church governance burdening church autonomy.

To the extent O'Connell reads those cases as limiting church autonomy to protect only against liability and never against the burdens of litigation, that reading conflicts with precedent of the Supreme Court, this Circuit, and other appellate courts. *Supra* Section I(A)(1) (citing, *e.g.*, *Catholic Bishop*, *Catholic University*, and *Duquesne*); *see also Moody*, 95 F.4th at 1121 (Brennan, J., dissenting) ("[T]he Religion Clauses prevent not just an adverse judgment, but also the irreparable harm caused by judicial proceedings where a secular court will take sides on issues of religious doctrine." (cleaned up)); *Belya*, 59 F.4th at 577-82 n.2 (Park, J., joined by Livingston, C.J., and Sullivan, Nardini, & Menashi, JJ., dissenting from denial of rehearing en banc) (explaining that the reasoning of *Our Lady*, *Hosanna-Tabor*, *Catholic Bishop*, and *Milivojevich* "leads to the same conclusion: that 'the very process of inquiry' into matters of faith and church governance offends the Religion Clauses"); *id.* at 573 (Cabranes, J., dissenting from denial of rehearing en banc); *Tucker v. Faith Bible Chapel*, 53 F.4th 620, 625 (10th Cir. 2022) (Bacharach, J., joined by Tymkovich & Eid, JJ., dissenting from denial of rehearing en banc) ("structural role" of the Religion Clauses "limit[s] governmental power over religious matters" and "protects a religious body from the suit itself" to avoid "protracted litigation over matters of religion").

29

And time has shown the trouble with reading church autonomy as merely a defense to liability. On remand in *Tucker*, the trial court's insistence on intrusive merits discovery and trial forced the church to settle, despite overwhelming evidence showing the plaintiff—a chaplain and religion teacher—was a minister. *Tucker v. Faith Bible Chapel*, 19-cv-1652 (D. Colo.), Dkts.104 (minute order), 112 (hearing transcript) (trial court emphasizing the parties should settle because, even though the church would likely prevail on appeal "based on the law," Dkt.112 at 13, "the discovery process, preparation for trial, [and] a lengthy jury trial … will be <u>very</u> expensive," Dkt.104). And on remand in *Belya*, despite promises that the plaintiff would only inquire into who signed what and when, the Russian Orthodox Church Outside of Russia and its most senior leadership were forced to answer intrusive inquiries about "their understanding of canon law" regarding the election of a bishop. *See* Mem. of Law at 16-17, *Belya v. Kapral*, No. 20-cv-06597 (S.D.N.Y. Aug. 5, 2024), Dkt.111. When the *Belya* dissenters said O'Connell's reading would "eviscerate" church autonomy, they were right. 59 F.4th at 580.

\* \* \*

USCCB is asserting a "structural constitutional claim[]" rooted in the First Amendment that, as result of the order below and the nature of O'Connell's allegations, will be "'effectively lost' if review is deferred." *Axon Enter.*, 598 U.S. at 191-92. Thus, the denial of that claim satisfies *Cohen*. This Court has jurisdiction over this appeal.

30

## II. O'Connell's claims are barred by the First Amendment's church-autonomy doctrine.

The Religion Clauses "guarantee[]" the Church "independence from secular control or manipulation" in its internal affairs. *Duquesne*, 947 F.3d at 828. Courts have recognized that this independence bars judicial resolution of claims disputing how the Church (1) stewards religious offerings for religious purposes, (2) speaks to the faithful about religious matters, and (3) governs internal church polity. It also prohibits (4) claims that require entangling intrusions into religious matters. Any one of those invasions of church autonomy suffices to dismiss a claim. And the Complaint implicates all four.

The district court thus should have dismissed the Complaint on church-autonomy grounds. But it declined. Instead, it decided that the "neutral principles" approach could resolve the case without touching on religious matters. A149. That was error. Under the Complaint's terms, it is impossible to "filter out the religious elements" intrinsic to O'Connell's claims. *Catholic Univ.*, 83 F.3d at 466. And the district court's use of the "neutral principles" approach in this context is a mistake this Court and others have long rejected.

### A. Church autonomy bars claims that interfere with matters of faith, doctrine, and internal church governance.

"[C]ivil courts exercise no jurisdiction" over religious questions, such as "theological controversy, church discipline, [and] ecclesiastical govern-

31

ment." *Milivojevich*, 426 U.S. at 713-14. This doctrine of church autonomy is rooted in a "long line of Supreme Court cases that affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Catholic Univ.*, 83 F.3d at 462 (quoting *Kedroff*, 344 U.S. at 116). It is a "broad principle," *Our Lady*, 591 U.S. at 747, which "lies at the foundation of our political principles," *Watson*, 80 U.S. at 728, was part of the "background" against which "the First Amendment was adopted," *Hosanna-Tabor*, 565 U.S. at 182-88, and can be traced through 150 years of Supreme Court precedent, *id*.

Church autonomy is grounded in both the Free Exercise Clause and the Establishment Clause, because "[s]tate interference" to "dictate or even to influence such matters" would "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Our Lady*, 591 U.S. at 746. Involving civil government in this sphere would "plainly jeopardize" constitutional "values" by both "inhibiting the free development of religious doctrine" and entwining "secular interests in matters of purely ecclesiastical concern." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). "In tandem," then, "the Religion Clauses establish a 'scrupulous policy … against a political interference with religious affairs.'" *Duquesne*, 947 F.3d at 827-28 (quoting *Hosanna-Tabor*, 565 U.S. at 184).

