ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7173

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAVID O'CONNELL,

*Plaintiff–Appellee*,

*v.*

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,

*Defendant–Appellant*.

On Appeal from the United States District Court for the
District of Columbia, Case No. 1:20-cv-01365-JMC
(Hon. Jia M. Cobb)

**BRIEF OF DR. LAEL WEINBERGER AS AMICUS CURIAE
IN SUPPORT OF DEFENDANT-APPELLANT
THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS
AND REVERSAL**

Aaron M. Streett
Matthew M. Hilderbrand
Beau Carter
**BAKER BOTTS L.L.P.**
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1855
Fax: (713) 229-7855
aaron.streett@bakerbotts.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Dr. Lael Weinberger states as follows:

**(A)    Parties and Amici.** Except for the following, all parties, intervenors, and amici appearing in this Court are listed in the Brief for Defendant-Appellant, the United States Conference of Catholic Bishops:

Amicus Curiae: Dr. Lael Weinberger.

**(B)    Rulings Under Review.** Reference to the rulings at issue appear in the Brief for Defendant-Appellant.

**(C)    Related Cases.** Amicus is unaware of any related cases pending in this Court or in any other court.

/s/ *Aaron M. Streett*

Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1855
Fax: (713) 229-7855
aaron.streett@bakerbotts.com

*Counsel for Amicus Curiae*
*Dr. Lael Weinberger*

i

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...........................................................................1

RULE 29 STATEMENT ........................................................................................1

INTRODUCTION & SUMMARY OF ARGUMENT...............................................2

ARGUMENT .......................................................................................................4

    I.      CASE LAW: ACT III AS FIRST AMENDMENT HARM .................................4

    II.     CASE STUDIES: WHAT HAPPENS IN ACT III? .........................................6

          A.     Act I: The Falling Out ................................................................7

          B.     Act II: Ministerial-Exception Litigation ...................................10

          C.     Act III: The Aftermath ...............................................................13

          D.     Epilogue: The Lesson of Act III ................................................17

CONCLUSION .....................................................................................................20

CERTIFICATE OF COMPLIANCE.......................................................................21

CERTIFICATE OF SERVICE ...............................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belya v. Kapral*,
    45 F.4th 621 (2d Cir. 2022) ...................................................................2, 13

*Belya v. Kapral*,
    59 F.4th 570 (2d Cir. 2023) ...................................................................1

*Belya v. Kapral*,
    No. 1:20-cv-06597-VM, 2021 WL 1997547 (S.D.N.Y. May 19,
    2021) ...................................................................................................13

*Billard v. Charlotte Catholic High Sch.*,
    101 F.4th 316 (4th Cir. 2024) ...............................................................18

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F.3d 648 (10th Cir. 2002) ..............................................................18

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) ...........................................................5, 18

*Garrick v. Moody Bible Inst.*,
    95 F.4th 1104 (7th Cir. 2024) ...............................................................1

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012).................................................................................4

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ................................................................18

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)................................................................................4

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)............................................................................4

*Tucker v. Faith Bible Chapel Int'l*,
    2020 WL 2526798 (D. Colo. May 18, 2020) .......................................12

*Tucker v. Faith Bible Chapel Int'l*,
   36 F.4th 1021 (10th Cir. 2022) .......................................................12, 14

*Tucker v. Faith Bible Chapel Int'l*,
   53 F.4th 620 (10th Cir. 2022) ...............................................................12

*United Methodist Church v. White*,
   571 A.2d 790 (D.C. 1990) ........................................................................5

*United States v. Rose*,
   28 F.3d 181 (D.C. Cir. 1994)..................................................................19

*United States v. Trump*,
   91 F.4th 1173 (D.C. Cir. 2024)...............................................................17

*Watson v. Jones*,
   80 U.S. 679 (1872)...............................................................................5, 18

## Statutes

28 U.S.C. § 1291 ...........................................................................................6

## Other Authorities

Paul Horwitz, *Act III of the Ministerial Exception*, 106 Nw. U. L. Rev.
   973 (2012)................................................................................................2

Robert Joseph Renaud & Lael Daniel Weinberger, *Spheres of
   Sovereignty: Church Autonomy Doctrine and the Theological
   Heritage of the Separation of Church and State*, 35 N. Ky. L. Rev.
   67 (2008)..................................................................................................2

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U.
   Chi. L.J. 471 (2023) ..........................................................................1, 5

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame
   L. Rev. 1253 (2023).........................................................................1, 17

iv

## INTEREST OF AMICUS CURIAE

Dr. Lael Weinberger is a nonresident fellow at the Constitutional Law Center at Stanford Law School and an attorney with the Washington, D.C., office of Gibson, Dunn & Crutcher. He has written and taught on church autonomy and has an interest in the sound development of this field of law.

