NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 23-7173**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

DAVID O'CONNELL,

*Plaintiff-Appellee*,

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,

*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the District of Columbia (No. 20-cv-01365) (Cobb, J.)
_____

**BRIEF OF *AMICI CURIAE* SEVEN RELIGIOUS ORGANIZATIONS
IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**
_____

Michael J. Showalter
Victoria N. Lynch-Draper
Joel S. Nolette
Ezhan S. Hasan
Stephanie Rigizadeh
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Fax: (202) 719-7049
mshowalter@wiley.law
vlynch-draper@wiley.law
jnolette@wiley.law

September 13, 2024                 *Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*Amici Curiae* the Jewish Coalition for Religious Liberty, the General Conference of Seventh-day Adventists, the Assembly of Canonical Orthodox Bishops of the United States of America, The Church of Jesus Christ of Latter-day Saints, the National Association of Evangelicals, the Lutheran Church—Missouri Synod, and the Muslim Public Affairs Council provide the following information in accordance with D.C. Circuit Rule 28(a)(1):

### A.    Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Opening Brief of Defendant-Appellant United States Conference of Catholic Bishops ("USCCB"): the Jewish Coalition for Religious Liberty, the General Conference of Seventh-day Adventists, the Assembly of Canonical Orthodox Bishops of the United States of America, The Church of Jesus Christ of Latter-day Saints, the National Association of Evangelicals, the Lutheran Church—Missouri Synod, and the Muslim Public Affairs Council.

### B.    Ruling Under Review

USCCB seeks review of the November 17, 2023 decision of the district court (District Judge Jia M. Cobb) denying USCCB's motion to dismiss the complaint of Plaintiff-Appellee David O'Connell. *See* A145–55. There is no official citation for the decision below, which was pronounced orally and entered by Minute Order. There are no other prior rulings under review.

i

**C.      Related Cases**

Counsel for *Amici Curiae* are unaware of any other case pending before this

or any other court that is related to this case under D.C. Circuit Rule 28(a)(1)(C).

September 13, 2024                                    /s/ Michael J. Showalter
                                                     Michael J. Showalter
                                                     Victoria N. Lynch-Draper
                                                     Joel S. Nolette
                                                     Ezhan S. Hasan
                                                     Stephanie Rigizadeh
                                                     **WILEY REIN LLP**
                                                     2050 M Street NW
                                                     Washington, DC 20036
                                                     Phone: (202) 719-7000
                                                     Fax: (202) 719-7049
                                                     mshowalter@wiley.law
                                                     vlynch-draper@wiley.law
                                                     jnolette@wiley.law

                                                     *Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *Amici Curiae* the Jewish Coalition for Religious Liberty, the General Conference of Seventh-day Adventists, the Assembly of Canonical Orthodox Bishops of the United States of America, The Church of Jesus Christ of Latter-day Saints, the National Association of Evangelicals, the Lutheran Church—Missouri Synod, and the Muslim Public Affairs Council state that they have no parent companies and there is no publicly held company that has a ten percent (10%) or greater ownership interest in any of *Amici Curiae*'s organizations. *Amici Curiae* are religious organizations whose general purposes are to promote and advance the interests of their respective faiths.

September 13, 2024

/s/ Michael J. Showalter
Michael J. Showalter
Victoria N. Lynch-Draper
Joel S. Nolette
Ezhan S. Hasan
Stephanie Rigizadeh
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Fax: (202) 719-7049
mshowalter@wiley.law
vlynch-draper@wiley.law
jnolette@wiley.law

*Counsel for* Amici Curiae

## D.C. CIRCUIT RULE 29(D) CERTIFICATE

*Amici Curiae* the Jewish Coalition for Religious Liberty, the General Conference of Seventh-day Adventists, the Assembly of Canonical Orthodox Bishops of the United States of America, The Church of Jesus Christ of Latter-day Saints, the National Association for Evangelicals, the Lutheran Church—Missouri Synod, and the Muslim Public Affairs Council certify that they have joined in a single brief to the extent practicable. To the extent other *amicus* briefs are filed in support of USCCB, this separate *amicus* brief is necessary. It alone squarely addresses the religious-autonomy doctrine and does so from the unique perspectives of *Amici Curiae*, who collectively have thousands of years of history and experience with religious, charitable offerings and who rely on the religious-autonomy doctrine to exercise freely their respective faiths.

