**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 23-7173

DAVID O'CONNELL,

*Plaintiff-Appellee,*

*v.*

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:20-cv-01365-JMC, Jia M. Cobb, U.S. District Judge*

## BRIEF FOR PLAINTIFF-APPELLEE

MARTIN WOODWARD
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, Texas 75240
(214) 443-4304
martin@kitnerwoodward.com

SIMON C. FRANZINI
GABRIEL Z. DOBLE
DOVEL AND LUNER
201 Santa Monica Boulevard, Suite 600
Santa Monica, California 90401
(310) 656-7066
simon@dovel.com
gabe@dovel.com

*Counsel for Plaintiff-Appellee*

November 6, 2024



COUNSEL PRESS    (800) 4-APPEAL • (714071)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici.**

The following are parties in this Court and the district court:

    a.  David O'Connell, Plaintiff-Appellee.

    b.  United States Conference of Catholic Bishops, Defendant-Appellant.

The following are amici in this Court:

    a.  Dr. Lael Weinberger.

    b.  Professor Derek T. Muller.

    c.  The Jewish Coalition for Religious Liberty, the General Conference of Seventh-day Adventists, the Assembly of Canonical Orthodox Bishops of the United States of America, The Church of Jesus Christ of Latter-day Saints, the National Association of Evangelicals, the Lutheran Church—Missouri Synod, and the Muslim Public Affairs Council.

    d.  Thomas Berg, Elizabeth Clark, Richard W. Garnett, Douglas Laycock, Christopher Lund, Michael W. McConnell, Michael P. Moreland, Robert J. Pushaw, and Eugene Volokh.

**B.    Rulings Under Review.**

The ruling under review is the 11/17/2023 Minute Order issued by Judge Cobb.  A6.  No formal citation exists.  The district court's reasoning can be found in the Joint Appendix, at pages A145-155.

**C.    Related Cases.**

Appellee is unaware of any related cases pending in this Court or any other court.

*/s/ Gabriel Doble*
Gabriel Doble

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..................................................................................... i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ................................................................................. 1

STATEMENT OF ISSUES .................................................................. 3

STATEMENT OF THE CASE ............................................................ 3

I.      Facts ...................................................................................... 3

II.     Procedural history ............................................................... 5

SUMMARY OF ARGUMENT ............................................................ 9

ARGUMENT ........................................................................................ 10

I.      This Court lacks appellate jurisdiction. ............................. 10

     A.    Pleading-stage denials of church-autonomy defenses do not meet the stringent requirements for collateral appeal ................................................................................ 11

          1.    Pleading-stage denials of church-autonomy defenses are not effectively unreviewable on appeal from final judgment. ...................................... 14

          2.    Pleading-stage denials of church-autonomy defenses do not conclusively determine the issue. ...... 35

          3.    Pleading-stage denials of church-autonomy defenses are not separate from the merits. ................. 37

     C.    USCCB fails to distinguish cases from other circuits holding that this category of order is not collaterally appealable ........................................................................ 39

     D.     USCCB relies on inapposite cases..........................................44

II.      The district court correctly determined that the church-autonomy doctrine does not bar O'Connell's claims at the pleading stage. ...................................................................................45

     A.     O'Connell's claims do not require the court to second-guess USCCB on a religious question. ..................................45

     B.     USCCB's arguments misunderstand the complaint and First Amendment law. ..........................................................49

          1.     O'Connell does not seek to second-guess the Pope's use of religious offerings. ...................................49

          2.     O'Connell's claims do not interfere in internal religious speech and polity. ...........................................51

          3.     O'Connell's claims do not require any "other entangling inquiries." ....................................................53

          4.     O'Connell's claims do not require entangling discovery.........................................................................55

     C.     USCCB's argument misunderstands church autonomy and would result in blanket immunity from secular claims. ....................................................................................60

III.     USCCB's failure-to-state-a-claim arguments fail.................64

     A.     This Court lacks pendent jurisdiction over USCCB's failure-to-state-a-claim arguments. ......................................64

     B.     The district court correctly determined that O'Connell states a claim.........................................................................66

CONCLUSION ..................................................................................68

CERTIFICATE OF COMPLIANCE ......................................................70

CERTIFICATE OF SERVICE..............................................................71

iv

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States*,
    431 U.S. 651 (1977) ............................................................. 35

*Acoustic Sys. v. Wenger Corp.*,
    207 F.3d 287 (5th Cir. 2000) ............................................... 19

*Ambassador Coll. v. Geotzke*,
    675 F.2d 662 (5th Cir. 1982) ......................................... 46, 56

*Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
    2007 Tenn. App. LEXIS 29 (Tenn. Ct. App. Jan. 19, 2007)............... 62

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    469, 897 F.3d 314 (D.C. Cir. 2018) ..................................... 63

*Azima v. RAK Inv. Auth.*,
    926 F.3d 870 (D.C. Cir. 2019) ........................................... 65

*Belize Soc. Dev., Ltd. v. Gov't of Belize*,
    668 F.3d 724 (D.C. Cir. 2012) ........................................... 34

*Belya v. Kapral*,
    45 F.4th 621 (2d Cir. 2022) ............ 11, 14, 20, 30, 36, 38, 40, 41, 42, 60

*Belya v. Kapral*,
    59 F.4th 570 (2d Cir. 2023) .............................................. 11

*Boresky v. Graber*,
    144 S. Ct. 681 (2024) .................................................... 32

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F.3d 648 (10th Cir. 2002) ........................................... 60

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940) ..................................................... 61

*Carroll Coll., Inc. v. NLRB*,
    558 F.3d 568 (D.C. Cir. 2009). ....................................... 26, 58

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949) ................................................................ 10

*Costello Pub. Co. v. Rotelle*,
   670 F.2d 1035 (D.C. Cir. 1981) .............................................. 63

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
   793 F. Supp. 2d 311 (D.D.C. 2011) ....................................... 68

*Demkovich v. St. Andrew the Apostle Parish*,
   3 F.4th 968 (7th Cir. 2021) .................................................... 59

*Dhiab v. Obama*,
   787 F.3d 563 (D.C. Cir. 2015) ............................................... 43

*Dig. Equip. Corp. v. Desktop Direct*,
   511 U.S. 863 (1994) ......................... 10, 11, 12, 20, 21, 23, 24, 26, 33, 34

*Doe v. Exxon Mobil Corp.*,
   473 F.3d 345 (D.C. Cir. 2007) ............................ 17, 21, 22, 28, 29, 31, 33

*Duquesne Univ. of the Holy Spirit v. NLRB*,
   947 F.3d 824 (D.C. Cir. 2020) ......................................... 25, 57

*EEOC v. Catholic Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996) ...................................... 25, 26, 58

*Faith Bible Chapel Int'l v. Tucker*,
   143 S. Ct. 2608 (2023) ........................................................... 11

*Flanagan v. United States*,
   465 U.S. 259 (1984) .................................................... 14, 17, 18

*Garraway v. Ciufo*,
   113 F.4th 1210 (9th Cir. 2024)............................................... 32

*Garrick v. Moody Bible Inst.*,
   2024 U.S. App. LEXIS 10521 (7th Cir. Apr. 30, 2024) ......... 11

*Garrick v. Moody Bible Inst.*,
   95 F.4th 1104 (7th Cir. 2024)... 11, 14, 20, 22, 23, 30, 31, 34, 36, 38, 40,
   41, 44

*Gen. Council on Fin. & Admin., United Methodist Church v. Cal. Superior Court,*
  439 U.S. 1369 (1978) .............................................................. 63

*Gordon College v. DeWeese-Boyd,*
  142 S. Ct. 952 (2022) ............................................................. 16

*Graber v. Doe,*
  59 F.4th 603 (3d Cir. 2023) ................................................... 32

*Gross v. Winter,*
  876 F.2d 165 (D.C. Cir. 1989) .............................................. 65

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
  485 U.S. 271 (1988) ............................................................... 13

*Herx v. Diocese of Fort Wayne-South Bend, Inc.,*
  772 F.3d 1085 (7th Cir. 2014) ......... 11, 14, 17, 20, 22, 23, 30, 31, 36, 39

*Himmelreich v. Fed. Bureau of Prisons,*
  5 F.4th 653 (6th Cir. 2021) .................................................... 32

*Hinshaw v. Smith,*
  436 F.3d 997 (8th Cir. 2006) ................................................. 19

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ................................................... 15, 16, 19

*Huntsman v. Corp. of President of Church of Jesus Christ of Latter-day Saints,*
  76 F.4th 962 (9th Cir. 2023) .................................................. 48

*Huntsman v. Corp. of President of Church of Jesus Christ of Latter-day Saints,*
  94 F.4th 781 (2024) ............................................................... 48

*In re Bible Speaks,*
  493 U.S. 816 (1989) ............................................................... 46

*In re Bible Speaks,*
  869 F.2d 628 (1st Cir. 1989) ................................................. 46

*In re Rafferty*,
   864 F.2d 151 (D.C. Cir. 1988) ............................................................ 18

*In re Stone*,
   940 F.3d 1332 (D.C. Cir. 2019) .......................................................... 18

*Johnson v. Fankell*,
   520 U.S. 911 (1997) ............................................................................ 45

*Jones v. Wolf*,
   443 U.S. 595 (1979) ............................................................................ 64

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) .......................................................... 65

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) .......................................................... 22

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004) .......................................................... 65

*Klein v. Oved*,
   2024 U.S. App. LEXIS 6012 (11th Cir. Mar. 13, 2024) ..... 11, 14, 21, 30, 36, 39, 40

*Lauro Lines s.r.l. v. Chasser*,
   490 U.S. 495 (1989) .............................................................. 14, 17, 24

*Madigan v. Telemarketing Assocs.*,
   538 U.S. 600 (2003) ............................................................................ 61

*Marceaux v. Lafayette City-Parish Consol. Gov't*,
   731 F.3d 488 (5th Cir. 2013) .............................................................. 18

*McCarthy v. Fuller*,
   714 F.3d 971 (7th Cir. 2013) .............................................................. 41

*McClendon v. City of Albuquerque*,
   630 F.3d 1288 (10th Cir. 2011) ..................................................... 13, 34

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
   141 S. Ct. 2852 (2021) ........................................................................ 37

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
  966 F.3d 346 (5th Cir. 2020) ........................................................ 37, 44

*Midland Asphalt Corp. v. United States*,
  489 U.S. 794 (1989) ................................................................ 21, 24, 29

*Minker v. Balt. Annual Conference of United Methodist Church*,
  894 F.2d 1354 (D.C. Cir. 1990) .................. 36, 37, 46, 52, 53, 56, 60, 63

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) .................................................................... 23

*Mohamed v. Jones*,
  100 F.4th 1214 (10th Cir. 2024) .......................................... 32

*Mohawk Indus. v. Carpenter*,
  558 U.S. 100 (2009) ...................................................... 12, 13, 17, 33, 34

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) .................................................................... 30

*NLRB v. Catholic Bishop*,
  440 U.S. 490 (1979) .................................................................... 25

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
  2006 U.S. Dist. LEXIS 102373 (C.D. Cal. Aug. 9, 2006) .................... 66

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
  711 F.3d 1136 (9th Cir. 2013) .......................................... 19

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*,
  477 U.S. 619 (1986) ................................................................ 27, 30

