# No. 23-7173

IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

**DAVID O'CONNELL,**
*Plaintiff-Appellee,*

*v.*

**UNITED STATES CONFERENCE OF CATHOLIC BISHOPS,**
*Defendant-Appellant.*

―――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
JIA M. COBB, DISTRICT JUDGE ・ CASE NO. 1:20-CV-01365-JMC

―――――――

## BRIEF OF J. REUBEN CLARK LAW SOCIETY AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLANT'S PETITION FOR REHEARING EN BANC

―――――――

HORVITZ & LEVY LLP
JOHN A. TAYLOR, JR.
JASJAAP S. SIDHU
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800
ATTORNEYS FOR AMICUS CURIAE
**J. REUBEN CLARK LAW SOCIETY**

## DISCLOSURE STATEMENT

As required by Federal Rules of Appellate Procedure 26.1 and 29(A)(4)(a), and D.C. Circuit Rule 26.1, the J. Reuben Clark Law Society certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock. Additionally, the J. Reuben Clark Law Society's general nature and purpose, as relevant to this litigation, is described in the Statement of Interest on the next page. *See* D.C. Circuit Rule 26.1(b).

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ....................................................................i

TABLE OF CONTENTS ........................................................................iii

TABLE OF AUTHORITIES .....................................................................iii

STATEMENT OF INTEREST ................................................................... 1

INTRODUCTION ................................................................................. 1

ARGUMENT ...................................................................................... 2

I.    Plaintiff's claims require an inquiry the First Amendment forbids: determining a reasonable parishioner's understanding of the purpose of Peter's Pence. ............................. 2

    A.    Plaintiff must establish that he reasonably relied on USCCB's alleged misrepresentation, and that USCCB made the misrepresentation with knowledge of its falsity and with intent to deceive. ......................................... 2

    B.    Establishing those elements calls for an improper inquiry into the purpose of Peter's Pence as understood by a reasonable parishioner and USCCB. ............................. 4

II.    The forbidden inquiry begins as soon as discovery starts, which necessitates interlocutory review. ....................................... 7

III.    Plaintiff's fraud theories threaten all charities, religious and non-religious alike. ......................................................... 11

CONCLUSION ................................................................................. 15

CERTIFICATE OF COMPLIANCE ......................................................... 16

CERTIFICATE OF SERVICE................................................................. 17

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudas Chasidei Chabad of United States v. Russian Fed'n,*
    19 F.4th 472 (D.C. Cir. 2021) ............................................................... 10

*Alcazar v. Corp. of the Cath. Archbishop of Seattle,*
    627 F.3d 1288 (9th Cir. 2010) ............................................................... 11

*Belya v. Kapral,*
    59 F.4th 570 (2d Cir. 2023) ................................................................... 10

*Belya v. Kapral,*
    2025 WL 963111 (S.D.N.Y. Mar. 31, 2025) ......................................... 10

*Demkovich v. St. Andrew the Apostle Parish,*
    3 F.4th 968 (7th Cir. 2021) ................................................. 6, 7, 8, 9, 11

*Democratic Nat'l Comm. v. McCord,*
    416 F.Supp. 505 (D.D.C. 1976) .............................................................. 2

*Drake v. McNair,*
    993 A.2d 607 (D.C. 2010) ........................................................................ 3

*Duquesne Univ. of the Holy Spirit v. NLRB,*
    947 F.3d 824 (D.C. Cir. 2020) ................................................................. 9

*E.E.O.C. v. Cath. Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) .................................................. 5, 8, 9, 10

*E.M. v. Shady Grove Reproductive Sci. Ctr. P.C.,*
    496 F.Supp.3d 338 (D.D.C. 2020) .................................................. 2, 3, 4

*In re Est. of McKenney,*
    953 A.2d 336 (D.C. 2008) .................................................................. 2, 3

*Falconi-Sachs v. LPF Senate Square, LLC,*
    142 A.3d 550 (D.C. 2016) ........................................................................ 3

*Fowler v. Rhode Island,*
   345 U.S. 67 (1953) .................................................................... 5

*Howard v. Riggs Nat'l Bank,*
   432 A.2d 701 (D.C. 1981) ................................................... 3, 4

*Huntsman v. Corp. of the President of the Church of Jesus
   Christ of Latter-Day Saints,*
   127 F.4th 784 (9th Cir. 2025) ...................................... 6, 7, 11

*Powell v. D.C. Hous. Auth.,*
   818 A.2d 188 (D.C. 2003) ......................................................... 3

