# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 23-7173**                           **September Term, 2025**

**1:20-cv-01365-JMC**

**Filed On:** November 4, 2025

David O'Connell,

        Appellee

    v.

United States Conference of Catholic
Bishops,

        Appellant

**BEFORE:**    Srinivasan, Chief Judge; Henderson, Millett, Pillard, Wilkins, Katsas, Rao***, Walker*, Childs, Pan, and Garcia, Circuit Judges; and Edwards**, Senior Circuit Judge

### <u>O R D E R</u>

Appellant's petition for rehearing en banc was circulated to the full court, and a response and a vote were requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, the motions for invitation to file briefs as amici curiae in support of appellant's petition for rehearing en banc, the lodged briefs, and the 28(j) letters, it is

**ORDERED** that the petition for rehearing en banc be denied. It is

**FURTHER ORDERED** that the motions for invitation to file briefs as amici curiae be granted. The Clerk is directed to file the lodged briefs.

### <u>Per Curiam</u>

                        **FOR THE COURT:**
                        Clifton B. Cislak, Clerk

              BY:    /s/
                      Michael C. McGrail
                      Deputy Clerk

\* A statement by Circuit Judge Walker, concurring in the denial of rehearing en banc, is attached.

\*\* A statement by Senior Circuit Judge Edwards, concurring in the denial of rehearing en banc, is attached.

\*\*\* A statement by Circuit Judge Rao, dissenting from the denial of rehearing en banc, is attached.

WALKER, *Circuit Judge*, concurring in the denial of rehearing en banc:

David O'Connell attends Sacred Heart Catholic Church in East Providence, Rhode Island. One Sunday, in response to a call for alms from the pulpit, O'Connell made a cash donation to Peter's Pence. He understood the special collection to be exclusively for "emergency assistance to the neediest people around the world." JA 26.

Peter's Pence funds do not always go directly to those in need. Some money is invested or used for other administrative purposes. Believing himself defrauded, O'Connell sued the United States Conference of Catholic Bishops, the church body that administers the Peter's Pence collection in the United States.

Before the district court, the Conference of Catholic Bishops argued that a branch of government (the Judiciary) cannot wade into a dispute about church governance.[1] The district court disagreed, and in a brief oral ruling, it concluded that proceeding with discovery would not violate the church-autonomy doctrine. The Conference of Catholic Bishops appealed that interlocutory order, and a panel of this court dismissed the appeal for lack of appellate jurisdiction.[2]

In its opinion, the panel found "the unanimity of our sister circuits on this question to be notable and their reasoning persuasive."[3] But unanimity of holdings should not be

---

[1] *Cf.* T.S. ELIOT, MURDER IN THE CATHEDRAL 25 (1935) ("We do not know very much of the future / Except that from generation to generation / The same things happen again and again.").

[2] *See O'Connell v. United States Conference of Catholic Bishops*, 134 F.4th 1243, 1248-49 (D.C. Cir. 2025).

[3] *Id.* at 1255.

2

mistaken for unanimity of opinion. The panel's decision conflicts with the conclusions of many sister-circuit colleagues.[4]

This "chorus of circuit-court dissenters" has persuasively explained why ecclesial defendants are entitled to appeal denials of motions to dismiss on church-autonomy grounds.[5] The church-autonomy doctrine protects religious bodies against "time-consuming and expensive litigation" when "the litigation itself" would "enmesh[] the courts in ecclesiastical disputes."[6] So when a district court erroneously denies a motion to dismiss based on the church-autonomy doctrine, the district court threatens the religious defendant with irreparable First Amendment harm by proceeding to discovery and

---

[4] *See, e.g.*, *Garrick v. Moody Bible Institute*, 95 F.4th 1104, 1117 (7th Cir. 2024) (Brennan, J., dissenting); *Belya v. Kapral*, 59 F.4th 570, 573 (2d Cir. 2023) (Park, J., joined by Livingston, C.J., Sullivan, Nardini, and Menashi, JJ., dissenting from denial of rehearing en banc); *Tucker v. Faith Bible Chapel International*, 53 F.4th 620, 625 (10th Cir. 2022) (Bacharach, J., joined by Tymkovich and Eid, JJ., dissenting from denial of rehearing en banc); *cf. McRaney v. North American Mission Board of Southern Baptist Convention, Inc.*, 980 F.3d 1066, 1067 (5th Cir. 2020) (Ho, J., joined by Jones, Smith, Elrod, Willett, and Duncan, JJ., dissenting from denial of rehearing en banc); *id.* at 1075 (Oldham, J., joined by Smith, Willett, Duncan, and Wilson, JJ., dissenting from denial of rehearing en banc).

[5] *Hanson v. District of Columbia*, 120 F.4th 223, 264 (D.C. Cir. 2024) (Walker, J., dissenting). Legal scholars too have joined the chorus. *See, e.g.*, Adam Reed Moore, *A Textualist Defense of a New Collateral Order Doctrine*, 99 NOTRE DAME L. REV. REFLECTION 1, 44-45 (2023); *see also* Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 LOY. U. CHI. L. J. 471, 503-05 (2023).

[6] *Tucker*, 53 F.4th at 627 (Bacharach, J., dissenting from denial of rehearing en banc).

3

possibly trial.[7]   And that is an immediately appealable collateral order.[8]

This court's panel suggested that the district court could begin to adjudicate O'Connell's fraud claims by applying "neutral principles of law" that do not threaten "judicial interference in ecclesiastical matters."[9]  I am not so sure.  As Judge Bumatay wrote, a court cannot decide "whether the Church's statements about its tithing policy were fraudulent" without "necessarily settl[ing] a dispute between the Church and a disaffiliated member concerning the meaning of 'tithes.'"[10]

Nevertheless, this case does not meet our circuit's exceedingly high standard for en banc review — even if that

---

[7] *See Garrick*, 95 F.4th at 1122 (Brennan, J., dissenting) ("it is not only the conclusions that may be reached by the government which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions" (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)) (cleaned up)); *Belya*, 59 F.4th at 573 (Park, J., dissenting from denial of rehearing en banc) ("litigation, including discovery and possibly trial, on matters relating to church governance . . . imperils the First Amendment rights of religious institutions").

[8] *See Garrick*, 95 F.4th at 1117, 1121-24 (Brennan, J., dissenting); *Belya*, 59 F.4th at 573, 577-82 (Park, J., dissenting from denial of rehearing en banc); *Tucker*, 53 F.4th at 625, 625-30 (Bacharach, J., dissenting from denial of rehearing en banc).

[9] *O'Connell*, 134 F.4th at 1258.

[10] *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 813 (9th Cir. 2025) (en banc) (Bumatay, J., concurring in judgment).

4

review would be consistent with the traditions of other circuits that go en banc more often than we do.[11]

---

[11] *See, e.g.*, *Air Line Pilots Association v. Eastern Air Lines, Inc.*, 863 F.2d 891, 925 (D.C. Cir. 1989) (Ginsburg, R.B., J., concurring in the denial of rehearing en banc) ("Only in the rarest of circumstances, . . . should we countenance the drain on judicial resources, the expense and delay for the litigants, and the high risk of a multiplicity of opinions offering no authoritative guidance, that full circuit rehearing of a freshly-decided case entails." (cleaned up)); *see also* D.C. CIR. R. 40(d) ("rehearing ordinarily will not be granted"); D.C. CIRCUIT HANDBOOK OF PRACTICE AND INTERNAL PROCEDURES 58 (2024) (en banc petitions are "rarely granted" and "are not favored") (citing FED. R. APP. P. 40).