To protect the "century-old affirmation of a church's sovereignty over its own affairs," courts must not only refrain from "choosing among competing religious visions," but also must more generally avoid "situations where a protracted legal process pits church and state as adversaries." *Catholic Univ.*, 83 F.3d at 463, 465 (cleaned up).

## B. O'Connell's claims interfere with matters of faith, doctrine, and internal church governance.

The Complaint invades USCCB's First Amendment rights in four ways. First, O'Connell's allegations require civil courts to second-guess the Pope's judgment on how best to steward a religious offering given to him by the faithful. Second, O'Connell's allegations require civil courts to use a religious invitation from the pulpit at Mass as the basis for liability, directly interfering in internal matters of religious speech, canon law, and deliberation. Third, to establish the elements of his claims—such as the truth or falsity of USCCB's statements or whether USCCB retained any Peter's Pence offerings for itself—O'Connell will necessarily need the court to become entangled in religious doctrine and governance. And finally, to answer any of these inquiries will require invoking "the full panoply of legal process designed to probe the mind of the church," *Rayburn v. Gen. Conf.*, 772 F.2d 1164, 1171 (4th Cir. 1985), itself a First Amendment violation.

33

## 1. The claims call for second-guessing the Pope's use of religious offerings.

In this case, O'Connell's claims boil down to second-guessing the prudential judgment of the Church's most senior leader—the Pope—to choose to spend or invest religious offerings that have been provided to him for his religious uses by the faithful for over a millennium. But O'Connell nowhere disputes that the Holy Father's use of the offerings was religious. He doesn't assert that the Pope or anyone else strayed from the religious mission of Peter's Pence by spending funds on an illicit purpose. He instead quibbles with whether these offerings were spent "immediately" and "exclusively" for "assist[ing] the charitable works of Pope Francis" as "witnesses to charity." A18 ¶22; A30-31¶¶48-49, 52-53, 55.

But that suffers from several pitfalls. First, O'Connell acknowledges that at least *some* of the offering *has* gone to "charitable works" he deems acceptable with an alacrity he approves of. A24 ¶30. Far from presenting binary questions, then, O'Connell's claims involve matters of degree. They require a civil determination that it was "improper" for the Pope to conclude that "mak[ing] an investment" with some amount of Peter's Pence for some period of time was wise stewardship of a religious offering entrusted to his care. Dkt.24 at 22; A24 ¶31; *but see*, *e.g.*, *Matthew* 25:14-30 (parable on stewardship and investment).

That kind of fine-grained second-guessing would necessarily "involve[] the same intrusive inquiry and the *exact* kind of questioning into religious matters" that this Court has already found unconstitutional. *Duquesne*, 947 F.3d at 830 (internal quotation marks omitted). It is "*far* outside the competence" of judges to "determine whether various faculty" of a Catholic school are "sufficiently religious." *Id.* at 835-37 (emphasis added). So it is exponentially further afield for judges and juries to scrutinize the Supreme Pontiff's prudential decisions about spending religious offerings "immediately" and "exclusively"—and then hold USCCB liable if they decide he hasn't.

In any event, O'Connell's Complaint never identifies any statement he heard at the time of his offering that the Pope would "immediately" or "exclusively" do anything. Indeed, O'Connell's only argument supporting "immediately" appears not in the Complaint, but in his opposition briefing below. There, he quotes USCCB guidelines as stating that certain collections should "immediately" be sent in "without delay and in their entirety." Dkt.24 at 5. But this only shows the wisdom of why the Supreme Court has emphasized that "inquiring into whether the Church ha[s] followed its own procedures" is off-limits for civil courts. *Hosanna-Tabor*, 565 U.S. at 187 (quoting *Milivojevich*, 426 U.S. at 720). Even if O'Connell had been aware of the guidelines before making his offering

(which he doesn't claim he was), "immediately" only refers to the obligation of dioceses not to withhold collected offerings but rather to send them promptly to the place where offerings are aggregated.

Second, what O'Connell alleges that USCCB actually stated is that Peter's Pence is used for "assist[ing] the charitable works of Pope Francis." A18 ¶22. But how is a civil court supposed to determine as a matter of law that offerings used to support the Holy See itself (as O'Connell alleges most of them were, A24 ¶30) *weren't* "assisting the charitable works of Pope Francis"? The Holy See has an "unusual" significance for advancing the "concerns of the universal Church" as the home "of the Successor of Peter" and thus "the cent[er]" and "the heart of the entire People of God." *See* 2003 Address. Can a "civil factfinder sit[] in ultimate judgment" of the Vatican's importance in accomplishing the Pope's charitable mission? *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., joined by Kagan, J., concurring).

Third, the meaning of a Pope's "charitable works" and "witnessing to charity" are inescapably religious. For a civil court to insert its own secular definition—especially for communications within the Church during Mass from the pulpit—would be an unprecedented intrusion into "matters of internal [church] government" and issues of "faith and doctrine" protected by the First Amendment. *Our Lady*, 591 U.S. at 747. The Pope's understanding of how to fulfill the Church's charitable mission, including

36

expressly in the context of Peter's Pence, requires making pastoral judgments about how best to provide for spiritual needs. *See*, *e.g.*, *Deus Caritas Est* ¶22; Catechism §§2447, 1827; 2007 Address at 1. The First Amendment leaves such questions of religious mission in the hands of the Church, not judges and juries. *Our Lady*, 591 U.S. at 747.