## RULE 29 STATEMENT

All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part. No counsel or any party, other than Amicus or his counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), Amicus certifies that filing a separate brief is necessary in this case. To his knowledge, this brief is the only one in this appeal that conducts an in-depth, real-world case study of the consequences of denying an interlocutory appeal upon an erroneous denial of the church-autonomy defense. Dr. Weinberger has produced scholarship on this subject, and circuit-court judges have relied on his expertise in this specific context. *See*, *e.g.*, Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 LOY. U. CHI. L.J. 471 (2023); Lael Weinberger, *The Limits of Church Autonomy*, 98 NOTRE DAME L. REV. 1253 (2023); *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1123-24 (7th Cir. 2024) (Brennan J. dissenting) (citing *Is Church Autonomy Jurisdictional*); *Belya v. Kapral*, 59 F.4th 570, 581 n.7

1

(2d Cir. 2023), *denying rehearing en banc of* 45 F.4th 621 (2d Cir. 2022) (Park, J., dissenting) (citing in a five-judge dissent from denial of rehearing en banc Robert Joseph Renaud & Lael Daniel Weinberger, *Spheres of Sovereignty: Church Autonomy Doctrine and the Theological Heritage of the Separation of Church and State*, 35 N. KY. L. REV. 67, 89, 92 (2008), for the point that there is no way to resolve an issue of church discipline by "neutral principles").

## INTRODUCTION & SUMMARY OF ARGUMENT

Like a piece of theatre, church autonomy litigation can be viewed as unfolding over three discrete acts. *See* Paul Horwitz, *Act III of the Ministerial Exception*, 106 NW. U. L. REV. 973 (2012). Act I is the prelude to conflict, where seeds of discord are sown, and wherein tensions and disputes outside the courtroom set the stage for the legal drama to follow. As the curtain rises for Act II, legal proceedings begin. It is here that the religious institution (typically in the role of defendant) raises the shield of church autonomy.

The outcome of Act II is pivotal; if the doctrine correctly applies, then Act III transitions to a quiet resolution, with the church moving forward without further judicial scrutiny of the underlying religious dispute. The plaintiff, of course, can immediately appeal. If the doctrine is incorrectly applied and its protections denied, however, then, absent an immediate appeal, Act III becomes an extended and costly legal battle.  It potentially puts courts in the constitutionally untenable position of

interfering with the free exercise of religion and deciding matters of religious doctrine, governance, and discipline.  That is true even where courts are not actively engaged with the merits of the underlying religious dispute. As shown below, the process itself—discovery, depositions, trial—is the punishment.

This case is at that crucial pivot point. Plaintiff David O'Connell brought this putative nationwide class action against the United States Conference of Catholic Bishops, seeking to have a federal court determine whether the Catholic Church properly stewarded the religious offerings of its faithful for the Pope's charitable works. A17. The district court denied the USCCB's church-autonomy defense, reasoning that O'Connell's claims can be resolved without entangling the court in matters of Church governance and decisionmaking. A149. Whether the court erred in doing so is a matter deserving this Court's immediate review.

Two recent cases out of Colorado and New York—*Faith Bible* and *Belya*, respectively—foreshadow the USCCB's likely fate if appellate review is denied at this juncture. Those two cases demonstrate vividly how Act III typically unfolds when the church-autonomy defense is incorrectly denied and interlocutory appeal is unavailable. It would be wrong to assume that an erroneous denial of church autonomy can be fixed *after* discovery, trial, and judgment. Church autonomy protects against being subjected to litigation on the merits at all when this involves matters of church doctrine and internal governance—and an incorrect denial of

3

church autonomy is impossible to fix after litigation. Interlocutory appeal *before* Act III prevents that harm. The Court should therefore find that it has appellate jurisdiction over the USCCB's appeal and reverse the district court.

## ARGUMENT

The whole point of church autonomy is to avoid subjecting religious matters to judicial scrutiny in the first place. When such questions are left unresolved until the *end* of litigation, that purpose is defeated. By that time, the damage is done. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). The drama of *Faith Bible* and *Belya* offers vivid case studies of this point.