September 13, 2024

/s/ Michael J. Showalter
Michael J. Showalter
Victoria N. Lynch-Draper
Joel S. Nolette
Ezhan S. Hasan
Stephanie Rigizadeh
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Fax: (202) 719-7049
mshowalter@wiley.law
vlynch-draper@wiley.law
jnolette@wiley.law

*Counsel for* Amici Curiae

iv

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

D.C. CIRCUIT RULE 29(D) CERTIFICATE ....................................................... iv

GLOSSARY..................................................................................................... ix

STATEMENT OF INTEREST .................................................................................1

INTRODUCTION AND SUMMARY ....................................................................3

ARGUMENT .........................................................................................................7

I.    The First Amendment Bars Courts from Adjudicating Disputes in Which Religious and Secular Questions Are Inextricably Intertwined........... 7

II.   Judicial Probing into Religious Dialogue About Charity Unavoidably Harms the Group's Free Exercise. ............................................................. 12

III.  Civil Court Review for Fraud Is Necessarily Narrow. ................................. 17

CONCLUSION .....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bryce v. Episcopal Church in the Diocese of Colo.*,
   289 F.3d 648 (10th Cir. 2002) ..........................................................12

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940)...............................................................6, 17–18

*Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*,
   531 S.W.3d 146 (Tenn. 2017) ...............................................................8

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)...............................................................................19

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
   Saints v. Amos*,
   483 U.S. 327 (1987)...........................................................................3–4

*EEOC v. Cath. Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996)..................................6, 9–10, 18, 20

*Ginyard v. Church of God in Christ Ky. First Jurisdiction, Inc.*,
   6 F. Supp. 3d 725 (W.D. Ky. 2014).....................................................4

*Gregorio v. Hoover*,
   238 F. Supp. 3d 37 (D.D.C. 2017).......................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012).................................................4, 7–8, 10, 16–17

*Hutchison v. Thomas*,
   789 F.2d 392 (6th Cir. 1986) ...............................................................9

*Jones v. Wolf*,
   443 U.S. 595 (1979)..........................................................................8–10

*Kedroff v. St. Nicholas Cathedral Russian Orthodox Church in N.
   Am.*,
   344 U.S. 94 (1952)..............................................................3, 8, 10–11

*McRaney v. N. Am. Bd. of S. Baptist Convention, Inc.*,
    980 F.3d 1066 (5th Cir. 2020) ...............................................................8

*Moon v. Moon*,
    833 F. App'x 876 (2d Cir. 2020) ..............................................6, 18–19

*Okla. Ann. Conf. of the United Methodist Church, Inc. v. Timmons*,
    2023 OK 101 .....................................................................................8, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020).............................................................................4–5

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem.*
    *Presbyterian Church*,
    393 U.S. 440 (1969)...........................................................7–8, 10–11

*Roman Cath. Archdiocese of San Juan, Puerto Rico v. Acevedo*
    *Feliciano*,
    589 U.S. 57 (2020)..................................................................................4

*Schleicher v. Salvation Army*,
    518 F.3d 472 (7th Cir. 2008) ...............................................................18

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
    426 U.S. 696 (1976)...............................................4–5, 12, 17–19, 21

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981)..............................................................................19

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) ...............................................................20

*United States v. Ballard*,
    322 U.S. 78 (1944)..........................................................................18–19

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) .......................................................4, 7–8

## Other Authorities

*Charity*, Halachipedia .............................................................................15

The Church of Jesus Christ of Latter-day Saints, *Doctrine and Covenants* .......................................................................................... 13

The Holy See, Code of Canon Law, Book II Can. 212 .................................... 16–17

Islamic Relief Worldwide, *Zakat: Purifying and Blessing Your Wealth* ............... 14

John A. Widstoe, *Evidences and Reconciliations* (1970) ........................................ 13

John Locke, *A Letter Concerning Toleration* (1689) ................................................ 7

Lael Weinberger, *Is Church Autonomy Jurisdictional*, 54 Loy. U. Chi. L.J. 471 (2022) ....................................................................................... 8

*Leviticus* 19:11 ....................................................................................... 17–18

*Matthew* 18:15–17 ........................................................................................ 16

*Masechet Bava Batra 7a-13b* at 8a-b (Rabbi Adin Steinsaltz ed., 2009) ................................................................................................... 15

*Micah* 6:11 .................................................................................................. 18

Michael A. Helfand, *Litigating Religion*, 93 B.U. L. Rev. 493 (2013) ................... 16

Mishneh Torah, *Laws of Charity* .................................................................... 12–13

*Proverbs* 11:1 .............................................................................................. 17

W. Cole Durham & Robert Smith, 1 *Religious Orgs. & the Law* (2d ed. updated Dec. 2023) ........................................................................... 9