*Ohno v. Yasuma*,
  723 F.3d 984 (9th Cir. 2013) .......................................... 46

*Osborn v. Griffin*,
  865 F.3d 417 (6th Cir. 2017) .......................................... 68

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ................................................ 15, 16, 42, 45, 64

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l
Presbyterian Church,*
393 U.S. 440 (1969) ............................................................... 61

*Price v. Socialist People's Libyan Arab Jamahiriya,*
389 F.3d 192 (D.C. Cir. 2004) ............................................ 64

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria,*
962 F.3d 576 (D.C. Cir. 2020) ............................................ 37

*Rayburn v. Gen. Conference of Seventh-Day Adventists,*
772 F.2d 1164 (4th Cir. 1985) ............................................ 60

*Richardson-Merrell, Inc. v. Koller,*
472 U.S. 424 (1985) ...................................................... 38, 40

*Roman Catholic Diocese v. Cuomo,*
592 U.S. 14 (2020) ............................................................... 18

*S.E.C. v. Contorinis,*
743 F.3d 296 (2d Cir. 2014) ............................................... 68

*Schmidt v. Catholic Diocese,*
18 So. 3d 814 (Miss. 2009) ............................................ 47, 48

*Schneider v. State,*
308 U.S. 147 (1939) ............................................................ 61

*Serbian E. Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) ....................................... 15, 16, 27, 62

*Sierra Club v. USDA,*
716 F.3d 653 (D.C. Cir. 2013) ............................................ 12

*Surinach v. Pesquera De Busquets,*
604 F.2d 73 (1st Cir. 1979) ................................................ 59

*Swint v. Chambers Cty. Comm'n,*
514 U.S. 35 (1995) ...................................................... 12, 65

*Synod of Bishops of the Russian Orthodox Church Outside of Russ. v. Belya*,
  143 S. Ct. 2609 (2023) ........................................................... 11

*Tilton v. Marshall*,
  925 S.W.2d 672 (Tex. 1996) ................................................... 47

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) .............................................................. 57

*Trump v. United States*,
  144 S. Ct. 2312 (2024) .......................................................... 24

*Tucker v. Faith Bible Chapel Int'l*,
  36 F.4th 1021 (10th Cir. 2022)..11, 14, 17, 20, 22, 23, 30, 31, 36, 41, 42

*Tucker v. Faith Bible Chapel Int'l*,
  53 F.4th 620 (10th Cir. 2022) ................................................ 11

*Unified Container, LLC v. Mazuma Capital Corp.*,
  280 F.R.D. 632 (D. Utah 2012) ............................................. 66

*United States ex rel. Tran v. Comput. Scis. Corp.*,
  53 F. Supp. 3d 104 (D.D.C. 2014) ......................................... 67

*United States v. Ballard*,
  322 U.S. 78 (1944) ........................................................... 47, 48

*United States v. Cisneros*,
  169 F.3d 763 (D.C. Cir. 1999) ..............................21, 24, 28, 30, 31, 35

*United States v. Coates*,
  692 F.2d 629 (9th Cir. 1982) ................................................. 56

*United States v. Fokker Servs. B.V.*,
  818 F.3d 733 (D.C. Cir. 2016) .............................................. 24

*United States v. Freedom Church*,
  613 F.2d 316 (1st Cir. 1979) ................................................. 56

*United States v. Holmes*,
  614 F.2d 985 (5th Cir. 1980) ................................................. 56

*United States v. MacDonald,*
   435 U.S. 850 (1978) .............................................................. 17

*United States v. Quaintance,*
   523 F.3d 1144 (10th Cir. 2008) ........................................... 25

*United States v. Trump,*
   88 F.4th 990 (D.C. Cir. 2023) ....................................... 17, 24

*Univ. of Great Falls v. NLRB,*
   278 F.3d 1335 (D.C. Cir. 2002) ................................... 25, 58

*Van Osdol v. Vogt,*
   908 P.2d 1122 (Colo. 1996) .................................................. 62

*WE, Inc. v. City of Phila., Dep't of Licenses & Inspections,*
   174 F.3d 322 (3d Cir. 1999) ................................................ 19

*Whole Woman's Health v. Smith,*
   896 F.3d 362 (5th Cir. 2018) ........................................ 44, 59

*Will v. Hallock,*
   546 U.S. 345 (2006) ......................................... 12, 21, 22, 23, 29, 30

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) .............................................................. 60

*Wyatt v. Cole,*
   504 U.S. 158 (1992) .............................................................. 23

## Statutes

28 U.S.C. § 1291....................................... 1, 10, 12, 21, 39, 44

28 U.S.C. § 1292(b) ............................................................ 8, 33

28 U.S.C. § 1292(e) ................................................................ 12

28 U.S.C. § 1332 ...................................................................... 1

28 U.S.C. § 1367...................................................................... 1

28 U.S.C. § 1651(a) ....................................................... 8, 33, 34

28 U.S.C. § 2072(c) ............................................................. 12

29 U.S.C. § 211(c) .............................................................. 56

**Other Authorities**

H.R. Rep. No. 101-734 (1990) ............................................ 13

S. Rep. No. 102-342 (1992) ............................................... 13

U.S. Const. amend. I ......................................................... 25

## GLOSSARY

USCCB          United States Conference of Catholic Bishops

FLSA           Fair Labor Standards Act

NLRB           National Labor Relations Board

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

This Court lacks appellate jurisdiction because this appeal is not from a final decision under 28 U.S.C. § 1291. *See* pages 10-45 and 64-65.

## INTRODUCTION

USCCB told donors that their money would be used as aid for victims of war, oppression, natural disaster, or disease. But USCCB knew that the money would instead be invested in things like Hollywood movies and luxury real estate. That is fraud. And it is fraud whether you are an individual, a business, a non-profit, or a church.

USCCB asserts that to resolve this case the court must "scrutinize the Supreme Pontiff's prudential decisions about spending religious offerings," "scrutiniz[e] internal deliberations concerning religious speech," and "evaluate competing opinions on religious subjects." Br. 35, 40 (cleaned up). But none of that is required to determine, under straightforward common-law principles, whether USCCB committed fraud.

1

The district court recognized this, and denied USCCB's motion to dismiss on this basis.  At the same time, the district court emphasized the pleading-stage nature of its decision.  And it made clear that if this case somehow does end up requiring it to get entangled in religious matters, it will not—and cannot—do so.

USCCB seeks interlocutory appeal of that decision.  But it did not use established and preferred case-specific methods of interlocutory appeal.  Instead, USCCB asks this Court to create a new categorical right of immediate appeal whenever a defendant raises a church-autonomy defense in a motion to dismiss.

Four other circuits have been asked to expand the collateral order doctrine in this way.  All four have uniformly refused.  That is for good reason.  The Supreme Court and Congress have both determined that any new categories of immediately appealable order should be created via the rulemaking process that Congress created for that exact purpose, not by judicial decision.  And a pleading-stage denial of a church-autonomy defense does not satisfy any of the stringent requirements for collateral review.  This Court should follow its sister circuits and dismiss this appeal for lack of jurisdiction.

## STATEMENT OF ISSUES

1.      Should this Court follow the four circuits that have considered the issue and decline to create a new category of collateral appeal for pleading-stage orders denying a church-autonomy defense?

2.      Did the district court correctly determine that, at the pleading stage, it could resolve O'Connell's secular claims without second-guessing USCCB on religious questions?

3.      Should this Court follow its precedents and decline to exercise pendent jurisdiction over USCCB's arguments that O'Connell failed to state a claim?

4.      Did the district court correctly hold that O'Connell adequately pleaded his claims?

## STATEMENT OF THE CASE

### I.    Facts

Peter's Pence is a collection in Catholic churches every June.  A16 ¶18.  The church solicits donations from parishioners, ostensibly to aid people in need around the world.  A30 ¶48.  USCCB oversees the promotion of Peter's Pence in the United States.  A16-17 ¶19.  It creates promotional materials about the collection and distributes them for parishes and dioceses to use.  A17 ¶20.

3

USCCB's promotional materials say that donations to Peter's Pence will be used as aid for victims of war, oppression, natural disaster, or disease.  A30 ¶48.  For example, its "Bulletin Announcements" state, "Funds from this collection help victims of war, oppression, and natural disasters."  A19 ¶23.  Its bulletin inserts make clear that donations will be used, for example, to purchase "food and medicines" for those in need.  A18 ¶22.  USCCB also distributes text that it instructs parishes to "read … from the pulpit, or include it as part of your weekly announcements."  A19 ¶24.  That text states that the donated funds "help the Holy Father reach out to people suffering in our world, especially those enduring the effects of war and violence, natural disasters, and religious persecution."  *Id.*  All of USCCB's promotional materials make this same representation—that the Peter's Pence funds will be used as aid for people suffering from war, oppression, natural disaster, or disease.  A17 ¶21.

In the summer of 2018, O'Connell attended Sunday mass on the day the church solicited donations for Peter's Pence.  A25-26 ¶34.  The speaker at O'Connell's parish read the message written and distributed by USCCB, consistent with USCCB's instructions.  *Id.*  Relying on that

message, O'Connell made a cash donation. *Id.* Because he was told his money would be used as assistance for those in need, he believed that to be true. *Id.*

In reality, 90% of the collected Peter's Pence funds were not used as assistance for those in need. Instead, those funds were invested in ventures like Hollywood movies and luxury real estate, or used to plug holes in the Vatican's administrative budget. A12 ¶4; A22-25 ¶¶27-33. So USCCB misrepresented how the funds were going to be used. A16 ¶16; A30 ¶49. And USCCB knew that its representations were false when it made them. A30 ¶¶49-50. If O'Connell had known the truth, he would not have donated. A26 ¶35; A32 ¶56.

## II. Procedural history

O'Connell brought this putative class action lawsuit in January 2020. A9. He alleges fraud, unjust enrichment, and breach of fiduciary duty. A30-33. His claims are for USCCB's misrepresentations about how the funds would be used. *E.g.*, A30 ¶¶48-49 (fraud claim based on "false representation" about how the "solicited donations" would be used). He does not allege that the church cannot use collected funds for

5

investments or overhead—only that USCCB cannot misrepresent how the funds will be used.

USCCB answered the complaint in July 2020.  A36.  Shortly thereafter, O'Connell served document production requests.  Those requests seek documents showing the Peter's Pence promotional materials that USCCB created; lists of donors and amounts received (because this case is a putative class action); USCCB's knowledge of how the funds would be used; and how the funds were used.  USCCB has not responded to these requests, so the district court has had no occasion to rule on them.  There has been no other discovery.

After answering the complaint, USCCB moved to dismiss and for judgment on the pleadings.  Dkt. 22-1.  It argued, primarily, that O'Connell failed to state a claim.  *Id.* at 6-22.  It also argued that the lawsuit would require adjudicating religious questions, in violation of the First Amendment's church-autonomy principles.  *Id.* at 22-27.

Then-Judge Jackson heard argument.  A62.  She expressed skepticism of USCCB's church-autonomy defense, stating that O'Connell's allegations "appear to be stating a claim of fraud in the traditional sense."  A71.  She did not see this case "as the Court

6

deciding whether or not the expenditures … are lawful or are consistent with church doctrine." A73. Rather, "through neutral principles, the Court and a jury could decide whether or not there was fraud." A75.