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
   772 F.2d 1164 (4th Cir. 1985) ................................................ 6

**Statutes**

26 U.S.C. § 501(c)(3) ................................................................. 13

28 U.S.C. § 1292(b) .................................................................. 10

**Rules**

Fed. R. App. P. 40(b)(2)(D) ...................................................... 10

**Miscellaneous**

Brian Mittendorf, *Is the '100 Percent Promise' Right for Your
   Nonprofit?*, Stan. Soc. Innovation Rev. (July 19, 2022),
   https://tinyurl.com/100percentpromise ........................................ 11, 12

*Did You Know 100% of Your Donation to UMCOR Goes
   Where You Specify?*, United Methodist Church,
   https://tinyurl.com/umcordonation ..................................................... 12

Inaugural Address 1989, 25 Weekly Comp. Pres. Doc. 99
   (Jan. 20, 1989) ............................................................................. 14

Lewis Faulk et al., *Nonprofit Trends and Impacts 2021*,
   Urban Inst. (2021), https://tinyurl.com/urbaninstitute21 .................. 13

iv

*Research Data on the Nonprofit Sector*, U.S. Bureau of Lab.
    Stats. (May 14, 2020),
    https://tinyurl.com/researchdatanonprofit..........................................13

Uri Gneezy et al., *Avoiding Overhead Aversion in Charity*,
    346 Sci. 632 (2014) ................................................................11

## STATEMENT OF INTEREST

The J. Reuben Clark Law Society is a worldwide faith-based organization of approximately 10,000 lawyers and law students supported by the J. Reuben Clark Law School at Brigham Young University. The Society has a strong interest in advancing the proper interpretation and application of the First Amendment, including the church autonomy doctrine and its application to religious entities such as Defendant-Appellant United States Conference of Catholic Bishops (USCCB).[1]

## INTRODUCTION

Plaintiff's claims require a fact-finder to determine a reasonable parishioner's understanding of the purpose of Peter's Pence. But a court or jury cannot make that determination without unconstitutionally casting judgment on a religious sermon and practice.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than amicus and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. No judicial member of the Society participated in any way in the decision to prepare or file this brief, or the drafting or review thereof.

And interlocutory review is necessary because such improper inquiries

will arise as soon as discovery begins.

Additionally, Plaintiff's fraud theory will have a chilling effect on

charitable donations, especially for smaller charities.  To avoid that

harm and to effectuate the First Amendment's requirements, this court

should grant USCCB's petition for rehearing.

## ARGUMENT

## I.    Plaintiff's claims require an inquiry the First Amendment forbids: determining a reasonable parishioner's understanding of the purpose of Peter's Pence.

### A.    Plaintiff must establish that he reasonably relied on USCCB's alleged misrepresentation, and that USCCB made the misrepresentation with knowledge of its falsity and with intent to deceive.

A plaintiff seeking to recover on the basis of a fraudulent

misrepresentation must establish that he acted in reliance on the

misrepresentation.  *See In re Est. of McKenney*, 953 A.2d 336, 342 (D.C.

2008).  That reliance "must be found to be justifiable under the

circumstances."  *Democratic Nat'l Comm. v. McCord*, 416 F.Supp. 505,

507–508 (D.D.C. 1976); *E.M. v. Shady Grove Reproductive Sci. Ctr. P.C.*,

496 F.Supp.3d 338, 404 (D.D.C. 2020) ("a fraudulent misrepresentation

is not material if a reasonable person would not have relied on it").

In evaluating whether the plaintiff's reliance was reasonable, courts consider whether the plaintiff had an adequate opportunity to conduct an independent investigation, and whether the party making the representation had exclusive access to relevant information. *See Drake v. McNair*, 993 A.2d 607, 621 (D.C. 2010); *McKenney*, 953 A.2d at 343. Where clarifying information is readily accessible, the plaintiff's reliance on "less detailed" information is not reasonable. *Shady Grove*, 496 F.Supp.3d at 404. A plaintiff may not place "dispositive reliance" on information that an adequate investigation would have clarified. *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 707 (D.C. 1981).