EDWARDS, *Senior Circuit Judge*, concurring in the denial of rehearing *en banc*: The narrow issue in this case is whether this court has jurisdiction to hear this appeal pursuant to the collateral order doctrine. The case law on this matter is quite clear, as the panel explained in its opinion. *See O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243 (D.C. Cir. 2025). The panel faithfully adhered to the law of the circuit, which is consistent with the prevailing law in the federal courts. *Id*. at 1255-57. The United States Conference of Catholic Bishops (USCCB) seeks to expand the collateral order doctrine to suit its purposes. But USCCB's claim finds no support in the prevailing law as established by the Supreme Court and the federal circuit courts.

The panel decision does not involve a question of exceptional importance, nor does it conflict with any decision of the United States Supreme Court. Fed. R. App. P. 40(b)(2)(B), (D). Therefore, *en banc* review is not justified. The panel's decision that it lacks jurisdiction over this case is not only perfectly consistent with established law, but also reflects a just application of law.

Under the "final decision rule," the appellate jurisdiction of the federal courts of appeals is generally limited to "final decisions of the district courts of the United States." 28 U.S.C. § 1291. A final decision is typically one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945) (citation omitted). The "collateral order doctrine" provides a limited exception to the final decision rule for a "small class" of collateral rulings that, although they do not end the litigation, are appropriately deemed "final." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). This "small category includes only decisions [1] that are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers*

2

*Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen*, 337 U.S. at 546). The Supreme Court has made it clear that these requirements are "stringent." *Will v. Hallock*, 546 U.S. 345, 349 (2006). The Court has also stressed the importance of the third *Cohen* factor, *i.e.*, a decision that can be effectively reviewed on appeal is not covered by the collateral order doctrine. *See, e.g.*, *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 107-08 (2009).

The Supreme Court has openly acknowledged that many trial court rulings "may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment." *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 872 (1994) (citations omitted). Nevertheless, the Court has been resolute in saying that "the mere identification of some interest that would be 'irretrievably lost' has never sufficed to meet the third *Cohen* requirement." *Id*. (quoting *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 431 (1985)). It is important to remember that, in its current posture, this case does not involve a dispute over "church autonomy." Throughout this litigation, USCCB has appeared to assume that it has "immunity" from any action against it. It is mistaken. The church autonomy doctrine protects against judicial interference in ecclesiastical matters; it does not provide religious organizations with a blanket immunity from suit, discovery, or trial. *See O'Connell*, 134 F.4th at 1257-58.

USCCB attempts to bring a collateral order appeal to challenge the District Court's order denying its motion to dismiss based on the church autonomy doctrine. Without in any way addressing the merits of the parties' claims, the District Court simply denied the motion to dismiss. The court found that, at this stage of the litigation, O'Connell's claims raised a purely secular dispute that could be resolved according to neutral principles of law. However, the District Court made it

3

clear to the parties that it could not and would not address purely religious questions, should they arise during litigation. Thereafter, rather than proceeding with trial, USCCB filed an appeal with this court seeking interlocutory review.

The church autonomy doctrine protects against government interference in matters of faith, doctrine, and internal management. It may be raised as a defense in a civil suit, but it does not immunize religious organizations from civil actions. *See O'Connell*, 134 F.4th at 1258. Pleading-stage denials of a church autonomy defense, such as the contested motion to dismiss in this case, do not satisfy the strict requirements of the collateral order doctrine. This is especially true in a case of this sort in which nothing of significance has happened in the District Court. The contested denial of a motion to dismiss in this case is neither conclusive nor separate from the merits, and, most importantly, it can be reviewed upon post-judgment appeal.

Indeed, the idea that there could be collateral order review in a case of this sort would mean that there could be a constant stream of interlocutory review petitions every time a litigant merely asserts a religious privilege during trial (which could happen every time the district court issued an evidentiary or discovery order). You could have interlocutory review after interlocutory review after interlocutory review, endlessly. This makes no sense in light of the final decision rule, especially given that a religious organization always retains the right to appeal any final judgment (or preliminary injunction) issued against it before it is required to take any contested action.

Neither the Supreme Court nor any circuit has ever expanded the collateral order doctrine to categorically cover alleged denials of a church autonomy defense. *See O'Connell*, 134 F.4th at 1257-58. This is hardly surprising. The limited

4

scope of the collateral order doctrine reflects a healthy respect
for the virtues of the final decision rule, which serves as an
important safeguard against piecemeal and premature review.
USCCB's claimed rights can be adequately addressed on
appeal after the District Court issues a final decision and,
therefore, are not eligible for interlocutory review.

RAO, *Circuit Judge*, dissenting from the denial of rehearing en banc: *Obolo di San Pietro*, or "Peter's Pence," is a thousand-year-old collection by which Catholic faithful annually give money to the Pope. In 2020, an individual congregant sued the United States Conference of Catholic Bishops (the "Bishops"), alleging fraud and other misconduct relating to the promotion and management of Peter's Pence. The Bishops raised a church autonomy defense in their motion to dismiss, which the district court rejected because the case could be decided using "neutral principles of law." A panel of this court then dismissed the Bishops' interlocutory appeal for lack of jurisdiction.

The First Amendment's Religion Clauses protect a "sphere" of autonomy for churches and other religious institutions and organizations. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060–61 (2020). Within that sphere, the church autonomy defense prohibits state interference "in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 2061. Because the donations at issue here implicate the faith, practice, and governance of the Catholic Church, the district court wrongly relied on "neutral principles of law" to overcome the Bishops' church autonomy defense. *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 189–90 (2012). Moreover, because state interference can include the process of judicial inquiry, the church autonomy defense is best understood as a constitutional immunity from suit. The rejection of a church autonomy defense therefore supports interlocutory review under the collateral order doctrine.

Given the important constitutional rights at stake, and the tension between the panel's decision and Supreme Court precedent, the full court should have heard this case.

2

I.

A.

Peter's Pence is a collection of monetary contributions the Catholic Church annually solicits to support the Pope's "work of evangelization" and "aid of the poor and needy." Pope Benedict XVI, *Address to the Members of the "Circolo San Pietro"* (Mar. 8, 2007), https://perma.cc/EDM7-32MB; *see Peter's Pence*, The Vatican, https://perma.cc/G53Z-QP7G. Its roots lie in a religious practice described in the New Testament, whereby material aid was given to Jesus Christ and his followers for their work spreading the gospel and aiding the poor. *See History of Peter's Pence*, The Vatican, https://perma.cc/72GK-GXYJ. Later, the apostle Paul instituted a collection of monetary support from Christian communities for the "Mother Church," then in Jerusalem. *Id.*

From this religious backdrop, Peter's Pence originated more than a thousand years ago as an annual gift of alms that Anglo-Saxon royalty pledged to the Pope. *See* W.E. Lunt, *The Financial System of the Medieval Papacy in the Light of Recent Literature*, 23 Q.J. of Econ. 251, 278 (1909). For centuries, the collection was treated not only as a gift, but also as a religious obligation that expressed devotion to the Pope. *See History of Peter's Pence*, The Vatican.