It is for such reasons that multiple courts have barred lawsuits challenging how houses of worship spend religious funds. In *Bell v. Presbyterian Church (U.S.A.)*, a former employee sued a Presbyterian denomination and other religious ministries over their choices of how to "expend funds raised by the church for religious purposes." 126 F.3d 328, 332-33 (4th Cir. 1997). The Fourth Circuit concluded that the claims were beyond its power to adjudicate, since such decisions "fall[] within the ecclesiastical sphere that the First Amendment protects from civil court intervention." *Id.* at 333.

Similarly, in *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F.Supp.3d 71 (D.D.C. 2019), parishioners challenged how leadership chose to use their "contributions towards the Church's operating expenses and reserve funds," claiming negligence, conversion, and unjust enrichment. *Id.* at 80. The court stated that "[j]udicial review of these claims would fall afoul of the First Amendment," because "[h]ow a church spends worshippers' contributions is, like the question of who may worship there, central to the exercise of religion." *Id.* Thus, permitting a chal-

lenge to those decisions "would constitute an impermissible judicial interference with the Church's ability to make governance and spending decisions." *Id.*

Other courts agree. *See, e.g., Harris*, 643 S.E.2d at 571 (First Amendment barred determination of "whether [an] expenditure was proper in light of Saint Luke's religious doctrine and practice"); *El Pescador Church v. Ferrero*, 594 S.W.3d 645, 658 (Tex. Ct. App. 2019) (rejecting fraud-based tithing claim as "necessarily embroil[ing] the courts into membership, church discipline, and church governance matters"); *Hawthorne v. Couch*, 911 So.2d 907, 910 (La. Ct. App. 2005) (rejecting fraudulent misrepresentation claim for return of tithes because "[t]he issue of tithing is at its core a purely ecclesiastical matter" outside the review of "civil courts").

This case sits at the heart of church autonomy. O'Connell seeks to draw civil courts "into a religious thicket," *Milivojevich*, 426 U.S. at 719, by making them second-guess the Pope's stewardship of religious offerings entrusted to his care for centuries. That alone is enough to reject O'Connell's claims.

### 2. The claims call for interfering in internal religious speech and polity.

Magnifying the problem, O'Connell demands civil courts pry into statements made "from the pulpit at church services" to make his case. A19 ¶24; *accord* A25 ¶34.

But the church-autonomy doctrine is "rooted" in protecting the "First Amendment rights of the church to discuss church doctrine and policy freely." *Bryce v. Episcopal Church*, 289 F.3d 648, 658 (10th Cir. 2002). And here, in a case concerning religious speech made from the pulpit at Mass, those protections are at their zenith. *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) (it is not "in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings"). Because the challenged church speech here did not "address purely secular matters," but instead "clearly addressed religious topics" and was expressed "in the context of an internal church dialogue," it is "protected … by the church autonomy doctrine." *Bryce*, 289 F.3d at 659.

That conclusion is reinforced twice over. First, O'Connell also encourages a civil court (and ultimately a jury) to evaluate whether the alleged (unspecified) statements followed "both Canon law" and "USCCB guidelines." *See, e.g.*, A21 ¶26. But, again, the judiciary cannot ask "whether [a] Church ha[s] followed its own procedures." *Hosanna-Tabor*, 565 U.S. at 187. Requiring secular courts to weigh whether religious speech about a religious offering at a religious service was canon-law compliant is even more clearly barred.

Second, O'Connell seeks to compare this speech from Mass with deliberations between various Church leaders, including parish priests, bishops, cardinals in Rome, and even the Pope, about how to implement the

Church's religious mission regarding charitable works. *See*, *e.g.*, A175 (seeking all communications with the "Holy See, Vatican City, [and] Apostolic Nunciature" relating to the Peter's Pence collection). But courts may not "troll[ ] through the beliefs of the [Church]" to make "determinations about its religious mission," *Great Falls*, 278 F.3d at 1342, "evaluate … competing opinions on religious subjects," *Catholic Univ.*, 83 F.3d at 465, or otherwise ask "what one minister … said to another" in the search for "subjective motives," all of which causes "excessive entanglement with[] the religious sphere," *Demkovich v. St. Andrews the Apostle Parish*, 3 F.4th 968, 977-78, 983 (7th Cir. 2021) (en banc). Here, civil courts would be doing precisely that—"scrutinizing" internal deliberations concerning religious speech to determine "whether and how" a given investment decision accomplishes the Church's religious "mission." *Carson v. Makin*, 596 U.S. 767, 787 (2022).

### 3. The claims' elements call for other entangling inquiries.

Adjudicating O'Connell's claims will also create an "inevitable risk" of severe religious entanglement. *Catholic Univ.*, 83 F.3d at 466.