## I.    CASE LAW: ACT III AS FIRST AMENDMENT HARM

The Free Exercise and Establishment Clauses give rise to the church-autonomy doctrine.[1] Interfering with the internal governance of a religious institution violates religious liberty (free exercise), and taking sides in such disputes lets the court dictate religious dogma (establishment). *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012). Thus, the church-autonomy doctrine gives churches "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020).

---

[1] The doctrine shields all religious institutions—churches, synagogues, mosques, etc.—but for convenience, Amicus follows the Supreme Court in using "church autonomy" as a generic label.

4

When church autonomy is wrongly denied, the constitutional harm is not just liability; it is the litigation itself. The Religion Clauses "grant churches an immunity from civil discovery"—for "once exposed to discovery and trial, the constitutional rights of the church to operate free of judicial scrutiny would be irreparably violated." *United Methodist Church v. White*, 571 A.2d 790, 792-93 (D.C. 1990). This Court recognized this point in *EEOC v. Catholic University*, when it held that the EEOC's intrusive discovery process itself—which required a religious school to be "deposed, interrogated, and haled into court" over religious matters—violated the Establishment Clause. 83 F.3d 455, 467 (D.C. Cir. 1996).

Denying church autonomy can also put judges in an impossible position. As the Supreme Court has long acknowledged, religious authorities are more "competent in the ecclesiastical law and religious faith" than are judges. *Watson v. Jones*, 80 U.S. 679, 729 (1872). To appeal from the religious body to the courts "would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so." *Id.*

Therefore, the question whether church autonomy applies should be resolved as early as possible. If the defense is denied erroneously and the lawsuit allowed to proceed, there is no way to undo the constitutional harm which occurs simply by virtue of the litigation itself. Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 LOY. U. CHI. L.J. 471, 504-05 (2023).

5

## II.   CASE STUDIES: WHAT HAPPENS IN ACT III?

Without the availability of interlocutory appeal, the right to appeal threshold issues of church autonomy is asymmetrical. Plaintiffs can appeal an erroneous grant of immunity under 28 U.S.C. § 1291. Churches, however, are asked to wait until after the case concludes. But even if the denial of church autonomy is later found erroneous, the damage is already done.

Recent lawsuits in Colorado and New York provide case studies of the type and extent of such damage. In *Tucker v. Faith Bible Chapel Int'l*, No. 19-CV-01652-RBJ (D. Colo. filed June 7, 2019), a local church operated a Christian school that terminated a teacher (a chaplain, actually) after a contentious debate about theology and pedagogy at the school resulting from a chapel program addressing race and the church. The former teacher sued, claiming he had been fired in retaliation for opposing a racially hostile environment. In *Belya v. Kapral*, No. 1:20-cv-06597-AS (S.D.N.Y. filed Aug. 8, 2020), church leadership decided against elevating a particular clergyman to serve as a bishop. The disgruntled clergyman sued a panoply of leaders of the highest rank in the Russian Orthodox Church Outside of Russia, as well as a diocese of that Church and the Church's executive body (the Synod) of the highest authority of the Church (the Sobor).  He alleged that they had defamed him by claiming he falsified the papers confirming his election to the office.

6

After courts rejected the church-autonomy defenses in *Faith Bible* and *Belya*, the parties developed a rich public record of the dispute, documenting the burdens on the parties in Act III. These records illustrate what is at stake for many religious institutions upon getting a debatable denial of church autonomy, without the right to seek immediate review of that denial: extensive judicial entanglement in the innerworkings of a fundamentally religious dispute, leading to considerable (expensive) litigation about sensitive matters of theology and practice within the religious institution. While one should of course be careful about generalizing from a case or two, *Faith Bible* and *Belya* are nonetheless very helpful, as they show the chaos that inevitably happens when a religious dispute is forced through protracted civil litigation. This case is even more straightforward than those, in any event: In *Faith Bible* and *Belya*, purported factual disputes at issue formed the justification for denying interlocutory appeal; no such dispute exists here.

We start, of course, in Act I.

**A. Act I: The Falling Out**

***Faith Bible.*** In *Faith Bible* Act I, the characters are plaintiff Gregg Tucker and defendant Faith Bible Chapel International ("Faith Bible").