Zakat Foundation, *What Is Sadaqah?* ................................................................ 14

# GLOSSARY

| | |
|---|---|
| JCRL | Jewish Coalition for Religious Liberty |
| MPAC | Muslim Public Affairs Council |
| USCCB | United States Conference of Catholic Bishops |

## STATEMENT OF INTEREST

The Jewish Coalition for Religious Liberty ("JCRL") is a nonprofit, non-de-nominational organization of Jewish communal and lay leaders, seeking to protect the ability of Americans to freely practice their faith.[1] JCRL also aims to foster co-operation between Jewish and other faith communities in an American public square in which all supporters of freedom can flourish. Its founders have litigated religious liberty issues, published op-eds in prominent news outlets, and established an extensive volunteer network encouraging Jewish communal leadership to make public statements and act on religious liberty issues.

The General Conference of Seventh-day Adventists is a worldwide Christian denomination with over 22 million members. Recognizing that constitutional religious liberty protections for all rise and fall based on how they are applied to any religious organization or individual, the General Conference files *amicus* briefs on religious freedom issues in federal and state courts around the country.

The Assembly of Canonical Orthodox Bishops of the United States of America consists of all active, canonical Orthodox Christian bishops in every jurisdiction in the United States. The Assembly preserves and contributes to the unity of the

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *Amici Curiae* or their counsel contributed money intended to fund the brief's preparation or submission.

Orthodox Church in the United States by furthering her spiritual, theological, ecclesiological, canonical, educational, missionary, and philanthropic aims.

The Church of Jesus Christ of Latter-day Saints is a Christian denomination with 17 million members worldwide. Religious freedom is an essential element of its faith. The Church joins this brief out of a profound commitment to the principle that the First Amendment guarantees a faith community the autonomy to administer its voluntary donations for religious purposes, as religious leaders direct.

The National Association of Evangelicals is the largest network of evangelical churches, denominations, colleges, and independent ministries in the United States—serving forty member denominations as well as numerous evangelical associations, missions, social-service charities, colleges, seminaries, and independent churches.

The Lutheran Church—Missouri Synod, a Missouri nonprofit religious corporation, has some 6,000 member congregations, 22,000 ordained and commissioned ministers, and 2 million baptized members throughout the United States. The Synod treasures religious freedom and fully supports the preservation of First Amendment protections.

The Muslim Public Affairs Council ("MPAC") is a 501(c)(3) nonprofit that has worked since its founding in 1988 to enhance American pluralism, improve understanding of American Muslims, and speak out on policies that affect American

Muslims and other historically marginalized communities. MPAC routinely works with members of other faith groups and other diverse communities to encourage civic responsibility in order to help preserve our nation's democratic ideals as enshrined in the U.S. Constitution.

*Amici Curiae* believe that the First Amendment guarantees a faith community the autonomy to exercise religion according to that community's doctrine, policies, and standards. Allowing claims like O'Connell's to proceed against religious organizations like USCCB threatens that autonomy and thus the religious freedom it safeguards for all faith communities. *Amici Curiae* have a strong interest in ensuring that this Court decides the case in a manner that ensures that genuine fraud is not insulated from liability just because it is cloaked in religious garb while vindicating the First Amendment autonomy of religious organizations to be free from the sort of intrusion the claims here would precipitate.

## INTRODUCTION AND SUMMARY

Adherents to a diverse set of religions nationwide rely not only on the First Amendment's protection of the individual right to the free exercise of religion, but also on its protection of their freedom to "organize voluntary religious associations to assist in the expression and dissemination of . . . religious doctrine." *Kedroff v. St. Nicholas Cathedral Russian Orthodox Church in N. Am.*, 344 U.S. 94, 114 (1952). For the many believers whose "religious activity derives meaning in large measure

3

from participation in a larger religious community," *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in the judgment), the importance of the First Amendment's guarantee to protect a community's collective practice of faith cannot be overstated.

The longstanding religious-autonomy doctrine effectuates this guarantee. *See Roman Cath. Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 589 U.S. 57, 62 (2020).[2] Under that doctrine, when a religious body decides a question of discipline, faith, or ecclesiastical rule or custom, "legal tribunals must accept such decisions as final, and as binding." *Id.* The doctrine provides religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (internal quotation marks omitted); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020).