This case was later transferred to Judge Cobb, who denied USCCB's motion to dismiss because, "at this stage, it's not apparent … that the resolution of the claims will involve impermissible religious entanglement." A150. She reasoned that "this is a case about what defendant represented, what it knew, and the relationship between defendant and plaintiff as a putative class representative." A149. And, at this stage, it appeared those questions "can be resolved using neutral principles of law." A149.

Judge Cobb was careful to note certain religious questions that she would not—and could not—answer. She stated that the church-autonomy doctrine "would prevent [her] from reviewing decisions involving matters of church government as well as those of faith and doctrine, and this would include any decisions about the organization's determination of whose voice speaks for the church, whether someone may worship at church, matters that are purely ecclesiastical even if they affect civil rights." A147-148. Similarly, she stated that "it would

be improper for [her] to delve into" questions of "church operations, religious doctrine, religious hierarchy, or religious decisionmaking," as well as "church governance, the makeup of church congregations or anything related to membership and, importantly, … the way the church chooses to use its funds." A149. In fact, Judge Cobb specifically stated that she "could not rule that the church could only exercise its financial discretion in one way or another." A149. At the pleading stage, it did not appear that answering such questions was "required for the Court to determine, under straightforward common-law principles, whether or not fraud took place in this case." A149.

Judge Cobb also concluded that O'Connell adequately pleaded claims for fraud, unjust enrichment, and breach of fiduciary duty. A150-154.

USCCB did not ask the district court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Nor did USCCB seek a writ of mandamus under 28 U.S.C. § 1651(a). Instead, USCCB filed this interlocutory appeal of the district court's order, claiming that it falls within the collateral order doctrine.

## SUMMARY OF ARGUMENT

I.      This Court lacks appellate jurisdiction because orders denying motions to dismiss on church-autonomy grounds are not collaterally appealable.  Such orders are not effectively unreviewable without immediate appeal, do not conclusively determine the issue, and are not separate from the merits.  Creating this new category of collateral appeal would contradict the Supreme Court's directive that the doctrine remain narrow and that rulemaking, rather than judicial expansion, is the right way to create new categories of interlocutory appeals.  This Court should follow the four circuits that have already ruled on this issue.

II.     The district court correctly concluded that the church-autonomy doctrine does not bar O'Connell's claims at the pleading stage.  Claims based on specific, secular misrepresentations about how solicited funds will be used do not invade church autonomy.  This case turns on what USCCB represented, how the funds were used, and whether USCCB knew its representations were false.  Those questions can be answered without second-guessing USCCB on any religious matter.

9

III.    This Court does not have pendent jurisdiction over USCCB's

failure-to-state-a-claim argument.  Moreover, the district court correctly

held that the complaint states a claim.

## ARGUMENT

## I.    This Court lacks appellate jurisdiction.

The collateral order doctrine is a judge-made exception to the final

judgment requirement of section 1291.  *Cohen v. Beneficial Indus. Loan

Corp.*, 337 U.S. 541, 546 (1949) (holding a "small class" of non-final

orders to be "final" for purposes of section 1291).  The doctrine applies to

entire categories of orders, rather than individual cases.  *Dig. Equip.

Corp. v. Desktop Direct*, 511 U.S. 863, 868 (1994) (collateral-order status

"is to be determined for the entire category to which a claim belongs").

Therefore, applying the doctrine in a given case creates an immediate

right of appeal for an entire category of orders.  *See id.* at 877 ("[I]f

Digital prevailed here, any district court order denying effect to a

settlement agreement could be appealed immediately.").

USCCB asks this Court to apply the collateral order doctrine to an

order denying a motion to dismiss on church-autonomy grounds.  No

circuit has applied the collateral order doctrine to such an order.  Doing

so would mean that any district court order denying a motion to dismiss

on church-autonomy grounds could be appealed immediately. And

every other circuit that has been asked to expand the doctrine in this

manner has refused—with the Supreme Court twice declining to review

these refusals. *Garrick v. Moody Bible Inst.*, 95 F.4th 1104 (7th Cir.

2024), *reh'g en banc denied*, 2024 U.S. App. LEXIS 10521 (7th Cir. Apr.

30, 2024); *Belya v. Kapral*, 45 F.4th 621 (2d Cir. 2022), *reh'g en banc

denied*, 59 F.4th 570 (2d Cir. 2023), *cert. denied*, 143 S. Ct. 2609 (2023);

*Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021 (10th Cir. 2022), *reh'g

en banc denied*, 53 F.4th 620 (10th Cir. 2022), *cert. denied*, 143 S. Ct.

2608 (2023); *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d

1085 (7th Cir. 2014); *Klein v. Oved*, 2024 U.S. App. LEXIS 6012 (11th

Cir. Mar. 13, 2024). This Court should follow suit.

### A. Pleading-stage denials of church-autonomy defenses do not meet the stringent requirements for collateral appeal.

The collateral order doctrine applies only to categories of orders

"that are conclusive, that resolve important questions completely

separate from the merits, and that would render such important

questions effectively unreviewable on appeal from final judgment in the

underlying action." *Digital Equipment*, 511 U.S. at 867.

The application of these requirements is "stringent." *Id.* at 868.
The "Supreme Court … has repeatedly emphasized the narrow and
modest scope of the collateral order doctrine." *Sierra Club v. USDA*,
716 F.3d 653, 657 (D.C. Cir. 2013); *see Mohawk Indus. v. Carpenter*, 558
U.S. 100, 113 (2009) (collateral order doctrine "must remain 'narrow
and selective in its membership'") (quoting *Will v. Hallock*, 546 U.S.
345, 350 (2006)); *Digital Equipment*, 511 U.S. at 868 (this "'narrow'
exception should stay that way"). Keeping the doctrine narrow protects
"efficient judicial administration" and "the prerogatives of district court
judges." *Mohawk*, 558 U.S. at 106 (quotation omitted).

It also gives "full respect" to Congress's determination that
"rulemaking, 'not expansion by court decision,' [is] the preferred means
for determining whether and when prejudgment orders should be
immediately appealable." *Id.* at 113-14 (quoting *Swint v. Chambers
Cty. Comm'n*, 514 U.S. 35, 48 (1995)). After the collateral order doctrine
proved unruly, Congress enabled the Supreme Court to make rules for
interlocutory appeals outside of section 1291's express exceptions. 28

12

U.S.C. § 2072(c) (1990); 28 U.S.C. § 1292(e) (1992).[1]  This rulemaking process is better suited for creating category-wide exceptions because it "draws on the collective experience of bench and bar" and "facilitates the adoption of measured, practical solutions."  *Mohawk*, 558 U.S. at 114; *see id.* at 118 (Thomas, J., concurring in part and in the judgment) (noting the hazards of creating "entire categor[ies]" of immediate appeal by "case-by-case adjudication").  In light of Congress's decision, "[a]ny further avenue for immediate appeal … should be furnished, if at all, through rulemaking," not judicial expansion.  *Mohawk*, 558 U.S. at 114; *see McClendon v. City of Albuquerque*, 630 F.3d 1288, 1296 n.2 (10th Cir. 2011) (Gorsuch, J.) ("[A]ny pleas to expand appellate jurisdiction ought be directed to the Rules Committee," not to courts.).[2]

---

[1] It did so because the collateral order doctrine created "[c]onsiderable uncertainty," H.R. Rep. No. 101-734, at 18 (1990), and "blur[red] the edges of the finality principle," S. Rep. No. 102-342, at 24 (1992).  *See Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 292 (1988) (Scalia, J., concurring) (collateral-order jurisprudence was "sorely in need of further limiting principles")

[2] Justice Thomas has urged courts to cease relying on *Cohen* altogether, describing the collateral order doctrine as "a judicial policy that we for many years have criticized and struggled to limit." *Mohawk*, 558 U.S. at 115 (Thomas, J., concurring in part and in the judgment).

Thus, the Supreme Court strongly disfavors further expansion of the collateral order doctrine. And pleading-stage denials of church-autonomy defenses do not meet any of its stringent requirements. This Court should follow the four circuits that have already decided this issue.

> **1. Pleading-stage denials of church-autonomy defenses are not effectively unreviewable on appeal from final judgment.**

An order is not "effectively unreviewable" unless the "legal and practical value" of the asserted right "would be destroyed if it were not vindicated before trial." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498-99 (1989) (quotation omitted). Waiting for post-judgment review must "practically defeat the right to any review at all." *Flanagan v. United States*, 465 U.S. 259, 265 (1984) (quotation omitted). Every circuit to consider the issue has concluded that church autonomy is not such a right. *Garrick*, 95 F.4th at 1115-17; *Belya*, 45 F.4th at 633-34; *Tucker*, 36 F.4th at 1036-47; *Herx*, 772 F.3d at 1090-92; *Klein*, 2024 U.S. App. LEXIS 6012, at *3.

Church autonomy precludes courts from second-guessing religious organizations on matters of "faith and doctrine" or "church

government." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (quotation omitted).  It protects religious organizations' "power to decide for themselves" on such matters.  *Id.* (quotation omitted).  So when a religious organization decides a question of faith and doctrine or church government, courts must accept that decision as "binding" and may not second-guess it.  *Id.* (quotation omitted).  For example, a court may not set aside a church's discipline of a bishop because it interprets the church's constitution differently than the church.  *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 725 (1976).  Nor may the government "contradict a church's determination of who can act as its ministers," *Hosanna-Tabor*, 565 U.S. at 185, or serve in other positions of similarly "vital religious duties," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 756 (2020).

This right is not effectively destroyed if vindicated in a post-judgment appeal.  If a court improperly overrules a religious organization on a matter of faith and doctrine or church government, that error can be reversed in a post-judgment appeal.  The religious organization's autonomy will not be destroyed, because it will maintain

15

the "power to decide [the issue] for [itself]." *Hosanna-Tabor*, 565 U.S. at 186. That is exactly what happened in *Milivojevich*, where a church's religious autonomy was vindicated in a post-judgment appeal following a "lengthy trial" and appeal to the state's high court. 426 U.S. at 707-08.

A more recent Supreme Court ruling also confirms that church-autonomy rights can be adequately vindicated after trial. In *Gordon College v. DeWeese-Boyd*, 142 S. Ct. 952 (2022), the Supreme Court declined to review a state high court's rejection of a church-autonomy defense at summary judgment.[3] Justice Alito, joined by Justices Thomas, Kavanaugh, and Barrett, found that the state-court ruling "reflect[ed] a troubling and narrow view of religious education." *Id.* at 954 (Alito, J., concurring). But the Justices observed that "nothing … would preclude [the defendant] from appealing … when the decision is actually final." *Id.* at 955. Thus, these Justices joined in the denial of certiorari on the "understanding" that the defendant's autonomy could be adequately protected by a post-trial appeal. *Id.*

---

[3] *Gordon College* involved the "ministerial exception," which is a kind of church-autonomy defense. *See Our Lady*, 591 U.S. at 747.