Additionally, the plaintiff must establish *both* that the defendant knew the statement was false *and* that the defendant intended to deceive the plaintiff. *See Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 555 (D.C. 2016). This element "requir[es] the fact-finder to assess the state of mind" of the defendant. *Powell v. D.C. Hous. Auth.*, 818 A.2d 188, 195 (D.C. 2003). That is "a fact-based inquiry based on documentation, determinations of witness credibility and inferences." *Id.*

**B.     Establishing those elements calls for an improper inquiry into the purpose of Peter's Pence as understood by a reasonable parishioner and USCCB.**

Plaintiff cannot establish reasonable reliance without an improper inquiry into a reasonable parishioner's understanding of the purpose of Peter's Pence.  Plaintiff believed—based on unidentified language from a sermon—that Peter's Pence would "be used entirely and exclusive[ly] for emergency assistance to the poor."  A26.  Plaintiff indicates that he did not independently investigate the purpose of Peter's Pence.  *See id.* (suggesting his understanding would hold even if he had "carefully researched external sources").

Whether Plaintiff's understanding was reasonable will be disputed.  Peter's Pence has long been used not only for charitable purposes, but also for the Church's other needs as determined by the Pope and the Holy See.  AOB 6–10.  That information is publicly accessible and creates doubts as to whether Plaintiff unreasonably focused on "less detailed" information in one portion of a single sermon, *Shady Grove*, 496 F.Supp.3d at 404, and whether Plaintiff unreasonably placed "dispositive reliance" on that information rather than performing a short investigation, *Riggs*, 432 A.2d at 707.

4

But that very question—what is a *reasonable* understanding of Peter's Pence—strikes at the heart of the Church's First Amendment rights.  The church autonomy doctrine precludes a fact-finder from (1) evaluating a millennium-old religious practice, the Church's statements related to that practice, and the sermon delivered to Plaintiff; and then (2) deciding whether a parishioner's understanding of that religious practice was "reasonable."  *See Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) (courts may not "approve, disapprove, classify, regulate, or in any manner control sermons").  That inquiry carries with it the "inevitable risk that the persons assessing the [question] would consider whether [different understandings of Peter's Pence] were in accord with what the Church teaches or what, in their judgment, the Church ought to teach."  *E.E.O.C. v. Cath. Univ. of Am.*, 83 F.3d 455, 466 (D.C. Cir. 1996).

Similarly, Plaintiff cannot establish USCCB's knowledge and intent without an improper inquiry into its understanding of the purpose of Peter's Pence.  The knowledge and intent requirement means a court or jury must improperly "probe the mind" of USCCB, the minister who delivered the relevant sermon, and the Holy See.

5

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).  That inquiry into "subjective motive[s]" and "what one minister" "said to another" is strictly prohibited.  *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 977, 983 (7th Cir. 2021) (en banc).

The Ninth Circuit's recent opinion in *Huntsman v. Corporation of the President of the Church of Jesus Christ of Latter-Day Saints* is illustrative.  *See* 127 F.4th 784 (9th Cir. 2025) (en banc).  *Huntsman* held that the plaintiff failed to prove that the defendant church engaged in fraud when it used tithing funds in a manner that allegedly differed from the purpose stated in a sermon.  See *id.* at 786.

But five judges agreed that, regardless of the answer to that question, the case could not proceed any further without violating the First Amendment.  Judge Bress, joined by three of his colleagues, explained that, to resolve the plaintiff's claim, a court or jury "would need to decide that a reasonable member of [the church] would pay tithing based on the [church's] representations about its spending decisions."  *Id.* at 799 (Bress, J., concurring).  To do that, "a factfinder would need to credit his position notwithstanding its evident

contradiction with church teachings." *Id.*  Judge Bress also noted that "it is startling to think that courts and juries would be examining a religious sermon for 'accuracy,'" and that the church autonomy doctrine bars a plaintiff from alleging that a church leader "should have spoken with greater precision about inherently religious topics, lest the Church be found liable for fraud." *Id.* at 796, 798.

Similarly, Judge Bumatay explained that resolving the plaintiff's claim would improperly require a court or jury to decide "what a religious adherent *should* understand about church doctrine," and "the level of precision that [c]hurch teachings must follow to avoid fraud charges." *Id.* at 813–814 (Bumatay, J., concurring).

The same holds true here.  Assessing a reasonable parishioner's or USCCB's understanding of Peter's Pence would require a court or jury to improperly cast judgment on a religious sermon and practice.

## II.   The forbidden inquiry begins as soon as discovery starts, which necessitates interlocutory review.

In holding that the district court's order does not qualify for interlocutory review, the panel reasoned that "district courts have ample tools at their disposal to limit discovery," Slip. Op. p. 17, and that

7

defendants will have avenues for interlocutory review of future orders that intrude into religious matters, *see id.* p. 18.