Peter's Pence continues today as a worldwide yearly collection of financial support from Catholics for the Pope, both as a "tangible sign of communion with Him, as Peter's Successor," and as alms for the "most disadvantaged." *What is Peter's Pence*, The Vatican, https://perma.cc/AJ73-FNCN. Church law requires local bishops to assist in procuring financial means for the Pope, and the Church has accordingly adopted legislation governing Peter's Pence and other

3

fundraising appeals. *See Code of Canon Law*, Book V, Title I, §§ 1262 & 1271 (1983).

## B.

In 2018, David O'Connell, a congregant at Sacred Heart Church in East Providence, Rhode Island, made a donation to Peter's Pence during Sunday Mass. Two years later, he brought a class action suit against the Bishops for fraud, unjust enrichment, and breach of fiduciary duty related to the Bishops' promotion and management of Peter's Pence.[1] Among other things, O'Connell claimed the Bishops made affirmative misrepresentations about how donations to Peter's Pence would be used, received money that they "ought not to retain," and breached their duty to ensure that donations would be spent by the Pope in a particular way. J.A. 30–33.

O'Connell sought to represent a class made up of "[a]ll persons in the United States who donated money to the Peter's Pence collection," which could include "millions" of believers. J.A. 26–27. O'Connell also requested substantial discovery from the Bishops, including a list of donors to Peter's Pence and records of amounts received, the ways in which such donations were ultimately used, and communications the Bishops had with the Pope and the Vatican. *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1250 (D.C. Cir. 2025). As to remedies, O'Connell asked for an injunction modifying how the Bishops promote and manage Peter's Pence. He also requested damages, attorney's fees and costs, and

---

[1] The Bishops deny that they play any role in the administration, collection, or distribution of funds given to Peter's Pence. But at the motion to dismiss stage, this court accepts the plaintiff's factual allegations as true and draws all reasonable inferences in his favor. *Attorney General v. Wynn*, 104 F.4th 348, 352 (D.C. Cir. 2024).

4

disgorgement of all contributions made by class members to Peter's Pence.

The Bishops moved to dismiss, arguing that, because the lawsuit concerned the solicitation and expenditure of religious donations, it was barred by the First Amendment's protection of church autonomy. The district court denied the motion, holding it could resolve the case using "neutral principles of law" and without inquiring into "church operations, religious doctrine, religious hierarchy, or religious decisionmaking." *Id.* (cleaned up). Since the court could thereby avoid an "impermissible religious entanglement," the church autonomy doctrine did not bar its consideration of the suit. *Id.* (cleaned up).

The Bishops sought interlocutory review, arguing that O'Connell's claims were constitutionally barred because they interfered with matters of faith, doctrine, and internal church governance, and that immediate appeal was justified under the collateral order doctrine.

The panel dismissed the appeal for lack of jurisdiction, holding that "pleading-stage denials of a church autonomy defense do not satisfy the requirements of the collateral order doctrine." *Id.* at 1261. Following the district court's substantive approach, the panel concluded that an exclusive reliance on "'objective, well-established [legal] concepts,' or neutral principles of law" enables a court to "steer[] clear of any violations of the church autonomy doctrine." *Id.* at 1254 (quoting *Jones v. Wolf*, 443 U.S. 595, 603 (1979)). The panel also rejected the categorization of the church autonomy doctrine as an immunity from suit. *Id.* at 1257–58. The Bishops seek rehearing en banc on these important questions.

5

II.

I begin by explaining the district court's fundamental error in rejecting the Bishops' church autonomy defense on the ground that "neutral principles of law" can decide the lawsuit. First, as the Supreme Court has repeatedly indicated, the church autonomy doctrine protects a sphere of vital First Amendment interests and is an affirmative defense that cannot be rejected simply because a lawsuit could be resolved using neutral principles of law. Second, this lawsuit implicates religious donations given to the leader of the Catholic Church, a matter squarely within the sphere of church autonomy protected by the First Amendment. The lawsuit accordingly should have been dismissed before intrusive discovery and judicial probing into matters of faith, doctrine, and internal church governance occurred. By allowing neutral principles of law to trump church autonomy, the district court failed to protect the First Amendment rights of the Catholic Church and its followers.

A.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Together, the two Religion Clauses undergird the church autonomy doctrine,[2] which recognizes that the Constitution "protect[s]

---

[2] While the doctrine of course covers more than churches, I adopt the prevailing terminology. *See, e.g.*, *Our Lady of Guadalupe*, 140 S. Ct. at 2061; *cf. Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring) (observing the need to look past labels in the ministerial exception context, given that "[t]he term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists").

6

the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (cleaned up). The church autonomy doctrine secures the free exercise and associational rights of individual believers. For many individuals, religion includes "important communal elements"—"[t]hey exercise their religion through religious organizations." Douglas Laycock*, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1389 (1981). Indeed, it is "through religious communities that individuals jointly develop religious ideas and beliefs." Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising Lessons of* Smith, 2004 B.Y.U. L. Rev. 1633, 1676; *see Hosanna-Tabor*, 565 U.S. at 188 ("The members of a religious group put their faith in the hands of their ministers."). Because individual believers often practice their faith through and within religious institutions and communities, protecting the autonomy of such groups "furthers individual religious freedom as well." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in the judgment).

These important religious liberty interests ground the blackletter law that religious institutions and organizations have a constitutionally protected "sphere" of "independent authority" over certain activities. *Our Lady of Guadalupe*, 140 S. Ct. at 2060–61. When evaluating the ministerial exception— one part of the "general principle of church autonomy"—the Supreme Court has explained that the First Amendment prevents judicial intrusion into areas essential to the independence of religious institutions, including matters of "faith," "doctrine," and "internal government." *Id.* at 2061; *see also Hosanna-Tabor*, 565 U.S. at 188; *Cath. Charities Bureau,*

7

*Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1595 (2025) (Thomas, J., concurring) ("The First Amendment guarantees to religious institutions broad autonomy to conduct their internal affairs and govern themselves."). These recent decisions built on older church autonomy cases that likewise recognized the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952); *see Serbian E. Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 720 (1976) (holding that the First Amendment commits the resolution of "quintessentially religious controversies" to church authorities).

In *Hosanna-Tabor*, the Supreme Court clarified that church autonomy operates as an affirmative defense. 565 U.S. at 195 n.4. Importantly, in the context of the ministerial exception, the Court also held that a church autonomy defense trumps neutral principles of law. In reaching this conclusion, the Court first distinguished *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), as inapposite. *See Hosanna-Tabor*, 565 U.S. at 189–90. Furthermore, it did not matter whether a minister was fired for a non-religious reason. The ministerial exception enables a religious organization to wield "control over the selection of those who will personify its beliefs." *Id.* at 188. Such control would be greatly reduced if the organization could fire its ministers only for religious reasons. Thus, the authority to "select and control who will minister to the faithful"—for whatever reason—was reserved to the "church[] alone." *Id.* at 195. Regardless of whether a suit presents neutral principles, the Court maintained that the First Amendment prohibits judicial interference with the decisions of religious

8

organizations implicating matters of faith, doctrine, and internal governance. *See id.* at 188–90.