O'Connell's claims revolve around asserting that USCCB's alleged statements that Peter's Pence "assist[ed] the charitable works of Pope Francis" and thereby "witness[ed] to charity and help[ed] the Holy See reach out to those who are marginalized" were untrue. A18 ¶22; A22 ¶27; *see, e.g.*, *Bennett v. Kiggins*, 377 A.2d 57, 60 (D.C. 1977) (fraud claim fails if statement true); *Sabre Int'l Sec. v. Torres Advanced Enter. Sols.*, 60

F.Supp.3d 36, 41 (D.D.C. 2014) (unjust enrichment claim fails if no injustice); *Henok v. Chase Home Fin.*, 915 F.Supp.2d 162, 169 (D.D.C. 2013) (breach of fiduciary duty must "allege fraud, misrepresentation, self-dealing, or overreaching"). But here, to evaluate the truth of those statements, the Court must decide which of two "competing religious visions" about the administration of Peter's Pence should prevail—O'Connell's or the Pope's. *Catholic Univ.*, 83 F.3d at 465. That it cannot do.

Similarly, to concoct a theory of USCCB's liability regarding the alleged statements, the Complaint alleges that USCCB "directed" the unnamed speaker in the Sacred Heart Church in Providence to make a "solicitat[ion] from the pulpit." A25 ¶34; *see* A13 ¶5. But the question whether USCCB can "direct" a speaker at a Sunday Mass—or use that speaker as a vessel to "urge" donations—comes down to this: does USCCB exercise canonical control over bishops, pastors, deacons, or other speakers at the parish level? USCCB and canon law say no; O'Connell insists yes. No civil court can take sides on an issue of church law and polity.

Likewise, O'Connell's breach of fiduciary duty claim fails if there is no special relationship of trust and confidence between the two parties. *Henok*, 915 F.Supp.2d at 169. But subjecting that defense to "cross-examination," *Catholic Univ.*, 83 F.3d at 467, will ask a civil court to answer questions of ecclesiastical authority between the Holy See, USCCB, dioceses, parishes, and each individual parishioner—all matters of canonical application and church authority into which civil courts may not pry.

Finally, evaluating O'Connell's unjust enrichment claim and USCCB's defenses will raise religious questions over whether USCCB retained any benefit from Peter's Pence. *See Sabre*, 60 F.Supp.3d at 41. O'Connell asks a secular judge and jury to scrutinize the Church's representations on ecclesiastical structure and religious authority over Peter's Pence. *See*, *e.g.*, *Office of National Collections FAQs* (noting dioceses transmit Peter's Pence offerings to the Holy See, not USCCB). Once again, that will insert civil government into protected internal church decisions about how to understand and implement the Pope's charitable works.

### 4. The claims call for entangling discovery.

As though each of these deeply entangling religious questions were not enough, "[t]he very process" of inquiry needed to answer each of them also "would entangle the [Court] in religious affairs." *Duquesne*, 947 F.3d at 830, 835. As explained above, this Court has already held that it definitively violated the First Amendment to question a Catholic University president about its religious mission and consistency with the church, *Great Falls*, 278 F.3d at 1343-44; *supra* at 21, and that it was impermissibly entangling for the EEOC to engage in a "two-year investigation," "extensive pre-trial inquiries," and "trial itself," *Catholic Univ.*, 83 F.3d at 467, *supra* at 21. And far less than that can raise "sensitiv[e]" and "serious First Amendment questions." *Catholic Bishop*, 440 U.S. at 502 n.10, 504, 507-08 (giving as an example an inquiry into "how many liturgies" are held "at Catholic parochial high schools").

Here, O'Connell's requested inquiry is far *more* entangling: seeking the depositions of Church leaders over church customs, doctrines, law, and polity *and* demanding that the Church turn over ecclesial documents related to sensitive religious topics. Consistent with the face of the Complaint, he has broadly demanded all communications with the "Holy See, Vatican City, [and] Apostolic Nunciature" regarding Peter's Pence, A175, as well as a list of all of the faithful who gave to Peter's Pence, all documents that relate to how the Church used those offerings, and all church laws related to stewarding the offerings. And he has stated that he "cannot" prove his claims without peering into pulpits nationwide and obtaining all "records of Defendant's collection, administration, accounting, or disposition of any donated funds." A172.

That's well beyond just adding up the number of liturgies at a high school. Indeed, courts have long frowned on demanding "extremely detailed information about the expenditure of funds" of religious bodies. *Surinach v. Busquets*, 604 F.2d 73, 78 (1st Cir. 1979) (enjoining investigation into Catholic school expenditures). Here, the intrusive inquiry inherent in O'Connell's claims "itself invades the religious body's integrity." *Whole Woman's Health*, 896 F.3d at 372; *see also Demkovich*, 3 F.4th at 978, 983 ("depositions of fellow ministers and the search for a subjective motive behind" their actions necessarily "cause[s] civil intrusion into, and excessive entanglement with, the religious sphere"). Thus, since there is

43

"no escape" from intrusion into religious matters, the "First Amendment does not permit such inquir[ies]." *Carroll Coll.*, 558 F.3d at 571.

\* \* \*

Resolving O'Connell's claims would require the court to answer a host of religious questions and engage in any number of intrusive inquiries, each of which has been found to be impermissible by courts. Any one of these inquiries would violate the First Amendment. Cumulatively, they should render his case a nonstarter.

### C. The district court erred.

The district court correctly "recognize[d]" that "federal courts lack jurisdiction over disputes that cannot be resolved without extensive inquiry into religious law and polity." A146-47 (citing *Milivojevich*, 426 U.S. 696). But it determined that O'Connell's claims fell into a "narrow" exception for "alleged fraud or collusion." A147-48. This, according to the court, allowed the claims to be decided using the "neutral principles" approach, *id.*, an analysis developed for church property disputes. That was error.