Faith Bible is a church in Colorado. ECF 72 at 4.[2] It operated a religious school, Faith Christian Academy. *Id.* Both were dedicated to the same purpose: to "[b]ring[] people to Jesus and to membership in His Family" and "[e]quip[] people for their ministry in the church and life mission in the world." *Id.* Founded in 1965, the church is a fixture in the community. ECF 41-4 at 1.

Tucker taught at the school from 2000 to 2006, left for missions work overseas, and then returned to teaching at Faith Bible from 2010 until 2018. ECF 41-7 at 1. This productive relationship came to a dramatic end in 2018. ECF 25 at 1. Because "celebrating God's diverse Kingdom is integral to Faith Bible's core mission," it held a special chapel program on race and faith, a subject that in American church history has unfortunately been fraught with controversy and division. *Id.* at 1-3.

Tucker disagreed with other leadership in the church and school about how to address the subject and about the proper use of Scripture in analyzing it. *Id.* at 6. Tucker did the chapel service his way, seeking to confront what he believed to be racism in the community. ECF 13 at 10-11. Parents and students complained. *Id.* at 12. Faith Bible leadership believed Tucker had misapplied Scripture and approached the issue in an inappropriately confrontational manner. ECF 25 at 6. Tucker refused

---

[2] In the ***Faith Bible*** discussions of this brief, all ECF citations refer to the *Faith Bible* district-court docket. *See* D. Colo. No. 19-cv-1652.

to acknowledge the validity of their concerns or their interpretations of Scripture, instead choosing to publish a letter airing his views. *Id.* He openly opposed leadership on the issue. ECF 57 at 19-20. Predictably, it did not end well. Tucker lost his job, the school lost goodwill, and Tucker sued.

*Belya.* In the parallel story of *Belya*, Act I, the characters are plaintiff Father Alexander Belya and the leadership of the Russian Orthodox Church Outside Russia ("ROCOR"), which is a semi-autonomous part of the Russian Orthodox Church.

Father Alexander was a priest who was considered for elevation to a position as a ROCOR bishop. ECF 112 at 10.[3] But for pastoral reasons, church leadership decided not to proceed and removed Father Alexander from further consideration. ECF 112 at 10-12. To their surprise, though, things didn't end there. Church leadership thereafter received correspondence from colleagues in the Moscow Patriarchate purporting to recognize Father Alexander's elevation (supposedly, at an election that never took place). ECF 112 at 14. Senior clergy investigated and discovered a host of irregularities (such as apparently forged letters from church leaders). ECF 112 at 15. They explained to a broader church governance body, the Synod, that documents that had been sent to Moscow contained falsehoods as well as mistakes of canon law. ECF 112 at 15-22. The senior clergy also explained some

---

[3] In the ***Belya*** discussions of this brief, all ECF citations refer to the *Belya* district-court docket. *See* S.D.N.Y. No. 1:20-cv-06597-AS.

9

of the pastoral concerns about Father Alexander that were relevant to removing his candidacy from consideration for the bishopric. ECF 112 at 21-22. The head of the ROCOC, Metropolitan Hilarion, thereafter suspended Father Alexander from religious duties. ECF 112 at 22-23. Father Alexander appealed his priestly suspension through the ROCOC's process. ECF 112 at 23. The Spiritual Court and the Synod both upheld his suspension, ECF 112 at 23-24. So he turned to the secular courts.

Act I set the scene.  In Act II, the church raises the shield of church autonomy.

## B. Act II: Ministerial-Exception Litigation

***Faith Bible*.** In *Faith Bible*, Tucker alleged that the school fired him in retaliation for opposing a racially hostile environment, in violation of Title VII. ECF 13 at 19-23. As happens in many lawsuits against churches, Tucker's pleading artfully avoided mentioning religious aspects of Faith Bible and his position there. Indeed, he *amended* his original complaint in an unabashed effort to downplay the role of religion so that he might survive a motion to dismiss. For example, he deleted his original characterization of Faith Bible Chapel International as a "religious organization," rebranding it as "FBCI," which he claimed operated a "vast business network":

10

> 12.    FBCI operates a vast business network. Each business activity of FBCI is carried out by a distinct enterprise, doing business under a trade name of FBCI.  ~~At all times applicable herein, Defendant Faith Bible Chapel International Inc. is a religious organization incorporated within the laws of the State of Colorado.~~