In cases turning on such issues, "civil courts" may "exercise no jurisdiction." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1872); *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713–14 (1976) (internal

---

[2] Courts have also referred to this doctrine as the "church autonomy doctrine" or the "ecclesiastical abstention doctrine." *See, e.g.*, *Ginyard v. Church of God in Christ Ky. First Jurisdiction, Inc.*, 6 F. Supp. 3d 725, 727 (W.D. Ky. 2014).

quotation marks omitted). This strict jurisdictional bar represents the confluence of the Establishment Clause's prohibition on "any attempt by government to dictate or even to influence such matters" and the Free Exercise Clause's protection from "[s]tate interference" in the religious "sphere." *Our Lady of Guadalupe*, 591 U.S. at 746.

The district court held that this case could be resolved on "neutral principles of law," reasoning that answering central questions "about what [USCCB] represented, what it knew, and the relationship between [USCCB] and [O'Connell]" would require no necessary inquiry into "church operations, religious doctrine, religious hierarchy, or religious decisionmaking." A149. Even if this "neutral principles" approach applies here, *but see* USCCB Br. 45–47, the district court misapplied it. Examining what USCCB allegedly represented in church, the relationship between USCCB and the international Catholic hierarchy, and the relationship between USCCB and congregants—the central questions identified by the district court—requires inquiry into *all* the religious matters the district court identified. *See* USCCB Br. 31–48. USCCB's alleged solicitation for Peter's Pence consists of a religious message delivered in a religious setting informed by thousands of years of religious practice. And determining whether the alleged solicitation was truthful would require the court to determine the religious meaning of the Pope's "charitable works." Resolving these questions would require delving into matters at the heart of

5

the religious-autonomy doctrine. The district court disregarded this inextricably in-
tertwined religious context.

In religious communities across the nation, exhortations to give take many
forms that are steeped in religious meaning and cannot be subject to secular inter-
pretation that disregards religious context. Scrutinizing such exhortations undercuts
the group's autonomy to decide for itself what its religious messaging means and
thus is beyond a civil court's proper role under the First Amendment.

Fraud may not be committed "with impunity" by wrapping it in the "cloak of
religion." *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940). For instance, fraud-
sters cannot conceal secular misdeeds "behind a religious smokescreen." *Moon v.
Moon*, 833 F. App'x 876, 880 (2d Cir. 2020). And statements or acts susceptible to
"analysis [that] can be done in purely secular terms"—wholly separable from reli-
gious questions—can be actionable. *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 466
(D.C. Cir. 1996) (emphasis omitted) (internal quotation marks omitted).

But this case is not one of those. As O'Connell's allegations highlight,
USCCB was a bona fide, sincere representative of the Catholic faith. And USCCB's
exhortations—involving statements uttered from the pulpit inside a church at a Sun-
day mass about a millennium-old collection taken up to support the "charitable
works" of the Pope—implicate religious questions in every relevant way.

The Court should reverse. First, under Supreme Court law, the religious-autonomy doctrine bars judicial inquiry into religious questions and disputes, even when they are intertwined with secular matters. Second, wading into a religious organization's religious dialogue about charity—and thus, inevitably, its charitable practices—unavoidably harms its members' collective exercise of faith. Third, while fraud can be justiciable in cases involving imposters or representations that do not require answering religious questions to adjudicate, this is not such a case.

## ARGUMENT

### I.    The First Amendment Bars Courts from Adjudicating Disputes in Which Religious and Secular Questions Are Inextricably Intertwined.

"Religious groups are the archetype of associations formed for expressive purposes," *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring, joined by Kagan, J.), and the First Amendment provides "special solicitude" to such organizations, *id.* at 189 (majority opinion); *see also Watson*, 80 U.S. at 728 (recognizing that religious liberty "lies at the foundation of our political principles"). Accordingly, under the First Amendment, religious matters are committed to religious organizations for management and resolution—they "cannot belong to the civil magistrate." John Locke, *A Letter Concerning Toleration* 7 (1689); *accord Watson*, 80 U.S. at 707.

The religious-autonomy doctrine implements this "special solicitude" by leaving "the civil courts no role in determining ecclesiastical questions." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S.

7

440, 447 (1969). The doctrine prohibits courts from "exercis[ing] . . . jurisdiction" in cases involving "matters of church government," "faith," and "doctrine." *Watson*, 80 U.S. at 733; *Kedroff*, 344 U.S. at 116.[3]

Historically, the Supreme Court has applied the neutral-principles approach relied on by the district court only when adjudicating church-property disputes. *See, e.g.*, *Presbyterian Church*, 393 U.S. at 449 (holding that states may adjudicate property disputes when applying "neutral principles of law, developed for use in all property disputes," without delving into "religious doctrine and practice"); *see also Jones v. Wolf*, 443 U.S. 595, 603–04 (1979) (permitting a state to apply the neutral-principles approach in a property dispute because "[t]he method relies exclusively on