USCCB argues that church-autonomy defenses should be collaterally appealable because they "embody substantial interests of the 'highest order.'" Br. 20. Religious autonomy is "undoubtedly important." *Herx*, 772 F.3d at 1090; *Tucker*, 36 F.4th at 1039. But importance does not confer collateral-order status. Courts "routinely require litigants to wait until after final judgment to vindicate valuable rights." *Mohawk*, 558 U.S. at 108-09. Many interests are "important in the abstract," *id.* at 108, yet do not warrant collateral-order review because they are not "destroyed" if vindicated after trial, *Lauro Lines*, 490 U.S. at 499. *See, e.g.*, *Flanagan*, 465 U.S. 259 (Sixth Amendment right to effective assistance of counsel); *United States v. MacDonald*, 435 U.S. 850 (1978) (Sixth Amendment right to speedy trial); *Mohawk*, 558 U.S. 100 (attorney-client privilege); *Doe v. Exxon Mobil Corp.*, 473 F.3d 345 (D.C. Cir. 2007) (political question doctrine). Church autonomy is such a right.

By contrast, each of the collateral-order cases cited by USCCB involved an order restricting speech during the pendency of a case. *See United States v. Trump*, 88 F.4th 990, 1001 (D.C. Cir. 2023) (gag order "regulating speech prior to and during trial," which "almost always will

17

expire by its own terms once final judgment is entered"); *In re Stone*, 940 F.3d 1332, 1340 (D.C. Cir. 2019) (non-parties' interests in speaking about a case "during the pendency of [the] case"); *In re Rafferty*, 864 F.2d 151, 154 (D.C. Cir. 1988) (protective order prohibiting disclosure of information "during the potentially quite lengthy litigation"); *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 491 (5th Cir. 2013) (protective order limiting officers' communications during litigation and requiring them to take down website).  For this category of order, waiting for post-judgment review "practically defeat[s] the right to any review at all," because by the time judgment is entered the party has irretrievably lost its right to speak while the case is pending.  *Flanagan*, 465 U.S. at 265 (quotation omitted).  Similarly, *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020), a preliminary injunction case, involved the ability of faithful to attend religious services during the pendency of litigation—a right that could not be restored after trial.  *Id.* at 19. Church autonomy, unlike these rights, can be vindicated after judgment, because a decision that contradicts a church's religious determination can be reversed.

USCCB's invocation of the First Amendment is therefore not enough for immediate appeal.  Indeed, sister circuits have held that the *Noerr-Pennington* doctrine—another defense grounded in the First Amendment—is not collaterally appealable because it operates as a defense to liability, not an immunity from suit.  *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1140 (9th Cir. 2013); *Hinshaw v. Smith*, 436 F.3d 997, 1003 (8th Cir. 2006); *Acoustic Sys. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000); *WE, Inc. v. City of Phila., Dep't of Licenses & Inspections*, 174 F.3d 322, 330 (3d Cir. 1999).  That is true even though the *Noerr-Pennington* doctrine has been called an "immunity."  *E.g.*, *Nunag-Tanedo*, 711 F.3d at 1140 ("[T]he use of the term 'immunity' in this context signals immunity from liability, not from trial.").

The church-autonomy defense similarly operates as a defense to liability, not an immunity from suit.  The Supreme Court has not characterized the church-autonomy defense as an immunity from suit.  Instead, it has described it as an ordinary "defense on the merits," going to the issue of "whether the allegations the plaintiff makes entitle him to relief."  *Hosanna-Tabor*, 565 U.S. at 195 n.4 (quotation omitted).

And, like other defenses on the merits, its value is not destroyed if

vindicated after trial because an improper finding of liability can be

reversed. *See Tucker*, 36 F.4th at 1036-37 (ministerial exception fails

"effectively unreviewable" requirement on this basis, among others);

*Digital Equipment*, 511 U.S. at 882 ("[A]voiding trial probably pales in

comparison with the benefit of limiting exposure to liability (an interest

that is fully vindicable on appeal from final judgment).").

USCCB nonetheless argues that the church-autonomy doctrine

"protects 'not only from the consequences of litigation's results but also

from the burden of defending' from suit." Br. 20. Each other circuit to

consider the issue has rejected this precise argument. *Garrick*, 95 F.4th

at 1116 (rejecting argument that church-autonomy doctrine confers

"immunity from trial"); *Herx*, 772 F.3d at 1090 (rejecting argument that

First Amendment "provides an immunity *from trial*, as opposed to an

ordinary defense to liability"); *Tucker*, 36 F.4th at 1025 (rejecting "novel

argument that the 'ministerial exception' … immunizes religious

employers altogether from the burdens of even having to litigate such

claims"); *Belya*, 45 F.4th at 633 (church-autonomy defense "serves more

as 'an ordinary defense to liability'") (quoting *Herx*, 772 F.3d at 1090);

*Klein*, 2024 U.S. App. LEXIS 6012, at *3 (church-autonomy doctrine "does not immunize religious groups or figures from suit").

These holdings are on firm ground.  Courts must view claims of a "right not to be tried" in the collateral-order context with "skepticism, if not a jaundiced eye." *Digital Equipment*, 511 U.S. at 873; *see United States v. Cisneros*, 169 F.3d 763, 769 (D.C. Cir. 1999) ("One must be careful … not to play word games with the concept of a 'right not to be tried.'") (quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989)).  Allowing collateral appeals for every right that could be described as a right not to be tried "would 'leave the final order requirement of § 1291 in tatters.'" *Exxon Mobil*, 473 F.3d at 350 (quoting *Will*, 546 U.S. at 351).  "It would allow immediate appeal from all district court orders regarding personal jurisdiction, statutes of limitation, claim preclusion, the right to a speedy trial, and many other types of motions." *Id.*; *see Digital Equipment*, 511 U.S. at 873.  The Supreme Court has therefore strictly limited what counts as a right not to be tried for purposes of the collateral order doctrine.

One limitation is that a collaterally appealable "interest in avoiding trial" exists only where trial would threaten a "substantial

public interest." *Will*, 546 U.S. at 352-53. The recognized "substantial public interests" that may justify a right not to stand trial are: "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interests, [and] mitigating the government's advantage over the individual." *Exxon Mobil*, 473 F.3d at 350 (quoting *Will*, 546 U.S. at 352-53); *see Khadr v. United States*, 529 F.3d 1112, 1118 (D.C. Cir. 2008). These interests, respectively, are why claims for absolute immunity, qualified immunity, Eleventh Amendment immunity, and double jeopardy are immediately appealable. *See Will*, 546 U.S. at 352; *Khadr*, 529 F.3d at 1118. Where there is no such "significant public interest," there is no collaterally appealable right not to be tried. *Khadr*, 529 F.3d at 1118.

The church-autonomy doctrine does not implicate any of these recognized public interests in avoiding trial. *See Garrick*, 95 F.4th at 1115-16 (church-autonomy doctrine not collaterally appealable for this reason); *Herx*, 772 F.3d at 1090 (same); *Tucker*, 36 F.4th at 1050 (same). It is not a "public" interest at all, but rather a private interest held by private religious organizations in maintaining autonomy over their own

private affairs. *See Garrick*, 95 F.4th at 1115 (church-autonomy doctrine "implicates only private parties" and "[n]o public officials or unit of government is involved"); *Herx*, 772 F.3d at 1090 (distinguishing church autonomy, which "involves private parties," from collaterally appealable issues involving "public officials or a unit of government"); *Tucker*, 36 F.4th at 1040 ("The fact that the 'ministerial exception' applies only to private religious organizations, then, counsels against treating the 'ministerial exception' like an immunity from suit ….").[4] So it does not meet the strict requirements for a collaterally appealable right not to be tried.

A second limitation is that a "right not to be tried" must "rest[] upon an explicit statutory or constitutional guarantee that trial will not

---

[4] These cases correctly distinguish the church-autonomy defense from qualified immunity, which enjoys collateral-order status because "of the threatened disruption of governmental functions." *Will*, 546 U.S. at 352 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see Digital Equipment*, 511 U.S. at 871. "[Q]ualified immunity … acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. 158, 168 (1992). "These rationales are not transferable to private parties." *Id.*

occur." *Midland Asphalt*, 489 U.S. at 801.[5]  Where a "purported right to avoid trial" does not meet this requirement, it "does not satisfy the requirement of effective unreviewability." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 748 (D.C. Cir. 2016).  While this Court has not followed *Midland Asphalt*'s statement to its literal extreme, it still "require[s]" that the right "be analogized to explicit constitutional immunities." *United States v. Trump*, 91 F.4th 1173, 1187 (D.C. Cir. 2024), *vacated on other grounds*, 144 S. Ct. 2312 (2024).  For example, presidential immunity for official acts is "closely akin" to the protections of the Speech or Debate Clause in that there are "equivalent reasons for vindicating [it] in advance of trial"—namely, maintaining separation of powers.  *Id.* at 1187 (quotations omitted); *see Cisneros*, 169 F.3d at 770.  Similarly, rights under the Impeachment Judgment Clause are analogous to the Double Jeopardy Clause.  *Trump*, 91 F.4th at 1187-88.

---

[5] *Midland Asphalt* involved a criminal appeal, but this requirement "operates 'similarly' in civil cases." *Digital Equipment*, 511 U.S. at 880 n.8 (quoting *Lauro Lines*, 490 U.S. at 499); *see, e.g.*, *Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1181 (10th Cir. 2016) (applying requirement in civil case); *Transtech Indus. v. A & Z Septic Clean*, 5 F.3d 51, 58 (3d Cir. 1993) (same); *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 178 (5th Cir. 2009) (same); *Estate of Kennedy v. Bell Helicopter Textron*, 283 F.3d 1107, 1110 (9th Cir. 2002) (same).

The church-autonomy defense does not rest on any explicit immunity from trial, nor is it analogous to one. The First Amendment contains no explicit immunity from trial. U.S. Const. amend. I; *see United States v. Quaintance*, 523 F.3d 1144, 1146 (10th Cir. 2008) (finding "no explicit guarantee in the Constitution or in statute indicating [a right not to be tried] attaches to … free exercise claims"). Nor does USCCB argue that church autonomy is closely akin to any such explicit guarantee. USCCB's argument fails for this reason as well.

USCCB does not engage with any of this controlling law. Br. 20-22. Instead, it bases its right-not-to-be-tried argument on the assertion that "the process of inquiry into religious disputes" can sometimes cause "immediate harm." Br. 21. The cases USCCB cites to support its assertion of "immediate harm" involved intrusive government investigations by political agencies. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996); *NLRB v. Catholic Bishop*, 440 U.S. 490, 502-03 (1979); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002); *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020); *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 572

25

(D.C. Cir. 2009). These cases hold that "excessive entanglement may occur where there is a sufficiently intrusive investigation by a government entity into a church's employment of its clergy." *Catholic University*, 83 F.3d at 466.

But that is a separate question from whether the church-autonomy doctrine confers a right not to be tried sufficient to justify immediate appeal in all cases. The possibility of "immediate harm" does not bestow a collaterally appealable right not to be tried. *See Digital Equipment*, 511 U.S. at 872 ("[T]he mere identification of some interest that would be 'irretrievably lost' has never sufficed ...."). As described above, such a right exists only where certain public interests are threatened, and where the right is analogous to an explicit immunity from trial. The church-autonomy doctrine does not meet these requirements.

None of the cases USCCB cites suggest otherwise. Those cases did not involve the collateral order doctrine, or any other form of interlocutory appeal. To the contrary, as described above, USCCB's own cases show that church-autonomy rights can be adequately

vindicated in a post-judgment appeal. *See, e.g.*, *Milivojevich*, 426 U.S. at 707-08.