That reasoning ignores the "inevitable risk" at play here. *Cath. Univ. of Am.*, 83 F.3d at 466. Because Plaintiff cannot prove his claim without improper inquiries that violate the church autonomy doctrine, *see supra*, 2–7, it is obvious that improper inquiries will rear their head at an early stage.

For example, to establish a reasonable parishioner's or USCCB's understanding of the purpose of Peter's Pence, Plaintiff necessarily will need to depose church officials, including the minister who delivered the allegedly fraudulent sermon. *Cf. Demkovich*, 3 F.4th at 983 (holding, on interlocutory review, that ministerial exception barred plaintiff's claim, and noting "onerous" nature of "the depositions of fellow ministers and the search for a subjective motive"). Indeed, Plaintiff has *already* demanded internal communications between USCCB and the Holy See. A175.

There is thus no doubt that the church autonomy doctrine will be implicated as soon as this case returns to the trial court. And because plaintiff is proceeding on behalf of a putative class, the improper

inquiries that will necessarily occur will focus not on just one sermon or church, but on untold thousands nationwide.

The panel opinion attempts to sidestep *Demkovich* by noting that the church-defendant there had successfully petitioned for interlocutory review, and that USCCB could do the same in the future. Slip. Op. p. 18. But that approach elevates form over substance. Whether certified or direct, an interlocutory appeal on church autonomy grounds ensures that a church-defendant is not required to confront the "inevitable risk" of an improper inquiry into the church's mind and competing interpretations of religious practices. *Cath. Univ. of Am.*, 83 F.3d at 466. Regardless of the stage, the "very process of such an inquiry . . . would impinge on rights guaranteed by the Religion Clauses." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 835 (D.C. Cir. 2020) (citation omitted).[2]

---

[2] This burden will continue even after the case ends. A religious body that has once been subjected to the burden of unconstitutional litigation and bureaucratic entanglement will inevitably begin making theological decisions with any eye towards avoiding those burdens in the future. *Cf. Cath. Univ. of Am.*, 83 F.3d at 467 ("we think it fair to say that the prospect of future investigations and litigation would inevitably affect to some degree" ecclesiastical decision making). That long-term (and unconstitutional) impact on a church's internal theological matters further weighs in favor of interlocutory review.

The panel's emphasis on a certified interlocutory appeal also places substantial discretion in the hands of the district court. The denial of a motion under 28 U.S.C. § 1292(b) is not reviewable. *See Agudas Chasidei Chabad of United States v. Russian Fed'n*, 19 F.4th 472, 474 (D.C. Cir. 2021). Thus, absent a mechanism for interlocutory review, there is a substantial risk that church defendants will lose their First Amendment rights under the church autonomy doctrine. *See, e.g.*, *Belya v. Kapral*, 2025 WL 963111, at *1 (S.D.N.Y. Mar. 31, 2025) (granting summary judgment in favor of defendant based in-part on church autonomy grounds *after* Second Circuit rejected interlocutory review and case proceeded through discovery).

For those reasons, the "extensive pre-trial inquiries" that will be required in this case (and that Plaintiff has already foreshadowed with his document requests) necessitate interlocutory review. *Cath. Univ. of Am.*, 83 F.3d at 467. And whether that is correct presents an issue of "exceptional importance" warranting en banc review. Fed. R. App. P. 40(b)(2)(D); *see also Belya v. Kapral*, 59 F.4th 570, 573 (2d Cir. 2023) (Cabranes, J., dissenting). That is confirmed by the fact that numerous courts have used the en banc review process to address questions

related to church autonomy issues. *See Huntsman*, 127 F.4th at 789;
*Demkovich*, 3 F.4th at 974–75; *Alcazar v. Corp. of the Cath. Archbishop
of Seattle*, 627 F.3d 1288, 1290 (9th Cir. 2010).

## III.  Plaintiff's fraud theories threaten all charities, religious and non-religious alike.

The gravamen of Plaintiff's fraud and other claims is that he
believed his donations to Peter's Pence would be used exclusively for
charitable purposes, but a portion of the funds was instead used for
administrative expenses.  The chilling effect that theory would have on
fundraising by all charities—and especially smaller charities—is
another reason heightened scrutiny should apply in the religious
charitable context presented here.