In *Our Lady of Guadalupe*, the Supreme Court again upheld the priority of substantive church autonomy over neutral principles of law. The plaintiffs in that case taught at religious schools. Both were fired, not for religious reasons, but for poor classroom performance. *See Our Lady of Guadalupe*, 140 S. Ct. at 2056–59. The Court explained that the "quintessential" ministerial exception case was one in which "poor performance" was at issue, rather than a spiritual dispute. *Id.* at 2068. The Court had no trouble concluding that the ministerial exception barred the underlying employment lawsuits.

*Hosanna-Tabor* and *Our Lady of Guadalupe* express a self-evident principle: if the mere invocation of neutral principles permits a court to interfere with church autonomy, then the constitutional protection is a dead letter. *See* Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253, 1277 (2023) ("If the court simply asks whether 'neutral principles' can resolve the case, the answer will (almost) always be yes.") (cleaned up). Thus, when judicial intervention would intrude on church autonomy, the First Amendment bars suit even if the challenged conduct can be evaluated on purely neutral or secular terms.

In concluding that the presence of "neutral principles of law" defeated the Bishops' church autonomy defense, the district court relied on *Jones v. Wolf*, which involved an intra-church dispute over ownership of church property. 443 U.S. at 597–99. In *Jones*, the Supreme Court embraced a "neutral principles of law" approach, by which it could decide the case using "objective, well-established concepts of trust and property law familiar to lawyers and judges." *Id.* at 602–03.

9

Even when examining "certain religious documents, such as a church constitution," the Court maintained it could stay within its constitutional lane by "scrutiniz[ing] the document[s] in *purely secular* terms." *Id.* at 604 (emphasis added). In dissent, Justice Powell argued that *Jones* broke with earlier precedents that prohibited judicial interference with the internal decisions of church authorities. *See id.* at 611–19 (Powell, J., dissenting).

While the Supreme Court's 5-4 decision in *Jones* remains on the books, its reasoning is at odds with the Court's recent decisions. In *Hosanna-Tabor* and *Our Lady of Guadalupe*, the Supreme Court made no mention of *Jones* or its neutral principles of law approach, which conflicts with the church autonomy doctrine's substantive protections for faith, doctrine, and internal governance.[3] *See Hosanna-Tabor*, 565 U.S. at 190; *Our Lady of Guadalupe*, 140 S. Ct. at 2061. Nor has the Court extended *Jones*'s neutral principles framework beyond church property to other areas of law.

Outside of the property context, the Supreme Court has safeguarded the sphere of church autonomy even when a lawsuit was framed under general legal principles. The district court therefore erred in concluding that the mere presence of "neutral principles of law" overrode the Bishops' church autonomy defense.

---

[3] Notably, in opposing the ministerial exception, the plaintiffs in *Hosanna-Tabor* repeatedly cited *Jones*. *See, e.g.*, Brief for Respondent Cheryl Perich at 42–44, 56, *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012) (No. 10-553). The Court's implicit rejection of this approach confines *Jones* to its specific context and indicates that the availability of neutral principles does not normally overcome a church autonomy defense.

10

B.

Following the Supreme Court's lead, the district court should have assessed the merits of the Bishops' church autonomy defense to O'Connell's lawsuit. Because religious donations and decisions about how to use such funds are connected to the faith, doctrine, and internal governance of the Catholic Church, they are protected by the First Amendment, and O'Connell's suit should have been dismissed.

Donations are of great importance to religious organizations, which cannot pursue their "central mission" without sufficient resources. *Our Lady of Guadalupe*, 140 S. Ct. at 2060. For example, a church may use donations to employ ministers to teach and spread its message; provide space for its members to gather in worship; and perform charitable works.

Decisions about how to raise and spend religious donations are inextricably tied up with a church's "right to shape its own faith and mission" and "internal governance," so the church autonomy defense must protect these activities. *Hosanna-Tabor*, 565 U.S. at 188; *see also* Stephanie H. Barclay et al., *Original Meaning and The Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 548–49 (2019) (discussing how government regulation of "church tithes … involve[s] government interference in church affairs"). Other courts have already recognized that religious offerings and church spending are constitutionally protected from government interference. *See, e.g.*, *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 332–33 (4th Cir. 1997) (holding that decisions about how to spend "religious outreach funds" fall within "the ecclesiastical sphere that the First Amendment protects from civil court intervention"); *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp.

11

3d 71, 80 (D.D.C. 2019) ("How a church spends worshippers' contributions is, like the question of who may worship there, central to the exercise of religion.").

In this lawsuit, the relevant donation was made as part of a thousand-year-old church collection given directly to the head of the Catholic Church. O'Connell's challenge goes straight to the heart of how the Church raises and spends contributions made by its congregants—"internal church decision[s] that affect[] the faith and mission of the church." *Hosanna-Tabor*, 565 U.S. at 190. That subject is properly shielded from government interference by the Bishops' church autonomy defense.[4] Because a church's solicitation and use of religious donations are protected from government interference by the First Amendment, O'Connell's lawsuit should have been dismissed.

As a practical matter, it is worth highlighting how O'Connell's suit intrudes into the protected autonomy of the Catholic Church. O'Connell alleges fraudulent misrepresentation connected to his participation in Peter's Pence. District of Columbia law on fraudulent misrepresentation requires a defendant to have both "knowledge of [a representation's] falsity" and "intent to deceive." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d

---

[4] Recognizing that the giving and spending of religious contributions falls within the church autonomy doctrine in no way suggests that religious institutions enjoy "a general immunity from secular laws." *Contra O'Connell*, 134 F.4th at 1254. The church autonomy doctrine does not apply to everything that a religious institution does. Rather, it is cabined to those substantive areas that implicate faith, doctrine, or internal governance. *Our Lady of Guadalupe*, 140 S. Ct. at 2061; *see Hosanna-Tabor*, 565 U.S. at 188; *cf. Watson v. Jones*, 80 U.S. (13 Wall.) 679, 732–33 (1872) (indicating the doctrine does not extend to matters of criminal law).

12

550, 555 (D.C. 2016) (cleaned up). In an effort to plausibly plead these elements, O'Connell's complaint details various sources of the Bishops' guidance related to Peter's Pence, including a church bulletin insert for use at Mass, a similar bulletin announcement, a script for announcements about Peter's Pence from the pulpit, and the Bishops' implementation of canon law to regulate their fundraising operations.

An examination of the knowledge and intent of the Catholic Church in raising money—including what it means when priests speak about religious giving from the pulpit and the Bishops implement canon law—risks the "entangle[ment]" of federal courts with "essentially religious controversies." *Milivojevich*, 426 U.S. at 709; *see Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, 127 F.4th 784, 798 (9th Cir. 2025) (en banc) (Bress, J., concurring in the judgment) ("Nothing says 'entanglement with religion' more than [plaintiff's] apparent position that the head of a religious faith should have spoken with greater precision about inherently religious topics, lest the Church be found liable for fraud."). Moreover, allowing such lawsuits to proceed might create a chilling effect on how religious donations are raised and spent, impeding the free exercise of religion. *See Amos*, 483 U.S. at 336.