First, to employ the inapposite "neutral principles" approach, the district court echoed century-old dicta suggesting judicial inquiry may be permissible in some cases of "fraud, collusion, or arbitrariness." *Compare Milivojevich*, 426 U.S. at 712 (citing *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929)), *with* A148. But the Supreme Court confirmed that this language was "dictum only," emphasized that it has never been "given concrete content" or "appli[cation]," and rejected

44

any such review that "entail[s] inquiry" into religious matters. *Milivo-jevich*, 426 U.S. at 712-13. Lower courts have repeatedly rejected a "fraud" exception to church autonomy. *Anderson v. Watchtower Bible & Tract Soc'y of N.Y.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *16 (Tenn. Ct. App. Jan. 19, 2007) (collecting cases); *cf. Van Osdol v. Vogt*, 908 P.2d 1122, 1134 (Colo. 1996) ("inherently ecclesiastical" decisions are "logically inconsistent with a fraud or collusion exception"). And the first federal appellate decision to find such an exception was recently vacated, *see Huntsman v. Corp. of President of Church of Jesus Christ of Latter-day Saints*, 76 F.4th 962 (9th Cir. 2023), *vacated, rehearing en banc granted,* 94 F.4th 781 (2024).

Second, even if the exception sometimes applies, it cannot justify the district court's invocation of the "neutral principles" approach here—a decision which contradicts controlling precedent from the Supreme Court and this Court, as well as the well-reasoned decisions of other courts of appeals.

Start with the Supreme Court, which developed the "neutral princi-ples" approach specifically for church property disputes, *Presbyterian Church*, 393 U.S. at 449, and has never applied it elsewhere. Such cases are "fundamentally different types of dispute[s]" because they involve sit-uations where two competing religious bodies both claim to be the "true church," and thus both assert entitlement to the disputed property. *See*

45

Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 336 (2016). A court therefore cannot defer to an authoritative religious body on religious questions, forcing it instead to rely on extrinsic documents. *Id*. But outside that narrow context, the Supreme Court has repeatedly stressed that "the judicial process is singularly ill equipped to resolve [intra-faith] differences in relation to the Religion Clauses," *Thomas v. Rev. Bd.*, 450 U.S. 707, 715 (1981), and the courts must instead protect the "freedom for religious organizations … to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," *Kedroff*, 344 U.S. at 116.

Accordingly, *Milivojevich* rejected "reli[ance] on purported 'neutral principles' for resolving property disputes" as a tool to review "a matter of internal church government," as such matters were "obviously" beyond the "competence" of "[c]ivil judges." 426 U.S. at 714-15 & n.8, 717, 721. In *Hosanna-Tabor* and *Our Lady*, the Supreme Court similarly refused to apply "neutral principles" to religious organizations' decisions to terminate ministers. *Hosanna-Tabor*, 565 U.S. at 189-90; *Our Lady*, 591 U.S. at 746-47. Indeed, the church-autonomy doctrine's purpose is to *prevent* "neutral" laws from "interfer[ing] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. The "broad principle" of church autonomy bars adjudicating

*any* claims that, like O'Connell's, infringe religious communities' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747. There is no "neutral principles" exception to that rule.

*Catholic University* is this Circuit's leading case, which the district court ignored. There, the EEOC, like O'Connell here, "insist[ed]" that courts could avoid "entangling the Government 'in questions of religious doctrine, polity, and practice'" by "invoking" the "neutral principles" approach. 83 F.3d at 465-66. But this Court disagreed, refusing to expand the approach beyond "trust and property law." *Id.* (noting *Jones* only "dealt with a dispute over church property"). And even where the neutral-principles approach does apply, its scope is exceedingly narrow, "only" allowing review of "non-doctrinal matters" that can be analyzed in "*purely secular terms*." *Id.* Thus, for instance, although it was "undoubtedly" clear that there were "objective criteria … independent of religious content" at issue in *Catholic University*, the dispute was still not "purely secular" because it involved a role held "in the name of the Church." *Id.*

Here, the district court ignored *Catholic University* and treated only "purely *religious* determinations" as clearly protected. A149 (emphasis added). But *Catholic University* emphasizes that the Religion Clauses' protection is broader, rendering the "neutral principles" approach available at most solely for a "*purely secular*" dispute, regardless of whether some nominally non-religious "objective criteria" might also be at issue.

47

83 F.3d at 466. And here, whatever else it is, a case questioning the judgment of the Pope and his charitable works based on religious speech from the pulpit at Mass is not "purely secular."

This Court's rule is not alone. Both the Fourth Circuit's decision in *Bell* (protecting religious funding decisions) and the Tenth Circuit's in *Bryce* (protecting internal religious deliberations) limit judicial involvement to "purely secular" disputes. *Bell*, 126 F.3d at 331; *Bryce*, 289 F.3d at 658. Likewise, the Sixth Circuit emphasizes that the neutral-principles approach "applies only to cases involving disputes over church property" and should "never" be "extended to religious controversies in the areas of church government, order and discipline." *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *accord Diocese of Lubbock*, 624 S.W.3d at 513; *El-Farra v. Sayyed,* 226 S.W.3d 792, 795-96 (Ark. 2006); *Heard*, 810 A.2d at 880.