ECF 13-1 at 4. He deleted the word "chapel" in describing the event on faith and race, styling it a "symposium" without reference to its religious setting:

> ~~3.~~    ~~Plaintiff~~ Tucker had been given authority to organize the ~~Chapel~~ symposium and was at first praised for it by the school's administration. However, after the symposium ~~Chapel,~~

ECF 13 at 2. And he scrubbed references to his position as Chapel director:

> 92.    ~~In response to these parental complaints, Defendant~~ Hasz and Cook told Tucker that, in response to parent complaints, he would no longer have the responsibility of planning

18

Case 1:19-cv-01652-RBJ-STV    Document 13-1    Filed 09/03/19    USDC Colorado    Page 19 o 34

> Chapel Meetings. ~~removed Plaintiff from his position as Chapel director and~~ Hasz and Cook also told Tucker that he was banned ~~him~~ from speaking in front of students at future Chapel Meetings.

*Id.* at 18-19.

Faith Bible moved to dismiss the complaint under the ministerial exception. ECF 25. But on Tucker's motion, ECF 29, the court converted the motion to one for summary judgment, ECF 32, permitted Tucker months to conduct discovery, *id.*, and

11

denied Faith Bible's defense, ECF 52. The court reasoned, based "on the totality of the facts and circumstances"—which were drawn entirely from Tucker's own declaration, ECF 41-7—that a jury could conclude Tucker was not a "minister" within the ministerial exception. *Tucker v. Faith Bible Chapel Int'l*, 2020 WL 2526798, at *6 (D. Colo. May 18, 2020).

Over a vigorous dissent, the Tenth Circuit declined to review the order and held that it lacked appellate jurisdiction. *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028 (10th Cir. 2022); *see also Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620 (10th Cir. 2022) (denying rehearing *en banc* by a 6-4 vote). It mistakenly believed "this category of orders . . . can be effectively reviewed in the usual course of litigation." 36 F.4th at 1036. With that, the case went back for Act III.

*Belya*. Return now to New York for the story in *Belya*. Father Alexander sued church leadership, claiming defamation because leadership denied that Father Alexander was elected to the bishopric and accused him of forging documents relating to his election. As in *Faith Bible*, the defendants in *Belya* raised the defense of church autonomy, arguing that whether Father Alexander had in fact been validly elected to the bishopric would require the court to interpret religious laws and regulations to properly evaluate the truth of church leadership's statements. ECF 38 at 2. And like in *Faith Bible*, the plaintiff's counsel in *Belya* "narrowly drafted" his complaint "to allege a purely 'secular dispute'" to avoid the church-autonomy

12

defense. ECF 42 at 2. The district court agreed with Father Alexander, reasoning that his defamation claims "may be resolved by appealing to neutral principles of law" and turned only on whether Father Alexander *had* in fact forged he documents and church leadership's knowledge as to said forgery. *Belya v. Kapral*, No. 1:20-cv-06597-VM, 2021 WL 1997547, at *4 (S.D.N.Y. May 19, 2021).

The Second Circuit concluded that interlocutory review was inappropriate and, like the Tenth Circuit panel in *Faith Bible*, erroneously assumed the church-autonomy defense could be adjudicated at a later date. *Belya v. Kapral*, 45 F.4th 621, 633 (2d Cir. 2022). Perhaps at some future point it would be necessary to limit or dismiss Belya's claims, the panel noted—just not now. *Id.* at 631-33. The full court divided 6-6 on whether to rehear the case en banc. 59 F.4th 570 (2d Cir. 2023).

### C. Act III: The Aftermath

As it turns out, on remand, trying to work *around* religious issues did not go well in either case. As should have been evident from the beginning of the matter, religious issues suffused both cases.

***Faith Bible.*** Start with Tucker's job. In pleadings, Tucker had emphasized the science classes he taught, ECF 41-7 at 2, saying he did not teach "specific theology" or "doctrine," *id.* at 2-4. Discovery revealed, however, that most of his teaching took place in the Bible department. He taught, in total, 53 courses across his tenure at the school—*51* of which were in the Bible department—teaching aspects of Scripture,

13

Christian doctrine, and theology. ECF 118-1 at 53. These included a "Foundations of Faith" course, with the Bible as the primary text ("prepar[ing students] for leadership in the church"), and "Worldviews and World Religions," which emphasized evangelism. ECF 118-1 at 4, 12. Tucker led missions trips locally and internationally, ECF 118-1 at 19, and in 2017 he assumed the role of "Chaplain," ECF 25-1 at 1.