---

[3] *Hosanna-Tabor*'s conclusion that the ministerial exception is a non-jurisdictional affirmative defense, *see* 565 U.S. at 195 n.4, does not upset *Watson*'s treatment of the religious-autonomy doctrine as jurisdictional. *See, e.g.*, *Okla. Ann. Conf. of the United Methodist Church, Inc. v. Timmons*, 2023 OK 101, ¶¶ 14–18 (explaining why the religious-autonomy doctrine—which is "much older" and "much broader" than the ministerial exception—remains a jurisdictional bar even after *Hosanna-Tabor*); *McRaney v. N. Am. Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066, 1080–82 (5th Cir. 2020) (Oldham, J., dissenting from the denial of rehearing en banc) ("[T]he Supreme Court has held that the ecclesiastical-autonomy doctrine carries jurisdictional consequences. . . . [and] emphasized that it really meant what it said."); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45–46 (D.D.C. 2017) (reasoning that the religious-autonomy doctrine falls under Rule 12(b)(1), "consistent with the long-standing practice of treating questions of ecclesiastical entanglement as jurisdictional"); *accord Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 156–59 (Tenn. 2017). And either way, the religious-autonomy doctrine is a threshold defense that requires resolution at the outset of a case. *See* Lael Weinberger, *Is Church Autonomy Jurisdictional*, 54 Loy. U. Chi. L.J. 471, 476 (2022).

8

objective, well-established concepts of trust and property law familiar to lawyers and judges"). Some lower courts have thus held that this approach "applies only to cases involving disputes over church property." *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *see also* USCCB Br. 45–46.

But even if the neutral-principles approach applies here, "[a]s originally formulated," the approach "was designed to protect religious autonomy"—not permit an end-run around it—"by assuring that secular courts would intervene in religious affairs only when the religious community itself had expressly stated in terms accessible to a secular court how a particular controversy should be resolved." W. Cole Durham & Robert Smith, 1 *Religious Orgs. & the Law* § 5:16 (2d ed. updated Dec. 2023). In *Jones*, for instance, that meant settling the property dispute in question based on documents like property deeds and organizational charters under generally applicable trust and property law, *see* 443 U.S. at 603, insofar as the relevant language could be analyzed in "purely secular terms," *Cath. Univ.*, 83 F.3d at 466 (internal quotation marks omitted). The neutral-principles approach, in other words, is designed to give religious organizations "flexibility in ordering private rights and obligations" according to secular standards. *Jones*, 443 U.S. at 603.

But as soon as "religious concepts" enter the equation, so too does the religious-autonomy doctrine. *Id.* at 604. In such circumstances, the presence of an "ostensibly neutral or secular principle" is of no moment. Durham & Smith, *supra*. As

9

a unanimous Supreme Court has explained, what matters is not the presence of a "neutral" rule in a controversy, but whether adjudicating a claim under that rule would result in "government interference" in religious questions. *Hosanna-Tabor*, 565 U.S. at 190.

Thus, the religious-autonomy doctrine applies if adjudicating a controversy would "entangle[]" a civil court in religious questions, *Jones*, 443 U.S. at 603–04, as when those questions are "inextricably intertwined" with secular issues, *Timmons*, 2023 OK 101, ¶ 10. In other words, if the court cannot "escape" a religious issue in adjudicating a controversy, even when "objective criteria" are present, dismissal is required. *Cath. Univ.*, 83 F.3d at 466.

Numerous cases illustrate this proposition. In *Jones* itself, for instance, the Court cautioned that neutral principles notwithstanding, the religious-autonomy doctrine trumps insofar as the dispute would "require a civil court to pass on questions of religious doctrine." 443 U.S. at 609. The Supreme Court demonstrated the point in *Kedroff* by concluding that a statute determining the "right to use and occupancy of" Saint Nicholas Russian Orthodox Church exceeded constitutional limits. 344 U.S. at 95–96, 106–08, 120–21. The *Kedroff* Court explained that "[e]ven in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls" to the extent it would require a different outcome than what secular neutral principles would dictate. *Id.* at

10

120–21; *see also Presbyterian Church*, 393 U.S. at 450–52 ("First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.").

Under a neutral-principles approach, this Court must determine whether it can analyze the merits of O'Connell's claims without becoming entangled in questions of religious doctrine and practice. O'Connell claims that he was "solicited from the pulpit" "during a Sunday mass" in 2018 to donate to Peter's Pence. *See* A25 ¶ 34. Peter's Pence is a thousand-year-old tradition in which the Catholic faithful take up a collection for the Pope. USCCB Br. 7. In turn, these funds are "used both for 'the many different needs of the Universal Church' and 'the relief of those most in need.'" *Id.* (quoting a 2018 summary of Peter's Pence from the Vatican). As USCCB put it, according to O'Connell, donations to Peter's Pence assist and support the "charitable works of Pope Francis." *See* A17–19 ¶¶ 21–24.