Even in the context of a government investigation into a religious organization's employment decisions—i.e., the very context of the cases USCCB cites—the Supreme Court has held that religious autonomy rights can be adequately vindicated after the fact. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 628 (1986). In *Dayton*, a religious school sought to enjoin a state administrative investigation into sex-discrimination claims, arguing that the investigation itself violated its religious autonomy. *Id.* at 621. The Supreme Court allowed the investigation to proceed under the *Younger* abstention doctrine. *Id.* at 622. An important basis for that holding was that the school would "receive an adequate opportunity to raise its constitutional claims" during post-investigation judicial review. *Id.* at 628. It was "sufficient" that the "constitutional claims may be raised in state-court judicial review of the administrative proceeding"—i.e., after the investigation had already taken place. *Id.* at 629. *Dayton* squarely forecloses USCCB's argument that mere investigation irreparably destroys church autonomy.

27

USCCB's argument also fails under this Court's precedent, which has rejected identical claims of a right not to be tried in the separation-of-powers context. In *Cisneros*, a former Secretary argued that the mere "adjudication" of charges against him would constitute "a judicial inquiry into matters within the constitutional province of coordinate branches." 169 F.3d at 768-69. He argued that "the very conduct of the trial itself will violate the separation of powers." *Id.* at 769. This Court held that "[n]othing Cisneros argues amounts to a right not to be tried." *Id.* What he alleged was a "constitutional affront flowing from an adjudication," which was "fully reviewable on appeal should the defendant be convicted." *Id.* USCCB's argument is identical: that church-autonomy rights are collaterally appealable because they "can be harmed by 'the *mere adjudication*'" of religious questions. Br. 21. And it fails for the same reason: a judgment that improperly adjudicates a religious matter can be reversed, just like a conviction that improperly intrudes on political matters.

Similarly, in *Exxon Mobil*, this Court held that the political question doctrine does not confer "a 'right not to stand trial' that can justify an immediate appeal." 473 F.3d at 351. Like the church-

autonomy doctrine, the political question doctrine prevents courts from adjudicating questions constitutionally reserved for other entities (there, the political branches; here, religious organizations).  The defendant in *Exxon Mobil* argued that collateral review was "necessary to protect the executive branch from judicial intrusion into sensitive foreign policy matters," *id.* at 351, just as USCCB argues that collateral review is necessary to prevent judicial "intru[sion] … into the forbidden area of religious freedom," Br. 23.  This Court rejected that argument, because this type of structural limitation on the judiciary's role does not confer a right not to be tried.  *Exxon Mobil*, 473 F.3d at 351.[6]

For all these reasons, USCCB's claim to a right not to be tried does not hold water.  It does not implicate any of the substantial public interests necessary for such a right.  *Will*, 546 U.S. at 352-53.  It is not founded in (or analogous to) an explicit statutory or constitutional immunity from trial.  *Midland Asphalt*, 489 U.S. at 801.  The

---

[6] Then-Judge Kavanaugh dissented on the grounds that the court should have issued a writ of mandamus.  *Exxon Mobil*, 473 F.3d at 369 (Kavanaugh, J., dissenting).  To reach this conclusion, he necessarily agreed that the political question doctrine is not collaterally appealable, because mandamus requires "no other adequate means to attain the relief."  *Id.* at 367 (quotation omitted).

entanglement concerns in the cases USCCB cites can be adequately resolved by after-the-fact review. *Dayton*, 477 U.S. at 628-29. This Court has rejected identical claims of a right not to be tried in the separation-of-powers context. *Cisneros*, 169 F.3d at 768-69; *Exxon Mobil*, 473 F.3d at 351. And every other circuit to consider the issue has held that church autonomy does not confer a collaterally appealable right not to be tried. *Garrick*, 95 F.4th at 1116; *Herx*, 772 F.3d at 1090; *Tucker*, 36 F.4th at 1025; *Belya*, 45 F.4th at 633; *Klein*, 2024 U.S. App. LEXIS 6012, at *3.

Finally, USCCB argues that its church-autonomy defense is "akin to the separation of powers"—which is one of the interests that may justify collateral appeal. Br. 22. It argues that "[l]ike the 'separation of powers,' church autonomy is 'grounded' in 'constitutional structure,' 'confin[ing] the state and its civil courts to their proper roles.'" Br. 22. This argument fails on multiple levels.

To begin, the reason that some separation-of-powers issues are collaterally appealable is that the separation of powers is a public interest that protects the proper functioning of government. *Will*, 546 U.S. at 352; *see Nixon v. Fitzgerald*, 457 U.S. 731, 760-61 (1982) ("The

30

essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government ….").  Church autonomy protects private religious actors, not the proper functioning of government, and therefore is not "akin" to the separation of powers for purposes of the collateral order doctrine.  *See Garrick*, 95 F.4th at 1115; *Herx*, 772 F.3d at 1090; *Tucker*, 36 F.4th at 1040.

Moreover, USCCB's comparison to the separation of powers actually demonstrates why church-autonomy defenses are not collaterally appealable.  "Most separation-of-powers claims are clearly not in [the] category" of collaterally appealable orders.  *Cisneros*, 169 F.3d at 769.  As described above, that includes structural limitations on the judiciary's power to answer political questions.  *See id.* at 768-69; *Exxon Mobil*, 473 F.3d at 351.  That type of structural limitation is exactly what USCCB invokes here.  Br. 22-23.  The best analog for the church-autonomy doctrine in the separation-of-powers context is the political question doctrine.  Both doctrines impose a structural limitation on the judiciary's power to resolve questions constitutionally reserved for other entities.  And the political question doctrine is not collaterally appealable.  *Exxon Mobil*, 473 F.3d at 351.

31

Similarly, sister circuits have rejected collateral appeals of separation-of-powers objections to *Bivens* actions because "improper judicial intrusion into the legislative function can be effectively rectified upon review of a final judgment." *Garraway v. Ciufo*, 113 F.4th 1210, 1218 (9th Cir. 2024); *see Graber v. Doe*, 59 F.4th 603, 609 (3d Cir. 2023), *cert. denied sub nom. Boresky v. Graber*, 144 S. Ct. 681 (2024); *Mohamed v. Jones*, 100 F.4th 1214, 1232 (10th Cir. 2024); *Himmelreich v. Fed. Bureau of Prisons*, 5 F.4th 653, 662 (6th Cir. 2021). So too can improper judicial intrusion into religious matters.

Thus, even in the separation-of-powers context, defenses based on structural limitations of the judiciary's role do not warrant collateral appeal. USCCB's argument-by-analogy for church autonomy—which is *not* one of the recognized interests that can justify an immunity from trial—is even further afield from the collateral order doctrine.

***

In sum, waiting for post-judgment review does not effectively destroy the value of the church-autonomy defense. If a district court rules in a way that would infringe religious autonomy, that autonomy can be preserved by reversal on post-judgment appeal.

32

On the other hand, there is a significant "cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*, 558 U.S. at 108. Allowing collateral appeal in this case would open the door for immediate appeal in any case where a defendant raises a church-autonomy defense—no matter how tenuous. Were this Court to "allow defendants to appeal every time a district court denied a motion to dismiss based upon [church-autonomy] grounds, [it] would be substantially expanding the scope of the collateral order doctrine." *Exxon Mobil Corp.*, 473 F.3d at 353. The "successive, piecemeal appeals" that would result "would unduly delay the resolution of district court litigation and needlessly burden the courts of appeals." *Mohawk*, 558 U.S. at 112. And "it would be no consolation that a party's meritless … claim was rejected on immediate appeal; the damage to the efficient and congressionally mandated allocation of judicial responsibility would be done, and any improper purpose the appellant might have had in saddling its opponent with cost and delay would be accomplished." *Digital Equipment*, 511 U.S. at 873.

This does not mean that immediate appeal is unavailable for litigants who need it. Congress has created other "avenues of review,"

*Mohawk*, 558 U.S. at 110, that are a "better vehicle" for immediate appeal, *Digital Equipment*, 511 U.S. at 883.  For example, a party can request certification of an interlocutory appeal under 28 U.S.C. § 1292(b).  Or a party can seek a writ of mandamus under 28 U.S.C. § 1651(a).  *See Garrick*, 95 F.4th at 1114 ("[M]andamus affords protection for religious-institution litigants challenging district court orders that reject First Amendment defenses.").  These case-specific mechanisms provide "'safety valve[s]' for promptly correcting serious errors." *Mohawk*, 558 U.S. at 111 (quoting *Digital Equipment*, 511 U.S. at 883). And they do so without incidentally creating an entire category of immediately appealable orders.  *See Belize Soc. Dev., Ltd. v. Gov't of Belize*, 668 F.3d 724, 730 (D.C. Cir. 2012) (proceeding under mandamus, rather than collateral order doctrine, because "the court is mindful of the advantage of limiting the use of appellate recourse in response to stay orders, yet keeping the door open for the occasional case reflecting abuse of discretionary authority") (quotation omitted); *McClendon*, 630 F.3d at 1298 (Gorsuch, J.) ("Congress has already provided a way for parties to challenge a district court's erroneous assertion of jurisdiction

34

before the entry of a final judgment.  That path is paved by 28 U.S.C. § 1651(a) and its approval of writs of mandamus.").

### 2. Pleading-stage denials of church-autonomy defenses do not conclusively determine the issue.

An order does not conclusively determine an issue unless it is "a complete, formal and, in the trial court, final rejection" of that issue. *Abney v. United States*, 431 U.S. 651, 659 (1977).  There must be "no further steps that can be taken in the District Court to avoid" infringement of the claimed right.  *Id.*

Pleading-stage denials of church-autonomy defenses do not meet this standard.  The district court's order was not a final rejection of USCCB's church-autonomy defense.  USCCB can continue to assert the defense during discovery, in future dispositive motions, before trial, and during trial.  And there are further steps the district court can take if necessary to protect USCCB's religious autonomy—e.g., limiting discovery, narrowing the scope of the suit, cautioning the jury, or dismissing the case.  These are all "opportunities for the district judge to revise and refine the analysis contained in [her] order refusing to dismiss" the complaint.  *Cisneros*, 169 F.3d at 768.  It would therefore be "premature[]" for this Court to "jump into the fray" at the pleading

35

stage. *Belya*, 45 F.4th at 631; *accord Garrick*, 95 F.4th at 1114-15; *Tucker*, 36 F.4th at 1047; *Klein*, 2024 U.S. App. LEXIS 6012, at *2-3. And that is especially so where, as here, the district court has shown that it is sensitive to religious questions and will take steps to protect USCCB's religious autonomy if necessary.  A147-149; *see Belya*, 45 F.4th at 631; *Garrick*, 95 F.4th at 1114; *Herx*, 772 F.3d at 1091.

This Court's precedent compels this conclusion.  In *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990), this Court *reversed* a district court's dismissal of a breach of contract claim on church-autonomy grounds.  *Id.* at 1360. Dismissal was "premature" because "it may turn out that the potentially mischievous aspects of [the] claim are not contested by the Church or are subject to entirely neutral methods of proof."  *Id.*  And "[o]nce evidence is offered, the district court will be in a position to control the case so as to protect against any impermissible entanglements."  *Id.*  Thus, under controlling law, there are further steps district courts can take to prevent impermissible entanglement.