Obviously, nonprofit donors strongly prefer that contributions
support programming rather than administrative expenses.  Donations
soar when donors know their donations will support programming.  *See*
Uri Gneezy et al., *Avoiding Overhead Aversion in Charity*, 346 Sci. 632
(2014).  To minimize this "overhead aversion," nonprofits commonly
make a "100 percent promise" to use all new contributions for
programming.  *See generally* Brian Mittendorf, *Is the '100 Percent*

11

*Promise' Right for Your Nonprofit?*, Stan. Soc. Innovation Rev. (July 19, 2022), https://tinyurl.com/100percentpromise.

Indeed, although all nonprofits necessarily have some overhead expenses, these "100-percent" representations are ubiquitous. *E.g.*, *Did You Know 100% of Your Donation to UMCOR Goes Where You Specify?*, United Methodist Church, https://tinyurl.com/umcordonation (last visited Sept. 27, 2023) ("When you make a gift [to us], you can be assured that every dollar will go to the project you specify."). The societal benefit of this approach is that it maximizes fundraising efficacy and programming while ensuring that necessary administrative expenses are accounted for. Mittendorf, *supra*.

Against this factual backdrop, it is easy to see how Plaintiff's theory would invite litigation against any charity that makes benign fundraising promises that are later viewed as not matching the donor's subjective understanding of those promises. For example, a nonprofit might assure donors that "all your donations will be used to directly advance our mission," but then use some portion of the funds to hire new staffers. A charity's fundraising letter might state that "100% of your contributions will be used to grow our impact," followed by use of

12

the contributions to bolster its own fundraising.  Hiring staffers and bolstering collections are, of course, a manner of advancing a charity's mission and growing its impact.  But under Plaintiff's fraud theory, these common, benign situations would merit litigation based on assertions that the term "advance our mission" is insufficiently defined and is thus fraudulently misleading.  Even organizations that stop short of promising a 100-percent-to-services model could face liability under Plaintiff's theory, which invites litigation over a nonprofit's internal expenditure classifications.

The threat of such litigation will most severely impact small charities that perform the bulk of the country's philanthropy.  Among the nation's roughly 170,000 nonprofits organized under 26 U.S.C. § 501(c)(3), about 40% have fewer than five employees.  *Research Data on the Nonprofit Sector*, U.S. Bureau of Lab. Stats. (May 14, 2020), https://tinyurl.com/researchdatanonprofit.  Most of these charities are small operations:  roughly one-third of public charities report expenses under $100,000, and two-thirds report expenses under $500,000.  Lewis Faulk et al., *Nonprofit Trends and Impacts 2021*, Urban Inst. (2021), https://tinyurl.com/urbaninstitute21.  As President George H. W. Bush

13

said in his 1989 inaugural address, these organizations are like "a thousand points of light . . . spread like stars throughout the Nation, doing good." Inaugural Address 1989, 25 Weekly Comp. Pres. Doc. 99, 100 (Jan. 20, 1989).

But these small charities face many challenges in explaining their financing to donors and the world at large as they receive contributions from various sources. Their reserve funds are inadequate to fund defenses against unexpected litigation targeting benign pronouncements. And Plaintiff's proposed class action creates new liability risks that these small nonprofits can ill afford to bear. Those increased liability risks will ultimately inhibit nonprofit fundraising, making it harder for nonprofits to secure the funds needed to continue their important humanitarian work.

## CONCLUSION

USCCB's petition for rehearing should be granted.

Dated:  June 2, 2025

Respectfully submitted,

_____/s/ Jasjaap S. Sidhu_____
Jasjaap S. Sidhu
John A. Taylor, Jr.
(CA State Bar No. 129333)
Jasjaap S. Sidhu
(CA State Bar No. 335862)
**HORVITZ & LEVY LLP**
3601 West Olive Avenue, 8th Floor
Burbank, California  91505-4681
Telephone: (818) 995-0800
Fax: (844) 497-6592
jtaylor@horvitzlevy.com
jsidhu@horvitzlevy.com

Attorneys for Amicus Curiae
**J. REUBEN CLARK LAW SOCIETY**

15

## CERTIFICATE OF COMPLIANCE

I hereby certify, on June 2, 2025, that:

1.    This document complies with the word limit under Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 2,585 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Century Schoolbook font.

        /s/ Jasjaap S. Sidhu
Jasjaap S. Sidhu

**CERTIFICATE OF SERVICE**

I certify that on June 2, 2025, a true and correct copy of this Brief was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

          /s/ Jasjaap S. Sidhu         
Jasjaap S. Sidhu