The remedies O'Connell seeks further demonstrate how this lawsuit intrudes on the Bishops' religious autonomy. In *Hosanna-Tabor*, the Supreme Court found that reinstatement or a combination of frontpay and backpay "would operate as a penalty on the Church for terminating an unwanted minister." 565 U.S. at 194. Even that relatively tailored and modest remedy was found unconstitutional. By contrast, O'Connell seeks sweeping injunctive relief and millions in disgorgement and damages. O'Connell first demands class-wide injunctive relief requiring the Bishops to administer Peter's Pence in a

13

judicially prescribed manner. In attempting to change the way the Catholic Church speaks about, solicits, and deploys religious donations, O'Connell essentially seeks the structural reform of a religious institution. For a secular court to countenance such a request would plainly result in impermissible religious "entanglement." *See Our Lady of Guadalupe*, 140 S. Ct. at 2069.

O'Connell also asks for the disgorgement of "all monies contributed" to Peter's Pence. J.A. 32. Given that he hopes to represent a putative class of all American donors to Peter's Pence and requests the tolling of applicable limitations periods, O'Connell effectively asks for the return of all money *ever* donated by living American Catholics to Peter's Pence. Such sweeping injunctive relief and disgorgement of likely millions of dollars would result in a massive incursion into the constitutionally protected sphere of church autonomy.

Finally, O'Connell's lawsuit, touching as it does on matters of faith, doctrine, and internal governance, undermines the associational rights of individual Catholic believers. The Supreme Court has long recognized a link between the church autonomy doctrine and expressive association. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728–29 (1872) ("The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine … is unquestioned."); *see also Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring) ("Religious groups are the archetype of associations formed for expressive purposes."). As Justice Brennan explained, a religious community "represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals." *Amos*, 483 U.S. at 342 (Brennan, J., concurring in the judgment). Yet here, one individual seeks to interpose the coercive power of the courts between a religious institution and its members. As such,

14

O'Connell's lawsuit constitutes an impermissible interference with the associational rights of the Catholic Church and individual believers.

* * *

The district court erred by invoking neutral principles of law to reject a church autonomy defense. Instead, the district court was required to assess whether the Catholic Church's administration of Peter's Pence, a major giving initiative, was within the constitutionally protected sphere of church autonomy. Because the solicitation and expenditure of religious donations clearly implicate matters of faith, doctrine, and internal governance, O'Connell's lawsuit should have been dismissed.

III.

The panel did not resolve the Bishops' church autonomy defense, but instead concluded that we lack jurisdiction to review the district court's decision. On the panel's view, the rejection of a church autonomy defense is not a collateral order subject to interlocutory appeal, in part because the defense does not provide an immunity from suit. *O'Connell*, 134 F.4th at 1255–61. I respectfully disagree. Judges in other circuits have divided over the question of whether church autonomy provides an immunity from suit that fits within the collateral order doctrine, but no court has subjected the issue to en banc review.[5] Given the stakes of this case, which involves a

---

[5] *See, e.g.*, *Belya v. Kapral*, 59 F.4th 570 (2d Cir. 2023) (mem.); *Tucker v. Faith Bible Chapel Int'l*, 53 F.4th 620 (10th Cir. 2022) (mem.).

15

challenge to the use of religious donations by the leader of the Catholic Church, we should have been the first.

This Part sets forth the argument for why church autonomy provides a constitutional immunity from suit that should be subject to interlocutory review. First, the historical backdrop at the time of ratification demonstrates that the First Amendment protects a sphere of religious autonomy from government intrusion. This history and original meaning have been repeatedly reaffirmed by the Supreme Court. Second, the First Amendment's protection for church autonomy is similar to other affirmative defenses that provide immunity from suit. While the Supreme Court has not specifically addressed the question, the reasoning of its decisions strongly supports an immunity characterization. Finally, because the church autonomy defense is an immunity from suit, decisions rejecting a church autonomy defense warrant interlocutory appeal.

A.

Historical materials from before and after ratification of the Bill of Rights demonstrate that the First Amendment safeguards a sphere of church autonomy and prohibits state interference with matters of faith, doctrine, and internal governance.

1.

To understand the nature and scope of the Constitution's protection for church autonomy, I begin by considering the "background against which the First Amendment was adopted." *Our Lady of Guadalupe*, 140 S. Ct. at 2061 (cleaned up); *see also Hosanna-Tabor*, 565 U.S. at 182–85 (grounding the ministerial exception in historical materials from 1215 to 1811); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087–89 (2019) (plurality op.) ("look[ing] to history for

16

guidance" in interpreting the Establishment Clause). This history demonstrates that the First Amendment "was adopted against [the] background of distinct spheres for secular and religious authorities." *Cath. Charities Bureau*, 145 S. Ct. at 1597 (Thomas, J., concurring) (cleaned up).

Scholars and judges have extensively mapped the pre-Founding view that "church and state are 'two rightful authorities,' each supreme in its own sphere." *Id.* at 1596 (quoting Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1496–97 (1990)). Many of these authorities trace the separation to the early Christian church. In the Gospel of Matthew, Jesus Christ told the teachers of the law to "render to Caesar the things that are Caesar's, and to God the things that are God's." Matthew 22:21 (English Standard Version). "From antiquity onward," some Christians interpreted Jesus's statement to mean "that church and state are distinct, and that each has a legitimate claim to authority within its sphere." *Cath. Charities Bureau*, 145 S. Ct. at 1596 (Thomas, J., concurring). In the *City of God*, Augustine famously distinguished between the City of Man (the "earthly city") and the City of God (the "heavenly city"). *See* John D. Inazu, *The Freedom of the Church (New Revised Standard Version)*, 21 J. Contemp. Legal Issues 335, 348 (2013). Early popes similarly differentiated between "spiritual and temporal authority." Michael W. McConnell, *Why Is Religious Liberty the "First Freedom"?*, 21 Cardozo L. Rev. 1243, 1245 (2000).

This separation between religious and political spheres was recognized during the Middle Ages and up through the Reformation. Magna Carta proclaimed in 1215 that "the English church shall be free, and shall have its rights undiminished and its liberties unimpaired." James C. Holt, *Magna Carta* 317 (1965). The document codified the

17

"Norman-Anglo-Saxon mind that … differentiated the two spheres of church and of state." Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 B.Y.U. L. Rev. 1385, 1408; *see also* Roscoe Pound, *A Comparison of Ideals of Law*, 47 Harv. L. Rev. 1, 6 (1933) ("In the politics and law of the Middle Ages the distinction between the spiritual and the temporal, between the jurisdiction of religiously organized Christendom and the jurisdiction of the temporal sovereign … was fundamental."). Centuries later, Protestant reformers like John Calvin and Martin Luther would delineate the "two kingdoms" of "church and state." Robert J. Renaud & Lael D. Weinberger, *Spheres of Sovereignty: Church Autonomy Doctrine and the Theological Heritage of the Separation of Church and State*, 35 N. Ky. L. Rev. 67, 73–76 (2008). For instance, Calvin argued that the "spiritual kingdom … and civil government are things very different and remote from each other." 2 John Calvin, Institutes of the Christian Religion 633 (John Allen trans., 6th American rev. ed., 1928).