For good reason. Applying neutral principles "to matters of church government" is a category error that "would swallow the church autonomy doctrine altogether," because "[a]lmost any cause of action has secular components" and "could be pled to avoid questions of religious doctrine." *Belya*, 59 F.4th at 580-82 (Park, J., dissenting from denial of rehearing en banc); Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1277 (2023) (approach "eliminate[s] church autonomy"). So too here. If the "neutral principles" approach can be stretched to cover a millennium-old offering to the Vatican, no case is off-limits.

### III.  O'Connell failed to adequately plead his claims.

The district court also erred because O'Connell's Complaint fails to state any claim against USCCB. His vague, conclusory allegations do not approach the pleading requirements of *Iqbal*, *Twombly*, and Rule 9(b).

### A. This Court has pendent jurisdiction over the issue of O'Connell's pleading deficiencies.

Pendent appellate jurisdiction is proper under the collateral-order doctrine if such review will "likely terminate the entire case" or if "substantial considerations of fairness or efficiency demand it." *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019). Because this Court has jurisdiction over USCCB's church-autonomy defense and addressing the pleading deficiencies would immediately terminate the case, this Court should exercise pendent jurisdiction and avoid "wasted litigation." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997). For instance, in *Whole Woman's Health*, the Fifth Circuit had jurisdiction under *Cohen* given the threat to church autonomy interests, but resolved the appeal under the rules of federal civil procedure. 896 F.3d at 374.

### B. O'Connell's claims fail on the pleadings.

While the Court accepts well-pleaded factual allegations as true and draws all reasonable inferences in O'Connell's favor, "[t]hreadbare recitals" and "mere conclusory statements" aren't enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Nor are "inferences … [un]supported by the

facts set out in the complaint" or "legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

These standards doom O'Connell's claims. His fraud claim fails because he didn't plead the who, what, where, and when of the alleged fraud, and didn't plead that he read—much less relied upon—any USCCB statements. His unjust enrichment claim fails because, as the USCCB website indicates, USCCB is not the receiver (and thus not the retainer) of Peter's Pence. And because O'Connell doesn't allege facts establishing that USCCB owed him any fiduciary duty, that claim fails at the outset.

## 1. O'Connell's fraud claim fails.

O'Connell does not allege any valid theory of fraud, which requires facts plausibly alleging that USCCB knowingly made a false representation of, or willfully omitted, a material fact with the intent to deceive, and O'Connell relied on that representation or omission. *See Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1073 n.22 (D.C. 2008). O'Connell must also state these circumstances "with particularity." *Martin-Baker*, 389 F.3d at 1256 (discussing Rule 9(b)'s heightened pleading standard). In short, O'Connell must plead with particularity the "who, what, when, where, and how" of his fraud claim, *Anderson v. USAA Cas. Ins.*, 221 F.R.D. 250, 253 (D.D.C. 2004), which he has failed to do.

***No Particularity as to What.*** O'Connell's complaint lacks any specific "fact [that was] misrepresented" or omitted. *Martin-Baker*, 389 F.3d at 1257; *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (plaintiff must allege "content of the false misrepresentations [and] the fact misrepresented"); *Poblete v. Rittenhouse Mortg. Brokers*, 675 F.Supp.2d 130, 135 (D.D.C. 2009) (vague allegation that plaintiff was the victim of a "mortgage scam" insufficient under Rule 9(b)).

First, O'Connell's allegation—that "he was solicited from the pulpit as directed by USCCB to help those in need of emergency relief," A25 ¶34—contains no detail as to what the unnamed person said, making it impossible to determine whether that person stated anything fraudulent. *See Poblete*, 675 F.Supp.2d at 135; *Anderson*, 221 F.R.D.at 253 (Rule 9(b) ensures that the defendant has "notice of the claim").

Further, while the Complaint selectively quotes representations from USCCB's website, A16-19 ¶¶18-24, it does not identify a single USCCB statement O'Connell saw before making his offering. Rather, the Complaint indicates that O'Connell did not read or learn of any statement on USCCB's website before donating. *See* A12 ¶1, A26 ¶35 ("Even if [O'Connell] had slowly and carefully researched external sources such as the USCCB or Vatican websites…."). O'Connell thus fails to identify *any* allegedly fraudulent statement affecting his decision to make his offering.

***No Particularity as to Who.*** O'Connell also failed to "identify with specificity who precisely was involved in the fraudulent activity." *Martin-*

51

*Baker*, 389 F.3d at 1257. O'Connell merely alleges that he "was solicited from the pulpit," A25 ¶34, but nowhere indicates *who* made the alleged misrepresentation. Nor does he support his conclusory allegation that this solicitation was "directed by USCCB"; in fact, O'Connell doesn't allege that he read *any* USCCB statements before making his offering. In short, O'Connell does not sufficiently allege who it was that made the alleged misrepresentation at all, let alone that it was USCCB.

**No Particularity as to When.** O'Connell failed to allege the fraud's "timeframe with sufficient specificity." *Acosta Orellana v. CropLife*, 711 F.Supp.2d 81, 97 (D.D.C. 2010); *Martin-Baker*, 389 F.3d at 1257 (plaintiff cannot "nebulously allege" the time period of the alleged misrepresentation). O'Connell alleges only that he heard a solicitation at Mass "[i]n the Summer of 2018." A25 ¶34. This "open-ended time span," *Acosta*, 711 F.Supp.2d at 97, is too vague for Rule 9(b). And, importantly, O'Connell fails wholly to connect the single statement—the "when"—to USCCB.