Despite increasing evidence confirming that Tucker's job was anything but secular, the district court would not reconsider the ministerial exception, stating it would not address issues "previously decided," ECF 102 at 11, or even bifurcate the issue, *id.* at 13, meaning that a full trial on the merits was required to determine whether the exception applied. The Tenth Circuit held, after all, that the defense could "be effectively reviewed at the conclusion of the litigation." *Tucker*, 36 F.4th at 1048.

But while discovery lingered on, Faith Bible's expenses were mounting. The court knew this. It repeatedly pushed the parties towards settlement due to the "substantial" "litigation costs" the parties were incurring. ECF 102 at 10. It "strongly recommend[ed]" mediation because "the discovery process, preparation for trial, a lengthy jury trial, and what the Court suspects is an inevitable appeal from the result, will be very expensive to the parties." ECF 104; *see* ECF 122 (denying extension because "[t]he best motivator for a settlement is a fixed trial date").

14

Given the evidence produced in discovery, Faith Bible intended to move for summary judgment. ECF 125. If the applicability of the ministerial exception was at all doubtful at the pleading stage, it wasn't anymore. But the settlement conference was first. Whatever calculus Faith Bible had in mind for weighing the ongoing costs, psychological strain, and other burdens of litigation, as well as the statements of the district court about rehearing the defense, it was not enough to lead Faith Bible to stick to its contemplated course. *See* ECF 118 at 2-4 (describing the burdens of litigation); *see also* Matt. 5:25 (NIV) ("Settle matters quickly with your adversary who is taking you to court."). The parties settled. ECF 129. Act III was over in *Faith Bible*, settlement drawing the curtain over whatever remained of the story.

*Belya*. The ending was no prettier in *Belya*. On remand, the lawyers for Belya pursued "intrusive discovery into internal church deliberations," including "depositions of [ROCOR's] highest leadership on matters of church discipline." ECF 111 at 17. Father Alexander's counsel deposed 11 high-ranking church officials—including not only two archbishops, but also the *highest authority* of the Church (the Metropolitan)—on their understanding of church practices and their speculation as to other church officials' understandings of church practices. ECF 112 at 34-35. In the depositions, counsel probed internal communications among clergy, including church discipline commissions. ECF 112 at 35. And despite telling the court that "This Case Involves No Religious Issues," ECF 45 at 3, Father

15

Alexander's counsel probed wide and far into religious matters during discovery, deposing ROCOR officials and asking them—under penalty of perjury—to disclose internal church deliberations and private conversations going to sensitive matters of church practice, theology, governance, and hierarchy. For example, counsel asked several priests about visits to Russia and travel with certain religious icons, the relationship between marriage and ordination, and even their views on the Russian Orthodox Church in Moscow's position on the war in Ukraine. ECF 112 at 35.

As in *Faith Bible*, the costs of litigation in *Belya* are high and are continuously mounting. The defendants in *Belya* noted that defending against "Father Alexander's lawsuit has cost the Church hundreds of thousands of dollars," which is "many times more than the church salaries of all the Defendants combined," and has "sapped the attention and energy of the Church's senior hierarchy in ways that far exceed normal religious services and ministry." ECF 112 at 32, 34; *see* ECF 114 (sworn testimony of a bishop on behalf of the Synod confirming as much). Church leadership in their filings further lamented the fact that, as a result of compulsory discovery laws, "the Church has been forced to turn over many sensitive internal communications" about religious matters that ordinarily "would not be shared even with most ROCOR clergy" and which may ultimately end up on public dockets. ECF 112 at 33. Church leadership worries that litigation like *Belya* may habituate the church to think of

church-discipline and leadership matters as matters of litigation risk rather than questions of "the Holy Spirit and conscience." ECF 114 at 44.

Although there is a chance that the church-autonomy defense will one day win the day in *Belya*—the defendants' motion for summary judgment is pending as of this writing, ECF 111—regardless of who ultimately prevails, the damage to church leadership and to the religious community it shepherds has already been done.