On these facts, the Court would be forced to delve into decisions of religious doctrine and practice to resolve this dispute. O'Connell's claims, at bottom, require consideration of three distinctively religious questions. First, the Court would need to assess the content and intent of USCCB's religious messaging when soliciting donations for Peter's Pence to support the "charitable works" of Pope Francis. Second, the Court would need to determine what qualifies as the "charitable works" of Pope Francis, "the Supreme Pontiff" of the Catholic Church. USCCB Br. 6. Third,

the Court would need to determine what disbursements count as advancing or sup-porting those "charitable works." *See* A17–19 ¶¶ 21–24. All three questions require religious answers about an offering that began in the Church "over a millennium" ago. USCCB Br. 7. At its core, this exploration of religious questions would require the very sort of "searching" inquiry into matters of "faith and doctrine" that is "im-permissible" under the religious-autonomy doctrine. *Serbian E. Orthodox Diocese*, 426 U.S. at 722–23 (internal quotation marks omitted).

By O'Connell's own framing, this case ultimately is about "religious commu-nication and religious dialogue." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). The First Amendment thus bars it.

## II.   Judicial Probing into Religious Dialogue About Charity Unavoidably Harms the Group's Free Exercise.

Allowing O'Connell's challenge to proceed harms religious communities' rights to determine the meaning of religious doctrine for themselves, to entrust their leaders with matters of faith, and to refer internal controversies to internal dispute-resolution mechanisms.

First, when used in a religious context, charity often involves deeply complex matters of faith that may result in outcomes unexpected to a purely secular observer. For example, in Judaism, the greatest level of Maimonides' Eight Levels of Charity is "to support a fellow Jew by endowing him with a gift or loan, or entering into a partnership with him, or finding employment for him, in order to strengthen his hand

12

so that he will not need to be dependent upon others." Mishneh Torah, *Laws of Charity*, 10:7–14[1]. Stripped of this religious understanding, a secular interpretation of "charity" might not contemplate a loan to the non-destitute, a job-training program for those of any socioeconomic background, or a partnership with a small business to boost its work. But when a rabbi uses the term "charity" in the local synagogue, it may entail such meanings, which members of the community would understand. Likewise, for other religions, when a court entertains whether funds voluntarily given to a religious organization were used for a purpose consistent with secular expectations, it deprives the religious community of its right to live by its own understandings of matters of faith.

Second, the management of charitable funds, once voluntarily given, is committed to the discretion of religious leadership following religious principles that do not necessarily align with secular presuppositions. A prime example comes from "The Council on the Disposition of Tithes" of The Church of Jesus Christ of Latter-day Saints, comprised of several senior Church leaders to whom scripture commits the management, allocation, and disposition of tithing donations. *See* The Church of Jesus Christ of Latter-day Saints, *Doctrine and Covenants* § 120:1, https://tinyurl.com/yzfzj8vm. This Council "exercise[s] prayerful care in the use of tithing," which "is disbursed with scrupulous care, *for it is sacred*." John A. Widstoe, *Evidences and Reconciliations* 286 (1970) (emphasis added).

13

Similarly, under Islam, the law for charity generally prescribes two forms of giving that are religious acts of worship—giving that serves God by way of serving humanity. The first form of giving, known as "Zakat," is a mandatory annual donation typically required of every Muslim based on a specific percentage of wealth (usually 2.5% of savings). *See generally* Islamic Relief Worldwide, *Zakat: Purifying and Blessing Your Wealth*, https://tinyurl.com/55578yxv. According to Islamic law and custom, Zakat must be distributed to specific categories of recipients defined in the Qur'an and Prophetic tradition, including the poor, those in debt, and other specified groups in need. *See id.* The other form of giving is called "Sadaqa," which refers to voluntary charity or almsgiving above and beyond the obligatory Zakat that a Muslim gives out of their own free will and ability. *See generally* Zakat Foundation, *What Is Sadaqah?*, https://tinyurl.com/mubv2dbj. Sadaqa can take various forms, including financial contributions, donations of physical goods, or even acts of kindness and support. *See id.*

In Islam, the primary goals of both Zakat and Sadaqa are to reduce economic inequality, support the welfare of the community, and purify the giver's wealth and soul. They also serve to strengthen community bonds by redistributing wealth more equitably and are integral to promoting social justice and supporting the less fortunate. While both Zakat and Sadaqa can be given directly by a worshiper to a person in need, congregants routinely give those donations to a mosque and entrust its

14

leadership to distribute those funds in accordance with Islamic law and generally accepted interpretations of thousand-year-old doctrines deeply rooted in faith.