Similarly, the Fifth Circuit reversed a district court's dismissal under the church-autonomy doctrine as "premature," because "[i]f

further proceedings and factual development reveal that [the] claims cannot be resolved without deciding purely ecclesiastical questions, the court is free to reconsider whether it is appropriate to dismiss some or all of [the] claims." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 347, 350 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2852 (2021). So too here.

USCCB argues that the district court conclusively determined "whether USCCB may 'be compelled to defend on the merits.'" Br. 24 (quoting *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 581-82 (D.C. Cir. 2020)). But as described above, the church-autonomy doctrine (unlike foreign sovereign immunity, *see Nigeria*, 962 F.3d at 581) does not provide a collaterally appealable immunity from suit. *Supra* § I.A.1. And it certainly does not provide such an immunity on issues that do not involve religious questions. *See Minker*, 894 F.2d at 1360. If it becomes necessary, the district court can narrow the case to such issues.

### 3. Pleading-stage denials of church-autonomy defenses are not separate from the merits.

Orders are "entwined with the merits," when "courts of appeals will often have to review the nature and content of" the merits to

37

determine the issue. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 439 (1985).

Appellate courts resolving church-autonomy defenses must determine whether the nature and content of the merits require adjudicating religious questions. For example, to determine whether O'Connell's fraud claim requires the court to interpret religious statements, the court must look to the merits of O'Connell's claim to see what USCCB represented. That is a disputed merits question. *See, e.g.*, Br. 36 (arguing that what "USCCB actually stated is that Peter's Pence is used for 'assist[ing] the charitable works of Pope Francis'").

Other circuits have also determined that church-autonomy defenses are intertwined with the merits. *See Belya*, 45 F.4th at 632 (court would have to determine whether the "claims interfere with, for example, church discipline and autonomy by impacting ROCOR's ability to select, supervise, and discipline its ministers"); *Garrick*, 95 F.4th at 1115 ("An inquiry into the merits of Garrick's claim will determine whether Moody is able to assert the church-autonomy defense.").

USCCB argues that "whether the Religion Clauses provide a 'claim of immunity' from merits litigation[] is 'conceptually distinct'

38

from 'the merits.'" Br. 24. This argument misses the mark. Whether the church-autonomy defense provides immunity from litigation is relevant to the question of collateral appealability, not the viability of USCCB's church-autonomy defense. To succeed on its church-autonomy defense, USCCB must show that resolving the merits of *this case* requires adjudicating religious questions. *See infra* § II.

### C. USCCB fails to distinguish cases from other circuits holding that this category of order is not collaterally appealable.

USCCB fails to distinguish other circuits' holdings that pretrial denials of church-autonomy defenses are not collaterally appealable. USCCB asserts that some of those decisions "turned on perceived disputes of fact" specific to those cases, and "arose from employment-related disputes." Br. 27-28.[7] It argues that "the analysis in those other cases may well have yielded different outcomes on these facts." Br. 28.

This argument fails because the collateral order doctrine is not a case-by-case determination. The Supreme Court "has expressly rejected efforts to reduce the finality requirement of § 1291 to a case-by-case

---

[7] USCCB does not address the Eleventh Circuit's decision in *Klein* or the Seventh Circuit's decision in *Herx*.

determination of whether a particular ruling should be subject to appeal." *Richardson-Merrell*, 472 U.S. at 439.  Collateral-order status is a category-wide determination; it does not turn on the unique facts of any particular case.  So a holding refusing to apply the collateral order doctrine to an order applies to all orders in the same category.

In any event, these cases are materially identical for purposes of the collateral order doctrine: in each case, the defendant claimed that resolving the plaintiffs' claims would entangle the court in religious questions, and claimed that this warranted collateral appeal.[8]

USCCB's cherrypicked quotations do not suggest that these cases' jurisdictional holdings turned on unique questions of fact not present here.  The quotation it pulls from *Garrick* simply underscored that the church-autonomy defense did not satisfy the "separate from the merits" requirement because the viability of the defense turned on the same factual issues as the merits.  *Garrick*, 95 F.4th at 1115.  The same is true here.  *Supra* § I.A.3.  And the statements USCCB pulls from *Belya* and *Tucker* were made simply to demonstrate that the defendants'

---

[8] USCCB is also wrong that these cases concerned only employment disputes.  *See Belya*, 45 F.4th at 625 (defamation); *Klein*, 2024 U.S. App. LEXIS 6012, at *1 (fraud).

comparisons to qualified immunity were inapposite (a comparison that also fails for other reasons, *see supra* § I.A.1).  *Belya*, 45 F.4th at 634; *Tucker*, 36 F.4th at 1035 n.8.

USCCB points out that *Garrick* distinguished *McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013).  But this case is distinguishable from *McCarthy* for the same reasons.  In *McCarthy*, the district court had conclusively determined to send a religious question to the jury, and because "no religious institution [was] a party to [the] case," there was a risk that "the religious question on which the jury was (wrongly) allowed to rule [would] turn[] out not to be germane to the … appeal." *Id.* at 976.  *McCarthy* therefore did not involve a pleading-stage denial of a religious party's church-autonomy defense.  *See Garrick*, 95 F.4th at 1114 (distinguishing *McCarthy*).[9]  Moreover, *McCarthy* also dismissed as "premature" an appeal of a denial of summary judgment on church-autonomy grounds.  714 F.3d at 979.  So *McCarthy* agrees that such pretrial orders are not immediately appealable.

---

[9] *Garrick* also noted that this aspect of *McCarthy* may be "in tension with the Supreme Court's instructions against expanding" the collateral order doctrine.  95 F.4th at 1114.

USCCB also picks out a quotation from Judge Chin in *Belya* concerning a hypothetical situation "[w]here a district court in fact rejects the church autonomy defense and injects itself into matters of church governance," so as to "preclude [the defense's] future invocation." 59 F.4th at 583 (Chin, J., statement in support of denial of rehearing en banc).  But here, like in *Belya*, USCCB can invoke the defense later in the proceeding.  *Supra* § I.A.2.  And while *Tucker* ostensibly limited its holding to the ministerial exception, 36 F.4th at 1032 & n.7, the Supreme Court has clarified that the ministerial exception is just a kind of church-autonomy defense, *Our Lady*, 591 U.S. at 747.

Because it cannot distinguish them, USCCB asserts that the holdings from these other circuits "conflict[] with precedent."  Br. 29.  But as described above, the precedent USCCB cites does not even involve the collateral order doctrine, much less establish a right not to be tried for purposes of the collateral order doctrine.  *Supra* § I.A.1.  The more relevant precedent shows that the church-autonomy defense does not meet the strict requirements for a collaterally appealable right not

to be tried, and that it can be adequately vindicated in a post-judgment appeal. *Id.*

Finally, USCCB asserts that "time has shown the trouble with reading church autonomy as merely a defense to liability" because *Tucker* settled on remand and because the *Belya* defendant complained *in its own motion for summary judgment* that witnesses were asked religious questions in depositions. Br. 30. Even accepting USCCB's speculation that the *Tucker* defendant settled in part to avoid the costs of litigation, that does not distinguish *Tucker* from any other case that settles in part to avoid expensive and protracted litigation. "[T]he Supreme Court has consistently declined to find litigation burdens sufficient to bring a case within the narrow scope of the collateral order doctrine." *Dhiab v. Obama*, 787 F.3d 563, 567 (D.C. Cir. 2015). And even accepting the *Belya* defendant's characterizations of deposition questions, that does not mean that the church-autonomy defense in that case was "eviscerate[d]." Br. 30. If counsel asked improper questions in depositions, that testimony can be excluded at trial.

43

**D.    USCCB relies on inapposite cases.**

Unable to distinguish the on-point cases from the Second, Seventh, Tenth, and Eleventh Circuits, USCCB relies on the Fifth Circuit's decision in *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018).  That case allowed a third party's interlocutory appeal of an order enforcing a subpoena against it because of "the predicament of third parties," "who cannot benefit directly from [post-trial] relief." *Id.* at 367-68; *see id.* at 368 (distinguishing cases not involving "discovery against a third party").  Here, USCCB is a party able to benefit directly from a post-trial appeal, and the district court has not conclusively ordered any discovery against USCCB.  "An order conclusively determining that a nonparty religious organization must be subjected to extensive discovery … is not comparable to the class of order at issue here." *Garrick*, 95 F.4th at 1116 n.9 (distinguishing *Whole Woman's Health*); *see Belya*, 45 F.4th at 632 (same); *Tucker*, 36 F.4th at 1046 (same).

Moreover, the Fifth Circuit recently held that it was "premature" for a district court to grant a motion to dismiss on church-autonomy grounds.  *McRaney*, 966 F.3d at 347; *see supra* § I.A.2.  So the Fifth

44

Circuit would likely agree that interlocutory appeals like this one are premature.

With every federal circuit to address the issue going against it, USCCB is forced to rely on state-court cases. Br. 26-27. But state courts, unlike this Court, are not subject to section 1291, the Supreme Court's admonition that federal courts keep the class of collaterally appealable orders narrow, or Congress's explicit preference for rulemaking as the way to determine which categories of orders are immediately appealable. *See Johnson v. Fankell*, 520 U.S. 911, 916-18 (1997). So these cases are significantly less persuasive than the unified body of federal cases rejecting this category of interlocutory appeal.

## II. The district court correctly determined that the church-autonomy doctrine does not bar O'Connell's claims at the pleading stage.

### A. O'Connell's claims do not require the court to second-guess USCCB on a religious question.

The church-autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady*, 591 U.S. at 746. It means only that courts may not second-guess religious organizations on matters of "faith and doctrine" and "church government." *Id.* So where claims "are subject to entirely neutral

45

methods of proof," or where religious matters "are not contested by the Church," the doctrine does not apply. *Minker*, 894 F.2d at 1360. A plaintiff "need show only that *some* form of inquiry is permissible and *some* form of remedy is available to survive a motion to dismiss" on church-autonomy grounds. *Id.*

The church-autonomy doctrine does not prohibit claims for secular misrepresentations about how solicited donations will be used. Numerous courts have recognized that the church-autonomy doctrine "does not allow purely secular statements of fact to be shielded from legal action merely because they are made by officials of a religious organization." *In re Bible Speaks*, 869 F.2d 628, 645 (1st Cir. 1989), *cert. denied*, 493 U.S. 816 (1989). Accordingly, courts "have entertained claims of fraud … brought against religious entities by former members seeking recovery of donations and damages for harm." *Ohno v. Yasuma*, 723 F.3d 984, 1006-07 (9th Cir. 2013); *see, e.g.*, *Bible Speaks*, 869 F.2d at 643-46 (First Amendment did not bar claims for recovery of donations induced by misrepresentations); *Ambassador Coll. v. Geotzke*, 675 F.2d 662, 664 (5th Cir. 1982) (lawsuit seeking "to determine whether fraud or undue influence induced [a] gift to the church" raised

"no free exercise considerations of even arguable validity"); *Tilton v. Marshall*, 925 S.W.2d 672, 679 (Tex. 1996) (First Amendment did not bar fraud claims "based not on statements of religious doctrine or belief, but on … alleged promises to perform particular acts").