This very brief survey evidences a longstanding distinction between religious and governmental spheres. Yet at the same time, adherence to this separation was far from perfect. Beginning with the English Reformation, the English monarchy gained "control over the national religion" and proceeded to legislate "religious uniformity," collapsing the distinction between church and state. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2112–14 (2003); *see Hosanna-Tabor*, 565 U.S. at 182 (discussing the English government's "grip on the exercise of religion" in the sixteenth and seventeenth centuries). As a result, many dissenters fled to America, where colonists implemented a variety of church and state arrangements. *See Hosanna-Tabor*, 565 U.S. at 182–83.

18

For example, some New England colonists endorsed the two kingdoms conception, in which church and state "were understood as two coordinate but separate covenantal associations for the discharge of godly authority." McConnell, *Establishment and Disestablishment*, 44 Wm. & Mary L. Rev. at 2123. In one writing, Rhode Island minister Roger Williams discussed the "hedge or wall of Separation between the Garden of the Church and the Wilderness of the world." Roger Williams, *Mr. Cotton's Letter, Examined and Answered* (1644), reprinted in 1 *The Complete Writings of Roger Williams* 392 (Russell & Russell 1963). Thomas Jefferson would later make similar reference to a "wall of separation between Church and State." *Letter from Thomas Jefferson to the Danbury Baptist Association* (Jan. 1, 1802), in 5 *The Founders' Constitution* 96 (Philip B. Kurland & Ralph Lerner eds., 1987). By contrast, the Virginia colony tended more toward the English tradition of significant state involvement with religious practice, although these efforts were sometimes resisted. *See* McConnell, *Establishment and Disestablishment*, 44 Wm. & Mary L. Rev. at 2116–17; *Hosanna-Tabor*, 565 U.S. at 183.

By the ratification of the Constitution and Bill of Rights, American thought had shifted toward the New England distinction between spheres. The late 1770s saw the beginning of a trend toward disestablishment at the state level, perhaps furthered by the increasing numbers of non-Anglican Protestant Americans who supported greater separation between church and state. *See* Esbeck, 2004 B.Y.U. L. Rev. at 1457–58 (marking pre-1791 disestablishments in North Carolina, New York, Virginia, Maryland, and South Carolina); Renaud & Weinberger, 35 N. Ky. L. Rev. at 81–82 (discussing the increasing prevalence of the two kingdoms position). The same advocates of religious liberty "also supported adoption of constitutional protections at the federal level." McConnell,

19

*Origins and Historical Understanding*, 103 Harv. L. Rev. at 1440. Among these was James Madison, who pronounced "that in matters of Religion, no mans right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance." James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785), in 5 *The Founders' Constitution* 82. A year before Madison's declaration, the Confederation Congress rejected an entreaty from the Vatican that it choose a new bishop for American Catholics because it was without "jurisdiction" over this "purely spiritual" matter. 3 Secret Journals of the Acts and Proceedings of Congress 493 (Thomas B. Wait. ed., 1821); *see* Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 181 (2011).

This historical backdrop strongly supports the conclusion that the "two-kingdoms view of competing authorities is at the heart of our First Amendment." McConnell, *First Freedom*, 21 Cardozo L. Rev. at 1246; *see* Esbeck, 2004 B.Y.U. L. Rev. at 1579–81, 1589.

2.

Post-ratification decisions have relied on this constitutional backdrop when recognizing a sphere of church autonomy for religious institutions.

Many early state courts framed the issue in terms that tracked the pre-ratification conception and recognized "a sphere of ecclesiastical authority with which the civil courts ought not to interfere." Lael Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment* (Feb. 4, 2025), https://ssrn.com/abstract=4933864 (unpublished manuscript at 14). For instance, a South Carolina judge remarked that "[i]t belongs not to the civil power to enter

20

into or review the proceedings of a Spiritual Court." *Harmon v Dreher*, 17 S.C. Eq. (Speers Eq.) 87, 120 (S.C. App. Eq. 1843). The Missouri Supreme Court "[h]appily" recognized a "total disconnection between the church and state," by which "neither will interfere with the other when acting within their appropriate spheres." *State ex rel. Watson v. Farris*, 45 Mo. 183, 198 (Mo. 1869). The Kentucky Court of Appeals held that the "judicial eye of the civil authority … cannot penetrate the veil of the Church, nor can the arm of this Court either rend or touch that veil." *Shannon v. Frost*, 42 Ky. (3 B. Mon.) 253, 259 (Ky. 1842). And in 1846, the Pennsylvania Supreme Court expressed its view that the "civil courts, if they should be so unwise as to attempt to supervise [the decisions of ecclesiastical courts] on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt." *German Reformed Church v. Com. ex rel. Seibert*, 3 Pa. (3 Barr.) 282, 291 (Pa. 1846). Because the First Amendment did not yet apply to the states, these decisions were not formally grounded in the Constitution. Nevertheless, state courts recognized that "according to the Constitution of the United States, politics and religion move in separate spheres, clearly defined." *Gartin v. Penick*, 68 Ky. (5 Bush) 110, 116 (Ky. 1869).

Citing this state law background, the Supreme Court affirmed in *Watson v. Jones* that "a subject-matter … strictly and purely ecclesiastical in its character"—such as which slate of elders and trustees was rightfully in charge of a church—was "a matter over which the civil courts exercise no jurisdiction." 80 U.S. (13 Wall.) at 730–33. Where such a matter had already been resolved by church authorities, judicial inquiry "would lead to the total subversion of … religious bodies" by secular courts. *Id.* at 729. Moreover, such interference by the civil courts would be inconsistent with the

21

"unquestioned" right of individuals "to organize voluntary religious associations." *Id.* at 728–29.

Arising out of a suit in diversity in 1872, *Watson* was based in general law—a "broad and sound view of the relations of church and state under our system of laws." *Id.* at 727; *see Hosanna-Tabor*, 565 U.S. at 185. But the decision was later pronounced to have a "clear constitutional ring." *Milivojevich*, 426 U.S. at 710 (cleaned up). Early state court decisions and *Watson* thus embraced a conception of church autonomy that protected certain religious matters from judicial interference.[6]

Since *Watson*, the Supreme Court has repeatedly recognized the importance of a sphere of church autonomy protected by the First Amendment and beyond the control of the state. For instance, in *Kedroff*, the Supreme Court invalidated a state law that specified which church authority— Russian or American—controlled certain Orthodox churches in New York. 344 U.S. at 95–99, 106–07. Emphasizing that "the power … to appoint the ruling hierarch of" these churches had historically vested in "the Supreme Church Authority of the Russian Orthodox Church," the Court concluded that the

---

[6] A few scholars have pointed to nineteenth-century state regulations on church property and governance as evidence that might defeat the narrative of a longstanding church autonomy doctrine. *See* Sarah Barringer Gordon, *The First Disestablishment: Limits on Church Power and Property Before the Civil War*, 162 U. Pa. L. Rev. 307, 321–24 (2014); *cf.* Kellen Funk, *Church Corporations and the Conflict of Laws in Antebellum America*, 32 J.L. & Relig. 263, 269–70 (2017). But there are reasons to question the significance of those restrictions. Prior to 1868, states were not bound by the First Amendment, so to the extent church autonomy was only a common or general law doctrine in state courts, it could be validly overridden by state legislation. *See* Weinberger, *The Origins of Church Autonomy*, unpublished manuscript at 38–39.

22

"Church's choice of its hierarchy" was "an ecclesiastical right." *Id.* at 115, 119. The Court largely adopted *Watson*'s emphasis on church authority to hold that ecclesiastical rights were protected by the Constitution against state interference. *Id.* at 119.