**No Particularity as to Loss.** Finally, O'Connell only vaguely alleges he "made a cash donation." A25 ¶34. This singular statement of injury gives "no indication of … what costs [he] incurred," and thus lacks required particularity. *Busby v. Capital One*, 772 F.Supp.2d 268, 275-76 (D.D.C. 2011).

**No Duty as to Fraudulent Concealment.** O'Connell also alleges that USCCB failed to disclose that Peter's Pence funds "were never going to be routed immediately to the needy." A31 ¶53. But O'Connell never

plausibly alleges that USCCB even owed him any duty to disclose. *See Sundberg v. TTR Realty*, 109 A.3d 1123, 1131 (D.C. 2015) ("[M]ere silence does not constitute fraud unless there is a duty to speak."). A duty to speak arises only when there is some "special relationship or contact between the parties justifying" the duty. *Jefferson v. Collins*, 905 F.Supp.2d 269, 287 (D.D.C. 2012).[5] USCCB had no "special relationship" with O'Connell giving rise to a duty of disclosure. The Complaint doesn't allege any facts establishing that USCCB (a membership organization of bishops in Washington, D.C.) had any relationship whatsoever with O'Connell. In fact, it is unclear if O'Connell knew that USCCB existed when he made his offering. Because USCCB owed O'Connell no duty to say anything, it could not have fraudulently omitted any fact.

**No Particularity on Knowledge of Falsity or Intent to Deceive.** Although O'Connell may allege knowledge and intent "generally," Fed. R. Civ. P. 9(b), his Complaint must identify "the basis for inferring scienter" and include "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading," *N. Am. Catholic Educ. Programming Found. v. Cardinale*, 567 F.3d 8, 13

---

[5] O'Connell alleges "no contractual relationship, no communications, no business dealings, and no direct dealings" that would "give rise to" a duty to disclose absent a special relationship. *W. Rsrv. Life Assur. Co. v. Caramadre*, 847 F.Supp.2d 329, 340 (D.R.I. 2012). Indeed, O'Connell never alleges that he read USCCB's website before making his offering.

(1st Cir. 2009); *see Rodriguez v. Lab'y Corp. of Am. Holdings*, 13 F.Supp.3d 121, 129-30 (D.D.C. 2014) ("formulaic recitation of the elements of fraud" insufficient without facts suggesting defendant knew its statements were inaccurate, or intended to deceive plaintiff).

O'Connell falls short. He alleges that USCCB "knew or should have known" that the representations on its website were false. A30 ¶50. Not only is this a paradigmatic insufficient "formulaic recitation," *Rodriguez*, 13 F.Supp.3d at 130, it invokes a negligence standard far lower than the scienter requirement of a fraud claim. *See id*. The Complaint altogether lacks "specific facts" showing that USCCB knew that some Peter's Pence funds would be used for purposes other than "the charitable works of Pope Francis," including to "witness to charity and help[] the Holy See reach out compassionately to those who are marginalized." A18 ¶22. So too for USCCB's alleged "intent to deceive"—O'Connell merely states that USCCB "intended" him to rely on its representations regarding the use of funds, A30 ¶50, but never alleges that USCCB intended to deceive anyone about the funds' distribution.[6]

***No Facts Showing Reliance.*** O'Connell failed to allege that he relied on any USCCB misrepresentation. *Fort Lincoln*, 944 A.2d at 1073 n.22. O'Connell's sole allegation that he "decided to donate to Peter's Pence

---

[6] The news articles O'Connell cites do not establish knowledge by USCCB because they were published in or after October 2019, well over a year after the alleged fraud. *See* A22-25 ¶¶27, 29, 30, 34.

based in part on the representations communicated to [him] by USCCB," A30 ¶50, is insufficient. The Complaint contains no other allegation, and certainly no particularized one, establishing his reliance on USCCB's statements. Again, O'Connell nowhere alleges that he *actually read* any statements on USCCB's website before donating, meaning he couldn't possibly have relied on them. *Sundberg*, 109 A.3d at 1131 (affirming dismissal of fraud claim because "appellants did not allege … appellees made any misrepresentations or omissions [before appellants] signed the sales contract"); *Jefferson*, 905 F.Supp.2d at 286-87 (same).

Citing the "early stage of the litigation," the district court found that "material disputes of fact" precluded judgment, including "whether any statements were in fact false, whether [USCCB] was actually involved in the alleged statements, whether [USCCB] knew the statements were false, [USCCB's] intentions regarding the statements, and [O'Connell's] reliance on the representations." A152. The Court then stated without elaboration that the Complaint "contain[ed] enough detail" to satisfy Rule 9(b). A153. But the Complaint lacks necessary allegations on every necessary fraud element, and there can be no fact dispute where necessary allegations are wholly lacking. The district court erred.

### 2. O'Connell's unjust enrichment claim fails.

For his unjust enrichment claim to survive, O'Connell must plausibly allege that he conferred a benefit on USCCB, which USCCB unjustly retained. *Sabre*, 60 F.Supp.3d at 41. He did not.