### D. Epilogue: The Lesson of Act III

Act III of the *Faith Bible* and *Belya* stories presented no shocking twists. Its predictability is the point—and the problem. Church autonomy shields religious institutions from state intrusion on their internal affairs. If the judicial system can peer inside and second-guess decisions of religious institutions, there is considerably less autonomy for the religious institution in question. If the invocation of church autonomy were totally meritless in a given case, that would be one thing. *See* Lael Weinberger, *The Limits of Church Autonomy*, 98 NOTRE DAME L. REV. 1253 (2023) (urging recognition of limits of church autonomy). But when the religious component of the dispute is anything but trivial, as in *Faith Bible* and *Belya*, one wonders how cases like these could be allowed to proceed without permitting a hard look on appeal at the serious considerations of church autonomy. *Cf. United States v. Trump*, 91 F.4th 1173, 1187 (D.C. Cir.) (for purposes of appellate jurisdiction, a

"colorable" argument is sufficient), *vacated on other grounds sub nom.*, *Trump v. United States*, 144 S. Ct. 2312, 2347 (2024).

As it turns out, the process is the punishment. *See Catholic Univ.*, 83 F.3d at 467.

The civil courts are not experts in religious law. They are not supposed to be. When one takes a religious dispute to a secular tribunal, it goes from a court with more expertise to one with less. *Watson*, 80 U.S. at 729. It is thus nigh impossible for a court to navigate the treacherous shoals of a religious dispute without crashing ashore.

Meanwhile, it is no great discovery that defending a lawsuit is burdensome. This reality is what courts have acknowledged in the qualified-immunity context, where interlocutory appeals are available. Indeed, courts have often acknowledged the similarities between the church-autonomy defense and immunity to suit. *See, e.g.*, *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013) (justifying collateral review of denial of church autonomy because it is "closely akin to a denial of official immunity"); *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 (10th Cir. 2002) (recognizing that "the church autonomy defense" is "similar to a government official's defense of qualified immunity"). Further, given the obvious risk of judicial entanglement and of courts overstepping their bounds, courts also have analogized church autonomy to the separation-of-powers doctrine, *Billard v.*

18

*Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024), which this Court has recognized is an immunity defense entitled to interlocutory review, *e.g.*, *United States v. Rose*, 28 F.3d 181, 186-87 (D.C. Cir. 1994).

Of course, some religious institutions will assert a church-autonomy claim at Act II and lose. But if that happens, courts should know it is unrealistic that review at the end of Act III will provide an equally good chance to review as at the end of Act II. Given the costs of litigation and the harms imposed upon the congregation, the religious institution might not be able to raise its church-autonomy defense again. Critically, the chief harms that church autonomy guards against at the outset of a matter—suppression of free religious exercise and the courts' lack of competence— are aggravated by dragging religious institutions through the litigation process until the bitter end.

Given the examples of *Faith Bible* and *Belya*, it is not hard to see this case going down the same path. For example, the parties' discovery plan reveals that Mr. O'Connell has sought or intends to seek discovery on matters of church governance, including on whether the USCCB is able to monitor how Peter's Pence funds are distributed, A170, as well as the USCCB's communications with the Holy See and Vatican City, A175. Although the judiciary has many tools at its disposal to handle privilege and confidentiality on a case-by-case basis, the parties deserve a definitive

answer on the question whether this kind of lawsuit can even proceed to discovery in the first place.

## CONCLUSION

Amicus respectfully urges the Court to exercise its appellate jurisdiction and, for the reasons given in the USCCB's opening brief, reverse the district court.

September 13, 2024                    Respectfully submitted,

/s/ *Aaron M. Streett*
_____
Aaron M. Streett
Matthew M. Hilderbrand
Beau Carter
**BAKER BOTTS L.L.P.**
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1855
Fax: (713) 229-7855
aaron.streett@bakerbotts.com

*Counsel for Amicus Curiae*
*Dr. Lael Weinberger*

20

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32(e)(3) because, excluding the parts of the document exempt from the limit by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), this document contains 4,401 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ *Aaron M. Streett*
Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1855
Fax: (713) 229-7855
aaron.streett@bakerbotts.com

*Counsel for Amicus Curiae*
*Dr. Lael Weinberger*

21

## CERTIFICATE OF SERVICE

I certify that on September 13, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ *Aaron M. Streett*
Aaron M. Streett
**BAKER BOTTS L.L.P.**
910 Louisiana St.
Houston, Texas 77002
Tel: (713) 229-1855
Fax: (713) 229-7855
aaron.streett@bakerbotts.com

*Counsel for Amicus Curiae*
*Dr. Lael Weinberger*