As these examples illustrate, in some faiths an entity is ordained with holy authority to steward tithed funds. In others, it is an individual. In Judaism, for example, "a gabbay appointed by a community is assumed to have the implicit authorization" to manage charitable funds. *Charity*, text accompanying n.171, Halachipedia, https://tinyurl.com/5n6ch4w6 (last updated June 17, 2024). Whether a group or individual stewards tithed funds, this responsibility is integral to religious practice and community.

Those entrusted with responsibility over the use of tithes deal not only with the complex religious meanings of charity, but also with the equally complex rules about the funds' allocation. For instance, under Jewish doctrine, the gabbay can redirect "communal charity money to other communal needs." *Id.* The permissible scope of this authority is a matter of religious debate. *See id.*; *Masechet Bava Batra 7a-13b* at 8a-b (Rabbi Adin Steinsaltz ed., 2009), tinyurl.com/49mjku83. A court wading into the debate using its own secular principles undercuts the religious community's decisionmaking. These matters of religious doctrine should be left in the hands of entrusted religious leaders, not the civil courts.

Third, when facing debate over matters of religious belief, religious groups often have their own internal dispute-resolution mechanisms whose functioning

would be hindered by civil court entanglement. Religious doctrine reflects, and religious practice demonstrates, faith communities' commitment to keeping internal debates internal. *See Hosanna-Tabor*, 565 U.S. at 204–05 & n.5 (Alito, J., concurring, joined by Kagan, J.) (noting the "Lutheran doctrine that disputes among Christians should be resolved internally without resort to the civil court system and all the legal wrangling it entails" (citing a church treatise and 1 *Corinthians* 6:1)); Michael A. Helfand, *Litigating Religion*, 93 B.U. L. Rev. 493, 509–10 & nn.77–83 (2013) (describing various Christian denominations' use of "church courts" that "adjudicat[e] disputes between individual co-religionists or competing factions in accordance with shared religious norms and values"). This dispute-resolution process is part of the free exercise of religion, apart from the substance of any particular dispute.

Even without formal mechanisms, it is within the religious congregant's prerogative as a member of his community to attempt to persuade others towards his view. But to use the civil courts to get his way strips from the community any opportunity to turn to its faith-based resolution mechanisms. *See Matthew* 18:15–17 (outlining internal dispute-resolution process).

Here in particular, under canon law, all the Catholic faithful have "the right and even at times the duty" to "manifest to the sacred pastors their opinion on matters which pertain to the good of the Church and to make their opinion known to the rest of the Christian faithful." The Holy See, Code of Canon Law, Book II Can. 212, § 3,

16

https://tinyurl.com/2jcebj9c. Instead, however, O'Connell asks a secular court to re-solve what can be addressed only by appeal to his fellow believers.

The complex understanding of charity across faith traditions, commitments of religious questions to religious leaders, and designations of internal dispute-resolu-tion mechanisms underscore the need for the religious-autonomy doctrine. Without it, one faction in a religious community aggrieved by the internal resolution of a given dispute could drag another faction into court and induce the judiciary to settle intragroup differences, preventing the religious community from reaching its own resolution. Such an outcome would cut to the very core of the religious-autonomy doctrine, to protect religious bodies' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186 (internal quotation marks omitted).

## III.   Civil Court Review for Fraud Is Necessarily Narrow.

The doctrinal principles necessary to prevent harm to Americans' religious-associational rights leave room for courts to address fraud claims that do not require taking sides on religious questions. Fraud may not be committed "with impunity" by wrapping it in the "cloak of religion." *Cantwell*, 310 U.S. at 306.[4] But judicial

---

[4] Any instance of fraud—and especially fraud committed, most perversely, under the guise of religion—is abhorrent and would be staunchly opposed by any healthy re-ligious body whether justiciable or not. *See, e.g.*, *Proverbs* 11:1 (ESV) ("A false balance is an abomination to the Lord."); *Leviticus* 19:11 (ESV) ("You shall not

17

intervention is necessarily "marginal" and "narrow." *Serbian E. Orthodox Diocese*, 426 U.S. at 713. An imposter cannot hide "behind a religious smokescreen." *Moon*, 833 F. App'x at 880. And representations can be actionable when susceptible to "analysis [that] can be done in purely secular terms." *Cath. Univ.*, 83 F.3d at 466 (cleaned up). But neither situation is present here.

First, courts can entertain the narrow question whether solicitors of funds are who they say they are. *See Cantwell*, 310 U.S. at 306 ("Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent."). For example, a court can exercise jurisdiction if someone with no affiliation with a particular church solicits funds purportedly on behalf of the church and intends to use the money to buy a mansion or lavish car. *See, e.g.*, *Schleicher v. Salvation Army*, 518 F.3d 472, 478 (7th Cir. 2008) (reasoning that "proof that [a] church is a fake" would defeat the ministerial exception). The court can assess a defendant's sincerity

---

steal; you shall not deal falsely; you shall not lie to one another."). Fraud unjustly harms human beings created in God's image. Known fraud should not go unremedied by religious bodies, and concealed and unrepented fraud will not go unpunished by God. *See Micah* 6:11 (ESV) ("Shall I acquit the man with wicked scales and with a bag of deceitful weights?").

as a representative of the faith. *See generally United States v. Ballard*, 322 U.S. 78 (1944).

*Moon* illustrates this principle. 833 F. App'x 876. There, the plaintiff asserted a fraud claim against a religious organization in a dispute with a family member about who was the rightful successor to be named the worldwide leader of a church denomination. *Id.* at 880. But because the plaintiff did not allege an act "whose religious nature was a pretext for its secular purposes," the court held that it lacked jurisdiction. *Id.* at 880–81.

As *Moon* shows, the imposter rationale sets a high bar. After all, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *accord Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Absent allegations of "bad faith for secular purposes," *Serbian E. Orthodox Diocese*, 426 U.S. at 713, such a claim cannot proceed.

The imposter rationale does not apply here. O'Connell's allegations show that USCCB is a sincere, bona fide representative of the Catholic faith. *See* A13–14 ¶¶ 8–11. O'Connell does not allege that USCCB was putting up a "religious smokescreen" or that the solicitations were made in "bad faith for secular purposes." *Moon*, 833 F. App'x at 880; *Serbian E. Orthodox Diocese*, 426 U.S. at 713. O'Connell's claims

19

are not based on the sort of secular self-dealing envisioned by this principle. *See* USCCB Br. 13–14.

Second, courts can adjudicate fraud claims so long as "the analysis can be done in purely secular terms" and do not involve religious questions. *See Cath. Univ.*, 83 F.3d at 466 (internal quotation marks omitted). *Tilton v. Marshall* illustrates this basis for jurisdiction. 925 S.W.2d 672 (Tex. 1996). There, the plaintiffs alleged that a television preacher promised to perform certain "concrete" physical acts—personally reading, physically touching, and physically praying over their written prayer requests—in exchange for donations. *Id.* at 679 (plurality opinion). The court exercised jurisdiction because the claim was based on a straightforward, secular promise to "perform particular acts" that did not implicate questions of "religious doctrine or belief." *Id.*; *see also id.* at 682 (majority opinion) (characterizing the claim as whether the defendant "committed fraud by promising and by then failing to read, touch and pray over plaintiffs' prayer requests").

This basis for jurisdiction also does not apply here. As discussed, the alleged USCCB exhortations to donate in order to advance and support the Pope's "charitable works" do not involve a concrete promise separable from religious questions. Adjudicating this case, rather, would involve questions of what constitutes "charitable works" in Catholic doctrine.

Fraud is contemptible sin. But judicial involvement in intra-church disputes is available only in narrow circumstances. *Serbian E. Orthodox Diocese*, 426 U.S. at 713. O'Connell's claims do not fit within those narrow confines and thus must be dismissed.

## CONCLUSION

The Court should reverse.

September 13, 2024
/s/ Michael J. Showalter
Michael J. Showalter
Victoria N. Lynch-Draper
Joel S. Nolette
Ezhan S. Hasan
Stephanie Rigizadeh
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Fax: (202) 719-7049
mshowalter@wiley.law
vlynch-draper@wiley.law
jnolette@wiley.law

*Counsel for* Amici Curiae

21

## CERTIFICATE OF COMPLIANCE

I hereby certify, on September 13, 2024, that:

1. This document complies with the word limit under Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 4,836 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO in a fourteen-point Times New Roman font.

/s/ Michael J. Showalter
Michael J. Showalter

## CERTIFICATE OF SERVICE

I certify that on September 13, 2024, a true and correct copy of this Brief of *Amici Curiae* was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

/s/ Michael J. Showalter
Michael J. Showalter