Two examples in the case law are particularly on-point here. Justice Robert Jackson, while urging greater religious protections, expressed "no doubt" that the church-autonomy doctrine does not immunize "fraud for making false representations on matters other than faith or experience, as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes." *United States v. Ballard*, 322 U.S. 78, 95 (1944) (Jackson, J., dissenting).  And the Supreme Court of Mississippi rejected a church-autonomy defense where parishioners alleged the pastor misrepresented that solicited funds would be used to rebuild a church he knew would be closed.  *Schmidt v. Catholic Diocese*, 18 So. 3d 814, 831-32 (Miss. 2009).  That is because "the First Amendment does not protect fraudulent statements that concern neither religious doctrine nor practice." *Id.* at 831.

Similarly, in the pending Ninth Circuit en banc case *Huntsman v. Corp. of President of Church of Jesus Christ of Latter-day Saints*, 76 F.4th 962 (9th Cir. 2023), *vacated, rehearing en banc granted,* 94 F.4th 781 (2024), everyone agrees that the church-autonomy doctrine does not bar claims of this type. Paul Clement, counsel for the church in that case, argued that the church-autonomy doctrine does not apply when there is "a specific solicitation for a specific purpose and then the funds are diverted." ADD53 (*Huntsman* oral argument transcript). For example, if funds are solicited for the purpose of remedying a fire in a neighboring town, but instead go to hurricane relief elsewhere, "that's a claim." ADD64.

The claims in this case are of exactly that type. They allege that USCCB misrepresented that donations would be used for a specific purpose: to aid victims of war, oppression, natural disaster, or disease. A30 ¶48. These are "false representations on matters other than faith or experience." *Ballard*, 322 U.S. at 95 (Jackson, J., dissenting). They "concern neither religious doctrine nor practice." *Schmidt*, 18 So. 3d at 831. They simply describe, in secular terms, how the solicited funds are going to be used. The court need not consult religious doctrine to

48

determine the meaning of "victims of war, oppression, and natural disasters," "those enduring the effects of war and violence, natural disasters, and religious persecution," or "food and medicines."  A18-19 ¶¶22-24.  Those words carry secular meanings that a court—or any English speaker—can determine using an understanding of the English language.  Nor does the factual question of where the money went turn on religious doctrine.  Either it went to people in need, or it went somewhere else (e.g., movies or real estate).

If USCCB had simply said that the money would be used to "support the Church's mission to glorify God," a court may be precluded from second-guessing USCCB on what it means to "glorify God."  But instead, USCCB knowingly made specific misrepresentations, in secular terms, about where the money would go.  That is secular fraud.

## B.    USCCB's arguments misunderstand the complaint and First Amendment law.

### 1.    O'Connell does not seek to second-guess the Pope's use of religious offerings.

USCCB asserts that O'Connell's "claims call for second-guessing the Pope's use of religious offerings."  Br. 34.  But O'Connell does not allege that it is improper for a religious organization to use collections for investments or overhead—only that it may not misrepresent what

49

the collections are used for when soliciting them.  *E.g.*, A30 ¶¶48-49
(fraud claim based on "false representation" in soliciting funds).  For
that reason, USCCB's cited cases involving "lawsuits challenging how
houses of worship *spend* religious funds" are simply inapposite.  Br. 37
(emphasis added).  This lawsuit is not challenging how the church
spends its funds; it is challenging USCCB's false statements about what
those funds would be used for, made while soliciting the funds.  *Supra* §
II.A.

USCCB also argues that "at least *some* of the offering *has* gone to
'charitable works,'" such that "O'Connell's claims involve matters of
degree" in "scrutinize[ing] the Supreme Pontiff's prudential decisions
about spending."  Br. 34-35.  But, as just described, O'Connell does not
challenge the Pope's spending decisions; he challenges USCCB's
decision to misrepresent where the funds will go.  Moreover, USCCB's
statements represented that *all* the solicited funds would go to those in
need.  A31 ¶52.

Finally, USCCB argues that O'Connell "never identifies any
statement … that the Pope would 'immediately' or 'exclusively' do
anything," and that what "USCCB actually stated is that Peter's Pence

is used for 'assist[ing] the charitable works of Pope Francis.'"  Br. 35-36.

These arguments go to the merits of O'Connell's claims—i.e., did

USCCB represent what O'Connell alleges it represented—and fail for

the reasons described below.  *Infra* § III.B.  They also ignore the

statements describing precisely *how* the funds will be used for

charitable works, i.e., assistance for victims of war, oppression, natural

disaster, or disease.  *Supra* § II.A; A18-19 ¶¶22-24.

### 2.    O'Connell's claims do not interfere in internal religious speech and polity.

USCCB contends that this case would require the court to "pry

into" "religious speech made from the pulpit."  Br. 38-39.  That is wrong.

As described above, the representations about where the solicited funds

would go were secular, not religious.  *Supra* § II.A.  A secular statement

does not become a religious statement merely because it is made from

the pulpit during a service.  A speaker at the pulpit may address any

number of matters that have nothing to do with religious doctrine—for

example, logistics for an upcoming church event, the form-of-payment

options for a specific collection, or a description of how the funds from

that collection will be used.  And if the speaker makes a fraudulent

statement on a non-religious topic while at the pulpit, a court may

consider that statement just as it could if it were made from any other location.

USCCB again misunderstands the complaint when it asserts that O'Connell's claims would require the court "to evaluate whether the alleged (unspecified) statements followed 'both Canon law' and 'USCCB guidelines.'" Br. 39. O'Connell brings his claims under common law doctrines of fraud, unjust enrichment, and fiduciary duty law, not Canon law or USCCB guidelines. A30-33 ¶¶47-64. He does not have to show that USCCB violated Canon law or internal guidelines to prove them. The complaint mentions "Canon law" and "USCCB guidelines" merely for context that "USCCB is well aware of the importance of … honoring donor intent in connection with national collections like Peter's Pence." A20-21 ¶26. In any event, these guidelines "are not contested by" USCCB. *Minker*, 894 F.2d at 1360.

USCCB is also mistaken when it asserts that "O'Connell seeks to compare this speech from Mass with deliberations between various Church leaders." Br. 39-40 (citing a single document request seeking communications about Peter's Pence). A document request for communications about the subject matter of a lawsuit is hardly a

demand that the court "evaluate … competing opinions on religious subjects" or "'scrutiniz[e]' internal deliberations concerning religious speech." Br. 40. Communications regarding Peter's Pence are relevant to secular elements of O'Connell's secular claims, including whether the funds were used for the stated purpose and whether USCCB knew that the funds would not be used that way. And the district court is capable of limiting discovery as necessary, if and when USCCB actually challenges that discovery. *Supra* § I.A.2.

### 3. O'Connell's claims do not require any "other entangling inquiries."

USCCB ignores the clear, secular statements about where the funds will go, *see supra* § II.A, and instead focuses on other phrases, namely "charitable works" and "witness to charity," that it asserts are "inescapably religious," Br. 36, 40-41. USCCB does not say what the "religious" meanings of these phrases are—much less, for example, that the religious meaning of "charitable works" includes "luxury condominium developments and Hollywood movies." A12 ¶4. So again, this issue is not actually "contested by the Church." *Minker*, 894 F.2d at 1360.

Moreover, the court would not have to decide between any competing meanings of "charitable works" or "witness to charity" to resolve this case.  That is because the other statements (that USCCB ignores) represent, in purely secular terms, that the donated funds will be used to aid victims of war, oppression, natural disaster, or disease. *Supra* § II.A.

USCCB also argues that determining whether it "directed" the speaker in O'Connell's parish to make the alleged statement requires an inquiry into "canonical control."  Br. 41.  But USCCB created the promotional text that was read from the pulpit, and sent it along with the instruction, "Please read this text from the pulpit."  A19 ¶24.  No analysis of canonical control is necessary to determine whether the fraudulent statement—created by USCCB and read at its instruction— can be "attributed to" USCCB.  Br. 24.  For example, if a manufacturer distributes promotional materials, used by a retailer to sell a product, the representations in those materials can be attributed to the manufacturer, regardless whether the manufacturer exercised "control" over the retailer.  And here, USCCB's materials were accompanied by a specific instruction to read them to parishioners.

54

USCCB is also wrong that determining whether a fiduciary duty exists will require the court to "answer questions of ecclesiastical authority."  Br. 41.  As the district court found, "a fiduciary duty was generated by certain promotions, advertisements, the overseeing and collection of funds."  A154; *see* A33 ¶62.  That has nothing to do with "ecclesiastical authority."

Finally, USCCB contends that "evaluating O'Connell's unjust enrichment claim and USCCB's defenses will raise religious questions over whether USCCB retained any benefit."  Br. 42.  But whether USCCB "received money from Plaintiff" is a purely factual question.  A32 ¶59.

### 4. O'Connell's claims do not require entangling discovery.

USCCB contends that merely allowing O'Connell to conduct discovery to prove his secular claims would impermissibly entangle the court in religious affairs.   Br. 42-44.  This argument fails for multiple reasons.

To begin, USCCB's argument is purely speculative.  The only discovery so far is a single set of document requests.  USCCB has not even responded to those requests.  If certain discovery requests go too

far, the district court can entertain USCCB's challenges to those requests as they arise. *Supra* § I.A.2. USCCB does not get to dismiss this case merely because it will have to conduct discovery. *See Minker*, 894 F.2d at 1360 (allowing claim against church to proceed to discovery, rejecting argument that "even proving the existence of a contract in this case would require the sort of inquiry into subjective, spiritual, and ecclesiastical matters that the first amendment prohibits").

Moreover, requiring religious organizations to produce information relevant to secular claims between private parties raises "no free exercise considerations of even arguable validity." *Ambassador College*, 675 F.2d at 664. Like "any other similarly situated litigant," religious organizations must produce factual information relevant to secular claims. *Id.*; *see id.* at 663 (requiring production of lists of donors and financial information); *see also, e.g.*, *United States v. Freedom Church*, 613 F.2d 316, 320 (1st Cir. 1979) (government's document requests to determine "church's tax exempt status" did not constitute excessive entanglement); *United States v. Holmes*, 614 F.2d 985, 989-90 (5th Cir. 1980) (same); *United States v. Coates*, 692 F.2d 629, 633-34 (9th Cir. 1982) (same).

56

In other contexts, too, religious organizations are required to disclose information relevant to secular laws.  The FLSA requires that religious employers "make, keep, and preserve such records of the persons employed … and of the wages, hours, and other conditions and practices of employment maintained," and "make such reports therefrom to the Administrator."  29 U.S.C. § 211(c).  These "routine and factual inquiries … bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305 (1985).  Neither do the factual inquiries necessary to prove O'Connell's claims.

USCCB cites a line of cases concerning the NLRB's jurisdiction over religious schools.  Br. 42-44.  The problem in those cases was that the NLRB's actions would go "beyond resolving factual issues" where the schools stated that the "challenged actions were mandated by their religious creeds."  *Catholic Bishop*, 440 U.S. at 502.  The very process of resolving such issues required the NLRB to "second-guess" the schools on questions central to their religious mission, like whether "academic freedom serves a religious function."  *Duquesne*, 947 F.3d at 836; *see*

*Great Falls*, 278 F.3d at 1342; *Carroll College*, 558 F.3d at 572.[10]

Similarly, the investigation in *Catholic University* placed the

government "in a position of choosing among 'competing religious

visions.'" 83 F.3d at 465-66 (quotation omitted). These cases are a far

cry from civil discovery in a case between private parties about secular

misrepresentations. Discovery in this case would not require the

government to second-guess USCCB on any religious issue.

Indeed, USCCB's own cases show that courts can look at

information from religious institutions to answer legal questions. For

example, in *Great Falls*, this Court analyzed the "corporate structure" of

the university and the authority of its religious owners. 278 F.3d 1346-

47. It looked to the president's testimony "that he meets with the

[religious owners] once a quarter." *Id.* And it also analyzed the

university's "course catalogue, mission statement, [and] student

bulletin," as well as the decorations of its classrooms and offices. *Id.* at

1345-46. But this Court never suggested that it was improperly

---

[10] Contrary to USCCB's representation, *Catholic Bishop* did not
state that asking "how many liturgies" are held raised First
Amendment concerns. Br. 42-43. The issue was in "defining liturgies,"
a religious term. *Catholic Bishop*, 440 U.S. at 507-08.

entangling itself in religious affairs.  It was merely looking at factual information relevant to a legal question.

The other cases that USCCB cites also confirm that discovery in this case would not result in excessive entanglement.  *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 983 (7th Cir. 2021) (en banc) (distinguishing hostile work environment claims, which "bring[] the entire ministerial relationship under invasive examination," from "tort liability," which "generally does not arise as a direct result of the protected ministerial relationship"); *Whole Woman's Health*, 896 F.3d at 372-73 (distinguishing "a fraud case against a religious college"); *Surinach v. Pesquera De Busquets*, 604 F.2d 73, 76 (1st Cir. 1979) (disclosure requirements must be considered "in view of the purpose for which the information was solicited"—here, to prove secular claims).

Dismissing this case merely because a religious organization would have to provide factual information relevant to secular claims goes beyond the bounds of the church-autonomy doctrine.  It would effectively immunize religious organizations from all claims, because discovery will almost always be necessary to prove a claim.

### C.    USCCB's argument misunderstands church autonomy and would result in blanket immunity from secular claims.

"[T]he first amendment does not immunize the church from all temporal claims made against it." *Minker*, 894 F.2d at 1360.  USCCB's cases agree that "churches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)).  So "[b]efore the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).  "[S]ecular components of a dispute involving religious parties are not insulated from judicial review." *Belya*, 45 F.4th at 630.  Claims based on secular conduct—like lying to donors about where solicited funds are going—do not raise church-autonomy concerns.  *Supra* § II.A, and cases cited.

In addition, and separately, courts have recognized an *exception* to the church-autonomy doctrine for cases involving fraud.  *See Cantwell v.*

*Connecticut*, 310 U.S. 296, 306 (1940) ("Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public."); *Ill. ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612 (2003) ("'Frauds,' including 'fraudulent appeals ... made in the name of charity and religion,' may be 'denounced as offenses and punished by law.'") (quoting *Schneider v. State*, 308 U.S. 147, 164 (1939)).  This exception allows "marginal civil court review *of ecclesiastical determinations*" in cases involving fraud.  *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 447 (1969) (emphasis added).  In other words, it allows courts to adjudicate fraud claims *even when* doing so requires review of religious determinations.  When claims do not require review of religious determinations, no exception is needed because the church-autonomy doctrine does not apply.

USCCB, citing *Milivojevich*, argues that no such fraud exception exists, and therefore concludes that O'Connell's claims must be dismissed.  Br. 44-45.  This argument fails on multiple levels.  To begin, *Milivojevich* held only that there was no "arbitrariness" exception; it

expressly took no position on whether courts may adjudicate religious questions to avoid "fraud" or "collusion."  426 U.S. at 713 & n.7.

More fundamentally, O'Connell need not rely on the fraud exception because his claims do not require review of religious determinations.  *Supra* § II.A.  *Milivojevich* expressly distinguished between a "neutral principles" approach and the "'fraud, collusion, or arbitrariness' exception," describing them as two distinct reasons why the church-autonomy doctrine would not apply.  426 U.S. at 721.  And *Milivojevich* involved "quintessentially religious controversies," so the church-autonomy doctrine applied and an "exception" was required.  *Id.* at 720.[11]  *Milivojevich* and similar cases "are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud … [is] alleged." *Gen. Council on Fin. & Admin., United Methodist Church v. Cal.*

---

[11] *See also Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 2007 Tenn. App. LEXIS 29, at *83 (Tenn. Ct. App. Jan. 19, 2007) (involving the "purely religious decision" of "who is or is not a member of a religious organization"); *Van Osdol v. Vogt*, 908 P.2d 1122, 1134 (Colo. 1996) (involving the "inherently ecclesiastical" decision of "the choice of a minister").

*Superior Court*, 439 U.S. 1369, 1373 (1978) (Rehnquist, J., denying application to stay).

USCCB next argues that the church-autonomy doctrine precludes all claims against religious organizations—even those that can be resolved using neutral principles of law—except for "church property disputes." Br. 45-48. USCCB already conceded that this is not true: "the cases also say that if there is a case of fraud that can be brought and can be decided purely on the basis of neutral principles, then we have a different kettle of fish." A74. And concessions made in the district court cannot be taken back on appeal. *E.g.*, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 469, 897 F.3d 314, 322 (D.C. Cir. 2018).

USCCB's argument is also foreclosed under this Court's precedent. *Minker* allowed a breach of contract claim against a church to proceed because it may be "subject to entirely neutral methods of proof." 894 F.2d at 1360. And this Court has also allowed antitrust claims to proceed against religious officials, reversing a grant of summary judgment based on a religious exemption. *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1046-50 (D.C. Cir. 1981).

The "neutral principles" approach is simply one instance of the well-established principle that church autonomy does not preclude claims that can be resolved without answering religious questions. *Jones v. Wolf*, 443 U.S. 595, 606 (1979) ("The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods."). USCCB's argument would immunize religious organizations from all claims other than property disputes, impermissibly granting religious organizations "a general immunity from secular laws." *Our Lady*, 591 U.S. at 746.

## III.  USCCB's failure-to-state-a-claim arguments fail.

### A.  This Court lacks pendent jurisdiction over USCCB's failure-to-state-a-claim arguments.

Pendent appellate jurisdiction is "only rarely appropriate." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 199 (D.C. Cir. 2004). This Court has routinely refused to exercise pendent jurisdiction over Rule 12(b)(6) issues, like "[w]hether state tort law properly provides the plaintiff with a cause of action." *Id.* at 200 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d

1123, 1134 (D.C. Cir. 2004)); *see Gross v. Winter*, 876 F.2d 165, 168 (D.C. Cir. 1989) (no pendent jurisdiction over "the merits of [a] motion to dismiss for failure to state a claim"). These cases foreclose USCCB's request for pendent jurisdiction over that precise issue here.

USCCB argues that this Court should exercise pendent jurisdiction because "addressing the pleading deficiencies would immediately terminate the case." Br. 49. But this Court and the Supreme Court have "rejected that as a sufficient reason to permit appeal on a theory of pendent jurisdiction." *Kilburn*, 376 F.3d at 1135; *see id.* at 1135 n.14 (quoting *Swint* as rejecting pendent jurisdiction "notwithstanding that if the defendant were correct, 'reviewing the district court's order would put an end to the entire case'"). The cases USCCB relies on did not involve pendent jurisdiction over failure-to-state-a-claim arguments, but rather "threshold, nonmerits issue[s]" like *forum non conveniens* or personal jurisdiction. *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019) (quotation omitted); *see Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997).

**B.     The district court correctly determined that O'Connell states a claim.**

USCCB argues that O'Connell fails to allege fraud under Rule 9(b). Br. 50-55. This argument is procedurally improper, because USCCB answered the complaint before filing its motion. *See Unified Container, LLC v. Mazuma Capital Corp.*, 280 F.R.D. 632, 636 (D. Utah 2012) (Rule 9(b) "serves little purpose when a party has already been capable of answering the claim"); *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS 102373, at *6 (C.D. Cal. Aug. 9, 2006). Moreover, the district court correctly held that O'Connell adequately alleges his fraud claim. A150-153. USCCB fails to establish that any of the following facts are missing. Br. 51-54.

<u>What</u>: O'Connell "was solicited from the pulpit as directed by USCCB," A25 ¶34, i.e., using USCCB's "specific instructions for Peter's Pence appeals to be read from the pulpit," A19 ¶24.

<u>Who</u>: USCCB, who created and distributed the instructions for the text to be read from the pulpit. A19 ¶24.

<u>When</u>: "In the summer of 2018, during a Sunday mass" on the day the church solicited donations for Peter's Pence. A25 ¶34; *see United*

66

*States ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 123

(D.D.C. 2014) ("specific *dates*" not required).

Loss:  The "cash donation" that O'Connell made.  A25 ¶34.

Duty to disclose:  USCCB had a duty to disclose because it (1) "had

exclusive knowledge of the material, suppressed facts"; (2) "took

affirmative actions to conceal the material facts"; and (3) made

misleading "partial representations."  A31-32 ¶55.

Knowledge and intent:  USCCB misrepresented and "actively

concealed the true character and nature of the Peter's Pence collection,"

A16 ¶16, because it "knew that prospective donors would be inclined to

donate to Peter's Pence if they believed their donations were urgently

needed by people in dire circumstances," A30 ¶49.

Reliance:  O'Connell "contributed money for specific charitable

purposes" based on USCCB's representations and omissions.  A30 ¶51.

"But for USCCB's fraud, [O'Connell] would not have donated to the

Peter's Pence collection."  *Id.*

USCCB also argues that O'Connell failed to plead unjust

enrichment because USCCB did not receive a benefit from his donation.

Br. 55-57.  But the complaint's allegation that "USCCB has received

money" from O'Connell must be taken as true. A32 ¶59. Moreover,

USCCB can be liable for unjust enrichment regardless whether it

retained the funds. *See, e.g.*, *Osborn v. Griffin*, 865 F.3d 417, 455 (6th

Cir. 2017); *S.E.C. v. Contorinis*, 743 F.3d 296, 307 (2d Cir. 2014).

USCCB also argues that O'Connell failed to plead a fiduciary duty

or a breach. "[A] claim for breach of fiduciary duty is generally not

amenable to dismissal for failure to state a claim when the claimed

ground for dismissal is the absence of a fiduciary relationship." *Council*

*on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d

311, 341 (D.D.C. 2011). O'Connell adequately alleges that USCCB owed

a fiduciary duty to donors through its representations about how the

funds would be used, and breached that fiduciary duty because the

funds were not used as represented. A33 ¶¶62-63.

## CONCLUSION

This Court should dismiss this appeal for lack of jurisdiction. If

this Court concludes it has jurisdiction, it should affirm.

Dated: November 6, 2024

Respectfully submitted,

By: /s/ *Gabriel Doble*

Gabriel Doble (Bar No. 65055)
Simon Franzini (Bar No. 65081)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
gabe@dovel.com
simon@dovel.com

Martin Woodward
martin@kitnerwoodward.com
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, Texas 75240
Telephone: (214) 443-4300
Facsimile: (214) 443-4304

*Counsel for Plaintiff-Appellee
David O'Connell*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,997 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

*/s/ Gabriel Doble*
Gabriel Doble

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2024 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/Gabriel Doble*

Gabriel Doble