Two decades later in *Milivojevich*, the Court rejected a lawsuit brought by a former Orthodox bishop challenging his removal. 426 U.S. at 702–08, 724–25. The bishop had been removed by church officials for religious reasons, and the Court dismissed his attempt to relitigate a "quintessentially religious" controversy in civil court. *Id.* at 720. As it was "the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith," "secular notions" of civil law like "due process" could not resolve the case. *Id.* at 714–15.

As already discussed, the Supreme Court's recent decisions in *Hosanna-Tabor* and *Our Lady of Guadalupe* more explicitly recognize that the First Amendment protects a sphere of church autonomy into which secular courts cannot intrude. In *Hosanna-Tabor*, the Court unanimously held there was a ministerial exception to generally applicable employment discrimination laws. 565 U.S. at 188. That proposition followed from both the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, which "prohibits government involvement" in decisions about "which individuals will minister to the faithful." *Id.* at 188–89. In a concurrence joined by Justice Kagan, Justice Alito likewise connected the "private sphere" of church autonomy to the "free dissemination of religious doctrine," explaining that a "religious body's control over [its ministers] is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world." *Id.* at 199, 201 (Alito,

23

J., concurring). Justice Alito also justified the church autonomy doctrine on freedom of association grounds, characterizing religious groups as "the archetype of associations formed for expressive purposes." *Id.* at 200.

In *Our Lady of Guadalupe*, the Supreme Court reinforced the church autonomy doctrine and the Constitution's protection for the "independence of religious institutions in matters of faith and doctrine," which is "closely linked to independence in what we have termed matters of church government." 140 S. Ct. at 2060 (cleaned up). The Court again grounded the church autonomy doctrine in both of the Religion Clauses. *Id.* While religious institutions are not generally immune from secular laws, the Constitution "protect[s] their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* The Court concluded that "judicial intervention into disputes between the [religious] school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 2069.

In sum, American courts recognize that the First Amendment protects a sphere of church autonomy free from government regulation and judicial interference. Safeguarding this autonomy with respect to matters of faith, doctrine, and internal governance ensures "a spirit of freedom for religious organizations, an independence from secular control or manipulation." *Kedroff*, 344 U.S. at 116.

## B.

The foregoing history and precedent demonstrate that the Religion Clauses protect a sphere of church autonomy from state interference. Because such interference can include the very process of judicial inquiry, the church autonomy defense is best understood as a constitutional immunity from suit.

24

Although the Supreme Court has not addressed this precise question, its precedents strongly support treating the church autonomy defense as a constitutional immunity from suit. As discussed, a chorus of decisions stretching back to *Watson* emphasizes how churches and other religious organizations occupy a separate sphere into which the state may not intrude. In addition, the Court has recognized that the rights protected by the Religion Clauses are burdened not merely by final decisions, but also by the "very process of inquiry leading to findings and conclusions."[7] *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979). For instance, the Court in *Catholic Bishop* rejected the National Labor Relations Board's efforts to assert jurisdiction over Catholic school teachers, explaining that the resolution of labor charges would impermissibly and "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. Although decided on constitutional avoidance grounds, the Court reasoned that allowing the Board to resolve labor disputes within religious schools "would implicate the guarantees of the Religion Clauses." *Id.* at 507.

Similarly, the Court has stressed the "well established" rule that "courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.). It is categorically "not within the judicial ken" to assess religious questions like "the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699

---

[7] Our court has long reaffirmed these principles. *See, e.g.*, *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455, 466–67 (D.C. Cir. 1996); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341–42 (D.C. Cir. 2002); *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 571–72 (D.C. Cir. 2009).

25

(1989); *see also Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 715 (1981) (concluding "the judicial process is singularly ill equipped to resolve [intrafaith] differences in relation to the Religion Clauses"). Judicial inquiry into such matters may lead courts into a "religious thicket," where they could become embroiled in "essentially religious controversies." *Milivojevich*, 426 U.S. at 709, 719.

Practically speaking, without an immunity from suit, religious institutions would face substantial transgressions into their constitutionally protected sphere of independence. Litigation may involve depositions of church leaders, probing inquiries into ecclesiastical doctrine and church structure, and discovery of sensitive church communications. As Justice Alito explained, civil courts cannot engage in a "pretext inquiry" as to the motivations of religious employers because such inquiry would "dangerously undermine … religious autonomy." *Hosanna-Tabor*, 565 U.S. at 205 (Alito, J., concurring). The "*mere adjudication* of such questions would pose grave [constitutional] problems for religious autonomy," because it would place a civil factfinder in "ultimate judgment" over the "importance and priority of the religious doctrine in question." *Id.* at 205–06 (emphasis added). Similarly, in *Our Lady of Guadalupe*, the Court declined to second guess how church schools characterized the essentially religious mission of their teachers, in part because courts lack "a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." 140 S. Ct. at 2066; *cf. id.* at 2070 (Thomas, J., concurring) ("What qualifies as 'ministerial' is an inherently theological question, and thus one that cannot be resolved by civil courts through legal analysis.").

These cases recognize that the First Amendment protects from judicial inquiry matters that implicate faith, doctrine, and

26

internal governance. When a lawsuit impinges on this autonomous sphere and requires a court to question and probe doctrine or governance, the Religion Clauses provide religious organizations with an immunity from suit.

While not explicitly addressing the immunity question, the Supreme Court has characterized the First Amendment's protection for church autonomy as a non-jurisdictional affirmative defense. *Hosanna-Tabor*, 565 U.S. at 195 n.4. We know from other contexts that some immunities, like absolute and qualified immunity for public officials, are non-jurisdictional affirmative defenses.[8] *See Nevada v. Hicks*, 533 U.S. 353, 373 (2001).

Absolute and qualified immunity protect interests similar to those safeguarded by the church autonomy doctrine. Absolute immunity enables officials to carry out the "proper and effective administration of public affairs" without the "apprehension" and "fear of consequences" that emanate from the possibility of subsequent litigation. *Nixon v. Fitzgerald*, 457 U.S. 731, 745–46 (1982) (cleaned up). For instance, the President enjoys absolute immunity from both civil and criminal prosecution, because "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024). Even the threat of prosecution could

---

[8] Longstanding Supreme Court and circuit precedent is therefore at odds with the panel's suggestion that a non-jurisdictional affirmative defense cannot provide an immunity from suit. *Cf. O'Connell*, 134 F.4th at 1258. Of course, some immunities from suit, like legislative immunity under the Speech and Debate Clause, are jurisdictional bars. *See Fields v. Off. of Eddie Bernice Johnson*, 459 F.3d 1, 13 (D.C. Cir. 2006) (en banc). But as explained above, other immunities are not.

27

render him "unduly cautious in the discharge of his official duties" and thus pose "unique risks to the effective functioning of government." *See Fitzgerald*, 457 U.S. at 751–52 & n.32. For many other officials, qualified immunity shields the performance of official duties from liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982). Because these immunities encompass "an entitlement not to stand trial or face the other burdens of litigation," they are effectively lost if a case wrongly goes to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). Absolute and qualified immunity recognize a sphere of independence free from intrusions by the judicial process.

Similarly, the Religion Clauses protect a sphere of "independence" in which religious organizations may structure their faith and practice without "[s]tate interference." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. Within this sphere of autonomy, religious organizations must have freedom from judicial intrusion. The vitality of this constitutional freedom requires that, in matters implicating church autonomy, religious organizations enjoy a constitutional immunity from suit.

The en banc court should recognize that the church autonomy defense is an immunity from suit. The reasoning of Supreme Court decisions comports with treating church autonomy as an immunity.[9] Lower courts have an obligation to

---

[9] The Fifth Circuit recently concluded that church autonomy provides an immunity from suit, splitting from the Second, Seventh, and Tenth Circuits. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 2025 WL 2602899, at *12–13 (5th Cir. Sept. 9, 2025). Under an immunity rationale, the appellate courts of multiple states and the District of Columbia also allow interlocutory review of church autonomy denials. *See, e.g.*, *United Methodist Church, Baltimore Ann. Conf. v. White*, 571 A.2d 790, 792–93 (D.C.

28

uphold the Constitution, and we may be required at times to recognize the full scope of a constitutional right before the Supreme Court. *See, e.g.*, *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008). For instance, the ministerial exception was first recognized by the Fifth Circuit in 1972. *See McClure v. Salvation Army*, 460 F.2d 553, 558–61 (5th Cir. 1972). Only 40 years later did the Supreme Court squarely hold that this exception was required under the First Amendment's church autonomy doctrine. *Hosanna-Tabor*, 565 U.S. at 188.

As new cases arise, we must of course follow the direction of the Supreme Court. With respect to First Amendment protections for religious institutions, that direction strongly points to recognizing the church autonomy doctrine as conferring an immunity from suit.

C.

Because the church autonomy defense is best understood as an immunity from suit, the district court's rejection of the Bishops' defense was an immediately appealable collateral order.

The collateral order doctrine allows interlocutory appeals from orders "[1] that are conclusive, [2] that resolve important questions separate from the merits, and [3] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). In deciding whether an interlocutory appeal qualifies under the collateral order

1990) (Rogers, C.J.); *Harris v. Matthews*, 643 S.E.2d 566, 569–70 (N.C. 2007).

29

doctrine, our analysis focuses on a "class of claims" and eschews an "individualized jurisdictional inquiry." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (cleaned up). The Supreme Court has kept the "'small class' of collaterally appealable orders … narrow and selective in its membership." *Will v. Hallock*, 546 U.S. 345, 350 (2006). Even applying this stringent standard, the requirements for a collateral order are met for a church autonomy defense.

First, the rejection of a church autonomy defense is conclusive in that it necessarily subjects a religious organization to the burdens of further litigation. "[A]lmost every order the Court has deemed to be collateral involves a claimed right not to stand trial." Adam Reed Moore, *A Textualist Defense of a New Collateral Order Doctrine*, 99 Notre Dame L. Rev. Reflection 1, 9 (2023). The First Amendment protects a sphere of church autonomy with respect to faith, doctrine, and internal governance and immunizes religious organizations from lawsuits that implicate such matters. As an immunity, church autonomy serves as "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell*, 472 U.S. at 526. When a case is "erroneously permitted to go to trial," the immunity is "effectively lost." *Id.* If a church autonomy defense is denied at the motion to dismiss stage, the matter is not "open, unfinished or inconclusive." *Abney v. United States*, 431 U.S. 651, 658 (1977) (cleaned up). Rather, the defendant's obligation to proceed to discovery and endure further burdens of litigation has been conclusively determined.

Second, the rejection of a church autonomy defense is "separate" or "conceptually distinct" from the resolution of the underlying case. *Mitchell*, 472 U.S. at 527–29. The immunity protects important First Amendment rights, namely the "independence" of religious organizations "in matters of faith

30

and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 140 S. Ct. at 2061. Whether a lawsuit touches on this sphere raises a legal question distinct from a plaintiff's underlying substantive claims. In this case O'Connell alleges common law claims for fraud, unjust enrichment, and breach of fiduciary duty. The merits of those claims are wholly separate from the validity of the Bishops' church autonomy defense. That defense depends on whether the Catholic Church's administration of a millennium-old religious offering from congregants to the Pope is a matter of faith, doctrine, or internal governance protected by the Religion Clauses. Analyzing that issue does not require consideration of whether, for example, the Bishops made material misrepresentations on which Catholic parishioners detrimentally relied.

Third and finally, the rejection of a church autonomy defense is effectively unreviewable on final appeal because, like other immunities, it is best understood as "an *immunity from suit* rather than a mere defense to liability." *Mitchell*, 472 U.S. at 526. It cannot be "effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014); *see Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, 2023 WL 7294839, at *17 (D.C. Cir. May 25, 2023) (Rao, J., dissenting from the denial of an injunction pending appeal) ("The harm caused by the NLRB trolling through the beliefs of the Consortium and making determinations about its religious mission … cannot be undone through a later appeal.") (cleaned up); *cf. McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 2025 WL 2602899, at *13 (5th Cir. Sept. 9, 2025) ("An immediate appeal … protects ecclesiastical organizations from unconstitutional deprivations of the First Amendment's" protections.). As with

31

other immunities, the protections of the church autonomy
defense will be destroyed if not vindicated before trial.

To satisfy the stringent requirements of the collateral order
doctrine, "the decisive consideration is whether delaying
review until the entry of final judgment would imperil a
substantial public interest or some particular value of a high
order." *Mohawk Indus.*, 558 U.S. at 107 (cleaned up). "When a
policy is embodied in a constitutional or statutory provision
entitling a party to immunity from suit (a rare form of
protection), there is little room for the judiciary to gainsay its
'importance.'" *Digital Equip. Corp. v. Desktop Direct, Inc.*,
511 U.S. 863, 879 (1994). The First Amendment protects a
sphere of church autonomy, a paramount freedom for both
religious institutions and individuals. The Supreme Court's
decisions in *Hosanna-Tabor* and *Our Lady of Guadalupe*
reinforce the importance of the church autonomy defense and
its suitability for interlocutory review.[10]

* * *

The facts of this case typify the stakes for religious liberty
when a church autonomy defense is denied. O'Connell, an
individual congregant, challenges the Catholic Church's use of
his donation and asks the Bishops to disclose lengthy donor
lists, records of amounts received, and the ways in which
contributions made under Peter's Pence were deployed.
Describing the litigation demonstrates how it plainly

---

[10] In *Hosanna-Tabor* and *Our Lady of Guadalupe*, the Supreme
Court reviewed the appellate courts' denial of a church autonomy
defense before the dispute went back to the district court and a full
trial was held. *See Hosanna-Tabor*, 565 U.S. at 181; *Our Lady of
Guadalupe*, 140 S. Ct. at 2058–60. Although the collateral order
doctrine does not apply to the Court's review, in a sense the Court
reviewed interlocutory appeals similar to the one before us now.

32

encroaches on the heartland of matters committed to the Church's exclusive sphere, including ecclesiastical decisions about how to solicit, manage, and use religious donations. Without immediate interlocutory review, the Bishops have no meaningful route to protect their independence from judicial intrusion into matters of faith, doctrine, and internal governance. Requiring the Bishops to go forward with this litigation comports with neither the Constitution nor the Supreme Court's precedents. I respectfully dissent.