55

To plausibly allege conferral of a benefit, O'Connell must be able to tie his offering *directly* to the allegedly enriched party. *Id.* at 41-42. As a matter of canon law and internal church management, USCCB does not receive contributions from the Peter's Pence collection. Rather, individual dioceses are responsible for collecting and sending it annually to the Holy See. Canon 1266.

USCCB's website likewise makes clear that it neither collects nor distributes Peter's Pence funds. *See Office of National Collections FAQs.* Rather, U.S. Dioceses send them to the Holy See's domestic representative, the Apostolic Nunciature, which is wholly separate from USCCB. *Id.* And as explained *supra*, accepting O'Connell's baseless allegations that USCCB received his money would require civil entanglement in canon law and internal church management. For similar reasons, USCCB cannot have "retained" any benefit because it did not receive and keep the funds. *See Paul v. Jud. Watch,* 543 F.Supp.2d 1, 8 (D.D.C. 2008) (dismissing claim where "no allegation that [defendants] retained any of the donated funds for themselves").

The district court's clipped analysis summarily points to "disputes about whether in fact the defendant did retain the donations or whether the defendant is actually the proper defendant at all." A154. But there are no fact disputes. The only on-point allegation is O'Connell's bare assertion that "USCCB has received money from Plaintiff." A32 ¶59. But,

as shown above, that contradicts USCCB's website. In short, USCCB was not unjustly enriched because it was never enriched at all.

### 3. O'Connell's breach of fiduciary duty claim fails.

To state a breach-of-fiduciary-duty claim, O'Connell must plausibly allege that USCCB owed him a fiduciary duty, breached it, and caused him injury. *Paul*, 543 F.Supp.2d at 5-6. Bald allegations that a fiduciary duty exists between the parties, without "any facts which show the existence of a special relationship of trust or confidence," are inadequate. *Henok*, 915 F.Supp.2d at 169. Because this claim arises out of the same sparse nucleus of fact as his fraud claim, it is also subject to heightened pleading requirements. *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (Rule 9(b) applies to counts other than fraud where fraud "lies at the core of the action"); *Frota v. Prudential-Bache Sec.,* 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty.").

Here, no allegations support the existence of a fiduciary duty, nor a breach even if such a duty existed. No alleged facts support a conclusion that USCCB is a fiduciary to American Catholics generally, or that USCCB had a relationship of trust and confidence with O'Connell personally, discussed *supra* at 53. The mere allegations that USCCB "promoted" the Peter's Pence collection or "solicit[ed]" charitable contributions, A33 ¶62, do not create such a special relationship. And even if they could, O'Connell never alleges that USCCB solicited his contribution or

engaged him directly. *See Sandza v. Barclays Bank*, 151 F.Supp.3d 94, 107 (D.D.C. 2015) ("Ms. Sandza does not even allege that Barclays had any direct contact with her[.]"). The allegation that USCCB "oversaw[] and collected funds from donors," A33 ¶62, is also inadequate. Mere "collection of funds" does not a fiduciary make—even if USCCB collects Peter's Pence, which it does not. And where there is no fiduciary relationship, *a fortiori* there is no breach.

O'Connell has not successfully alleged a breach. As he (accurately) alleges, USCCB's "National Collections Committee oversees the *promotion* of the Peter's Pence Collection." A17 ¶19 (emphasis added). USCCB's participation is thus limited to making promotional materials available to individual dioceses, A17-19 ¶¶20-24; USCCB has no authority to possess or control Peter's Pence funds. *See supra* 11-12.

Once again, the district court failed altogether to explain its reasoning, stating that "this question about a fiduciary relationship is often a fact-intensive inquiry that's often based on a fuller record." A154. In other words, the court did not even consider whether USCCB could possibly have a fiduciary relationship with O'Connell, much less breach it.

Because O'Connell failed to allege facts showing a fiduciary relationship or breach, his claim should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should exercise its jurisdiction and reverse.

Respectfully submitted,

*/s/ Daniel H. Blomberg*

| | |
|---|---|
| KEVIN T. BAINE | DANIEL H. BLOMBERG |
| EMMET T. FLOOD |    *Counsel of Record* |
| WILLIAMS & CONNOLLY LLP | LAURA WOLK SLAVIS |
| 680 Maine Ave. SW | COLTEN L. STANBERRY |
| Washington, DC 20024 | KELLY R. OELTJENBRUNS |
| (202) 434-5000 | THE BECKET FUND FOR |
| *eflood@wc.com* |   RELIGIOUS LIBERTY |
| | 1919 Pennsylvania Ave. NW |
| |   Suite 400 |
| | Washington, DC 20006 |
| | (202) 955-0095 |
| | *dblomberg@becketlaw.org* |

*Counsel for Defendant-Appellant*

September 10, 2024

59

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

This motion complies with the requirements of Fed. R. App. P. 27(d)(2)(C) and Circuit Rule 27(a)(2) because it has 12,967 words.

This motion complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5), (6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

## CERTIFICATE OF SERVICE

I certify that on September 6, 2024, a copy of the Opening Brief was filed with the Clerk of the Court's electronic filing system, and that on September 10, 2024, the foregoing corrected copy of the Opening Brief was filed with the Clerk of Court's electronic filing system. That electronic filing system is designed to serve all counsel of record.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg